Richard Hall, ISB No. 8080
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  (208) 389-9000
Facsimile:  (208) 389-9040
*richard.hall@stoel.com*

Maren R. Norton, WSBA No. 35435
James T. Graves, WSBA No. 48033
*pro hac vice applications pending*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA  98101
Telephone:  (206) 624-0900
Facsimile:  (206) 386-7500
*maren.norton@stoel.com*
*james.graves@stoel.com*

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CRESCENT MINE, LLC,** | Case No. _____ |
| Plaintiff, | |
| v. | |
| **BUNKER HILL MINING CORPORATION; PLACER MINING CORPORATION** (d/b/a New Bunker Hill Mining Co.); and **ROBERT HOPPER, Jr.** | **COMPLAINT** |
| Defendants. | |

## COMPLAINT

Plaintiff Crescent Mine, LLC, (hereinafter "Plaintiff" or "Crescent"), by and through the

undersigned attorneys, brings this civil action for cost recovery under section 107(a) of the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA,"

COMPLAINT - 1

42 U.S.C. 9607(a)), and for trespass, nuisance, negligence, tortious interference with prospective economic advantage, and declaratory judgment against Defendants Bunker Hill Mining Corporation, f/k/a Liberty Silver Corporation ("BHMC"), Placer Mining Corporation, d/b/a New Bunker Hill Mining Co. ("PMC"), and Robert Hopper, Jr., ("Hopper"), (collectively, "Defendants"), and alleges as follows:

## THE PARTIES

1.    Plaintiff Crescent is a Delaware limited liability company with its principal place of business in Kellogg, Idaho.  Crescent owns and operates the Crescent Mine, located south of Kellogg, in the Silver Valley of Shoshone County, Idaho.

2.    Defendant BHMC is a Nevada corporation with its principal place of business in Toronto, Ontario, Canada.  BHMC is the current lessee and operator of the Bunker Hill Mine, located west of the Crescent Mine and southwest of Kellogg, in the Silver Valley of Shoshone County, Idaho.

3.    Defendant PMC is a Nevada corporation with its principal place of business in Kellogg, Idaho.  PMC owns the Bunker Hill Mine and does, or has done, business under the name of New Bunker Hill Mining Co.  PMC leases the Bunker Hill Mine to BHMC.

4.    Defendant Hopper is the successor in interest to Robert Hopper, Sr., now deceased, who was the owner and manager of PMC.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1367, and 2201.  This civil action presents a case of actual controversy within this Court's jurisdiction, within the meaning of 28 U.S.C. § 2201.  Crescent's claims under Idaho law for trespass, nuisance, negligence, tortious interference with prospective economic advantage, and

Crescent's federal CERCLA claim, arise from a common nucleus of operative facts and therefore are so related that they form part of the same case or controversy under Article III of the United States Constitution.  This Court's adjudication of Crescent's state law claims together with its federal claim furthers the interest of judicial economy.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)-(c) because all Defendants reside in Idaho within the meaning of 28 U.S.C. § 1391(b)-(c), and because the events or omissions giving rise to the claims in this lawsuit occurred in this District, and because the property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

6. The Bunker Hill Mine was once one of the world's largest lead and zinc mines. The Bunker Hill Mine's surface area covers approximately 6,500 acres with underground workings of approximately 6,000 vertical feet and 150 miles of tunnels.

7. Bunker Hill Mine production began in 1885 and ran for over 95 years. It was a lead mine with silver and zinc produced as a by-product.  It produced over 42 million tons yielding more than 165 million ounces of silver, 3.6 million tons of lead and 1.4 million tons of zinc.  During its long history, over 40 separate mineralized zones were exploited.

8. In the period of approximately December 1991 to April 1992, PMC acquired the Bunker Hill Mine property and its mineral rights out of bankruptcy.  PMC is the current owner of the Bunker Hill Mine, and has owned it continuously since the early 1990s.

9. Hopper is the successor in interest to Robert Hopper, Sr., now deceased, who was previously the sole owner and manager of PMC.

10. Water enters the Bunker Hill Mine through groundwater recharge and through surface water draining into the mine via cracks and fissures in the land surface, many of which

were created or exacerbated by mining activities.  The subsurface flows collect within the mine and form what is typically referred to as the "mine pool."

