Wade C. Foster, ISB No. 11105
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000
Facsimile: (208) 389-9040
*wade.foster@stoel.com*

Maren R. Norton, admitted *pro hac vice*
Sean T. James, admitted *pro hac vice*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
*maren.norton@stoel.com*
*sean.james@stoel.com*

James T. Graves, admitted *pro hac vice*
GRAVES ENVIRONMENTAL
LAW PLLC
4736 NE 187th Place
Lake Forest Park, WA 98155
Telephone: (206) 889-2330
*james@gravesenvirolaw.com*

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CRESCENT MINE, LLC,** | **Case No. 2:21-cv-00310-DCN** |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **BUNKER HILL MINING CORPORATION; PLACER MINING CORPORATION,** (d/b/a New Bunker Hill Mining Co.)**,** | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................. 3

    A.    The Bunker Hill Mine Continuously Accrues and Discharges a Large
        Volume of Contaminated Mine Water............................................................. 3

    B.    Bunker Hill Mine Owners, Including Placer, Diverted Millions of Gallons
        of Contaminated Water into the Lower Workings of the Bunker Hill Mine
        and Crescent Mine. ......................................................................................... 7

    C.    In 1992-1994, Placer Flooded the Lower Crescent Mine. .................................... 9

    D.    BHMC Takes Over Operation of the Bunker Hill Mine Then Sues
        Crescent for Water Treatment Costs That BHMC Owes EPA. .......................... 13

    E.    Crescent Has Incurred and Continues to Incur CERCLA Response Costs
        That Are Necessary and Consistent with the National Contingency Plan. ......... 16

III. ARGUMENT ................................................................................................... 17

    A.    Legal Standard. ............................................................................................. 17

    B.    Placer and BHMC Are Liable for Trespass. ...................................................... 19

        1.    Placer Is Liable for Civil and Common Law Trespass for Flooding
            the Crescent Mine with Contaminated Water. ......................................... 19

        2.    BHMC Is Liable for Civil and Common Law Trespass Because It
            Has Not Removed the Contaminated Bunker Hill Mine Water in
            the Crescent Mine. .................................................................................. 23

    C.    Placer and BHMC Are Liable Under CERCLA for Crescent's Response
        Costs............................................................................................................. 24

        1.    The Bunker Hill Mine Is a "Facility." .................................................... 26

        2.    There Have Been "Releases," "Threatened Releases," and
            "Disposals" of "Hazardous Substances" at and from the Bunker
            Hill Mine Facility................................................................................... 26

        3.    Placer and BHMC Are Each a "Person" That Owned and Operated
            the Bunker Hill Mine Facility at the Time of a Disposal of
            Hazardous Substances at the Facility. ..................................................... 29

        4.    Crescent Has Incurred Necessary and NCP-consistent Response
            Costs Resulting from Releases and Disposals for Which BHMC
            and Placer Are Responsible Parties. ....................................................... 30

    D.    Crescent Is Entitled to Declaratory Relief as to Response Costs Incurred
        After February 5, 2024.................................................................................... 32

    E.    Crescent Is Entitled to Summary Judgment Dismissing BHMC's
        CERCLA Section 107(a) Claim...................................................................... 33

    F.    The Crescent Parties Are Entitled to Summary Judgment That They Are
        Not Liable Under CERCLA for BHMC's or Placer's Contribution Claims. ....... 34

# TABLE OF CONTENTS
(continued)

Page

1.  BHMC's Incurrence of Costs Results from Releases at and from the Bunker Hill Mine, Not the Crescent Mine. ...................................... 35

    a.  The Bunker Hill Mine predominantly pumps the water that continually replenishes its mine pool surface. ........................... 36

    b.  Bunker Hill's pumping is a secondary release and is the ongoing release that most proximately causes its incurrence of costs. ..................................................................................... 40

2.  The Crescent Parties Are Not Owners, Operators, or Arrangers Within the Meaning of CERCLA Section 107(a) for Releases or Disposals at or from the Bunker Hill Mine. .............................................. 41

G.  The Crescent Parties Are Entitled to Summary Judgment on BHMC's Claim for Indemnity, Subrogation, and Contribution. ......................................... 42

IV. CONCLUSION ........................................................................................................ 42

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams v. United States*,
318 F.2d 861 (9th Cir. 1963) ...............................................................................18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................18

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
69 F.3d 337 (9th Cir. 1995) .................................................................................18

*ASARCO LLC v. Atl. Richfield Co., LLC*,
975 F.3d 859 (9th Cir. 2020) ...............................................................................32

*Asuncion v. Dist. Dir. of U.S. Immigr. & Naturalization Serv.*,
427 F.2d 523 (9th Cir. 1970) ...............................................................................18

*Atl. Richfield Co. v. NL Indus., Inc.*,
No. 20-CV-00234-PAB-KLM, 2021 WL 321263 (D. Colo. Feb. 1, 2021) ...........28

*Bliss v. Minidoka Irrigation Dist.*,
167 Idaho 141, 468 P.3d 271 (2020) ..............................................................19, 24

*Bob's Beverage, Inc. v. ACME, Inc.*,
169 F. Supp. 2d 695 (N.D. Ohio 1999), *aff'd*, 264 F.3d 692 (6th Cir. 2001) ..................27, 40

*Boeing Co. v. Cascade Corp.*,
207 F.3d 1177 (9th Cir. 2000) .............................................................................32

*Bunker Hill Mining Corp. v. Venzee Techs. Inc.*,
No. 2:21-cv-00209-DCN (D. Idaho Nov. 19, 2021), ECF No. 16................................. passim

*Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*,
358 F.3d 661 (9th Cir. 2004) ...............................................................................31

*Cal. Dep't of Toxic Substances Control v. Payless Cleaners, Coll. Cleaners*,
368 F. Supp. 2d 1069 (E.D. Cal. 2005) ................................................................22

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) ...............................................................................25

*Castaic Lake Water Agency v. Whittaker Corp.*,
272 F. Supp. 2d 1053 (C.D. Cal. 2003) ...........................................................25, 32

# TABLE OF AUTHORITIES
(continued)

Page

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)...............................................................................................18

*City of Portland v. Boeing Co.,*
179 F. Supp. 2d 1190 (D. Or. 2001) ...............................................................31, 39

*CNH Am., LLC v. Champion Env't Servs., Inc.,*
863 F. Supp. 2d 793 (E.D. Wis. 2012)...................................................................31

*Cox v. Am. Fid. & Cas. Co.,*
249 F.2d 616 (9th Cir. 1957) .................................................................................18

*Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.,*
764 F.3d 1019 (9th Cir. 2014) ...............................................................................27

*Goe Eng'g Co. v. Physicians Formula Cosmetics, Inc.,*
No. CV 94-3576-WDK, 1997 WL 889278 (C.D. Cal. June 4, 1997) ....................25

*Goldingay v. Progressive Casualty Insurance Co.,*
306 F. Supp. 3d 1259 (D. Or. 2018) ................................................................23, 24

*Hull v. Giesler,*
156 Idaho 765, 331 P.3d 507 (2014)......................................................................42

*Jacques v. Pioneer Plastics, Inc.,*
676 A.2d 504 (Me. 1996)........................................................................................22

*JBG/Twinbrook Metro Ltd. P'ship v. Wheeler,*
346 Md. 601, 697 A.2d 898 (1997) ........................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)................................................................................................19

*Mock v. Potlatch Corp.,*
786 F. Supp. 1545 (D. Idaho 1992) ........................................................................19

*Moon v. N. Idaho Farmers Ass'n,*
140 Idaho 536, 96 P.3d 637 (2004)........................................................................19

*Mueller v. Hill,*
158 Idaho 208, 345 P.3d 998 (2015)......................................................................19

*Murray v. Bath Iron Works Corp.,*
867 F. Supp. 33 (D. Me. 1994) ..............................................................................22

# TABLE OF AUTHORITIES
(continued)

**Page**

*Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec*,
854 F.2d 1538 (9th Cir. 1988) ...................................................................................18

*of New Mexico Env't Dep't v. United States Env't Prot. Agency*,
310 F. Supp. 3d 1230 (D.N.M. 2018) .......................................................................28

*Pakootas v. Teck Cominco Metals, LTD.*,
830 F.3d 975 (9th Cir. 2016) ....................................................................................28

*Pakootas v. Teck Cominco Metals, Ltd.*,
905 F.3d 565 (9th Cir. 2018) ....................................................................................26

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
714 F.3d 161 (4th Cir. 2013) ....................................................................................40

*Regan v. Cherry Corp.*,
706 F. Supp. 145 (D.R.I. 1989).................................................................................22

*Regional Airport Authority of Louisville v. LFG, LLC*,
460 F.3d 697 (6th Cir. 2006) ....................................................................................42

*Reichhold Chemicals, Inc. v. Textron, Inc.*,
888 F. Supp. 1116 (N.D. Fla. 1995).........................................................................27

*Rosenthal v. City of Crystal Lake*,
171 Ill. App. 3d 428, 525 N.E.2d 1176 (1988) ........................................................21

*Sunnyside Gold Corp. v. Env't Prot. Agency*,
715 F. App'x 7 (D.C. Cir. 2018)...............................................................................28

*Thomas v. Thomas*,
No. 1:14-CV-00131-REB, 2015 WL 1467207 (D. Idaho Mar. 30, 2015).............24

*United States v. Alcan Aluminum Corp.*,
990 F.2d 711 (2d Cir. 1993).............................................................................25, 28

*United States v. Davis*,
261 F.3d 1 (1st Cir. 2001) .........................................................................................32

*United States v. Fed. Res. Corp.*,
30 F. Supp. 3d 979, 994 (D. Idaho 2014) (citation omitted), *judgment entered*,
525 B.R. 759 (D. Idaho 2015), *judgment entered*, 525 B.R. 768 (D. Idaho
2015), and *aff'd in part*, 691 F. App'x 441 (9th Cir. 2017)....................................41

## TABLE OF AUTHORITIES
(continued)

Page

*United States v. Honeywell Int'l, Inc.*,
   542 F. Supp. 2d 1188 (E.D. Cal. 2008)...............................................................18

*United States v. Iron Mountain Mines*,
   724 F. Supp. 2d 1086 (E.D. Cal. 2010)..............................................................27

*United States v. Iron Mountain Mines, Inc.*,
   812 F. Supp. 1528 (E.D. Cal. 1992)....................................................................27

*United States v. Mottolo*,
   695 F. Supp. 615 (D.N.H. 1988).........................................................................27

*United States v. Placer Mining Co., Inc.*,
   No. 2:04-CV-00126-EJL, 2018 WL 7352423 (D. Idaho June 19, 2018) ...............14

*United States v. Spear*,
   No. 2:22-CV-00439-BLW, 2023 WL 6463039 (D. Idaho Oct. 4, 2023) .........19, 24

*United States v. Sterling Centrecorp Inc.*,
   977 F.3d 750 (9th Cir. 2020) .........................................................................27, 30

*United States v. Sterling Centrecorp Inc.*,
   No. 2:08-CV-02556-MCE, 2011 WL 6130887 (E.D. Cal. Dec. 8, 2011) .........28, 30

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) ............................................................................18

*Voggenthaler v. Maryland Square, LLC*,
   No. 2:08-CV-1618-RCJ-GWF, 2012 WL 1815651 (D. Nev. May 17, 2012),
   *aff'd in part, rev'd in part on other grounds*, 724 F.3d 1050 (9th Cir. 2013) .........30

*Von Duprin LLC v. Major Holdings, LLC*,
   12 F.4th 751 (7th Cir. 2021) ...............................................................................31

*Whittaker Corp. v. United States*,
   825 F.3d 1002 (9th Cir. 2016) ............................................................................33

*Wickland Oil Terminals v. Asarco, Inc.*,
   792 F.2d 887 (9th Cir. 1986) ..............................................................................31

*Woodland v. Lyon*,
   78 Idaho 79, 298 P.2d 380 (1956).......................................................................19

## TABLE OF AUTHORITIES
(continued)

Page

**Statutes**

28 U.S.C. § 2201(a) ..............................................................................................1

42 U.S.C. § 9601(9) ............................................................................................26

42 U.S.C. § 9601(20)(A) .....................................................................................29

42 U.S.C. § 9601(21) ..........................................................................................29

42 U.S.C. § 9601(22) ..........................................................................................26

42 U.S.C. § 9601(23) ..........................................................................................31

42 U.S.C. § 9601(24) ..........................................................................................31

42 U.S.C. § 9601(25) ..........................................................................................31

42 U.S.C. § 9601(29) .....................................................................................27, 28

42 U.S.C. § 9607 .................................................................................................32

42 U.S.C. § 9607(a) ...............................................................................1, 25, 35

42 U.S.C. § 9613(g)(2) ........................................................................................32

42 U.S.C. § 9613(g)(2)(B) ....................................................................................1

I.C. § 6-202 .......................................................................................................2, 19