11.    The Bunker Hill Mine has generated and discharged, and continually generates and continually discharges, highly contaminated water known as acid mine drainage ("AMD"). AMD is generated when water in the mine makes contact with exposed mineralized zones, causing the water to become highly acidic.  The AMD generated within the Bunker Hill Mine contains several heavy metals, including zinc, cadmium, lead, iron, manganese, and arsenic at levels exceeding regulatory standards.

12.    The Crescent Mine is located east of the Bunker Hill Mine and south of Kellogg, Idaho.  The mine has produced approximately 990 thousand tons of ore yielding 25 million ounces of silver.  Measured by tonnage produced, the Crescent Mine is approximately 2.4 percent the size of the Bunker Hill Mine.

13.    Crescent purchased the Crescent Mine in 2014 and has owned and operated it since that time.

14.    Although physically separate, the Crescent Mine and the Bunker Hill Mine are adjacent to each other, and were jointly owned and operated by the Bunker Hill Mining Company (U.S.), Inc., (a different entity than both BHMC and PMC, d/b/a New Bunker Hill Mining Co.) prior to 1991.

15.    In 1956, the Bunker Hill Company (also a different entity than BHMC) constructed a tunnel – known as the "Y-U crosscut" or the "Yreka crosscut" – connecting the Bunker Hill Mine with the Crescent Mine.

16.    Prior to 1991, water was pumped from the lower levels of both mines so as to dewater those areas to allow for mining.

17.     Prior to 1991, AMD was pumped from the lower levels of the Bunker Hill Mine and was discharged from the mine and channeled to the Central Treatment Plant ("CTP") where it was treated and then discharged to a creek flowing into the South Fork of the Coeur d'Alene River ("SFCDR").

18.     According to the U.S. Environmental Protection Agency ("EPA"), the pumping and conveyance to the CTP of AMD from the Bunker Hill Mine was necessary to prevent water levels within that mine from getting high enough that AMD would be released from the mine, flow downhill through the mine yard, across properties where public and environmental exposures would occur, and into the SFCDR (and/or would reach the SFCDR via groundwater migration) where it would have significant detrimental effects on the environment, including water quality and the ecosystem.

19.     In early 1991, mining operations ceased in the Bunker Hill Mine.

20.     According to the EPA, shortly after assuming ownership of the Bunker Hill Mine in 1991, PMC and Robert Hopper, Sr., began diverting AMD flow into the lower levels of the Bunker Hill Mine (rather than conveying it to the CTP), causing significant flooding of that mine's lower workings and raising the water level of the mine pool substantially.

21.     The diversion of AMD to lower levels of the Bunker Hill Mine by PMC and Robert Hopper, Sr., during the period from 1991 through 1994 was of sufficient volume, flow rate, duration, and elevation that it caused AMD to enter the Crescent Mine from the Bunker Hill Mine via the Y-U crosscut tunnel, and flooded the Crescent Mine's lower levels with AMD.

22.     Upon information and belief, before the mine water pumps were turned off and prior to the time when PMC began diverting AMD into the lower levels of the Bunker Hill Mine, PMC moved materials into the mine to construct a plug for the Y-U crosscut, such that AMD

would not flow through it to the Crescent Mine, but then failed to install the plug, allowing AMD to flow through the Y-U crosscut into the Crescent Mine.

23.     The diversion of AMD to lower levels of the Bunker Hill Mine by PMC and Robert Hopper, Sr. – including but not limited to diversion of waters down the No. 2 shaft of the Bunker Hill Mine – was an intentional act.

24.     During the period when PMC and Robert Hopper, Sr., caused AMD to enter into the lower levels of the Crescent Mine, the Crescent Mine (including both its surface rights and mineral rights) was owned by a party or parties other than PMC or Robert Hopper, Sr.  Upon information and belief, PMC and Robert Hopper, Sr., were not authorized to flood the lower levels of the Crescent Mine.

25.     In November 1994, after EPA determined that PMC's intentional flooding posed an imminent and substantial endangerment to the environment because of the potential for untreated AMD to be released to the SFCDR, EPA issued a unilateral administrative order ("UAO") to PMC and Robert Hopper, Sr., directing them to maintain the Bunker Hill Mine water level at least 300 vertical feet below the level of the SFCDR, to convey all AMD from the mine to the CTP (unless EPA approved a different method), and to construct an adequate piping system to convey AMD to the CTP from the Bunker Hill Mine.