I.C. § 6-202(1)(d) ...............................................................................................19

I.C. § 6-202(2)(a) .............................................................................................1, 19

CERCLA .............................................................................................................41

CERCLA Section 106 .........................................................................................33

CERCLA Section 107(a) .............................................................................. passim

CERCLA Section 113 ..........................................................................................42

CERCLA Section 113(f) .........................................................................33, 34, 42, 43

CERCLA Section 113(g)(2)(B) ............................................................................1

# TABLE OF AUTHORITIES
### (continued)

**Page**

Declaratory Judgment Act ............................................................................................1

**Rules**

FRCP 30(b)(6) ................................................................................................ passim

FRCP 56 .........................................................................................................1

FRCP 56(a) ....................................................................................................17

FRCP 56(c) ....................................................................................................17

FRCP 56(e)(2)................................................................................................18

**Other Authorities**

75 *Am. Jur. 2d Trespass* § 40 (2007) .............................................................19

*Restatement (Second) of Torts* § 161 (1965).............................................. passim

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Crescent Mine, LLC ("Crescent") respectfully moves for summary judgment on its First Cause of Action for cost recovery under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (42 U.S.C. § 9607(a)), its Second Cause of Action for declaratory judgment under CERCLA Section 113(g)(2)(B) (42 U.S.C. § 9613(g)(2)(B)) and the Declaratory Judgment Act (28 U.S.C. § 2201(a)), its Third Cause of Action for common law trespass, and its Fourth Cause of Action for continuing civil trespass under Idaho Code ("I.C.") § 6-202(2)(a). In addition, Crescent—together with Crescent Silver, LLC and Syringa Exploration, Inc. (collectively, the "Crescent Parties")—respectfully moves for summary judgment on all causes of action brought by Bunker Hill Mining Corporation ("BHMC") in its Second Amended Complaint.[1] In addition, because the historical releases driving BHMC's water treatment costs are Bunker Hill Mine (not Crescent Mine) releases, the Crescent Parties have no CERCLA liability for such costs and should be granted summary judgment on BHMC's claims against them.

## I.     INTRODUCTION

The Bunker Hill Mine generates hundreds of millions of gallons of low-pH, metals-contaminated water per year. The U.S. Environmental Protection Agency ("EPA") has, for decades, required the owner of the Bunker Hill Mine to convey this contaminated water to a specialized treatment plant (the "Central Treatment Plant" or "CTP") to prevent environmental contamination. Despite repeated orders from the EPA requiring the contaminated water to be conveyed to the CTP for treatment, Placer diverted contaminated water into the lower workings of the Bunker Hill Mine, flooding the mine. The water that flooded the Bunker Hill Mine also flowed

---

[1] Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, No. 2:21-cv-00209-DCN (D. Idaho Nov. 19, 2021), ECF No. 16. *Bunker Hill Mining Corp* was consolidated with this case on April 19, 2024. *See* ECF No. 54.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 1

through the Y-U or Yreka Crosscut and flooded the Crescent Mine.[2] Placer was well aware, at the time of the flooding, that flooding the Bunker Hill Mine would result in flooding of the Crescent Mine. BHMC took over operation of the Bunker Hill Mine in 2017 and has owned the mine since 2022. Neither Placer nor BHMC have attempted to pump out the Bunker Hill or Crescent Mines and both mines remain flooded with contaminated water today. For the reasons set forth below, Placer and BHMC are each liable as an "owner or operator" under CERCLA for response costs incurred by Crescent as a result of releases and disposals of hazardous substances at and from the Bunker Hill Mine. In addition, the actions by these past and current owners of the Bunker Hill Mine constitute a civil and common law trespass under Idaho law. Placer committed civil trespass under I.C. § 6-202 as well as common law trespass when it flooded the Crescent Mine with contaminated water. BHMC is separately liable for civil and common law trespass because it is the current owner of the Bunker Hill Mine and has not removed the contaminated water from the Crescent Mine. Crescent respectfully moves the Court for an order of partial summary judgment establishing that Placer and BHMC are liable under CERCLA for Crescent's response costs and are liable for civil and common law trespass as a matter of law.[3] In addition, because the historical releases driving BHMC's water treatment costs are Bunker Hill Mine (not Crescent Mine) releases, the Crescent Parties have no CERCLA liability for such costs and should be granted summary judgment on BHMC's claims against them.

---

[2] A longitudinal diagram showing the respective workings and levels of the Bunker Hill Mine and Crescent Mine is attached hereto as Appendix 1.
[3] The amount of Crescent's response costs that are necessary and consistent with the National Contingency Plan, as well as the tort damages caused by Placer and BHMC's trespass, will be resolved at trial.

## II. FACTUAL BACKGROUND

The Crescent Mine is nestled between the Bunker Hill Mine and the Sunshine Mine in the Silver Valley of Idaho. The Bunker Hill Mine consists of hundreds of miles of tunnels through 6,000 vertical feet of mine. The Bunker Hill Mine dwarfs the Crescent Mine in size. When measured by tonnage of ore produced, the Crescent Mine is a mere 2.4 percent of the size of the Bunker Hill Mine. With respect to the infiltration, management, and disposition of mine water, unlike the Bunker Hill Mine (with a continuous vertical succession of layered mine workings from top to bottom), the Crescent Mine is essentially two mines—the Upper and Lower Crescent,[4] which are separated by thousands of feet of rock and connected only by a single shaft (the Ellis Shaft). And Upper Crescent water has been conveyed out of the upper mine without reaching the lower mine for all years at issue in this case. A 3.7-mile tunnel, called the "Y-U Crosscut" or the "Yreka Crosscut," connects the Bunker Hill and Crescent Mines. The Lower Crescent has been flooded with contaminated water from the Bunker Hill Mine since the early 1990s and remains so today, rendering the Crescent Parties unable to mine it.

A.   **The Bunker Hill Mine Continuously Accrues and Discharges a Large Volume of Contaminated Mine Water.**

Over the past century, the mining methods used in the Bunker Hill Mine, including the mining of shallow resources near the surface of the mine, have caused Bunker Hill Mine to continuously receive several hundred gallons per minute, and sometimes thousands of gallons per minute, of water from the surface.[5] Surface water enters the mine in several areas, the most significant of which, is the Guy Cave area, where an entire creek of surface water enters the mine

---

[4] As used herein, "Upper Crescent" refers to the Hooper Tunnel level and above, and "Lower Crescent" refers to the remainder of the mine below the Hooper Tunnel level.

[5] Declaration of Maren R. Norton in Support of Motion for Partial Summary Judgment ("Norton Declaration"), Ex. A (Bunker Hill Mine Water Mitigation Measures) at B-3; *id.* Ex. B (Trexler, Sources and Causes of AMD) at 38.

and becomes highly acidified and contaminated as it drains down through the pyrite-rich Flood-Stanly workings. A portion of the surface water that enters the Bunker Hill Mine drains (via ditches and gravity) down to the Kellogg Tunnel on the 9 Level[6] and then flows by gravity to the CTP that was completed in 1974 specifically to treat Bunker Hill Mine Acid Mine Drainage ("AMD"). However, mine water—including highly contaminated water flowing out from the Flood-Stanly workings—also drains down past the Kellogg Tunnel level and into the Bunker Hill Mine's lower workings, continually recharging the Bunker Hill mine pool.[7] Since 1994, water in the Bunker Hill Mine pool has been pumped only intermittently, and only enough to maintain the mine pool level at approximately the 11 Level of the mine.[8] Water from the Bunker Hill Mine pool is pumped up the No. 2 shaft to the Kellogg Tunnel on the 9 Level, where it also flows to the CTP for treatment. Water flow and AMD formation in the Bunker Hill Mine is illustrated in the diagram below.

---

[6] As shown in Appendix 1, the Bunker Hill Mine is comprised of semi-vertical shafts and horizontal levels. The levels are numbered based on their depth from the surface, *e.g.*, the 15 Level is deeper than the 14 Level but closer to the surface than the 16 Level. Each level in the Bunker Hill Mine is approximately 200 feet apart.

[7] Norton Decl., Ex. K (Stefanoff Dep. Transcript) at 197:4-17 (stating that some highly acidic water from the Flood-Stanly area makes its way below the 9 Level and into the mine pool).

[8] *Id.*, Ex. C (July 1999 CH2M Hill Memorandum re: AMD Collection) at 10.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 4



Norton Decl., Ex. C (July 1999 CH2M Hill Memorandum) at 3, Figure 1.

In 1975, it was estimated that "[t]he mine drainage from the Kellogg Tunnel of the Bunker Hill Mine averages about 2,000 to 2,500 gallons per minute,"[9] which is more than one billion gallons per year. More recently, BHMC reports that between 2000 and 2023, it discharged between 583,500,000 and 819,434,740 gallons annually at an average rate of 1,334 gallons per minute.[10] A 1990 study estimated that 56% of all water exiting the Kellogg Tunnel was water that had entered, and then been pumped from, the mine's lower workings.[11] Based on the estimates of total Kellogg Tunnel discharge rates above, that means approximately 750 to 1,400 gallons of water enter the Bunker Hill Mine pool every minute.

---

[9] *Id.*, Ex. B (Trexler, Sources and Causes of AMD) at 7.
[10] *Id.*, Ex. AA (Expert Report of Richard White) at Appendix C-035, C-038.
[11] *Id.*, Ex. A (Bunker Hill Mine Water Mitigation Measures) at B-6.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 5

In stark contrast, historical reports indicate that the Lower Crescent Mine was a very dry mine before it was flooded with Bunker Hill Mine water in the 1990s,[12] and naturally "***makes only 10 gallons per minute***."[13] In addition to these historical reports, individuals who worked at the Crescent Mine and/or Bunker Hill Mine in the 1980s and 1990s also confirm that the Crescent Mine's lower workings naturally generate a negligible amount of water, especially in comparison to the Bunker Hill Mine.[14] Placer does not dispute this.[15] And the small amount of water that

---

[12] *Id.*, Ex. N (Pintlar 1991 Report) at 25 ("The Crescent mine pumped to the B.H. across the Y-U. The Crescent only pumped periodically (once or twice a week for a short duration) due to the fact that it was a relatively dry mine. The B.H. mine pumped continually and was a wet mine in comparison to others in the district."); *Id.*, Ex. CC (1975 U.S. Bureau of Mines Report) at 15 ("Very little ground water is present on the deeper levels of the Crescent mine"); *Id.*, Ex. KK (1980 Study on 3700 level of Crescent Mine) at 328 ("The tunnels contain almost no ground water, and the Crescent mine drilling logs do not report any loss of circulation or gain of water during drilling. Most of the observed water has been introduced mainly by construction and operation of the tunnel. This lack of ground water indicates an absence of fracture continuity between the ground surface and the underground openings.").

[13] *Id.*, Ex. BB (Crescent Mine Cooling System) at 2 (emphasis added).

[14] *Id.*, Ex. DD (Affidavit of Jack Swanson) at ¶ 8 (Crescent pumped "no more than sixty (60) to eighty (80) gallons per minute …. A portion of that water was fresh water that was being pumped from the surface into the Crescent Mine for daily use by the miners"); *Id.*, Ex. EE (Affidavit of Harold Fischer); *Id.*, Ex. FF (Affidavit of Paul Sala) at 6 ("In the absence of the water introduced from Big Creek during operations, I would estimate that the lower Crescent Mine naturally produces a minimal amount of water, which I would approximate to be in the range of 15 [gallons per minute] to 25 [gallons per minute]."); *Id.*, Ex. GG (P. Sala Dep. Transcript) at 84:14-16 ("I think the Crescent was dry enough. I doubt if it produces more than maybe 25 [gallons per minute] or so. It's a pretty dry mine."); *Id.*, Ex. O (L. Sala Dep. Transcript) at 29:2-5 (Crescent Mine "was hot and dry" below the Hooper Tunnel level), 78:19-79:24 (Levels below 3100 level of Crescent Mine were dry), 89:12-90:22 (The Crescent Mine was a "dry mine" and the Bunker Hill Mine was a "wet mine"); *Id.*, Ex. HH (Fischer Dep. Transcript) at 20:16-19 ("So during the week I would say there was 80 gallons a minute" being pumped from the Crescent Mine lower workings), 28:4-14 (took measurements of the water being pumped from the Crescent Mine lower workings, which "was about 80 gallons a minute"), 52:12-21 (estimating 60% of water pumped from Crescent Mine's lower workings was brought in from the surface to support mining activities), 53:2-9 (estimating Crescent Mine lower working naturally collected "20 gallons a minute probably"), 57:8-21 ("The Crescent is not near what the Bunker Hill put out. They put out a lot a lot of water. The Crescent Mine, basically a dry mine …. Because, like on 3700 and all them, there was hardly any water at all.").