26.     In late 1994, subject to EPA's UAO, PMC and Robert Hopper, Sr., resumed the pumping of AMD from the by-then-flooded Bunker Hill Mine, but only to the very limited degree necessary to keep mine water levels just below the level of the SFCDR.  The lower levels of the Bunker Hill Mine remained flooded with AMD, as did the lower levels of the Crescent Mine, due to the intentional acts of PMC and Robert Hopper, Sr.

27.     In July 1995, EPA assumed ownership and operations of the CTP.

28.     According to the EPA, PMC and Robert Hopper, Sr., failed to fully comply with the 1991 UAO by failing to convey all AMD from the Bunker Hill Mine to the CTP and by allowing numerous uncontrolled AMD releases from the mine.

29.     In September 1997, EPA issued a second UAO to PMC and Robert Hopper, Sr., requiring them to undertake further actions relating to AMD flows from the Bunker Hill Mine. According to the EPA, PMC and Robert Hopper, Sr., failed to comply with UAO and the EPA itself completed the work required under the 1997 UAO.

30.     According to the EPA, the failure of PMC and Robert Hopper, Sr., to timely comply with the 1991 UAO resulted in additional response costs incurred by EPA in addressing AMD discharges from the Bunker Hill Mine – costs that would not have been necessary if PMC and Robert Hopper, Sr., had timely complied with the UAO.

31.     According to the EPA, the agency sent more than 30 letters to PMC and Robert Hopper, Sr., documenting and seeking reimbursement of EPA's costs in treating AMD from the Bunker Hill Mine at the CTP.  By the summer of 2000, PMC and Robert Hopper, Sr., made clear to EPA that they did not ever intend to pay for AMD treatment.

32.     In October 2000, EPA sent PMC and Robert Hopper, Sr., a CERCLA section 104(e) request for information relating to AMD treatment and site-related costs.  Neither PMC nor Robert Hopper, Sr., responded to that request or to a 2001 follow-up request sent by EPA.

33.     In 2004, the United States (on behalf of EPA) sued PMC and Robert Hopper, Sr., under CERCLA, seeking (among other things) recovery of EPA's response costs (which were over $15 million at the time), and penalties and punitive (treble) damages for failure to comply with EPA's UAOs and CERCLA section 104(e) request for information.

///

34.     In August 2017, BHMC and PMC entered into an agreement whereby BHMC began leasing and operating the Bunker Hill Mine, and secured an option to purchase the mine. Under the lease agreement, BHMC was given full operational control and possession over the entire Bunker Hill Mine, including management and control of the mine's water.

35.     On March 12, 2018, BHMC and EPA (through the U.S. Department of Justice) entered into a Settlement Agreement and Order on Consent ("SAOC") whereby BHMC agreed to perform a response action and to make a series of payments in satisfaction of the liability of PMC and the Estate of Robert Hopper relating to the Bunker Hill Mine under CERCLA.

36.     In particular, in addition to agreeing to pay for certain of EPA's ongoing AMD treatment costs at the CTP, BHMC agreed to pay $20 million on behalf of PMC in satisfaction of EPA's claims against PMC in the 2004 lawsuit described in Paragraph 33.  The $20 million payment was also part of the consideration for the lease and anticipated sale of the Bunker Hill Mine from PMC to BHMC.

37.     Also on March 12, 2018, PMC and Hopper (as successor in interest to Robert Hopper, Sr.), entered into a consent decree with the United States, settling the claims in the 2004 lawsuit subject to the condition that BHMC pay $20 million (and other costs as set forth in the BHMC-U.S. SAOC) to the United States.

38.     All or substantially all of the AMD that PMC and Robert Hopper, Sr., caused to be introduced into the lower levels of the Crescent Mine has remained there, including during the period of Crescent's ownership of the Crescent Mine from 2014 to the present.

39.     If, after the flooding of the Crescent Mine with AMD from the Bunker Hill Mine, the flooded state of the Crescent Mine together with the resumption of pumping in the Bunker Hill Mine reversed the gradient such that water including AMD may have been transported from

the Crescent Mine to the Bunker Hill Mine, that would represent AMD originally released from the Bunker Hill Mine into the Crescent Mine that was returning to the facility from which it was released.

40.     Defendants have failed to remove the AMD that was introduced into the Crescent Mine from the Bunker Hill Mine as a result of the intentional acts of PMC and Robert Hopper, Sr.

41.     Defendants have failed to restore the subsurface of the Crescent Mine property to its condition prior to being flooded with AMD due to the intentional acts of PMC and Robert Hopper, Sr.