[15] *Id.*, Ex. H (Placer Fed. R. Civ. P. ("FRCP") 30(b)(6) Dep. Transcript) at 63:15-20, 97:1-9, 112:3-20.

infiltrates into the upper Crescent Mine (i.e., Hooper Tunnel level and above) has been conveyed

out of the mine at or above the Hooper Tunnel level since 1973; it does not flow into the Lower

Crescent Mine and does not (and cannot) contribute to water in the Bunker Hill Mine pool.[16]

**B.      Bunker Hill Mine Owners, Including Placer, Diverted Millions of Gallons of
         Contaminated Water into the Lower Workings of the Bunker Hill Mine and
         Crescent Mine.**

In 1991, the owners of the Bunker Hill Mine, including Bunker Limited Partnership and

Bunker Hill Mining Co., (U.S.), Inc., filed for bankruptcy, turned off all power to the mine,

removed the pumps used to remove water from the mine, and began diverting contaminated mine

water into the lower workings, causing the Bunker Hill Mine to begin flooding.[17] The deepest

pump station prior to the shutdown was on the 23 Level, which is where the surface of the Bunker

Hill Mine pool was located at that time.[18] This is also the level where the mine connects to the

Yreka Crosscut.

In September 1991, EPA issued a Unilateral Administrative Order ("1991 UAO") that

directed the owner of the Bunker Hill Mine to "[i]mmediately stop diverting acid mine drainage

from the upper workings of the Bunker Hill Mine … into the lower workings of the Bunker Hill

Mine," and ordered that "[a]ll acid mine drainage … must be directed to the Central Treatment

Plant for treatment[.]"[19]

---

[16] Specifically, from 1973 to approximately 2023, the entirety of the relatively small flow (approximately 170 gallons per minute) of surface water that entered the upper Crescent Mine was conveyed to the neighboring Sunshine Mine for treatment and did not reach the Crescent Mine's lower workings. *Id.*, Ex. M (Consent Decree) at 42-43. This water is now land applied, predominantly in areas overlying Sunshine Mine, not Crescent Mine, workings. *Id.*, Ex. PP (Rosasco August 2024 Report) at 4-5.

[17] *Id.*, Ex. D (Bunker Hill Mine Water Management RI/FS) at 2-5–2-6.

[18] *Id.*

[19] *Id.*, Ex. E (1991 UAO) at 28. In 1992 EPA issued a Record of Decision ("ROD") codifying the remedy identified in the 1991 UAO of pumping all water generated at the Bunker Hill Mine to the CTP. *Id.*, Ex. F (1992 ROD) at 9-9.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 7

The September 1991 UAO also stated that the Bunker Hill Mine "is presently being flooded and filled with highly acidic, metals laden water," which was filling "the lower workings of the mine (below level 9 of the Bunker Hill Mine)."[20] With respect to the Crescent Mine, the 1991 UAO states that when the water flooding the lower Bunker Hill Mine "fills up the lower workings of the Bunker Hill mine above the 23rd level, which it is steadily doing, it will . . . back into the Crescent Mine . . . ."[21] The 1991 UAO further states that "[c]ontinued discharge of mine drainage into the lower workings of the Bunker Hill mine, and the subsequent flooding of the Crescent Mine, is also a potential source of additional surface water and groundwater contamination . . . ."[22] The UAO further states that "the Crescent Mine will eventually flood" as a result of "ongoing flooding of the Bunker Hill Mine" and filling of the Crescent Mine.[23]

By the end of 1991, the Crescent Mine was likely flooding with Bunker Hill water. A November 1991 report describes the process by which the Crescent Mine may have been preserved from flooding from the Bunker Hill Mine, but indicates that it was likely too late for preservation efforts because Bunker Hill water was likely already flooding the Crescent.[24]

Following the Bunker Limited Partnership bankruptcy, Fausett International ("Fausett") obtained title to the Crescent Mine.[25] For years, Fausett's representatives expressed concerns to EPA that water was entering the Crescent Mine from the Bunker Hill Mine and would devalue the

---

[20] *Id.*, Ex. E (1991 UAO) at 8-9.
[21] *Id.* at 9.
[22] *Id.* at 9-10.
[23] *Id.* at 12.
[24] Norton Decl., Ex. N (Pintlar 1991 Report) at 1; *Id.*, Ex. O (L. Sala Dep. Transcript) at 75:22-81:3-23.
[25] *Id.*, Ex. M (2001 Consent Decree) at 4.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 8
127066592.1 0065623-00004

Crescent Mine by flooding the lower workings.[26] By 1994, Fausett representatives stated that "the [Crescent] mine *has been flooding with Bunker Hill water over the past two plus years*."[27]

A 1996 due diligence report by J. Stacey, PE, for Royal Silver Mines, discussing both the Crescent Mine and the Bunker Hill Mine, stated that "both mines are now flooded with the same water."[28]

> The successful de-watering of the Bunker Hill Mine will result in the Crescent Mine water level to be drawn down to the 3,100' Level. This presents the opportunity to separate the two mines with a water plug to prevent any *Bunker Hill water from again entering the Crescent Mine*.[29]

Placer has already admitted in this litigation that Bunker Hill Mine water flooded into the Lower Crescent Mine in the 1991-1994 period and remains there at present.[30]

## C.    In 1992-1994, Placer Flooded the Lower Crescent Mine.

On April 28, 1992, Placer completed its acquisition of the Bunker Hill Mine, at which time, Placer ceased diverting certain streams of water into the lower mine and conveyed the water to the CTP for treatment.[31] However, only water that would drain to and out of the Kellogg Tunnel by the force of gravity was routed to the CTP. All other water—on the order of several hundred gallons per minute[32]—continued to flow below the 9 Level and flood the lower Bunker Hill Mine, which was not subject to pumping at the time. This water included some of the mine's most contaminated water, which flowed through the Flood-Stanly workings.[33]

---

[26] *Id.*, Ex. M (2001 Consent Decree) at 55-56; *see also id.*, Ex. MM (Jorgensen Dep.) at 116:23-117:8 (describing history of Fausett correspondence).

[27] *Id.*, Ex. M (2001 Consent Decree) at 57 (emphasis added).

[28] *Id.*, Ex. QQ (J. Stacey 1996 report) at 1.

[29] *Id.* at 7 (emphasis added).

[30] Norton Decl., Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 90:19-91:18.

[31] *Id.*, Ex. D (Bunker Hill Mine Water Management RI/FS) at 2-6; *id.*, Ex. G (Placer Warranty Deed) at 1.

[32] *See supra* footnotes 9-11 and accompanying text.

[33] Norton Decl., Ex. K (Stefanoff Dep. Transcript) at 197:4-17.

In October 1993, despite EPA's clear directives in its 1991 UAO and 1992 Record of Decision calling for *all* AMD to be conveyed to the CTP for treatment, Placer ceased conveying *any* AMD to the CTP and instead diverted *all* of the Bunker Hill Mine's contaminated water into the mine's lower workings to avoid paying water treatment costs.[34] During this period, Placer was not pumping water from the Bunker Hill Mine pool so the mine's lower workings filled with water at a rate of more than 1,300 gallons per minute.[35]

On November 1, 1994, EPA issued another Unilateral Administrative Order (the "1994 UAO"), which explained that "[a]cid mine drainage from the Bunker Hill Mine is currently being diverted into the lower workings of the Mine.... When the water fills up the lower working of the [Mine] beyond Level 11 … it will pose a threat of uncontrolled release."[36] Therefore, EPA directed Placer to maintain the water level below the 11 Level and "convey the Bunker Hill Mine discharge to the CTP for treatment."[37] In December 1994, Placer began pumping the Bunker Hill Mine pool and sending the water to the CTP.[38]

As Crescent's expert, Geoff Beale explained, "[b]ecause of the hydraulic connection between the Bunker Hill Mine and the Lower Crescent Mine workings via the Y-U Crosscut, the flooding of the Bunker Hill Mine also caused the Y-U [Crosscut] and the Lower Crescent Mine to fill with water."[39] BHMC and Placer's own expert agrees that the Crescent and Bunker Hill Mines

---

[34] *Id.*, Ex. D (Bunker Hill Mine Water Management RI/FS) at 2-6; *Id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 76:4-77:16, 79:2-80:5, 120:12-121:22.

[35] *Id.*, Ex. AA (Expert Report of Richard White) at Appendix C-038; *Id.*, Ex. O (L. Sala Dep. Transcript) at 75:22-76:21.

[36] *Id.*, Ex. I (1994 UAO) at 5-6.

[37] *Id.*, Ex. I (1994 UAO) at 13.

[38] *Id.*, Ex. D (Bunker Hill Mine Water Management RI/FS) at 2-6; *Id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 79:2-17.

[39] *Id.*, Ex. TT (Beale June 2024 Report) at 32-33; *see id.*, Ex. SS (Beale Dep. Transcript) at 9:20-10:11.

are hydraulically connected and that when the mine pool in the Bunker Hill Mine rises, so would the mine pool in the Crescent Mine.[40] James Stefanoff, EPA's technical consultant focusing on Bunker Hill Mine water since 1995,[41] explained that with regard to the Bunker Hill and Crescent Mines, "it's like you have two buckets [i.e., the mines] connected with a pipe [i.e., the Yreka Crosscut] at the bottom of the buckets[.]"[42] If "you pull down or add water to one side, it's going to go up or go down on the other side."[43] And "[i]f the water level on one side is higher than the other, water is going to want to flow towards the low side, … assuming it can flow."[44] Therefore, as the Bunker Hill Mine filled with contaminated water, some of that water flooded into the Crescent Mine.[45]

According to Lisa Sala, who worked at the Bunker Hill Mine from 1988 to 1991,[46] "[i]t was a known fact that the Crescent Mine would flood if the Bunker Hill Mine quit dewatering" because the water would "go across the Y-U crosscut and fill the Crescent Mine."[47] Placer has already admitted in this litigation that water "certainly" could flow from the Bunker Hill Mine to the Crescent Mine, and has stated that it has no reason think that it did not flow to the Crescent in 1991.[48]

---

[40] Norton Decl., Ex. J (Morton 7/8/24 Expert Report) at Appendix C p. 102.
[41] *Id.*, Ex. K (Stefanoff Dep. Transcript) at 9:5-12, 12:6-19.
[42] *Id.* at 38:8-17.
[43] *Id.* at 96:22-25.
[44] *Id.* at 100:15-18.
[45] *Id.* at 100:19-23 ("Q. …assuming the Y-U is open, once it filled with water, would water then enter the Crescent Mine if the Bunker Hill Mine pool continued to rise? A. Yes.").
[46] Lisa Sala (née Carney) drafted the 1991 report describing how water would flow from the Bunker Hill Mine to the Crescent Mine when the Bunker Hill Mine flooded. *See* Norton Decl., Ex. N (Pintlar 1991 Report).
[47] *Id.*, Ex. O (L. Sala Dep. Transcript) at 81:7-16; *see also id.* at 88:18-24 ("[T]o clarify that, at the time the Bunker Hill Mine all dewatering ceased, water would have been flowing from the Bunker Hill Mine to the Crescent Mine, not the other way around.").
[48] *Id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 90:2-6.

When Placer began diverting all Bunker Hill Mine water into the mine's lower workings in October 1993, the Bunker Hill Mine pool level was just below the 15 Level.[49] When EPA forced Placer to resume pumping in December 1994, the water level was nearing the 11 Level.[50] Placer does not dispute that the water it diverted into the lower workings of the Bunker Hill Mine raised the water level of the conjoined mine pool.[51] As the Bunker Hill Mine filled with contaminated water, water also flowed across the Yreka Crosscut into the Crescent Mine.[52] Even after the Lower Crescent Mine pumps were first shut off in 1991, the Crescent Mine was still dry below the 4100 level, approximately 1,000 feet below the Yreka Crosscut.[53] In 2006, the "water elevation [in the Crescent Mine] [was] estimated to be approximately 660 feet below the Hooper Portal. This is the same elevation as about the 11 Level in the Bunker Hill."[54] The 1993-1994 rise in the Bunker Hill Mine pool up to about the 11 Level coincided with the rise in the Crescent Mine pool up to a level about 660 feet below the Hooper Tunnel level.

From the time that Placer resumed pumping in 1994, Placer and, more recently, BHMC have only pumped enough water to maintain the water level in Bunker Hill Mine near the 11

---

[49] *Id.*, Ex. D (Bunker Hill Mine Water Management RI/FS) at 2-6.

[50] *Id.* ("[i]n December 1994 the pumps at the 11 level were started"); *see also* Norton Decl., Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 120:21-24.

[51] *Id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 148:16-149:13.