42.     Defendants' failure to remove AMD introduced into the Crescent Mine from the Bunker Hill Mine has resulted in the continuing subsurface migration of AMD within the Crescent Mine and the continuing contamination of Crescent's subsurface property as well as a continuing invasion of Crescent's interests in the exclusive possession, use, and enjoyment of its subsurface property.  Among other injuries and damages exceeding $1,000 (including but not limited to damaged shafts, hoist, and tracks), the continuing invasion of the AMD and the continuing flooded state of the Crescent Mine's lower levels have precluded, and continue to preclude, Crescent from being able to mine approximately 9.3 million ounces of silver ore worth an estimated $75 million to $82 million (based on current spot prices of silver) and have precluded, and continue to preclude, Crescent from being able to explore areas that were previously accessible.

43.     The intentional acts of PMC and Robert Hopper, Sr., that introduced AMD into the Crescent Mine, as well as Defendants' failure to remove that AMD and restore Crescent's property to its condition prior to being flooded with AMD from the Bunker Hill Mine, constitute

oppressive, fraudulent, malicious, and outrageous conduct, and have resulted in substantial lost profits for Crescent and a substantial diminution in the value of Crescent's property.

44.     PMC's and Robert Hopper, Sr.'s, invasion of and interference with Crescent's property rights was reasonably foreseeable given that they knew or reasonably should have known that the two mines were connected via the Y-U crosscut tunnel, and they knew or reasonably should have known that their intentional diversion of AMD into the lower levels of the Bunker Hill Mine – either by itself or in conjunction with other known factors such as the continuing migration of groundwater into the Bunker Hill Mine pool through ongoing groundwater recharge within its lower levels – would, to a substantial certainty, result in AMD flowing up to a level and flowing at a rate sufficient for AMD to enter the Crescent Mine via the Y-U crosscut tunnel.

45.     Defendants knew or should have known that their actions and omissions described herein would interfere with and damage Crescent's ability to utilize its subsurface property and mineral assets therein.

46.     Crescent had the valid economic expectancy of selling the Crescent Mine by the end of the first half of 2021 and obtaining the proceeds therefrom.

47.     Upon information and belief, BHMC has, and has had, knowledge of Crescent's expectancy of selling the Crescent Mine by the end of the first half of 2021.

48.     Upon information and belief, BHMC, through its employees, contractors, and/or agents, intentionally interfered with Crescent's expectancy of selling the Crescent Mine by the end of the first half of 2021 through sharing false and misleading allegations about the Crescent Mine with third parties for the purposes of delaying or destroying Crescent's ability to sell the

Crescent Mine and/or inducing other parties to devalue the Crescent Mine, offer lower purchase prices, and/or refrain from making an offer.

49.     Upon information and belief, BHMC's interference caused Crescent to delay its sales activities indefinitely until such time as Crescent can investigate and correct the false and misleading assertions about the Crescent Mine that were spread by BHMC. BHMC's interference therefore induced the termination of Crescent's expectancy of selling the Crescent Mine during the first have of 2021.

50.     BHMC's interference caused damages to Crescent in the form of lost sales and profits, increased transaction and administrative costs, and other costs and expenses.

### FIRST CAUSE OF ACTION

### Cost Recovery under CERCLA Section 107(a)

51.     Paragraphs 1 through 50 are realleged and incorporated as if set forth fully herein.

52.     Plaintiff and Defendants are "persons" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

53.     The Bunker Hill Mine is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

54.     PMC and Hopper are current owners of the Bunker Hill Mine, and BHMC is the current operator of the Bunker Hill Mine, within the meaning of section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

55.     Crescent is the current owner and operator of the Crescent Mine within the meaning of section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

56.     AMD and heavy metals contained in AMD are "hazardous substances" within the meaning of section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

57.     In the period from approximately 1991 through 1994 (and possibly later periods as well), there were "releases" and/or threatened "releases" of "hazardous substances" (including AMD and heavy metals contained in AMD) from the Bunker Hill Mine into the Crescent Mine, causing the incurrence of "response" costs by Crescent, within the meaning of sections 101(22), 101(14), 101(25), and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14), 9601(14), and 9607.

58.     The "response" costs incurred by Crescent were reasonable, "necessary," and "consistent with the National Contingency Plan" within the meaning of section 107 of CERCLA, 42 U.S.C. § 9607.