[52] *Id.*, Ex. K (Stefanoff Dep. Transcript) at 100:19-23 ("Q. …assuming the Y-U is open, once it filled with water, would water then enter the Crescent Mine if the Bunker Hill Mine pool continued to rise? A. Yes."), 113:20-115:6 (agreeing that if the Yreka Crosscut is open "it would have allowed the waters [in each mine] to equalize"), 168:16-24 ("when the water was getting dumped down the shaft, it just didn't fill the tunnel – well, obviously it filled the tunnel, but then it would have been connected to all the other workings in the Bunker and all the other workings in the Crescent …. So where that water ended up – you know, it filled everything up."); *see also id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 90:2-6, 90:19-91:18.

[53] *Id.*, Ex. L (Durick Dep. Transcript) at 58:17-59:8 (explaining how he visited the 4100 level of the Crescent Mine with an EPA employee after the pumps had been shut off in 1991).

[54] *Id.*, Ex. II (U.S. Discovery Responses) at 6.

Level.[55] The water level in the Crescent Mine continues to mirror the elevation of the water level in the Bunker Hill Mine.[56] There is little mixing between the surface and deeper portions of the Bunker Hill Mine pool,[57] instead, the water that drains below the Kellogg Tunnel level and into the Bunker Hill Mine pool "is thought to flow across the upper pool toward the extraction pumps, which maintain the pool level at about 30 feet below 11 Level at Raise No. 2."[58] Thus, pumping from the 11 Level from late 1994 to the present has essentially just removed new water that has continually replenished the surface of the Bunker Hill Mine pool, but the pumping has not removed the water that Placer diverted into the lower workings in 1993 and 1994,[59] including the water that flooded the Crescent Mine.[60]

### D.    BHMC Takes Over Operation of the Bunker Hill Mine Then Sues Crescent for Water Treatment Costs That BHMC Owes EPA.

In 2004, the United States sued Placer and its President, Robert Hopper, Sr., because they "failed to convey all AMD to the CTP for treatment, and have had numerous uncontrolled AMD releases."[61] According to EPA, by 2004, it had incurred $15 million in CERCLA response costs

---

[55] *Id.*, Ex. P (Bunker Hill Water Elevation Table); *see also id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 103:19-104:2 ("[T]heir UAO specifically states that they are 30 feet below the 11 Level and my communications with everybody on-site indicates that it's still there.").

[56] *Id.*, Ex. JJ (Crescent Water Elevation Table); *see also id.*, Ex. II (U.S. Discovery Responses) at 6.

[57] *Id.*, Ex. A (Bunker Hill Mine Water Mitigation Measures) at B-3–B-4.

[58] *Id.* at B-4.

[59] Norton Decl., Ex. A (Bunker Hill Mine Water Mitigation Measures) at B-4; *see also id.*, Ex. K (Stefanoff Dep. Transcript) at 124:19-125:13, 125:18-126:6 ("Q. ...has the water that accumulated in the Bunker Hill Mine pool between 1991 and 1994 when the pumps were turned off and water was intentionally diverted into the lower workings ever been fully pumped out? ... THE WITNESS: No, ... I'm not aware that the water level has ever been pumped appreciably below 11 level, but I don't know what the current operator is doing."), 127:18-128:9 ("[M]y opinion would be that the water being pumped out from 11 shaft is water that is closest to getting into 11 level from surface workings.").

[60] *Id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 90:19-91:18.

[61] *Id.*, Ex. Q (EPA First Amended Complaint) at ¶ 21.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 13

because of Placer and Mr. Hopper's conduct.[62]

EPA settled its lawsuit with Placer in May 2018. Specifically, in a three-party arrangement effected via parallel Placer-US and BHMC-US agreements entered into on the same day, BHMC agreed to pay EPA $20 million (in a years-long schedule of payments) on behalf of Placer to resolve the EPA's cost recovery claim against Placer. In return, BHMC received from Placer an exclusive option to purchase the Bunker Hill Mine, and the multi-million-dollar commitment to pay EPA was considered explicitly to be a portion of BHMC's purchase price for the mine.[63] In January 2022, BHMC completed its purchase of the Bunker Hill Mine.[64] As part of the agreement, BHMC agreed to indemnify Placer with respect to the present litigation.[65]

In early 2021, BHMC also attempted to purchase the Crescent Mine.[66] Its offer was rejected and, almost immediately thereafter, BHMC sent a demand letter to Crescent alleging that Crescent is responsible for 27.45% of all Bunker Hill Mine water treated at the CTP and demanding $5.49 million for past water treatment costs from 1994 to 2017.[67] BHMC also demanded $922,320 for water treatment costs that BHMC owed EPA from 2017 to 2021, and asserted that Crescent is responsible for 27.45% of all water treatment costs going forward.[68]

---

[62] *Id.* at ¶ 33.

[63] *Id.*, Ex. R (Settlement Agreement and Order on Consent for Response Action by BHMC) at 12 (describing $20 million payment as "a portion of [BHMC's] purchase price" for the Bunker Hill Mine); *id.*, Ex. XX (2018 Consent Decree) ¶ 4 ("[P]art of the consideration for the lease and sale of the [Bunker Hill] Mine shall consist of [BHMC's] payment to the United States of $20 million."); *United States v. Placer Mining Co., Inc.*, No. 2:04-CV-00126-EJL, 2018 WL 7352423, at *2 (D. Idaho June 19, 2018) ("[A] portion of the lease and purchase payments . . . would be paid by BHMC directly to EPA")..

[64] Norton Decl., Ex. S (Bunker Hill Mine Purchase and Sale Agreement); *Id.*, Ex. LL (BHMC Press Release).

[65] *Id.*, Ex. S (Bunker Hill Mine Purchase and Sale Agreement) at 19.

[66] *Id.*, Ex. RR (BHMC Purchase Offer Letter) at 1. Note: the letter is erroneously dated "2020" when, in fact, it was sent in January 2021.

[67] *Id.*, Ex. U (2/3/21 Demand Letter); *Id.*, Ex. YY (BHMC 2nd Demand Letter) at 3.

[68] *Id.*

An email from BHMC's former CFO sent the same day as the demand letter shows that BHMC hoped the demand letter would interfere with Crescent's efforts to sell the Crescent Mine:

> I think we should formally get this over to Crescent as soon as possible. … [I]f he receives [the demand letter] before he wraps up a deal, he'll be forced to disclose it under reps and warranties to the other party. Once he's forced to disclose it, it effectively raises the purchase price for any other party in the amount of the bill. Much better for Marty to receive this from us now than any new owner of the mine. Obviously helps our negotiating position as well.

Norton Decl., Ex. W (2/3/21 David Wiens Email) at 1.

At the same time, BHMC acknowledged internally that its demands were baseless.[69] BHMC contacted staff at the University of Idaho to try to find support for BHMC's demands.[70] In response, Dr. Jerry Fairley, the Chair of the Department of Geography and Geological Sciences at the University of Idaho unequivocally said "that there is no way to know" how much of the water discharged from the Kellogg Tunnel is from the Crescent Mine, based on available information.[71] BHMC admitted internally that neither Dr. Fairley nor its consultant hydrologist Barbara Ford "could … create [a] basis for allocating [a] % of the water to Crescent."[72] Instead of following the (lack of) evidence, BHMC continued to assert cost claims against Crescent in order "to keep the 'discussion' going with our friends at Crescent. Our aim being to keep them under pressure and have this an 'open' case for BD [business development] reasons."[73]

BHMC sent another demand letter to Crescent on May 3, 2021, threatening that "[i]f an amicable solution cannot be reached, we will be forced to seek legal remedy next week."[74] Ultimately, after learning more about the two mines and their history and past releases, Crescent

---

[69] *See Id.*, Ex. V (3/3/21 Barnett Email); *id.*, Ex. T (3/11/21 Barnett Email).
[70] *Id.*, Ex. V (3/3/21 Barnett Email).
[71] *Id.*, Ex. X (2/22/21 Email from Dr. Fairley).
[72] *Id.*, Ex. V (3/3/21 Barnett Email).
[73] *Id.*, Ex. Y (4/2/21 Williams Email).
[74] *Id.*, Ex. Z (5/3/21 Ash Email).

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 15

was forced to initiate litigation to defend itself against BHMC's demands and to seek redress for the contaminated Bunker Hill Mine water that has flooded the Crescent Mine. BHMC sued the Crescent Parties in November 2021, alleging that 22 percent of the water discharged from the Kellogg Tunnel for treatment at the CTP comes from the Crescent Mine.[75]

**E.      Crescent Has Incurred and Continues to Incur CERCLA Response Costs That Are Necessary and Consistent with the National Contingency Plan.**

From approximately 2018 to the present, Crescent has incurred costs for actions aimed at ascertaining the nature and extent of the contamination in the Lower Crescent Mine.[76] Crescent personnel have compiled and analyzed maps, historical reports, and other factual materials providing information regarding the nature and extent of the flooding of the Lower Crescent Mine, the likely volume and chemical quality of the flood water at issue, the source and timing of the flooding that occurred in the 1990s, and other topics pertinent to understanding the nature and extent of the contamination in the flooded Lower Crescent Mine.[77] In addition, Crescent incurred costs for rehabilitation of the Crescent Mine's Hooper Tunnel necessary for accessing the Ellis Shaft and the flood water within it for sampling.[78] Crescent also measured and monitored the water level within the Ellis Shaft and developed a Sampling and Analysis Plan (consistent with the National Contingency Plan ("NCP")) for additional sampling of the contaminated water in the Lower Crescent Mine.[79] Such costs were reviewed by Crescent's expert Paul Rosasco and were

---

[75] Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, No. 2:21-cv-00209-DCN (D. Idaho Nov. 19, 2021), ECF No. 16 at ¶ 46.

[76] Norton Decl., Ex. OO (Rosasco June 2024 Report) at 49-55; *id.*, Ex. PP (Rosasco August 2024 Report) at Exhibit 1.

[77] Declaration of Roger Gross in Support of Motion for Summary Judgement ("Gross Decl.) ¶¶ 8-9.

[78] *Id.* ¶ 11.

[79] *Id.* ¶ 10.

determined by him to be necessary and NCP-consistent response costs under CERCLA.[80] Crescent is continuing to incur response costs, including but not limited to costs it has incurred as it has begun implementing the Ellis Shaft Sampling and Analysis Plan.[81]

### III. ARGUMENT

Placer has long sought to avoid liability for the AMD that flooded from the Bunker Hill Mine into the Lower Crescent Mine in the 1990s. This flooding has made the lower levels of the Crescent Mine, and the valuable silver deposit in the lower mine, inaccessible. Because Placer is responsible for flooding the Crescent Mine with contaminated water and hazardous substances, it is liable for trespass and Crescent's response costs to address the flooding. As the current owner, BHMC owes Crescent a duty to remove the trespassing water, and it is therefore liable for the continuing trespass. BHMC and Placer are also liable to Crescent for CERCLA response costs because they are current and past (respectively) owners and operators of the Bunker Hill Mine, at and from which hazardous substances have been released and disposed of.

While both Placer and BHMC are liable to Crescent, the Court should dismiss BHMC's claim against the Crescent Parties, because there is no dispute of material fact that the releases causing BHMC to have incurred response costs originated in the Bunker Hill Mine. Crescent should not be held liable for BHMC's costs of dealing with BHMC's and Placer's legacy of contamination.

### A.    Legal Standard.

Rule 56(a), (c) of the Federal Rules of Civil Procedure mandates that summary judgment be granted if the pleadings, the discovery and disclosure materials on file and any affidavits show

---

[80] Norton Decl., Ex. OO (Rosasco June 2024 Report) at 49-55; *id.*, Ex. PP (Rosasco August 2024 Report) at 29-37 and Exhibits 1-2.

[81] *Id.*, Ex. PP (Rosasco August 2024 Report) at 34; Gross Decl. ¶ 14.

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Ninth Circuit has recognized the usefulness of summary judgment to dispose of legal issues prior to trial. *See, e.g.*, *Asuncion v. Dist. Dir. of U.S. Immigr. & Naturalization Serv.*, 427 F.2d 523, 524 (9th Cir. 1970); *Adams v. United States*, 318 F.2d 861, 867 (9th Cir. 1963); *Cox v. Am. Fid. & Cas. Co.*, 249 F.2d 616, 618 (9th Cir. 1957).