59.     As detailed herein in the specific allegations against each Defendant, pursuant to CERCLA, 42 U.S.C. § 9607(a)(1), PMC and Hopper are liable as current owners, and BHMC is liable as the current operator, of a "facility" (the Bunker Hill Mine) from which "hazardous substances" (AMD and metals therein) were "released" (diverted into the Crescent Mine via the Y-U crosscut), resulting in the incurrence of "response" costs, within the meaning of CERCLA.

60.     Based on the foregoing, pursuant to CERCLA section 107(a), each Defendant is strictly, and jointly and severally, liable for Crescent's past and future response costs incurred as a result of releases of AMD or other hazardous substances from the Bunker Hill Mine into the Crescent Mine.

## SECOND CAUSE OF ACTION

### Declaratory Judgment

61.     Paragraphs 1 through 60 are realleged and incorporated as if set forth fully herein.

62.     Under the Declaratory Judgment Act, a court may declare the rights and other legal relations of any interested party seeking such declaration so long as it is a case of actual controversy within its jurisdiction.  28 U.S.C. § 2201(a); *see also* Federal Rule of Civil

Procedure 57.  A court may also grant further necessary or proper relief based on such a declaratory judgment.  28 U.S.C. § 2202.

63.     The factual and legal allegations contained in this Complaint indicate a present and actual controversy between Crescent and Defendants.

64.     Crescent will continue to incur response costs resulting from releases of AMD or other hazardous substances from the Bunker Hill Mine into the Crescent Mine.

65.     Crescent seeks a declaratory judgment finding each Defendant liable under CERCLA section 107(a) (42 U.S.C. § 9607(a)) for future response costs incurred by Crescent resulting from releases of AMD or other hazardous substances from the Bunker Hill Mine into the Crescent Mine.

66.     After the flooding of the Crescent Mine with AMD from the Bunker Hill Mine, no additional AMD could have been generated in the lower levels of the Crescent Mine based on chemical conditions precluding the generation of AMD.

67.     If, after the flooding of the Crescent Mine with AMD from the Bunker Hill Mine, any AMD may have been transported from the Crescent Mine back into the Bunker Hill Mine via the Y-U crosscut tunnel, that represents AMD originally released from the Bunker Hill Mine that is simply returning to the facility from which it was released.  As such, Crescent is not liable under CERCLA for the transport of those hazardous substances back to the facility from which they were released.

68.     Based on the foregoing, Crescent seeks a declaratory judgment that Crescent is not liable under CERCLA section 107(a) for any of Defendants' past or future costs for treatment, handling, or disposal of water containing AMD or other hazardous substances at the CTP or elsewhere, because there have been no releases of AMD or other hazardous substances

from the Crescent Mine into the Bunker Hill Mine that have resulted in the incurrence of response costs.

## THIRD CAUSE OF ACTION

### Common Law Trespass

69.     Paragraphs 1 through 68 are realleged and incorporated as if set forth fully herein.

70.     Defendants, through their employees, contractors, and/or agents, committed intentional acts that caused AMD to enter into and remain within Crescent's subsurface property without permission, and have failed to remove that continuously invading AMD from Crescent's property.

71.     Defendants had and have a duty to remove the tangible thing (i.e., AMD) that invaded Crescent's property from the Bunker Hill Mine.

72.     The initial and continuing invasions of AMD into the lower levels of Crescent's mine interfered with, and continue to interfere with, Crescent's right to exclusive possession of its property.

73.     The initial and continuing invasions of AMD into the lower levels of Crescent's mine are the direct results of intentional acts or omissions committed by Defendants; namely, their diversion of AMD into the lower levels of the Bunker Hill Mine in a manner that predictably flooded the Crescent Mine with AMD, and their failure to remove the AMD once introduced, thus allowing it to continue to obstruct, contaminate, and migrate within the lower levels of  the Crescent Mine.

74.     Pursuant to its lease agreement with PMC, BHMC has had full operational control over the entire Bunker Hill Mine including the management, control, and possession of the mine's water from 2017 to the present.

75.     BHMC, as the party that has had full operational control over the Bunker Hill Mine including management and control of, and a property interest in, the mine's water from 2017 to the present, had and has a duty to remove the AMD that had invaded the Crescent Mine from the Bunker Hill Mine, and whose continuing presence and movement within the Crescent Mine constitutes a continuing trespass.

76.     By introducing AMD into the Crescent Mine and by failing to remove the AMD from the Crescent Mine – including during the period from 2014 to the present when Crescent has owned the Crescent Mine – Defendant's intentional acts and/or omissions have resulted in, and continue to result in, a continuing trespassory invasion of Crescent's right to exclusive possession of the Crescent Mine.