A material fact is one that influences the outcome under governing law. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 343 (9th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *United States v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188, 1196 (E.D. Cal. 2008). Factual disputes that are irrelevant or unnecessary need not be considered. *See Anderson*, 477 U.S. at 248. Although the facts are to be viewed and the inferences drawn in a light most favorable to the non-moving party, the district court "need not draw *all* possible inferences in [the non-moving party's] favor, but only all *reasonable* ones." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

Once the moving party satisfies its burden of showing that no genuine issue of material fact exists, the non-movant has the burden of proving a reasonable dispute as to salient facts, which cannot be satisfied by merely resting upon one's pleadings, but rather must involve the presentation of actual evidence that creates a genuine issue of material fact. *See* FRCP 56(e)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson*, 477 U.S. at 248-49; *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec*, 854 F.2d 1538, 1544-45 (9th Cir. 1988). The non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

**B.      Placer and BHMC Are Liable for Trespass.**

**1.      Placer Is Liable for Civil and Common Law Trespass for Flooding the Crescent Mine with Contaminated Water.**

I.C. § 6-202(2)(a) states that "any person who enters or remains upon the real property of another person without permission commits a civil trespass." Idaho case law has similarly defined common law trespass as "the wrongful interference with the right of exclusive possession of real property." *Moon v. N. Idaho Farmers Ass'n*, 140 Idaho 536, 541, 96 P.3d 637 (2004).[82] "An entry may take the form of the defendant … causing some tangible thing to intrude upon the land." *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992); *see also* I.C. § 6-202(1)(d) (defining "enter" to include "causing any … substance … to go upon or over real property"). Therefore, a trespass can be "committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it." *Bliss v. Minidoka Irrigation Dist.*, 167 Idaho 141, 150, 468 P.3d 271 (2020) (quoting *Restatement (Second) of Torts* ("*Restatement*") § 161 (1965)).

For this form of trespass, the "actor's failure to remove a thing tortiously placed on the land constitutes a continuing trespass for the entire time during which it is on the land." *Mueller v. Hill*, 158 Idaho 208, 214, 345 P.3d 998 (2015) (quoting 75 *Am. Jur. 2d Trespass* § 40 (2007)); *accord Restatement* § 161, cmt. b.[83] Here, Placer is liable for continuing trespass because, between October 1993 and December 1994, it diverted millions of gallons of contaminated mine water into

---

[82] Following the 2018 amendment of I.C. § 6-202 to remove the requirement that trespass must be willful and intentional, claims for statutory trespass under I.C. § 6-202(2)(a) and claims for common law trespass are virtually the same. *See United States v. Spear*, No. 2:22-CV-00439-BLW, 2023 WL 6463039, at *6 n.7 (D. Idaho Oct. 4, 2023).

[83] Idaho courts have long recognized the continuing-tort doctrine and the tort of continuing trespass. *See, e.g., Woodland v. Lyon*, 78 Idaho 79, 83, 298 P.2d 380, 381 (1956).

the Bunker Hill Mine's lower workings, a portion of which flooded into the Crescent Mine via the Yreka Crosscut and remains there today.

When Placer raised the water level of the Bunker Hill Mine from just below the 15 Level in 1993 to near the 11 Level in December 1994 by diverting contaminated water into the mine's lower workings, Placer also flooded the Crescent Mine via the Yreka Crosscut and caused the water level in the Crescent Mine to rise at approximately the same rate, further flooding the Lower Crescent Mine's workings.[84] This is because the water in the Bunker Hill Mine will flow across the Yreka Crosscut until the water achieves the same level in both mines. The water level in the Crescent Mine remains approximately the same as the water level in the Bunker Hill Mine today.[85]

Placer cannot credibly dispute the fact that the contaminated water it caused to enter the Crescent Mine in 1993 and 1994 is still there today. The water level in both mines has never meaningfully dropped below where it was when Placer first resumed pumping in 1994,[86] as Placer and BHMC have only maintained the post-flooding status quo by pumping out new water from the surface of the Bunker Hill Mine pool to keep the water level near the 11 Level.[87] Indeed,

_____

[84] *See* Norton Decl., Ex. TT (Beale June 2024 Report) at 32-33; *Id.*, Ex. L (Durick Dep. Transcript) at 58:17-59:8 (explaining he visited the 4100 level of the Crescent Mine with an EPA employee after the pumps had been shut off in 1991); *id.*, Ex. II ("The water elevations in the two mines are equal because the mines are connected by the Yreka Cross-Cut. … The current water elevation is estimated to be approximately 660 feet below the Hooper Portal. This is the same elevation as about the 11 Level in the Bunker Hill.").

[85] *Id.*, Ex. TT (Beale June 2024 Report) at 35; *compare id.*, Ex. JJ (Crescent Water Elevation Table) *with id.*, Ex. P (Bunker Hill Water Elevation Table).

[86] *See id.*, Ex. JJ (Crescent Water Elevation Table); *compare id.*, Ex. P (Bunker Hill Water Elevation Table) *with id.*, Ex. I (1994 UAO) at 6 ("This diverted water is nearing the Level 11.").

[87] *Id.*, Ex. K (Stefanoff Dep. Transcript) at 122:1-4 ("Q. … So from 1998 to present, are the pumps effectively maintaining the current elevation of the mine pool? A. That's right."), 124:17-125:13 ("Q. … they were effectively pumping enough to offset the new water that is being added to the mine pool … but not otherwise pumping enough to lower the elevation of the mine, well below the 11 level? … A. That's correct. They were trying to maintain the level below 11 level …. I'm not aware that, at least when we were doing our study, that they ever had the motivation to pump significantly below 11 level. Q. So effectively just offsetting the new water

experts who studied the Bunker Hill Mine pool have concluded there is "little mixing of the upper country water into the deeper pool. Rather, the upper country recharge is thought to flow across the upper pool toward the extraction pumps, which maintain the pool level at about 30 feet below 11 Level at Raise No. 2."[88] Placer testified that the flooding referenced in the document is the same flooding that is in the Crescent Mine today.[89] Thus, Placer does not dispute that it caused contaminated Bunker Hill Mine water to enter the Crescent Mine, which has never been abated and remains there today.[90]

The fact that Crescent did not own the Crescent Mine when Placer initially flooded it with contaminated water is irrelevant for purposes of liability. "The rule of continuing trespass … is of particular importance where there has been a transfer of the possession of the land or of the ownership of the thing." *Restatement* § 161, cmt. e. Specifically, "[i]f the possessory interest in the land has been transferred subsequent to the actor's placing of the thing on the land, the transferee of the land may maintain an action for its continuance there[.]" *Id.* Simply stated, "[i]f a trespass is continuing, any person in possession of the land at any time during its continuance may maintain an action for trespass." *Rosenthal v. City of Crystal Lake*, 171 Ill. App. 3d 428, 435–36, 525 N.E.2d 1176 (1988).

---

that was being added? A. Correct. … Maintaining the status quo, so to speak, [of the] water levels."), 127:18-128:9 ("[M]y opinion would be that the water being pumped out from 11 shaft is water that is closest to getting into 11 level from surface workings."), 169:23-170:3 ("[M]y opinion is, the water that gets pumped from the Bunker on a day-to-day basis is water that was infiltrated into the Bunker and is easiest to pump over there because it's just a pressure thing."), 170:25-171:5 ("So I would expect that the majority of the water that gets pumped from the Bunker is coming from water that infiltrated relatively close to the workings, to the upper level workings … less pressure is needed to pull that water in.").

[88] *Id.*, Ex. A (Bunker Hill Mine Water Mitigation Measures) at B-3–B-4.
[89] *Id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 90:19-91:18.
[90] *Id.*

Therefore, courts across the country have held that a party that has failed to remove contamination from a neighboring property is not shielded from liability simply because the contaminated property passed to a new owner. *See*, *e.g.*, *Murray v. Bath Iron Works Corp.*, 867 F. Supp. 33, 48 (D. Me. 1994) ("To the extent that the plaintiffs can show that wastes from the site continue to be present on their land, regardless of when they entered, they can maintain an action for a continuing trespass … since that tort would be continually occurring for statute of limitations purposes.") (citing *Restatement* § 161, cmt. b); *Cal. Dep't of Toxic Substances Control v. Payless Cleaners, Coll. Cleaners*, 368 F. Supp. 2d 1069, 1082 (E.D. Cal. 2005) (denying motion to dismiss continuing trespass claim where plaintiffs alleged that the defendant "deposited … PCE laden wastewater on their property and that it failed to remove the contaminants after they came into possession of the land"); *Regan v. Cherry Corp.*, 706 F. Supp. 145, 150–51 (D.R.I. 1989) (relying on *Restatement* § 161 to reject argument "that because plaintiffs did not own the property at the time of the alleged dumping, plaintiffs may not maintain a trespass action"); *JBG/Twinbrook Metro Ltd. P'ship v. Wheeler*, 346 Md. 601, 627–28, 697 A.2d 898 (1997) (rejecting Chevron's argument that it is only liable for gasoline contamination that occurred after the plaintiff acquired the property because "Chevron's contention ignores the continuing nature of the trespass"); *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504, 508 (Me. 1996) (rejecting argument that plaintiffs had to have possession of property when contamination occurred to maintain continuing trespass claim and holding "the plaintiffs' present possessory interest is sufficient to maintain this action").

Placer is liable for continuing trespass. The contaminated water has never been removed and, therefore, continues to interfere with Crescent's exclusive use and possession of the Crescent Mine.

2.    **BHMC Is Liable for Civil and Common Law Trespass Because It Has Not Removed the Contaminated Bunker Hill Mine Water in the Crescent Mine.**

For a continuing trespass, when "the ownership of the thing tortiously placed on the land is transferred … such transferee upon knowledge that the thing is wrongfully on the land comes under a duty to the possessor to remove the thing," and is liable for trespass if the item is not removed. *Restatement* § 161, cmt. f. Therefore, when BHMC purchased the Bunker Hill Mine, it assumed an obligation to remove the contaminated Bunker Hill Mine water from the Crescent Mine. Having failed to do so, BHMC is liable for continuing trespass. *Id.*

*Goldingay v. Progressive Casualty Insurance Co.*, 306 F. Supp. 3d 1259 (D. Or. 2018), is instructive on this point. There, Progressive purchased a property from Chevron in 2005, which had previously been used as a "petroleum bulk plant." *Id.* at 1264. The plaintiffs purchased the neighboring property in 2010 and discovered petroleum contamination in their groundwater. *Id.* In 2017, the plaintiffs sued Progressive for trespass and nuisance. *Id.* Progressive argued that these "claims fail because [plaintiffs] have not identified any action by Progressive that caused the contamination, and Progressive therefore has no duty to prevent the trespass or nuisance." *Id.* at 1265. The court rejected this argument, explaining:

> [S]ection 161 of the Restatement provides that a trespass may be committed by the continued presence on the land of a "thing" that a landowner's predecessor in interest tortiously placed there, if the landowner fails to remove the thing after having learned of it. Restatement (Second) of Torts § 161 (1965). The question as to Progressive's liability for the migrating contamination, therefore, is not whether Progressive caused the contamination, but whether it knew or should have known that the contamination was causing a trespass or nuisance and failed to abate it.

*Id.* at 1266.

Idaho courts also follow the rule that a continuing trespass is "committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed

there[.]" *Bliss*, 167 Idaho at 150 (quoting *Restatement* § 161).[91] Therefore, for purposes of liability, the question "is not whether [BHMC] caused the contamination, but whether it knew or should have known that the contamination was causing a trespass or nuisance and failed to abate it." *Goldingay*, 306 F. Supp. 3d at 1266.

BHMC has been fully aware of the contaminated Bunker Hill Mine water in the Crescent Mine since before it purchased the Bunker Hill Mine. EPA's 2004 complaint that BHMC and Placer settled in 2018 details how Placer flooded the Bunker Hill Mine with contaminated water, "raising the water level inside the Mine to approximately the level of the [South Fork of the Coeur D'Alene River]."[92] According to BHMC's own expert, "[t]he Crescent mine Ellis shaft water level mimics that of Bunker Hill No 2 shaft water level."[93] Therefore, BHMC cannot credibly dispute that the increase in water level in the Bunker Hill Mine was mirrored by a proportional increase in the water level of the Crescent Mine. And the evidence confirms that the contaminated Bunker Hill Mine water that flooded the Crescent Mine in 1993 and 1994 has never been removed.[94] Accordingly, BHMC is independently liable for continuing trespass because it is the current owner of the Bunker Hill Mine and has failed to remove the contaminated Bunker Hill Mine water that is present in Crescent Mine.

**C.     Placer and BHMC Are Liable Under CERCLA for Crescent's Response Costs.**

BHMC and Placer are liable under CERCLA for Crescent's response costs resulting from hazardous substance releases and disposals at and from the Bunker Hill Mine.  Courts routinely use summary judgment to resolve liability issues under CERCLA Section 107(a), while reserving

---

[91] *See also Thomas v. Thomas*, No. 1:14-CV-00131-REB, 2015 WL 1467207, at *7 (D. Idaho Mar. 30, 2015); *Spear*, 2023 WL 6463039, at *7.

[92] Norton Decl., Ex. Q (EPA First Amended Complaint) at 5-6.