77.     Defendants' ongoing trespassory invasion of Crescent's rights is abatable through means including but not limited to removing the AMD from the Crescent Mine.

78.     For reasons including but not limited to the fact that the ongoing invasion of AMD is abatable, it is a continuing trespass, not a permanent trespass.

79.     Alternatively, because, in close cases regarding whether a trespass is continuing or permanent, courts allow a plaintiff to choose how to characterize the trespass (i.e., continuing or permanent), the trespass in the current case should be considered a continuing trespass.

### FOURTH CAUSE OF ACTION

### Trespass

80.     Paragraphs 1 through 79 are realleged and incorporated as if set forth fully herein.

81.     Defendants, through the acts of their employees, contractors, and/or agents, are liable for a continuing civil trespass with damage under Idaho Code § 6-202(2)(b) because their intentional acts caused a tangible thing (i.e., AMD) to move from the Bunker Hill Mine and enter

and/or remain on Crescent's real property without permission, causing damage to Crescent's real property in excess of $1,000. And Defendants knew or had reason to know that the introduction and/or continuing presence of that AMD within Crescent's real property was not and is not permitted, because the lower levels of the Crescent Mine are enclosed in a manner that a reasonable person would recognize as delineating a private property boundary (i.e., the Crescent Mine is obviously separated from the Bunker Hill Mine but for the Y-U crosscut tunnel such that a reasonable person would recognize that tangible objects forced through that tunnel from the Bunker Hill Mine side to the Crescent Mine side would be crossing a private property boundary).

82.    In the alternative, Defendants, through the acts of their employees, contractors, and/or agents, are liable for a continuing civil trespass under Idaho Code § 6-202(2)(a) because their intentional acts caused a tangible thing (i.e., AMD) to move from the Bunker Hill Mine and enter and/or remain on Crescent's real property without permission.

83.    Defendants are liable for that continuing trespass under Idaho Code § 6-202 (as amended in 2018) from the date of the filing of this civil action back to three years before such filing (i.e., the limitations period for the trespass claim) or July 1, 2018, whichever date is later in time.

84.    Because Defendants are liable for a continuing civil trespass with damage under Idaho Code § 6-202(2)(b), they are liable for treble the amount of actual damages caused by the trespass, as well as reasonable attorney's fees and reasonable costs associated with investigating any trespass, as set forth in Idaho Code § 6-202(3)(b).

85.    In the alternative, because Defendants are liable for a continuing civil trespass under Idaho Code § 6-202(2)(a), they are liable for the amount of actual damages caused by the

trespass (which exceed $500 dollars), as well as reasonable attorney's fees and reasonable costs associated with investigating any trespass, as set forth in Idaho Code § 6-202(3)(a).

## FIFTH CAUSE OF ACTION

### Nuisance

86.     Paragraphs 1 through 85 are realleged and incorporated as if set forth fully herein.

87.     PMC's and Robert Hopper, Sr.'s intentional acts that introduced AMD into Crescent's mine, and all Defendants' failure to remove that AMD from Crescent's mine, have created a continuing obstruction to Crescent's free use of its property, a continuing interference with Crescent's enjoyment of the lower levels of its mine property, and a continuing unlawful obstruction of Crescent's free use of its subsurface basin of mine workings and mineral resources, under common law and within the meaning of Idaho Code § 52-101.

88.     Because AMD is water contaminated with metals above applicable regulatory limits, it is a nuisance at all times and under all circumstances, and thus, is a continuing nuisance per se under common law and/or Idaho Code § 52-101.

89.     In the alternative, because the AMD introduced into the Crescent Mine from the Bunker Mine and remaining there to the present has prevented, and is preventing, Crescent from freely using and enjoying the lower levels of the Crescent Mine (e.g., mining known silver deposits and exploring for additional silver or other valuable minerals), the AMD is a nuisance in fact due to such circumstances.

90.     The nuisance caused by Defendants on Crescent's real property is abatable through means including but not limited to removing the AMD from the Crescent Mine.

91.     For reasons including but not limited to the fact that the ongoing nuisance is abatable, it is a continuing tort, not a permanent tort.

92.     In the alternative, because – in close cases regarding whether a tort is continuing or permanent – courts allow a plaintiff to choose how to characterize the tort (i.e., continuing or permanent), the nuisance in the current case should be considered a continuing nuisance.