[93] *Id.*, Ex. J (Morton 7/8/24 Expert Report) at 16.

[94] *See supra* Sections II.B-C.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 24

a determination of the amount and recoverability of specific costs for later proceedings. *See, e.g.,* *Goe Eng'g Co. v. Physicians Formula Cosmetics, Inc.*, No. CV 94-3576-WDK, 1997 WL 889278, at \*23 (C.D. Cal. June 4, 1997) ("Nevertheless, there is nothing which prevents the Court from granting ... summary judgment on the issue of ... CERCLA liability, leaving the issues of damages to trial."); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719–20 (2d Cir. 1993).

With respect to establishing liability, Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that where a "release" or a "threatened release" of a "hazardous substance" at or from a "facility" results in the incurrence of "response costs," the current "owner and operator" of the facility as well as "any person" who owned or operated the "facility" at the time that the hazardous substance was "disposed" of at that facility "shall be liable for . . . [all] necessary costs of response incurred by any other person consistent with the national contingency plan." *See also Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1059 (C.D. Cal. 2003) (citing *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870–71 (9th Cir. 2001)).[95] "CERCLA liability is ordinarily joint and several, except in the rare cases where the environmental harm to a

---

[95] Specifically, CERCLA section 107(a) provides, in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section, (1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and] (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for . . . (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

42 U.S.C. § 9607(a).

site is shown to be divisible." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 588 (9th Cir. 2018).

     **1.**       **The Bunker Hill Mine Is a "Facility."**

     CERCLA defines "facility" (in pertinent part) as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9). The Bunker Hill Mine is a "facility" under 42 U.S.C. § 9601(9) as asserted by Placer and BHMC themselves[96] and as recognized by the EPA.[97]

     **2.**       **There Have Been "Releases," "Threatened Releases," and "Disposals" of "Hazardous Substances" at and from the Bunker Hill Mine Facility.**

     Placer and BHMC both admit that AMD and heavy metals contained in AMD are "hazardous substances" under CERCLA.[98] CERCLA defines "release" (in pertinent part) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22). Under CERCLA, "disposal" is the "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may

---

     [96] Placer, Second Amended Counterclaim [mistitled as "First Amended Counterclaim"], ECF No. 58 at ¶ 7; Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16 at ¶ 66.
     [97] Norton Decl., Ex. R (Settlement Agreement and Order on Consent for Response Action by BHMC) at 6.
     [98] Placer, Second Amended Counterclaim, ECF No. 58 at ¶ 9; Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16 at ¶ 67.

enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29); *id.* § 6903(3).

The United States has explicitly concluded that Placer was "the owner and operator [of the Bunker Hill Mine site] at the time of disposal of the hazardous substances at the Site,"[99] noting specifically how Placer, "[s]hortly after assuming ownership of the [Bunker Hill] Mine, . . . began to divert some of the AMD flow into the lower workings of the Mine, causing significant flooding of the Mine," which EPA determined to present "an imminent and substantial endangerment to the environment . . . ."[100]

CERCLA's definitions of "release" and "disposal" are broad.[101] Leakage or spillage onto floors or other surfaces or areas *within a facility* have been deemed to constitute releases and disposals. *See, e.g.*, *United States v. Iron Mountain Mines, Inc.*, 812 F. Supp. 1528, 1536-37 (E.D. Cal. 1992) (even a release that never leaves a mine is a covered release).[102] Courts have concluded that discharges of AMD and other mining wastes at and from mines constitute "releases" and "disposals" of "hazardous substances" under CERCLA.[103]

---

[99] Norton Decl., Ex. Q (EPA First Amended Complaint) at ¶¶ 29-31.

[100] *Id.* at ¶ 18.

[101] *See, e.g.*, *Bob's Beverage, Inc. v. ACME, Inc.*, 169 F. Supp. 2d 695, 722 (N.D. Ohio 1999) ("disposal" under CERCLA includes not only initial introduction of contaminants onto property but also spreading of contaminants due to subsequent activity), *aff'd*, 264 F.3d 692 (6th Cir. 2001); *see also Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (introduction of waste into groundwater is a disposal).

[102] *See also Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F. Supp. 1116, 1127 (N.D. Fla. 1995) (leakage or spillage of hazardous substances inside plant constitutes "disposal" under CERCLA); *United States v. Mottolo*, 695 F. Supp. 615, 623 (D.N.H. 1988) (discharge of contaminants within a facility to the environment, including "ground water" or "subsurface strata," constitutes release without any requirement of evidence of off-site pollution)..

[103] *See United States v. Iron Mountain Mines*, 724 F. Supp. 2d 1086, 1090 (E.D. Cal. 2010) (granting summary judgment holding mine owners and operators liable for releases of AMD at and from mine); *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750, 753–55 (9th Cir. 2020) (affirming district court holding that potentially responsible parties ("PRPs") for mine facility were liable for response costs addressing groundwater contamination in areas beyond

Here, Placer's intentional flooding of the lower Bunker Hill Mine with metals-contaminated water in 1993 and 1994 (which resulted in the flooding of the Lower Crescent Mine with the same water)[104] clearly fits within the broad CERCLA definition of "disposal" in that it constitutes a deliberate "discharge, deposit, injection, dumping [or] spilling" of contaminated wastewater "into or on any land or water" such that those contaminants "may enter the environment or be . . . discharged into any waters, including ground waters." 42 U.S.C. § 9601(29); *id.* § 6903(3). The contaminants in question entered into groundwater, and they were essentially dumped, deposited, or discharged by Placer for the purpose of disposal. Indeed, Placer admits that in 1993 through 1994, it ceased conveying *any* contaminated water to the CTP for treatment and disposal, and instead, conveyed *all* of it into the lower mine workings *to avoid paying the CTP water treatment and disposal costs*.[105] Placer's diversion of contaminated water was plainly an alternative (cheaper) means of disposal. Because "release" is defined as including "disposal," the above disposal actions also constitute a "release" under CERCLA.[106]

---

mine facility that were impacted by releases of mining wastes from mine); *United States v. Sterling Centrecorp Inc.*, No. 2:08-CV-02556-MCE, 2011 WL 6130887, at *2 (E.D. Cal. Dec. 8, 2011) (describing how mining wastes were washed downstream of mine facility and contaminated groundwater); *Sunnyside Gold Corp. v. Env't Prot. Agency*, 715 F. App'x 7, 8 (D.C. Cir. 2018) (recognizing discharge of AMD from mine as release of hazardous substances); *Atl. Richfield Co. v. NL Indus., Inc.*, No. 20-CV-00234-PAB-KLM, 2021 WL 321263, at *1 (D. Colo. Feb. 1, 2021) (same); *New Mexico on behalf of New Mexico Env't Dep't v. United States Env't Prot. Agency*, 310 F. Supp. 3d 1230, 1248-49 (D.N.M. 2018) (same).

[104] Importantly, for CERCLA liability, "'[q]uantity or concentration'" of hazardous substances released "'is not a factor,'" and "even minimal amounts of pollution" suffice for CERCLA liability. *Alcan Aluminum Corp.*, 990 F.2d at 720 (citation omitted).

[105] Norton Decl., Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 76:4-77:16, 120:12-121:22. The Ninth Circuit has considered the "passive migration" of contaminants "without human intervention" not to be a CERCLA "disposal," (*see, e.g.*, *Pakootas v. Teck Cominco Metals, LTD.*, 830 F.3d 975, 983 (9th Cir. 2016)), but in the present case, Placer's deliberate diversion of all Bunker Hill AMD into the lower mine, was not "passive migration" nor "without human intervention".

[106] Furthermore, Placer and (more recently) BHMC have continued releasing contaminated water into, and disposing of it within, the Lower Crescent Mine by virtue of their Bunker Hill Mine

**3.    Placer and BHMC Are Each a "Person" That Owned and Operated the Bunker Hill Mine Facility at the Time of a Disposal of Hazardous Substances at the Facility.**

Placer and BHMC are each a corporation and therefore a "person" under 42 U.S.C. § 9601(21). Under CERCLA, the term "owner or operator" means (in pertinent part) "any person owning or operating" a facility. 42 U.S.C. § 9601(20)(A). Placer admits that it owned and/or operated the Bunker Hill Mine from approximately 1992 to 2017, when it leased the mine to BHMC, and that it owned the mine thereafter until selling it to BHMC in January 2022.[107] BHMC admits that it began operating the mine as a lessee in 2017, and acquired ownership of the mine on January 7, 2022, and is its current owner.[108] Thus, Placer and BHMC are each an "owner or operator" under CERCLA. Placer was an "owner or operator" at the time of hazardous substance (i.e., AMD) "disposals" at and from the Bunker Hill Mine "facility," including the 1993-1994 diversion of all Bunker Hill Mine AMD into the lower Bunker Hill Mine and from there into the

---

pool management actions. Specifically, BHMC and Placer admit that the Bunker Hill Mine pool pumps are cycled on and off to maintain the mine pool level at approximately the 11 Level. *See, e.g.*, *id.*, Ex. VV (Morton Dep. Transcript) at 61:8-13, 104:6-9. And they argue (through their expert, Dr. Morton) that it is their pumping that draws water from the Crescent Mine into the Bunker Hill Mine because the two mines' pools are connected by the Yreka Crosscut. *Id.*, Ex. WW (Morton Expert Report 6/7/2024) at 18 ("Once pumping started at Bunker Hill mine No. 2 shaft the water table decreased, and a gradient was established that drains the Crescent mine water towards the Bunker Hill No. 2 shaft pumps); *see also id.*, Ex. VV (Morton Dep. Transcript) at 101:17-23, 106:17-19, 107:19-108:8. Thus, when the pumps are running, water (originally released from the Bunker Hill Mine in the 1990s) flows to some degree in the direction of the Bunker Hill Mine from the Crescent Mine. But when the pumps are turned off, the gradient is reversed and water from the Bunker Hill Mine pool (which continually receives at least several hundred gallons per minute of water) flows in the direction of the Lower Crescent Mine (which, prior to flooding, reportedly only received approximately 10 to 25 gallons per minute of water). *Id.*, Ex. OO (Rosasco June 2024 Report) at 2 ("10 to 25 gallons per minute"), 16, 24 (discussing water flow gradients); *id.*, Ex. TT (Beale June 2024 Report) at 35 (discussing water flow gradients).

[107] Crescent, Second Amended Complaint, ECF No. 51 at ¶ 3; Placer, Answer to Crescent's Second Amended Complaint, ECF No. 58 at ¶ 3.

[108] Crescent, Second Amended Complaint, ECF No. 51 at ¶ 2; BHMC, Answer to Crescent's Second Amended Complaint ECF No. 56, at ¶ 2.

Lower Crescent Mine, as described above. BHMC is the current "owner or operator" of the Bunker Hill Mine "facility" at and from which hazardous substances (i.e., AMD) have been released and disposed of, within the meaning of CERCLA.

### 4. Crescent Has Incurred Necessary and NCP-consistent Response Costs Resulting from Releases and Disposals for Which BHMC and Placer Are Responsible Parties.

From approximately 2018 to the present, Crescent has incurred costs for response actions including efforts to ascertain the nature and extent of the contamination in the Lower Crescent Mine that was caused by Placer and BHMC.[109] As of February 2024, Crescent had incurred over $200,000 in response costs for investigation of contamination in the Crescent Mine caused by releases from the Bunker Hill Mine.[110] These costs include investigation and evaluation of the Lower Crescent Mine, including rehabilitation of the Hooper Tunnel to access the Ellis Shaft, monitoring and evaluation of the conditions within the Ellis Shaft, and preparation of an NCP-consistent Sampling and Analysis Plan for additional monitoring and evaluation.[111] Crescent continues to incur additional costs to address the contaminated water that flooded the Lower Crescent Mine from the Bunker Hill Mine.[112] Courts routinely find parties liable under CERCLA as an "owner or operator" of their "facility" for costs to respond to hazardous substances released or disposed of at or from that facility which contaminate areas beyond the facility itself (whether a neighboring property, a nearby aquifer, or other area).[113]

---

[109] Norton Decl., Ex. OO (Rosasco June 2024 Report) at 49-55; *Id.*, Ex. PP (Rosasco August 2024 Report) at Exhibit 1.

[110] *Id.*, Ex. OO (Rosasco June 2024 Report) at 49.

[111] *Id.* at 49-55; Gross Decl. ¶¶ 7-13.

[112] Gross Decl. ¶ 14.