93.     Defendants have made no attempt to abate the continuing nuisance of the continuing presence and migration of Bunker Hill Mine AMD within Crescent's real property.

94.     Because a party neglecting to abate a continuing nuisance associated with its property after acquiring control of the property and acquiring a property interest in the source of the nuisance is liable for damages from the nuisance, BHMC – which has had full operational control of the Bunker Hill Mine and its subsurface water since 2017 – is liable for Crescent's damages (including but not limited to Crescent's lost profits and the diminution in value of Crescent's real property) for the maximum period allowed by Idaho law from the date of BHMC assuming control of the Bunker Hill Mine in 2017 to the present.

95.     Based on the foregoing alleged facts and legal standards, Defendants are liable for a continuing nuisance under common law and/or Idaho Code § 52-101 including Crescent's damages therefrom.

### SIXTH CAUSE OF ACTION

### Negligence

96.     Paragraphs 1 through 95 are realleged and incorporated as if set forth fully herein.

97.     Defendants are liable for injury and loss of property caused by the negligent and wrongful acts and omissions of its employees, contractors, and/or agents.

98.     Defendants had and have a duty to refrain from acts or omissions that would, with reasonable foreseeability, result in the occupation, possession, or encumbrance of the real property of another without the right to do so.

99.     PMC and Robert Hopper, Sr., breached this duty by diverting AMD into the lower levels of the Bunker Hill Mine in the period from 1991 through 1994 (and possibly later periods) in volumes, flow rates, and to elevations causing the reasonably foreseeable result that AMD was transported from the Bunker Hill Mine, through the Y-U crosscut tunnel, and into the lower levels of the Crescent Mine, resulting in the encumbrance (i.e., flooding) of Crescent's property without permission and without any other right to do so.

100.    Defendants also breached this duty, and are continuing to breach this duty, through their failure to remove the tangible, contaminated material (i.e., AMD) that was introduced into the Crescent Mine without permission and which constitutes an unauthorized and ongoing encumbrance to Crescent's real property.

101.    Defendants' negligent conduct through their employees, contractors, and/or agents directly and proximately caused, and continue to directly and proximately cause, damages to Crescent including but not limited to lost profits due to the inability to mine the lower levels of the Crescent Mine and the diminution of the value of the mine due to the flooded state of its lower levels.

102.    Crescent's ongoing injuries caused by Defendants' negligence are abatable through means including but not limited to removing the AMD from the Crescent Mine.

103.    For reasons including but not limited to the fact that the ongoing injuries from Defendants' negligence are abatable, Defendants are liable for continuing negligence.

104.    In the alternative, because – in close cases regarding whether a tort is continuing or permanent – courts allow a plaintiff to choose how to characterize the tort (i.e., continuing or permanent), the negligence in the current case should be considered a continuing tort.

///

## SEVENTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

105.    Paragraphs 1 through 104 are realleged and incorporated as if set forth fully herein.

106.    Crescent had the valid economic expectancy of selling the Crescent Mine during the first half of 2021 and obtaining the proceeds therefrom.

107.    Upon information and belief, BHMC has, and has had, knowledge of Crescent's expectancy of selling the Crescent Mine by the end of the first half of 2021.

108.    Upon information and belief, BHMC, through its employees, contractors, and/or agents, intentionally interfered with Crescent's expectancy of selling the Crescent Mine during the first half of 2021 through sharing false and misleading allegations about the Crescent Mine with third parties for the purposes of delaying or destroying Crescent's ability to sell the Crescent Mine and/or inducing other parties to devalue the Crescent Mine, offer lower purchase prices, and/or refrain from making an offer.

109.    Upon information and belief, BHMC's interference caused Crescent to delay its sales activities indefinitely until such time as Crescent can investigate and correct the false and misleading assertions about the Crescent Mine that were spread by BHMC.  BHMC's interference therefore induced the termination of Crescent's expectancy of selling the Crescent Mine during the first half of 2021.

110.    BHMC's interference caused damages to Crescent in the form of lost sales and profits, increased transaction and administrative costs, and other costs and expenses.

111.    Based on the foregoing, BHMC is liable to Crescent for tortious interference with prospective economic advantage including Crescent's damages therefrom.