[113] *See, e.g.*, *Sterling Centrecorp Inc.*, 977 F.3d at 753–55 (affirming district court holding that potentially responsible parties ("PRPs") for mine facility were liable for response costs addressing groundwater contamination in areas beyond mine facility that were impacted by releases of mining wastes from mine); *United States v. Sterling Centrecorp Inc.*, No. 2:08-CV-02556-MCE, 2011 WL 6130887, at *2 (E.D. Cal. Dec. 8, 2011) (describing how mining wastes

Crescent's response costs to date are necessary and consistent with the NCP.[114] The actions for which Crescent has incurred costs—e.g., investigatory activities including developing a Sampling and Analysis Plan for sampling media suspected to contain hazardous substances and providing for safe site access via the Hooper Tunnel to allow for sampling—are types of response actions that courts frequently determine to be necessary and NCP-consistent. 42 U.S.C. § 9601(23), (24), (25); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986) (investigatory costs are recoverable response costs); *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 770-71 (7th Cir. 2021) (same); *CNH Am., LLC v. Champion Env't Servs., Inc.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (same, collecting cases). For purposes of summary judgment, the Court need only find that Crescent has incurred a single dollar of necessary and NCP-consistent response costs to impose liability on BHMC and Placer. *See Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 668 n.4 (9th Cir. 2004) ("As soon as the [plaintiff] expended its first dollar, it could have sued [defendant] for this dollar[.]").

The releases and disposals of AMD and metals-laden contaminated water at and from the Bunker Hill Mine caused Crescent to incur the above response costs. For purposes of proving causation in cases where hazardous substances are alleged to have migrated from a release site to a neighboring site, commonly referred to as "two-site cases," the plaintiff must only 1) identify a contaminant at its site, 2) identify the same, or similar, contaminant at the defendant's site, and 3) provide evidence of a plausible migration pathway by which the contaminant could have

---

were washed downstream of mine facility and contaminated groundwater); *see also Voggenthaler v. Maryland Square, LLC*, No. 2:08-CV-1618-RCJ-GWF, 2012 WL 1815651, at *2–3 (D. Nev. May 17, 2012) (PRPs for shopping center facility with dry cleaner held liable for costs of response addressing PCE impacts to nearby neighborhood), *aff'd in part, rev'd in part on other grounds*, 724 F.3d 1050 (9th Cir. 2013); *City of Portland v. Boeing Co.*, 179 F. Supp. 2d 1190, 1201-02 (D. Or. 2001).

[114] Norton Decl., Ex. OO (Rosasco June 2024 Report) at 53.

traveled from the defendant's facility to the plaintiff's site. *Castaic Lake Water Agency*, 272 F. Supp. 2d at 1066 (collecting cases and describing standard).

Here, there is no disagreement among the litigants that water containing metal contaminants is present in both the flooded Lower Crescent Mine and flooded lower Bunker Hill Mine, and that the Yreka Crosscut is a "plausible migration pathway" by which such contaminated water could have traveled from the Bunker Hill Mine into the Crescent Mine.[115] Thus, Crescent has made a prima facie case for causation, and so the burden falls to BHMC and Placer to disprove causation. *Castaic Lake Water Agency*, 272 F. Supp. 2d at 1066.

**D.    Crescent Is Entitled to Declaratory Relief as to Response Costs Incurred After February 5, 2024.**

Where a court finds that a defendant is liable for response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607, it is also appropriate for the court to enter a declaratory judgment "on liability for response costs … that will be binding on any subsequent action … to recover further response costs…."42 U.S.C. § 9613(g)(2); *United States v. Davis*, 261 F.3d 1, 46 (1st Cir. 2001) (citing *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000)). Because BHMC and Placer are liable for Crescent's past response costs, it follows that Crescent is entitled to a declaratory judgment that BHMC and Placer are liable for Crescent's ongoing and future response costs. *See ASARCO LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 866 (9th Cir. 2020).

---

[115] BHMC and Placer themselves have stated that both the Lower Crescent Mine and the lower Bunker Hill Mine contain water contaminated with the same types of metal contaminants (e.g., zinc), and that the Yreka Crosscut provides a pathway for contaminated water between the mines. *See* Placer, Second Amended Counterclaim, ECF No. 35 at ¶¶ 9-10; Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16 at ¶¶ 8, 43-45, 67; *see also* Sections II.B-C, *supra* (discussing and citing several sources indicating the Yreka Crosscut as a conduit for contaminated water to move from the Bunker Hill Mine to the Crescent Mine).

Crescent has established that the response costs it incurred prior to February 5, 2024 were necessary and consistent with the NCP.[116] Since February 5, 2024, Crescent has continued to incur response costs to investigate and evaluate the hazardous substances that entered the Crescent Mine from the Bunker Hill Mine.[117] Accordingly, Crescent respectfully requests that the Court enter declaratory judgment that Placer and BHMC are joint and severally liable for Crescent's response costs incurred after February 5, 2024.

**E.    Crescent Is Entitled to Summary Judgment Dismissing BHMC's CERCLA Section 107(a) Claim.**

BHMC brings claims against the Crescent Parties under both CERCLA Section 107(a), for response costs, and Section 113(f) for contribution.[118] As BHMC admits in its complaint, "[BHMC's] past response costs and ongoing response costs for water treatment are owed pursuant to the Administrative Settlement Agreement, which was issued by EPA pursuant to Section 106 of CERCLA."[119]

BHMC's claim for response costs under CERCLA Section 107(a) fails as a matter of law. Under Ninth Circuit precedent, a party may not obtain response costs under Section 107(a) when, as here, those costs are incurred due to a settlement agreement. Instead, "a private party must use a § 113(f) contribution action to recover expenses paid under a settlement agreement or a judgment." *Whittaker Corp. v. United States*, 825 F.3d 1002, 1009 (9th Cir. 2016); *see also id.* at 1007 ("[A] party who *may* bring a contribution action for certain expenses *must* use the contribution action, even if a cost recovery action would otherwise be available.").

---

[116] *See* Norton Decl., Ex. OO (Rosasco June 2024 Report) at 49-55; *Id.*, Ex. PP (Rosasco August 2024 Report) at 29-37, Exhibit 1.

[117] Gross Decl. ¶ 14.

[118] Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16 at ¶¶ 61-91.

[119] *Id.* ¶ 73.

According to BHMC itself in its Second Amended Complaint, "effective May 15, 2018, [BHMC] entered into the Administrative Settlement Agreement with EPA, where Bunker Hill assumed Placer's obligations to pay for water treatment costs."[120] That complaint also states: "Both the past costs paid by [BHMC] under the Administrative Settlement Agreement Paragraph 38 and the ongoing water treatment costs paid by Bunker Hill under this agreement's Paragraph 39 include costs for treating water from the Crescent Mine."[121] Indeed, BHMC has not alleged *any specific costs* in its Second Amended Complaint that could be the predicate for a Section 107(a) action, i.e., costs lying outside the scope of costs covered in the 2018 Administrative Settlement Agreement.[122] Therefore, BHMC's claim for costs *must* proceed as a Section 113(f) contribution action and *not* as a Section 107(a) action, and BHMC's Section 107(a) claim should therefore be dismissed.

**F.    The Crescent Parties Are Entitled to Summary Judgment That They Are Not Liable Under CERCLA for BHMC's or Placer's Contribution Claims.**

Both BHMC and Placer seek contribution from Crescent under CERCLA Section 113(f).[123] To prevail on their contribution claims, BHMC and Placer must show that there has been a "release" or "threatened release" of a "hazardous substance" at or from a "facility," that such release or threatened release "caused" BHMC or Placer to incur "response" costs (that are necessary and NCP-consistent), and that, with respect to the "facility" in question, Crescent is among one of the four categories of responsible persons described under CERCLA Section 107(a), including (in pertinent part): a current owner or operator of the facility, or a person who arranged

---

[120] *Id.* ¶ 52.

[121] *Id.* ¶ 56.

[122] *See* Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16; Norton Decl., Ex. R (Settlement Agreement and Order on Consent for Response Action by BHMC) at ¶¶ 27-39.

[123] *See* Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16 at ¶¶ 83-91; Placer, Second Amended Counterclaim, ECF No. 58 at ¶¶ 5-14.

for disposal or treatment, or arranged for transport for disposal or treatment, of hazardous substances at the "facility" in question. 42 U.S.C. § 9607(a).

The Crescent Parties do not dispute that the Crescent Mine (like the Bunker Hill Mine) is a CERCLA "facility," and that there are hazardous substances located within the flood water in the Lower Crescent Mine. However, for CERCLA liability purposes, the pertinent "release(s)" and "disposal(s)" that resulted in the Lower Crescent Mine being flooded with contaminated water, and which "caused" BHMC to incur response costs, all took place at and from the Bunker Hill Mine facility, not the Crescent Mine. And the Crescent Parties are not owners or operators, or arrangers, under CERCLA Section 107(a) with respect to releases and disposals at or from the Bunker Hill Mine.

### 1. BHMC's Incurrence of Costs Results from Releases at and from the Bunker Hill Mine, Not the Crescent Mine.

BHMC alleges that it has incurred response costs for treatment of "water discharged from the Crescent Mine through the Bunker Hill Mine" and treated at the CTP.[124] BHMC's claim rests on ignoring fundamental facts about how the Crescent Mine came to be flooded with contaminated water in the first place, and ignoring the facts as to what is actually causing BHMC to incur response costs.

First, since late 1994, when Placer resumed pumping, the pumps in the Bunker Hill Mine have likely only removed contaminated water from the Bunker Hill Mine pool, not the Crescent Mine. Since 1994, the pumps in the Bunker Hill Mine have primarily (if not entirely) only removed water being added to the mine pool from surface recharge, not water from the deep mine pool or the Crescent Mine.

---

[124] *See* Second Amended Complaint, *Bunker Hill Mining Corp. v. Venzee Techs. Inc.*, ECF No. 16 ¶¶ 47-48, 56.

MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 35
127066592.1 0065623-00004

Second, to the extent that hazardous substances may have moved from the Crescent Mine to the Bunker Hill Mine due to Bunker Hill pumping since late 1994, those hazardous substances originally arrived at the Crescent Mine due to 1991-1994 releases from the Bunker Hill Mine. Once flooded with Bunker Hill Mine AMD, the Lower Crescent Mine could not thereafter generate any AMD of its own due to a lack of oxygen.[125] Thus, BHMC and Placer have exclusively been pumping and paying for treatment of hazardous substances originally released from the Bunker Hill Mine.

Lastly, it is Bunker Hill Mine's own pumping that has most proximately caused them to incur any costs associated with water in, or allegedly being drawn from, the Crescent Mine. That pumping, which has mobilized already-released hazardous substances, is itself a secondary release under CERCLA, a release for which BHMC and Placer are liable. Therefore, the only releases that have caused BHMC to incur response costs are releases at and from the Bunker Hill Mine facility, releases for which the Crescent Parties are not liable.

### a. The Bunker Hill Mine predominantly pumps the water that continually replenishes its mine pool surface.

In 1994, EPA required Placer to "maintain the water level 300 vertical feet below the level of the South Fork of the Coeur d'Alene River. This elevation corresponds to 11 Level in the Bunker Hill Mine, therefore water in the mine must be maintained below level 11."[126] A significant volume of highly contaminated water enters and recharges the Bunker Hill Mine pool from the upper workings of the Bunker Hill Mine.[127] Since 1994, pumps near the 11 Level of the Bunker Hill Mine have pumped an average of between 400 to 450 gallons per minute  from the mine pool.[128]

---

[125] Norton Decl., Ex. UU (Beale August 2024 Report) at 59; *Id.*, Ex. K (Stefanoff Dep. Transcript) at 151:14-153:10; *see also id.*, Ex. SS (Beale Dep. Transcript) at 9:20-22, 10:12-15.
[126] *Id.*, Ex. I (1994 UAO) at 13.
[127] *Id.*, Ex. K (Stefanoff Dep. Transcript) at 148:25-149:10, 197:4-17.
[128] *Id.*, Ex. TT (Beale June 2024 Report) at 47–48.

Despite this pumping, the water level in the Bunker Hill Mine has remained near 11 Level.[129] Because neither Placer nor BHMC have attempted to meaningfully lower the level of the mine pool, the volume of water pumped from the mine pool represents the water that entered the mine pool from the upper workings of the Bunker Hill Mine.

As EPA's consultant James Stefanoff explained, "my opinion is, the water that gets pumped from the Bunker on a day-to-day basis is water that was infiltrated into the Bunker" from the upper workings.[130] This is because pumps on the 11 Level pull water from the path of least resistance, meaning that the pumps are only pulling the surface water off of the mine pool.[131] Accordingly, while BHMC and Placer have been pumping water out of the Bunker Hill Mine pool, the overwhelming majority (if not all) of that water comes from the Bunker Hill Mine itself and not from the Crescent Mine.[132] Therefore, BHMC has not incurred response costs for a release of hazardous substances from the Crescent Mine.