## DAMAGES ALLEGATIONS

112.    Paragraphs 1 through 111 are realleged and incorporated as if set forth fully herein.

113.    As a direct and proximate result of Defendants' conduct alleged herein, Crescent has incurred and suffered damages from 2014 to the present, including but not limited to:

     a.   Loss of real property value due to property damage and deprived use of the lower levels of the Crescent Mine;

     b.   Loss of mineral estate and mineral rights value due to property damage and deprived use of the lower levels of the Crescent Mine;

     c.   Loss of business value due to property damage and deprived use of the lower levels of the Crescent Mine;

     d.   Lost profits due to property damage and deprived use of the lower levels of the Crescent Mine;

     e.   Reasonable costs of investigation (including but not limited to "response" costs within the meaning of CERCLA) associated with property damage and deprived use of the lower levels of the Crescent Mine; and

     f.   Other consequential damages.

114.    Crescent has also incurred and suffered other additional injuries and damages yet to be discovered and to be proved at trial.

115.    Crescent has incurred and will continue to incur reasonable attorney's fees and costs, and other reasonable expenses, in prosecuting this action and in investigating Defendants' continuing trespass and other continuing torts; and is entitled to recover such fees, costs, and

expenses from Defendants under the common law, under Idaho Code § 6-202(3), and potentially under Idaho Code § 12-121 or other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Crescent respectfully requests the Court enter judgment in its favor and against Defendants on the causes of action of this Complaint as follows:

1.      On its First Cause of Action, pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a), judgment in favor of Crescent and against Defendants for past response costs incurred as a result of releases of hazardous substances from the Bunker Hill Mine into the Crescent Mine, in an amount to be proven at trial;

2.      On its Second Cause of Action, pursuant to 28 U.S.C. § 2201, judgment declaring that Defendants are jointly and severally liable for future response costs that may be incurred by Crescent as a result of releases of hazardous substances from the Bunker Hill Mine into the Crescent Mine, in an amount to be proven at trial; and judgment that Crescent is not liable under CERCLA section 107(a) for any of Defendants' past or future costs for treatment, handling, or disposal of water containing AMD or other hazardous substances at the CTP or elsewhere, because there have been no releases of AMD or other hazardous substances from the Crescent Mine into the Bunker Hill Mine that have resulted in the incurrence of response costs;

3.      On its Third, Fourth, Fifth, and Sixth Causes of Action, an injunction requiring one or more of the Defendants to abate the continuing trespass upon Crescent's subsurface real property, abate the continuing nuisance upon Crescent's subsurface real property, and/or abate the continuing injuries suffered by Crescent arising from Defendants' continuing negligence so as to restore Crescent's subsurface property to its condition prior to being flooded with AMD introduced from the Bunker Hill Mine, with such abatement and restoration occurring through

pumping out all of the AMD-contaminated water within the Crescent Mine's lower levels or through other means to be determined at trial; or in the alternative, a damage award in an amount, to be determined at trial, for Crescent's costs to abate the continuing trespass, nuisance, and injuries to and upon the Crescent Mine through its own means;

4.      On its Third, Fourth, Fifth, and Sixth Causes of Action, an award for compensatory, incidental, and/or consequential monetary damages as well as prejudgment interest to the full extent permitted by law, as the Court may deem reasonable, just, and proper, resulting from Defendants' continuing torts of trespass, nuisance, and/or negligence;

5.      On its Fourth Cause of Action, an award of reasonable attorney's fees and costs, and other reasonable costs and expenses, incurred by Crescent in investigating Defendants' continuing trespass, pursuant to Idaho Code § 6-202(3);

6.      On its Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, an award of reasonable attorney's fees and costs, and other reasonable costs and expenses, incurred by Crescent in pursuing this action, in amounts to be determined at trial, to the full extent allowed under Idaho law including but not limited to Idaho Code § 12-121 if the Court finds that one or more of the Defendants pursues its defense in this case frivolously, unreasonably, or without foundation;

7.      On its Seventh Cause of Action, an award for compensatory, incidental, and consequential monetary damages as well as prejudgment interest and attorney's fees and costs, to the full extent permitted by law, in amounts to be determined at trial, as the Court may deem reasonable, just, and proper, resulting from BHMC's tortious interference with a prospective economic advantage of Crescent's; and

8.      Such other and further relief as the Court may deem reasonable, just, and proper.

DATED this 28th day of July 2021.

STOEL RIVES LLP


*/s/Richard Hall*
Richard Hall, ISB No. 8080
Maren R. Norton, *Pro Hac Vice application pending*
James T. Graves, *Pro Hac Vice application pending*
Attorneys for Plaintiff