Notwithstanding the above, even if some hazardous substances have made their way from the Crescent Mine to the Bunker Hill Mine due to Bunker Hill pumping from late 1994 to the present, those hazardous substances were originally released from the Bunker Hill Mine. Specifically, the contaminated water flooded into the Lower Crescent Mine from the Bunker Hill

---

[129] *Id.*, Ex. K (Stefanoff Dep. Transcript) at 20:8-13, 159:6-9; *Id.*, Ex. VV (Morton Dep. Transcript) at 131:14-19; *Id.*, Ex. P (BH Water Level Spreadsheet) at 1-2.

[130] *Id.*, Ex. K (Stefanoff Dep. Transcript) at 169:19-170:2.

[131] *Id.* at 127:23-128:9 ("[M]y opinion would be that the water being pumped out of the 11 shaft is water that is closest to getting into the 11 level from the surface workings.").

[132] If the Lower Crescent Mine has continued to receive its own naturally-infiltrating water since late 1994, it would be at some rate less than the 10-25 gallons per minute that infiltrated in years before the 1990s flooding (Norton Decl., Ex. NN (Rosasco Dep. Transcript) at 125:5-126-13), and it would be more likely to migrate to the much closer Sunshine Mine (which is pumped down to a level about 3,000 feet lower than the Crescent Mine pool surface) than it would be to find its way to Bunker Hill pumps that are 3.7 miles to the west and atop approximately 2,400 feet of Bunker Hill Mine pool water exerting pressure against it. *Id.*, Ex. PP (Rosasco August 2024 Report) at 3-4, 35; *Id.*, Ex. TT (Beale June 2024 Report) at 66.

Mine in the 1990s, particularly from July 1991 to December 1994.[133] When water was diverted to the lower workings of the Bunker Hill Mine, and allowed to flood the Bunker Hill Mine, it flowed across the Yreka Crosscut and flooded the Crescent Mine.[134] This contaminated water has remained in the Lower Crescent Mine since the flooding occurred; it was not pumped out in intervening years, and Placer does not dispute this.[135] Thus, even if some hazardous substances flowed back to the Bunker Hill Mine from the Crescent Mine, those hazardous substances originated in, and were released from, the Bunker Hill Mine. As Crescent's expert Paul Rosasco explained,

> [Placer] and subsequently BHMC were ordered by EPA to pump water from the Bunker Hill mine pool so as to maintain the mine pool level at a level no higher than approximately the 11 level. EPA has required such pumping by PMC and BHMC in order to prevent Bunker Hill Mine AMD from migrating (via groundwater transport) into the surrounding environment, including the South Fork of the Coeur d'Alene River.
>
> If this EPA-required pumping to protect the environment against the Bunker Hill Mine's AMD problem has had the effect of drawing limited amounts of water from the flooded lower Crescent Mine, that simply represents an ancillary effect of Bunker Hill Mine owners dealing with their AMD problem, the epicenter of which has been well studied and is located in the upper workings of the Bunker Hill Mine, nowhere near any part of the Crescent Mine. . . . Furthermore, the small amount of water that Bunker Hill pumping could be drawing from the flooded lower Crescent toward or into the flooded lower Bunker Hill Mine represents Bunker Hill Mine water that flooded into the lower Crescent in the 1991-1994 period and which

---

[133] *See supra* Sections II.B-C.

[134] *See* Norton Decl., Ex. K (Stefanoff Dep. Transcript) at 168:16-22 ("[W]hen the water was getting dumped down the shaft it just didn't fill the tunnel…it would have been connected to all the other workings in the Bunker and all the other workings in the Crescent.").

[135] *See id.*, Ex. H (Placer FRCP 30(b)(6) Dep. Transcript) at 90:19-91:18; *Id.*, Ex. A (Bunker Hill Mine Water Mitigation Measures) at B-4; *see also id.*, Ex. K (Stefanoff Dep. Transcript) at 124:19-125:13, 125:18-126:6 ("Q. …has the water that accumulated in the Bunker Hill Mine pool between 1991 and 1994 when the pumps were turned off and water was intentionally diverted into the lower workings ever been fully pumped out? … THE WITNESS: No, … I'm not aware that the water level has ever been pumped appreciably below 11 level, but I don't know what the current operator is doing."), 127:18-128:9 ("[M]y opinion would be that the water being pumped out from 11 shaft is water that is closest to getting into 11 level from surface workings."); *see generally* Sections II.B-C, *supra* (describing 1990s flooding of the Crescent).

Bunker Hill pumping thereafter may be drawing back into the mine it came from.[136]

Furthermore, after the Lower Crescent Mine quickly flooded with contaminated Bunker Hill water (i.e., AMD) in the early 1990s, no additional AMD could thereafter be generated in the flooded Lower Crescent Mine due to a lack of oxygen necessary for the oxidation required to generate AMD.[137] Thus, the Lower Crescent Mine has not been generating its own AMD since the 1990s; the AMD in its flood waters today is the AMD that flooded in from the Bunker Hill Mine in the 1990s.[138] Simply put, the releases that have caused BHMC to incur response costs are releases from the Bunker Hill Mine.

BHMC's claim for contribution is similar to those of defendants in *City of Portland v. Boeing Co.*, 179 F. Supp. 2d 1190 (D. Or. 2001). There, defendants asserted that the plaintiff was liable for defendants' response costs because there were hazardous substances that had migrated to the plaintiff's groundwater from other, third-party facilities, in addition to the hazardous substances from defendants' facilities. *Id.* at 1201. The court rejected the defendants' argument, explaining that "[d]efendants have presented no evidence that it [sic] incurred response costs as a result of the migration of hazardous wastes onto Plaintiff's property *from sources other than themselves*." *Id.* (emphasis added). Here, the hazardous substances that BHMC and Placer are required to pump and treat are their own, and they cannot demonstrate that they have incurred costs to treat hazardous substances that did not originate in the Bunker Hill Mine.[139]

---

[136] *See* Norton Decl., Ex. PP (Rosasco August 2024 Report) at 17.

[137] *Id.*, Ex. UU (Beale August 2024 Report) at 59; *Id.*, Ex. K (Stefanoff Dep. Transcript) at 151:14-153:10.

[138] *See supra* Section II.C.

[139] Indeed, the *City of Portland* case would be even more like the present case if Boeing and the Cascade Corporation were drawing (due to pumping) their own contamination back from the City of Portland wells onto their own source properties and attempting to hold the City liable for those "reversing the release" costs. This underscores how Bunker Hill releases are the "cause" of BHMC's response costs, and its attempts to claim otherwise are without merit.

**b.      Bunker Hill's pumping is a secondary release and is the ongoing release that most proximately causes its incurrence of costs.**

In addition to 1990s Bunker Hill Mine releases and disposals being the cause of both mines' lower workings being flooded, it is noteworthy—with respect to what is "causing" BHMC's incurrence of response costs for CERCLA purposes—that BHMC and Placer admit that it is *Bunker Hill Mine's pumping* that allegedly draws water from the flooded Lower Crescent Mine (back) into the Bunker Hill Mine.[140] That is to say, BHMC admits and alleges that its own pumping activities (and those of Placer before it) are causing, and have caused, hazardous substances to move from the Crescent property onto the Bunker Hill Mine property. As noted above, releases and disposals under CERCLA include secondary releases and disposals, for example, where a party moves, disturbs, or otherwise alters the locations and distribution of previously-released hazardous substances.[141] Thus, insofar as pumping conducted by BHMC and Placer may have repeatedly drawn contaminated water into the flooded lower Bunker Hill Mine from the flooded Lower Crescent Mine, such remobilizations of existing contamination should be considered secondary releases and/or disposals at the Bunker Hill Mine "facility," and it is those secondary releases and/or disposals that have caused, and are causing, BHMC to incur response costs for treatment of such pumped water at the CTP. On this basis alone (without need of reaching other issues discussed above), the Court can and should grant summary judgment in favor of the Crescent Parties on BHMC's CERCLA claims.

---

[140] Norton Decl., Ex. WW (Morton Expert Report 6/7/2024) at 18 ("Once pumping started at Bunker Hill mine No. 2 shaft the water table decreased, and a gradient was established that drains the Crescent mine water towards the Bunker Hill No. 2 shaft pumps); *see also id.*, Ex. VV (Morton Dep. Transcript) at 101:17-23, 106:17-19, 107:19-108:8.

[141] *See Bob's Beverage, Inc.*, 169 F. Supp. 2d at 722; *see also PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 177-78 (4th Cir. 2013) (redistribution of existing contamination constitutes a "disposal").

**2.      The Crescent Parties Are Not Owners, Operators, or Arrangers Within the Meaning of CERCLA Section 107(a) for Releases or Disposals at or from the Bunker Hill Mine.**

None of the Crescent Parties has ever had an ownership interest in, or operational relationship with, the Bunker Hill Mine, BHMC, or Placer, and therefore no Crescent Party is (or can be) liable as an "owner or operator" of the Bunker Hill Mine "facility" under CERCLA.[142]

Here, the release in question occurred at and from the Bunker Hill Mine. Although contaminated water generated at the Bunker Hill Mine had flooded both the Bunker Hill Mine and Crescent Mine by the time Crescent took ownership of the Crescent Mine, Crescent took no intentional steps to dispose of a hazardous substance, and therefore cannot be liable as an arranger.

This Court has previously held (and the Ninth Circuit affirmed) that where the record is clear that a party did not "take[] *intentional* steps to dispose of a hazardous substance," that party is entitled to judgment as a matter of law that it is not liable as an "arranger" under CERCLA. *See United States v. Fed. Res. Corp.*, 30 F. Supp. 3d 979, 994 (D. Idaho 2014) (citation omitted), *judgment entered*, 525 B.R. 759 (D. Idaho 2015), *judgment entered*, 525 B.R. 768 (D. Idaho 2015), and *aff'd in part*, 691 F. App'x 441 (9th Cir. 2017). This is so, as a matter of law, even where the party alleged to be an "arranger" has knowledge of the disposal. *Id.*

BHMC alleges that it is the pumping of water from the Bunker Hill Mine pool (by BHMC and Placer before it) that has allegedly drawn water into the Bunker Hill Mine from the Crescent Mine. Crescent never asked for such pumping and was never asked if it would like (and pay for) such pumping. Crescent has taken no intentional steps to dispose of a hazardous substance at the Bunker Hill Mine. Instead, BHMC and Placer's pumping has drawn their own contaminated water back to the Bunker Hill Mine. Furthermore, because Crescent is not a liable party under CERCLA

---

[142] Gross Decl. ¶ 5.

Section 107(a) with respect to the releases that caused Crescent to incur response costs, Placer's counterclaim for contribution under Section 113(f) fails as a matter of law.

**G.     The Crescent Parties Are Entitled to Summary Judgment on BHMC's Claim for Indemnity, Subrogation, and Contribution.**

BHMC's claim for equitable indemnification, subrogation, or contribution is superfluous to its claim for contribution under CERCLA Section 113 and should be dismissed. As the court explained in *Regional Airport Authority of Louisville v. LFG, LLC*, 460 F.3d 697 (6th Cir. 2006), equitable remedies, such as equitable indemnification, subrogation, or contribution, are only available when there is an inadequate remedy at law. *Id.* at 711; *accord Hull v. Giesler*, 156 Idaho 765, 776, 331 P.3d 507, 518 (2014) ("Equitable remedies are not available where the aggrieved party has a plain, speedy, adequate, and complete remedy at law."). "Since CERCLA itself provides an adequate remedy for damages, the equitable indemnification claim is superfluous." *LFG, LLC*, 460 F.3d at 711. BHMC's claims for equitable indemnification, subrogation, or contribution necessarily hinge on resolution of its CERCLA claim, "because CERCLA provides the sole means of determining liability." *Id.* Accordingly, BHMC's claims for equitable relief should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Crescent is entitled to summary judgment finding that BHMC and Placer are liable for common law and statutory trespass. Crescent is also entitled to summary judgment finding that BHMC and Placer are each liable parties under CERCLA for the releases of hazardous substances from the Bunker Hill Mine. As such, both BHMC and Placer are liable to Crescent for its response costs. With respect to BHMC's claims against the Crescent Parties, the Crescent Parties are entitled to summary judgment dismissing BHMC's CERCLA claims for cost

recovery under Section 107(a) and for contribution under Section 113(f), as well as its claim for

indemnity, subrogation, and contribution.


 DATED December 2, 2024.

STOEL RIVES LLP


*/s/Maren Norton*
Wade C. Foster, ISB No. 11105
Maren R. Norton, admitted *pro hac vice*
Sean James, admitted *pro hac vice*

Attorneys for Plaintiff

**Appendix 1**

**Appendix 1**



*Figure 2: Cross section showing the Bunker Hill Mine, the Crescent Mine, the Sunshine Mine and the Y-U crosscut (modified from figure obtained by Crescent Silver LLC from United Silver Corp.).*

