Christopher R. Hogle (USB #7223)
*Admitted pro hac vice*
Sarah M. Perkins (USB #17297)
*Admitted pro hac vice*
HOLLAND & HART LLP
222 S. Main St., Ste. 2200
Salt Lake City, UT  84101
Telephone:  (801) 799-5800
CRHogle@hollandhart.com
SMPerkins@hollandhart.com

Murray D. Feldman (ISB #4097)
Christopher C. McCurdy (ISB #8552)
HOLLAND & HART LLP
800 W. Main St., Ste. 1750
Boise, ID  83701
Telephone:  (208) 342-5000
mfeldman@hollandhart.com
ccmccurdy@hollandhart.com

Preston N. Carter, ISB No. 8462
Morgan D. Goodin, ISB No. 11184
Megann E. Meier, ISB No. 11948
GIVENS PURSLEY LLP
601 West Bannock Street
Post Office Box 2720
Boise, Idaho 83701-2720
Telephone (208) 388-1200
Facsimile (208) 388-1300
prestoncarter@givenspursley.com
morgangoodin@givenspursley.com
mem@givenspursley.com

*Counsel for Bunker Hill Mining Corporation and Placer Mining Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CRESCENT MINE, LLC,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>BUNKER HILL MINING CORPORATION;<br>and PLACER MINING CORPORATION<br>(d/b/a New Bunker Hill Mining Co.),<br><br>　　　　Defendants. | Case No.  2:21-cv-00310-DCN<br><br>**BUNKER HILL MINING<br>CORPORATION AND PLACER<br>MINING CORPORATION'S JOINT<br>OPPOSITION TO CRESCENT<br>PARTIES' MOTION FOR PARTIAL<br>SUMMARY JUDGMENT (DKT. 116)** |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

SUMMARY JUDGMENT STANDARD.................................................................................3

FACTUAL BACKGROUND....................................................................................................3

       A.    Before Placer acquired the Bunker Hill Mine in April 1992, the
            Crescent Mine was already flooded............................................................4

             1.    The Crescent Mine generates mine-impacted water at a far
                   greater rate than 10 gpm. .................................................................5

             2.    When the pumps were shut off and removed, the Crescent
                   Mine likely self-flooded..................................................................11

             3.    Based on the Crescent Parties' evidence, the Crescent Mine
                   flooded in 1991, when it and the Bunker Hill Mine were
                   owned by BHM (U.S.). ...................................................................12

       B.    Placer's 1992-1994 diversions of water violated no EPA order...............14

       C.    The Bunker Hill Mine pumping that resumed in 1994 necessarily
             includes mine-impacted water that spills over from the Crescent
             Mine through the Y-U Crosscut....................................................................15

ARGUMENT ...........................................................................................................................18

    I.    CM'S TRESPASS CLAIM FAILS AS A MATTER OF LAW, BUT IF
       NOT, FACT ISSUES PRECLUDE SUMMARY JUDGMENT IN CM'S
       FAVOR...................................................................................................................18

       A.    CM sustained no damages. ........................................................................19

       B.    CM has not presented indisputable facts proving conclusively that
             Placer  caused water to enter the Crescent Mine. ......................................20

       C.    CM invokes the Restatement (Second) of Torts § 161 as support
             for its trespass claim against BHMC, but its evidence does not
             satisfy § 161's elements. ............................................................................23

    II.    CM'S CERCLA § 107(a) CLAIM FAILS AS A MATTER OF LAW,
       BUT IF NOT, FACT ISSUES PRECLUDE SUMMARY JUDGMENT IN
       CM'S FAVOR. .......................................................................................................27

       A.    CM has not incurred response costs............................................................28

B.   The flooding that caused CM to allegedly incur response costs occurred from the Crescent Mine's own natural inflow. ...........................29

C.   The costs that CM seeks to recover were not "necessary." .......................33

D.   Even if CM had incurred necessary response costs, CM's § 107 claim is premature. ....................................................................................37

E.   The alleged costs on which CM's claim is based are not consistent with the NCP. .................................................................................................40

III.   BECAUSE CM IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CERCLA § 107(a) COST RECOVERY CLAIMS, IT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CERCLA § 113(g)(2) CLAIMS FOR DECLARATORY JUDGMENT. ..................................................41

IV.   SUBSTANTIAL EVIDENCE SUPPORTS BHMC'S AND PLACER'S CERCLA § 113(f) CONTRIBUTION CLAIMS......................................................41

A.   The Crescent Mine and the Bunker Mine are both "facilities" within the meaning of CERCLA...............................................................44

B.   Releases and disposals of hazardous substances have occurred from the Crescent Mine. .......................................................................44

C.   Since 1994, there have been releases and disposals of hazardous substances from the Crescent Mine to the Bunker Hill Mine...................46

D.   The Crescent Parties are among the classes of persons subject to liability under § 107(a)...............................................................................51

   1.   CM and Crescent Silver are liable as the current owner and operator of the Crescent Mine.........................................................51

   2.   Syringa is liable for disposals of hazardous substances that occurred during the times when it was an owner and operator of the Crescent Mine.........................................................52

E.   Releases of hazardous substances from the Crescent Mine caused BHMC to incur the portion of the water treatment costs that BHMC seeks to recover from the Crescent Parties. ...............................55

V.   THE MOTION WITH RESPECT TO BHMC'S AND PLACER'S § 113(g)(2) CLAIMS FOR DECLARATORY JUDGMENT SHOULD BE DENIED.................................................................................................................60

VI.    BHMC'S INDEMNITY, SUBROGATION AND CONTRIBUTION
CLAIMS ARE ACTIONABLE IF THE COURT IS INCLINED TO
DISMISS BHMC'S CERCLA CLAIMS. ............................................................60

CONCLUSION.....................................................................................................................61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*55 Motor Avenue Company v. Liberty Industrial Finishing Corp.*,
  885 F. Supp. 410 (E.D.N.Y. 1994) ...................................................................................21

*325-343 E. 56th Ct. Corp. v. Mobil Oil Corp.*,
  906 F. Supp. 669 (D.D.C. 1995) .....................................................................................21

*A&W Smelter and Refiners, Inc. v. Clinton*,
  146 F.3d 1107 (9th Cir. 1998) ....................................................................................45, 46

*Acushnet Co. v. Coaters Inc.*,
  937 F. Supp. 988 (D. Mass. 1996) ..................................................................................32

*Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co.*,
  729 F.3d 923 (9th Cir. 2013) ......................................................................................50, 51

*Asarco LLC v. Atl. Richfield Co.*,
  975 F.3d 859 (9th Cir. 2020) ...........................................................................................56

*Ascon Properties, Inc. v. Mobil Oil Co.*,
  866 F.2d 1149 (9th Cir. 1989) .........................................................................................27

*Atl. Research Corp. v. U.S.*,
  459 F.3d 827 (8th Cir. 2006), *aff'd*, 551 U.S. 128 (2007) ...........................................42

*Basic Management, Inc. v. U.S.*,
  569 F. Supp. 2d 1106 (D. Nev. 2008) .............................................................................29

*Bob's Bev., Inc. v. Acme, Inc.*,
  264 F.3d 692 (6th Cir. 2001) .....................................................................................31, 32

*Bob's Beverage, Inc. v. Acme, Inc.*,
  169 F. Supp. 2d 695 (N.D. Ohio 1999)............................................................................51

*Boeing Co. v. Cascade Corp.*,
  207 F.3d 1177 (9th Cir. 2000) ...................................................................30, 32, 40, 57, 60

*Boeing Co. v. Cascade Corp.*,
  920 F. Supp. 1121 (D. Or. 1996), *aff'd in part*, 207 F.3d 1177 (9th Cir. 2000)....................56

*Cadillac Fairview/California, Inc. v. Dow Chemical Co.*,
    840 F.2d 691 (9th Cir. 1988) .................................................................................34

*Cal ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*,
    358 F.3d 661 (9th Cir. 2004) .................................................................................38

*Calmat Co. v. San Gabriel Valley Gun Club*,
    809 F. Supp. 2d 1218 (C.D. Cal. 2011) .................................................37, 38, 40

*Carson Harbor Vill., Ltd. v. County of Los Angeles*,
    433 F.3d 1260 (9th Cir. 2006) .......................................................................27, 37

*Carson Harbor Vill., Ltd. v. Unocal Corp*,
    270 F.3d 863 (9th Cir. 2001) ........................................................................ passim

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
    710 F.3d 946 (9th Cir. 2013) .................................................................28, 29, 34

*City of Colton v. Am. Promotional Events, Inc.-W.*,
    614 F.3d 998 (9th Cir. 2010) .......................................................................34, 41

*City of Portland v. Boeing Co.*,
    179 F. Supp. 2d 1190 (D. Or. 2001) .............................................................32, 33

*CNH America, LLC v. Champion Environmental Servs., Inc.*,
    863 F. Supp. 2d 793 (E.D.Wis. 2012).............................................................3, 39

*Coeur d'Alene Tribe v. Asarco, Inc.*,
    280 F. Supp. 2d 1094 (D. Idaho 2003) ................................................................46

*Control Data Corp. v. S.C.S.C. Corp.*,
    53 F.3d 930 (8th Cir. 1995) ..................................................................................32

*CytoSport, Inc. v. Vital Pharms., Inc.*,
    894 F. Supp. 2d 1285 (E.D. Cal. 2012)..................................................................3

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
    889 F.2d 1146 (1st Cir. 1989).............................................................................54

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
    972 F.2d 453 (1st Cir. 1992)...............................................................................30

*Gallagher & Kennedy, P.A. v. City of Phoenix*,
    No. 23-15938, 2024 U.S. App. LEXIS 22106, 2024 WL 4003040 (9th Cir. Aug. 30,
    2024) ......................................................................................................................28

*Goe Eng'g Co. v. Physicians Formula Cosmetics*,
   Case No. CV 94-3576-WCK, 1997 U.S. Dist. LEXIS 23627, 1997 WL 889278 (C.D.
   Cal. 1997) .................................................................................................................30, 54, 55

*Goldingay v. Progressive Cas. Ins. Co*.,
   306 F. Supp. 3d 1259 (D. Or. 2018) .......................................................................24

*Hanlin Group, Inc. v. International Minerals & Chemical Corporation*,
   759 F. Supp. 925 (D. Maine 1990) .........................................................................21

*Hanna v. ARE Acquisitions, LLC*,
   929 A.2d 892 (Md. 2007) ........................................................................................22

*In re Bell Petroleum Servs., Inc*.,
   3 F.3d 889 (5th Cir. 1993) ......................................................................................57

*In re General Determination of Rights to Use Surface & Ground Waters of Payette River
   Drainage Basin*,
   687 P.2d 1348 (Idaho 1984).....................................................................................25

*Kaiser Aluminum and Chem. Corp. v. Catellus Dev. Corp.*,
   976 F.2d 1338 (9th Cir. 1992) .................................................................................53

*Key-Tronic Corp. v. United States*,
   511 U.S. 809 (1994).................................................................................................27

*Kotrous v. Goss-Jewett Co. of N. Cal*.,
   523 F.3d 924 (9th Cir. 2008) ..............................................................................42, 43

*Lewert v. Boiron, Inc*.,
   212 F. Supp. 3d 917 (C.D. Cal. 2016) ......................................................................3

*Lincoln Prop., Ltd. v. Higgins*,
   823 F. Supp. 1528 (E.D. Cal. 1992).........................................................................54

*Litgo N.J., Inc. v. Comm'r N.J. Dep't of Envtl. Prot*.,
   725 F.3d 369 ............................................................................................................51

*Mock v. Potlatch Corp*.,
   786 F. Supp. 1545 (D. Idaho 1992) .........................................................................20

*Moore v. Texaco, Inc*.
   244 F.3d 1229 (10th Cir. 2001) ...............................................................................21

*Murray v. Bath Iron Works Corp*.,
   867 F. Supp. 33 (D. Me. 1994) ................................................................................34

*New Jersey Turnpike Authority v. PPG Industries*,
    197 F.3d 96 (3rd Cir. 1999) ...................................................................................32

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010)...................................................................................43

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,
    210 F.3d 1099 (9th Cir. 2000) .................................................................................3

*One Wheeler Rd. Assocs. v. Foxboro Co.*,
    843 F. Supp. 792 (D. Mass. 1994) ........................................................................21

*Otay Land Co. v. United Enterprises, Ltd.*,
    338 Fed. Appx. 689 (9th Cir. 2009).................................................................37, 40

*Pakootas v. Teck Cominco Metals, Ltd.*,
    905 F.3d 565 (9th Cir. 2018), Memo. in Supp. (Dkt. 116-1)......................42, 46, 50

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
    714 F.3d 161 (4th Cir. 2013) .........................................................42, 50, 51, 54

*Petersen v. Progressive Casualty Ins. Co.*,
    Case No. 1:23-cv-00408-DCN, 2024 U.S. Dist. LEXIS 123312, 2024 WL 3374652
    (D. Idaho July 11, 2024) .......................................................................................3

*Reichhold Chems, Inc. v. Textron, Inc.*
    888 F. Supp. 1116 (N.D. Fla. 1995).................................................................50, 53

*Rhodes v. County of Darlington*,
    833 F. Supp. 1163 (D.S.C. 1992)..........................................................................30

*Springer v. Seaman*,
    821 F.2d 871 (1st Cir. 1987).................................................................................30

*Stanton Rd. Assocs. v. Lohrey Enters.*,
    984 F.2d 1015 (9th Cir. 1993) ..............................................................................38

*Tanglewood East Homeowners v. Charles-Thomas, Inc.*,
    849 F.2d 1568 (5th Cir. 1988) ..............................................................................53

*Town of Superior, Mt. v. Asarco*,
    874 F. Supp.2d 937 (D. Mont. 2004).....................................................................19

*Trimble v. Asarco, Inc.*,
    232 F.3d 946 (8th Cir. 2000) ................................................................................56

*U.S. v. Alcan Aluminum Corp.*,
  990 F.2d 711 (2d Cir. 1993)......................................................................................45

*U.S. v. Alt. Research Corp.*,
  551 U.S. 128 (2007)...................................................................................................43

*U.S. v. Bestfoods*,
  524 U.S. 51 (1998).....................................................................................................52

*U.S. v. Burlington Northern & Santa Fe Ry.*,
  520 F.3d 918 (9th Cir. 2008) ....................................................................................50

*U.S. v. Capital Tax Corp.*,
  545 F.3d 525 (7th Cir. 2008) ....................................................................................54

*United States v. Chapman*,
  146 F.3d 1166 (9th Cir. 1998) ..................................................................................46

*U.S. v. Davis*,
  261 F.3d 1 (1st Cir. 2001)..........................................................................................57

*U.S. v. Honeywell Int'l, Inc.*,
  542 F. Supp. 2d 1188 (E.D. Cal. 2008)................................................................51, 54

*U.S. v. Placer Mining Co., Inc.*,
  No. 2:04-CV-00126-EJL, 2018 WL 7352423 (D. Idaho June 19, 2018) ..........34, 57

*U.S. v. Sterling Centrecorp, Inc.*,
  960 F. Supp. 2d 1025 (E.D. Cal. 2013).....................................................................53

*U.S. v. Sterling Centrecorp Inc.*,
  977 F.3d 750 (9th Cir. 2020) ....................................................................................54

*Village of DePue v. Viacom Int'l, Inc.*,
  632 F. Supp. 2d 854 (C.D. Ill. 2009) ........................................................................24

*Village of DePue v. Viacom Int'l, Inc.*,
  713 F. Supp. 2d 774 (C.D. Ill. 2010) ........................................................................24

*Von Duprin LLC v. Major Holdings, LLC*,
  12 F.4th 751 (7th Cir. 2021) .....................................................................................39

*Washington State Dep't of Transp. v. Washington Natural Gas Co.*,
  59 F.3d 793 (9th Cir. 1995) ......................................................................................27

*Wellesley Hills Realty Tr. v. Mobil Oil Corp.*,
  747 F. Supp. 93 (D. Mass. 1990)..............................................................................21

*Whittaker Corp. v. United States*,
  825 F.3d 1002 (9th Cir. 2016) ...........................................................................41, 42

*Wickland Oil Terminals v. Asarco, Inc.*,
  792 F.2d 887 (9th Cir. 1986), and *CNH* ..............................................................39

*Wilson Auto Enterprises v. Mobil Oil Corp.*,
  778 F. Supp. 101 (D.R.I. 1991)......................................................................19, 21

*Zetwick v. Cnty. Of Yolo*,
  850 F.3d 436 (9th Cir. 2017) ...............................................................................3

### STATUTES

42 U.S.C. § 7412(b)(1) .............................................................................................45

42 U.S.C. § 9601(9) .........................................................................27, 43, 44, 54

42 U.S.C. § 9601(22) .......................................................................46, 50, 51, 58

42 U.S.C. § 9603(3) .................................................................................................53

42 U.S.C. § 9607(a) ..........................................................................27, 43, 58

42 U.S.C. § 9607(a)(4).....................................................................................29, 30

42 U.S.C. § 9607(a)(4)(B) ...........................................................................27, 34

42 U.S.C. § 9613(f)(1) .............................................................................................42

42 U.S.C. § 9613(f)(3)(B) .......................................................................................42

42 U.S.C. § 9613(g)(2) ...................................................................................41, 60

Clean Water Act and the Clean Air Act., 42 U.S.C. § 9601(14) ..................................45

Idaho Code § 42-230(a) ............................................................................................25

### OTHER AUTHORITIES

40 C.F.R. § 300.160(a)(1) (1998) .............................................................................40

40 C.F.R. § 300.700(c)(3)(ii) ...................................................................................56

40 CFR § 302.4 .......................................................................................................45

40 CFR § 401.15 .....................................................................................................45

Fed. R. Civ. P. 56(a) .................................................................................................3

Local Civil Rule 7.1(c)(1).........................................................................................1

Local Civil Rule 7.1(c)(2).........................................................................................4

Restatement (Second) of Torts § 161...............................................................23, 24, 27

Restatement (Second) of Torts § 161(2)..................................................................23, 24

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7.1(c)(1), Bunker Hill Mining Corporation ("BHMC") and Placer Mining Corporation ("Placer") submit this Joint Memorandum in Opposition to Crescent Mine, LLC, Crescent Silver, LLC and Syringa Exploration, Inc.'s ("Crescent Parties") Motion for Partial Summary Judgment (Dkt. 116) ("Motion").

## INTRODUCTION

Since 2018, BHMC has been paying to treat mine-impacted water pumped from the Bunker Hill mine pool and conveyed for treatment to the U.S. Environmental Protection Agency's ("EPA") Central Treatment Plant ("CTP"). BHMC's payments are pursuant to a 2018 Settlement Agreement and Order on Consent for Response Action by Bunker Hill Mine Corp. ("SAOC").[1] Unquestionably, some of the water pumped from the Bunker Hill mine pool originates from the Crescent Mine and spills over to the Bunker Hill Mine through the Y-U Crosscut. The Crescent Mine owners and operators have thus far avoided contributing toward the water treatment costs, but at least since July of 2020, the prospect of having to do so has been clear to them. So clear, in fact, that it disrupted their CEO's sleep.

In a July 2020 email, the CEO, Roger Gross, told his boss, Martin Hale, that he "[doesn't] know why they [meaning BHMC] have not come after us already for our portion of the water treatment plant costs. . . . This is the one that keeps me up at night."[2] In the same email exchange, Mr. Gross also wrote that he is "just concerned that [BHMC representatives] are

---

[1] Hogle Dec. (Dkt. 112-9) Ex. 22.

[2] Ex. 1 (7/21/20 Gross email – Dep. Ex. 55). Unless stated otherwise, all exhibits referred to herein are attached to the Declaration of Christopher R. Hogle in Opposition to the Crescent Parties' Motion for Partial Summary Judgment.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 1

going to bring the historical water issue to the forefront and try and make us pay our share of the water treatment costs."[3] Mr. Gross was right to be concerned about the Crescent Parties' liability for CTP water treatment costs because it is undeniable that Crescent mine-impacted water flows through the Y-U Crosscut to the Bunker Hill Mine and is part of the water that BHMC pays the EPA to treat.

The Crescent Parties are not nearly as candid with the Court as Mr. Gross was to his boss. The Crescent Parties now move for summary judgment on BHMC's claims—the same claims that kept Mr. Gross up at night before they were even filed.  In addition, Crescent Mine, LLC ("CM") moves for summary judgment on its own claims, on which it would bear the burden of proof at trial.  The Court should deny their Motion.

CM's claims fail as a matter of law for the reasons shown in BHMC's and Placer's Motions for Summary Judgment on Crescent Mine, LLC's Claims (Dkt. 108 and 112), which are incorporated herein.

In addition, genuine issues of material fact prevent summary judgment in CM's favor on its claims.  The same is true of the Crescent Parties' Motion with respect to BHMC's and Placer's claims.  The Crescent Parties move for summary judgment on every theory they can imagine, regardless of counterevidence, and even theories that their own experts are unprepared to adopt.  Based on the counterevidence, BHMC's and Placer's experts unsurprisingly advance contrary views.  Though the weight of the evidence is on BHMC and Placer's side, the Court may not weigh evidence on summary judgment motions.  The Crescent Parties' Motion should be denied.

---

[3] *Id*.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 2

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (cleaned up). In considering a motion for summary judgment, the Court must "view[]the facts in the non-moving party's favor." *Id*. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id*. (cleaned up). On the other hand, to succeed in a motion for summary judgment, the moving party must produce either (1) " evidence negating an essential element of the nonmoving party's claim or defense," or (2) "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).[4]

Summary judgment is especially improper to decide a "battle of experts."[5]   Even the

Crescent Parties' cited-authority recognizes that.[6]

## FACTUAL BACKGROUND

The Crescent Parties' Motion is predicated on three, primary factual assertions:

- Placer placed water within the Crescent Mine zin 1993-1994 when Placer, allegedly in violation of EPA orders, diverted water from the levels above the Kellogg Tunnel into the Bunker Hill mine pool;

---

[4] *Petersen v. Progressive Casualty Ins. Co*., Case No. 1:23-cv-00408-DCN, 2024 U.S. Dist. LEXIS 123312 *3, 2024 WL 3374652 (D. Idaho July 11, 2024).

[5] *See Lewert v. Boiron, Inc*., 212 F. Supp. 3d 917, 937 (C.D. Cal. 2016) ("'[T]he two conflicting expert opinions create a material issue of fact.'" (quoting *CytoSport, Inc. v. Vital Pharms., Inc*., 894 F. Supp. 2d 1285, 1300 (E.D. Cal. 2012)).

[6] *See CNH America, LLC v. Champion Environmental Servs., Inc.*, 863 F. Supp. 2d 793 (E.D.Wis. 2012) (where fact and expert witnesses did not "unequivocally prove [where] the contaminated fill originated . . . the origination of the contaminated fill constitutes a material issue of fact, and a triable issue remains.").

- The Crescent Mine on its own generates only 10 gallons per minute ("gpm"), and all the water contained in the Crescent Mine came from the Bunker Hill Mine in the early 1990s; and

- The pumping that resumed in the Bunker Hill Mine in 1994 removes only water that enters the mine pool from above the Kellogg Tunnel, not water from the Crescent Mine.

Each of these assertions, and others on which the Motion is based, are controverted with substantial evidence. Even the Crescent Parties' experts cannot support these assertions,[7] but the Crescent Parties expect the Court to find as much as a matter of law. Pursuant to Local Civil Rule 7.1(c)(2), BHMC and Placer have filed a separate Joint Response to Crescent Parties Statement of Facts, which is incorporated herein. This section will summarize the evidence outlined in BHMC and Placer's Joint Response that debunks the three assertions central to the Motion.

### A. Before Placer acquired the Bunker Hill Mine in April 1992, the Crescent Mine was already flooded.

In January 1991, the company that owned both the Bunker Hill and the Crescent Mines—Bunker Hill Mining Company (U.S.) Inc. ("BHM (U.S.)") shut down both mines.[8] By July 25, 1991, electrical equipment and pumps had been pulled from both the Bunker Hill Mine and the Crescent Mine, and on or about August 23, 1991, an auction was held for sale of the salvaged

---

[7] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 120:15-121:17 (acknowledging that his report indicates that the Crescent Mine flooded in 1991); *id*., Ex. 4 (Rigby) at 108:14-109:7 (same); *id*. Ex. 16 (Rosasco) at 44:9-18, 63:5-12, 71:23-72:24 (testifying that he doesn't know what the water level was in the Crescent Mine in June, 1992, December, 1992, and he has no basis to contradict report that the Crescent Mine had flooded by November 1991); *id*. at 184:10-15 (testifying that the Crescent Mine would have flooded regardless of Placer's diversions).

[8] Norton Dec. (Dkt. 116) Ex. D (2001 RI/FS) at BHMC_001256; Hogle Dec. (Dkt. 112-9) Ex. 14 (Nelson Rep. – Dep. Ex. 64) at 3; *id*., Ex. 15 (Nelson) at 8:12-25, 15:3-7, 18:4-20; *id*., Ex. 16 (Rosasco) at 42:18-43:1, 55:4-12, 193:9-194:6.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 4

equipment.[9]  The instant the pumps were removed, the Bunker Hill and the Crescent Mines started to flood, and once the pumps were sold at auction, there was no way to stop the flooding.[10]

Placer did not acquire the Bunker Hill Mine until April 28, 1992.[11]  By that time, the Crescent Mine was already flooded, either by water that accumulated from within the Crescent Mine itself, or from water from both the Bunker Hill Mine and the Crescent Mine which had accumulated during BHM (U.S.)'s ownership.

      1.    <u>The Crescent Mine generates mine-impacted water at a far greater rate than 10 gpm.</u>

The Crescent and the Bunker Hill Mines are connected by a 3.7-mile, underground tunnel known as the Yreka or Y-U Crosscut constructed over 50 years ago.[12]  The tunnel connects the 3100 Level of the Crescent Mine and the 23 Level of the Bunker Hill Mine.[13]

During the years of active mining operations, the Y-U Crosscut was used to dewater the Crescent Mine, not the Bunker Hill Mine.  Before it was shut down in 1986, water that infiltrated the Crescent Mine was pumped from the lower Crescent Mine levels up to the Y-U Crosscut, where the water then flowed to the Bunker Hill Mine, because the Crescent Mine had no other way to dewater levels below the Hooper Tunnel.[14]

---

[9] *See* Stmt. of Undisp. Facts in Supp. of BHMC's MSJ (Dkt. 112-2) ("BHMC SOF") ¶ 10.

[10] *Id*. ¶ 10.

[11] Hogle Dec. (Dkt. 112-9) Ex. 14 (Nelson Rep. – Dep. Ex. 64) at 3; *id*., Ex. 15 (Nelson) at 8:12-25, 15:3-7, 18:4-20; *id*., Ex. 16 (Rosasco) at 42:18-43:1, 55:4-12, 193:9-194:6.

[12] BHMC SOF ¶ 2.

[13] *Id*.

[14] *Id*. ¶ 4.

It is well-understood by those who were involved with the mines that if the Y-U could not convey Crescent Mine water to the Bunker Hill Mine, water would eventually fill the Ellis Shaft and flow out of the Hooper Tunnel.[15]  In fact, that is precisely what happened during World War II, before the Y-U Crosscut was constructed.[16]

When conducting the 2001 Remedial Investigation/Feasibility Study, EPA's team relied on a 1985 Master's Thesis that identified a 225 gpm rate of flow from the Crescent Mine to the Bunker Hill Mine and concluded that, if the Y-U Crosscut were still a conduit, acidic water would likely flow from the Crescent Mine to the Bunker Hill Mine.[17]  There is no evidence that the integrity of the Y-U Crosscut has been compromised.[18]

Before he was retained by the Crescent Parties for this case, Geoff Beale, was engaged by the Idaho Department of Environmental Quality ("IDEQ") to advise it regarding Bunker Hill Mine water, and after investigation and literature review, he reported to his client in 2003: "Mine staff who worked underground in the 1980s indicated they thought the flow into Bunker

---

[15] Norton Dec. Ex. N (1991 Pintlar Rep.) at 26 ("If this drift were to collapse and become a natural watertight plug, water would eventually be appearing at the Hooper portal.  There would need to be water treatment provisions at the time this happened."); Hogle Dec. (Dkt. 112-9) Ex. 6 (P. Sala) at 35:3-6 ("Q. Would you agree that if the Y-U crosscut had plugged, then water would eventually come up the number 1 shaft and out the Hooper Tunnel? A. Oh, eventually, yes."); *see also id.,* Ex. 18 (Beale) at 116:2-8 ("So to answer your question, yes, the Crescent Mine would have flooded itself in time. . .it would have flooded up to the Y-U Crosscut in time. If the Y-U Crosscut wasn't there, as it wasn't in the '40s, ultimately the water would have slowly come up to the zero level, which is the Hooper Tunnel.").

[16] Declaration of Kym Morton in Support of Bunker Hill Mining Corporation's Resp. to Crescent Parties' Mot. for Part. S.J. ("Morton Dec.") ¶¶ 10, 26, 33, 58, Ex. B at 12-13.

[17] Ex. 2 (Stefanoff) at 21:22-22:6, 22:21-23:4, 42:22-43:11, 75:24-76:25, 80:1-81:9; Hogle Dec. (Dkt. 112-9) Ex. 10 (1999 CH2M Hill Study – Dep. Ex. 142) at BHMC_002091; Norton Dec. Ex. D (2001 RI/FS) at BHMC_001268.

[18] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 56:16-19, 144:10-23; *id.,* Ex. 16 (Rosasco) at 62:17-23, 65:21-25; Morton Dec. ¶¶ 10, 27.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 6

Hill workings from the Crescent mine along the Yreka crosscut on the 23-Level was about 200-250 gpm.  A similar number was indicated by Bill Hudson," who was with CH2M Hill, EPA's consultant.[19]

Contrary to the Crescent Parties' assertions, the Crescent Mine is not, and has never been, a "dry" mine.[20]  Just to the surface, Crescent Mine discharges between 175 to 320 gpm: 80-150 gpm from the Hooper Tunnel, 15-20 gpm from the Big Creek No. 4 Tunnel, and 80-150 gpm from the Countess portal.[21]  Since 2023, all of that water has been reinjected into the Crescent catchment to prevent its flow to Big Creek, a water way just east of the mine.[22]

A portion of the water that enters the Crescent Mine from the surface infiltrates the Crescent Mine's lower levels.[23]  The entire Crescent Mine is hydraulically connected by over a mile of vertical or diagonal shafts and raises, with horizontal tunnels and drifts branching therefrom.[24]  Blasting and drilling for the mine openings increased the permeability of the surrounding rock, creating more cracks and fissures for water to flow through.[25]  In addition, the

---

[19] Ex. 3 (2003 Beale Rep. to IDEQ – Dep. Ex. 54) at § 4.7; Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 16:14-19:1, 19:13-16, 19:21-20:16.

[20] Morton Dec. ¶¶ 36, 41, 58, Ex. B at 3-22, 27-29, 41-57.

[21] *Id*. ¶ 36, Ex. A at iii, 11, 20-24, Ex. B at 10, 38-39, 50-51, 62.

[22] *Id*. ¶ 36; Hogle Dec. (Dkt. 112-9) Ex. 2 (2/21/24 Crescent 30(b)(6)) at 56:4-9, 57:11-16, 60:5-12.

[23] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 149:7-14; *id.* Ex. 16 (Rosasco) at 128:15-129:1; Norton Dec., Ex. UU (Beale 8/24 Rep.) at 15-16.

[24] Morton Dec. ¶ 38, Ex. B at 14, 21.

[25] *Id*. ¶ 38, Ex. A. at 13, Ex. B at 21.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 7

Crescent has scores of unplugged exploration drill holes that allow water to infiltrate its lower levels.[26] Below is photo of one of them:[27]



The notion that the Crescent Mine is "dry" is belied by the system of pumps installed and maintained in the lower levels of the Crescent Mine when it was in operation.[28] Crescent

---

[26] *Id.* ¶¶ 37-40, Ex. B at 10-12, 58; Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 159:17-160:9.

[27] Morton Dec. ¶ 40, Ex. B at 12.

[28] *Id.* ¶ 41, Ex. B at 13-14, 21, 48-49.

operated a "[p]retty extensive pumping system" with at least 14 pumps in the Crescent Mine to pump water to the Y-U Crosscut, which it maintained with five, full-time employees.[29]  A "dry" mine is not equipped with 14 pumps maintained by 5 employees.[30]

The Crescent Parties rely on various infiltration rates recalled by individuals involved in operations at the mines in the 1970s and 1980s.  None of these alleged infiltration rates are based on actual measurements, but rather what the individuals allegedly reported to one of the Crescent Parties' expert, Paul Rosasco, back in 2007.[31]  Mr. Rosasco took notes of his interviews, but he no longer has them.[32]  Their estimates could have been second-hand.[33]  But Mr. Rosasco never independently verified them.[34]  Mr. Rosasco apparently never asked how they came by their information.[35]  In addition, the  individuals still alive and available recalled different flow rates and, in any event, did not take any flow meter readings and were not around when any were being taken.[36]  The flow rates attributed to these individuals are either speculation, hearsay, or both.

---

[29] Hogle Dec. (Dkt. 112-9) Ex. 6 (P. Sala) at 9:16-10:14, 21:2-7, 22:8-14; Ex. 4 (Pump Schematic – Dep. Ex. 150).

[30] Morton Dec. ¶ 41.

[31] Hogle Dec. (Dkt. 112-9) Ex. 16 (Rosasco) at 93:22-25, 100:18-21, 115:9-16, 116:6-12, 116:22-117:3, 119:1-8.

[32] Id. at 96:25-19.

[33] Id. at 123:7-11.

[34] Id. at 125:1-4.

[35] See id. at 98:3-11, 117:20-118:4; Ex. 5 (2007 Draft Rosasco Rep. – Dep. Ex. 45) at 6-13.

[36] Hogle Dec. (Dkt. 112-9), Ex. 8 (Fischer) at 28:1-22; id. Ex. 6 (P. Sala) at 82:23-83:1, 88:23-89:1; id. Ex. 7 (L. Sala) at 15:20-23.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 9

The recollections on which the Crescent Parties rely were based on the individuals' involvement with the mine in the 1970s and 1980s, when it was being dewatered by Bunker Hill pumping.[37] At that time, the Bunker Hill Mine was aggressively pumping to dewater both the Crescent Mine and the Bunker Hill Mine.[38] This created an area of drawdown, sometimes referred to as a cone of depression, such that water that otherwise would have infiltrated the Crescent Mine instead flowed toward the pumps at the Bunker Hill Mine.[39]

In other words, the Bunker Hill pumping process drew water from the area surrounding the Crescent Mine, leading observers to state that the Crescent Mine was a "dry mine" when, in fact, the Crescent Mine was maintained in a dewatered state by pumping at the Bunker Hill Mine.[40] The geology and regional setting of the Crescent Mine and Bunker Hill Mine are very similar, further supporting the conclusion that pumping at the Bunker Hill Mine, rather than some idiosyncratic feature of the Crescent Mine, explains descriptions of the Crescent Mine as "dry."[41]

Water generated at the Crescent Mine is contaminated with heavy metals, and is acidic in places. Due to its contaminated nature, Crescent Mine must treat its water prior to discharge.[42] Historically, it sent its water to the Sunshine Mine, which treated the water. After the agreement

---

[37] *Id*. Ex. 16 (Rosasco) at 98:1-16, 99:9-100:3, 107:1-12, 125:14-17; Ex. 5 (2007 Draft Rosasco Rep. – Dep. Ex. 45) at 6-13.

[38] Morton Dec. ¶ 43, Ex. B at 21–22.

[39] *Id*.; Ex. 3 (2003 Beale Rep. to IDEQ –Dep. Ex. 54) at BHMC_0052546, 52549; Norton Dec., Ex. A at BHMC_012117-19.

[40] Morton Dec. ¶ 44, Ex. B at 21-22.

[41] *Id*. ¶ 45, Ex. B at 28, 31.

[42] Hogle Dec. (Dkt. 112-9) Ex. 2 (2/21/24 Crescent 30(b)(6)) at 56:4-9, 57:11-16, 104:15-101:4, 106:19-107:18; *id.* Ex. 24 (2/22/24 Crescent 30(b)(6)) at 45:15-46:16.

with Sunshine expired, the Crescent Parties considered various treatment methods.[43] These were too expensive, so the Crescent Parties decided to land-apply the mine-impacted water instead.[44] Historical reports indicate that water in the Crescent Mine was the most acidic near the Y-U Crosscut, and a site inspection confirmed the presence of sulfides in the mine, which generate metal-contaminated and acidic water.[45] Recent samples confirm the presence of hazardous materials, mostly metals, such as copper, iron, manganese, nickel, cadmium, and arsenic.[46]  The Crescent Parties' expert, Paul Rosasco expects that sampling of water in the lower levels of the Crescent Mine will confirm the presence of contaminated water.[47]

2.    When the pumps were shut off and removed, the Crescent Mine likely self-flooded.

Based on eye-witness testimony that the water level in the Bunker Hill Mine was below the 25 Level when the pumps were shut off, Bunker Hill and Crescent Mine void calculations, and inflow rates more realistic than the ones the Crescent Parties' espouse, Dr. Kym Morton has opined that the Crescent Mine self-flooded.[48]  Jon Groth was involved in the 1991 equipment salvage operation, and he testified that when all the pumps were turned off, the water level in the Bunker Hill Mine was below the 25 or the 25 and a half Level.[49]  He also testified that when he

---

[43] *Id*. at 104:15-105:12.

[44] *Id*. at 109:18-111:2

[45] Ex. 6 (6/24 Donahue Rep – Expert Dep. Ex. 20) at 5–8.

[46] *Id*.; Ex. 7 (7/24 Donahue Rep. – Expert Dep. Ex. 21) at 1-3; Ex. 8 (Donahue) at 8:3-15, 31:15-23; Ex. 9 (2018 Gross email – Dep. Ex. 115); Ex. 10 (2021 Gross email – Dep. Ex. 117); Ex. 11 (Klepfer) at 23:8-9, 27:7-24, 31:22-33:1.

[47] Hogle Dec. (Dkt. 112-9) Ex. 16 (Rosasco) at 148:25-149:11.

[48] Morton Dec. ¶ 55, Ex. B at 22-28, Appx. B and F.

[49] Hogle Dec. (Dkt. 112-9) Ex. 9 (Groth) at 18:22-19:4, 24:17-22, 72:12-21.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 11

was situated at the Y-U Crosscut Level in the Crescent Mine during the equipment salvage operation, he observed the Crescent Mine filling with water falling from the main shaft (the Ellis Shaft) on the opposite end of the mine from its connection to the Bunker Hill.[50]

Pumps within the Crescent Mine were removed first, and the Crescent Mine would have begun flooding from its own infiltration as soon as the Crescent pumps were removed.[51]  At a rate of 225 gpm—midpoint in the range identified by Mr. Beale in his 2003 report—the Crescent Mine would have flooded itself within about three-and-a-half months.[52]  While the Crescent Mine generates less water than the Bunker Hill, it also has less void space to fill, so it would have flooded faster than the Bunker Hill.[53]  BHMC's and Placer's experts opine that it is more likely that in 1991, the Crescent Mine self-flooded, and water moved through the Y-U Crosscut from the Crescent Mine to the Bunker Hill Mine.[54]

> 3.   Based on the Crescent Parties' evidence, the Crescent Mine flooded in 1991, when it and the Bunker Hill Mine were owned by BHM (U.S.).

The Crescent Parties argue that the Crescent Mine did not self-flood; it flooded with water that spilled over the Y-U Crosscut from the Bunker Hill Mine.  But according to their evidence, if that occurred, the Crescent Mine would have flooded in 1991.

The Crescent Parties insist that when the pumps were shut off and removed by July 25, 1991, the water level in the Bunker Hill Mine was already at the 23 Level—the same level as the

---

[50] *Id*. at 28:8-29:4, 32:5-33:6.

[51] *Id*. Ex. 5 (Durick) at 47:17-48:9, 134:4-23.

[52] Morton Dec., Ex. B at 41.

[53] *Id*. ¶ 52, Ex. B at 22-28, Appx. B and F.

[54] *Id*. ¶ 55, Ex. B at 27.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116) - 12**

Y-U Crosscut.[55]  If so, and assuming the rate of infiltration arrived at by Crescent Parties' expert

Geoff Beale and void space computations presented by another Crescent expert, Neal Rigby, the

Crescent Mine would have flooded in a couple of weeks.  Mr. Beal asserts that the Bunker Hill

Mine flooded at a rate of at least 1,500 gpm.[56]  At that rate, the Y-U Crosscut and the levels in

the Crescent Mine below the Y-U would have flooded in 15 days, according to void calculations

provided by and relied upon by Dr. Rigby.[57]  The rest of the Crescent Mine below the Hooper

Tunnel would have filled within two months thereafter.[58]  Consistently, Mr. Beale and Dr. Rigby

have stated that the flooding of the two mines occurred in 1991, when both the Crescent Mine

and the Bunker Hill Mine were owned by BHM (U.S.).[59]  The Crescent Parties' other expert,

Paul Rosasco, has no basis to contradict reports that the Crescent Mine flooded in 1991.[60]

---

[55] Memo. in Supp. (Dkt. 116-1) at 7.

[56] Norton Dec. Ex. UU (Beale 8/24 Rep.) at 41-42, 47; Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 122:5-17.

[57] Hogle Dec. (Dkt. 112-9) Ex. 3 (Rigby 6/24 Rep. – Dep. Ex. 28) at 16-17.  According to Dr. Rigby, the void space in the Y-U Crosscut and the sub-Y-U levels in the Crescent Mine could hold 10,905,840 gallons and 20,890,742 gallons, respectively, for a total of 31,796,582 gallons of water.  At Mr. Beale's estimated flow rate of 1,500 gpm, that void space would fill in under 15 days (31,796,582 gallons ÷ 1,500 gpm = 21,198 minutes ÷ 60 minutes = 353.3 hours ÷ 24 hours = 14.7 days).

[58] According to Dr. Rigby, the void space in the Crescent Mine between the Y-U Crosscut and the Hooper Tunnel could hold 13,904,497 gallons.  Hogle Dec. (Dkt. 112-9) Ex. 3 (Rigby 6/24 Rep. – Dep. Ex. 28) at 16.  An infiltration rate of 200 gpm is sufficient to fill the void space in the Crescent Mine between the Hooper Tunnel and the Y-U Crosscut in less than two months (13,904,497 gallons ÷ 200 gpm = 69,522.5 minutes ÷ 60 minutes = 1,158.7 hours ÷ 24 hours = 48.3 days).

[59] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 120:15-121:17; *id*., Ex. 4 (Rigby) at 108:14-109:7.

[60] *Id*., Ex. 16 (Rosasco) at 44:9-18, 63:5-12, 71:23-72:24

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 13

**B.    Placer's 1992-1994 diversions of water violated no EPA order.**

The EPA was content with Placer's diversion of mine water into the Bunker Hill Mine

pool. The 1992 ROD adopted a remedial action that required treatment of mine-impacted water

at the CTP "*if discharging*."[61]  Per the 1992 ROD, at the time, only "*a portion of* the acid mine

drainage from the Bunker Hill Mine" was routed to the CTP.[62]  Under the chosen remedial

action, all *discharged* AMD must be conveyed to the CTP for treatment, not *all* AMD.[63]

In March 1993, EPA and Placer representatives met, and the EPA sent a follow-up letter

indicating that Placer could "[d]ivert all of the mine drainage from the Reed Tunnel and the

Kellogg Tunnel back into the mine so there is no discharge at all."[64]  EPA recognized that this

"will speed up the rate of flooding of the Bunker Hill mine," but was acceptable so long as

Placer recognized that it "will still need to treat the mine drainage once the mine is flooded to a

level that again results in discharge from the Kellogg Tunnel."[65]  EPA's direction to Placer is

consistent with the remedial action chosen in the ROD: all AMD discharged from the mine must

be treated before discharging to surface waters.[66]

EPA itself asked Placer to divert water down the No. 2 Raise into the Bunker Hill Mine

pool 2-4 times each year.[67]  The EPA realized that if the Y-U Crosscut remains a conduit,

---

[61] *Id*., Ex. 17 (1992 ROD) at CRES_00021189, 21200 (emphasis added).

[62] *Id*. at CRES_00021208 (emphasis added).

[63] *Id.* at CRES_00021208–09; CRES_0021189.

[64] Ex. 1 to Ash Dec. (Dkt. 112-4) (3/4/93 EPA letter to R. Hopper – BHMC_051616-18) at 51616-17.

[65] *Id*.

[66] *Id.* Ex. 17 (1992 ROD) at CRES_00021189, 21209–09.

[67] Hogle Dec. (Dkt. 112-9) Ex. 9 (Groth) at 53:15-54:8.

Crescent Mine water will flow out of the Kellogg Tunnel at the Bunker Hill Mine rather than out of a Crescent Mine portal, because the Kellogg Tunnel is about 300 feet below the elevation of the lowest Crescent Mine portal.[68]

Crescent Parties' experts agree it was common in the mining industry to divert water from one part of a mine to another part of a mine, and Placer's diversions violated no EPA order.[69]

Moreover, the Crescent Mine flooded regardless of such diversions.[70]

**C.    The Bunker Hill Mine pumping that resumed in 1994 necessarily includes mine-impacted water that spills over from the Crescent Mine through the Y-U Crosscut.**

The Crescent Parties' assertion that Bunker Hill Mine pumping only removes water that enters the mine pool from above the Kellogg Tunnel, not water from the Crescent Mine, is unrealistic.  The water that naturally flows into the Crescent Mine has to go somewhere.  If it could not flow to the Bunker Hill Mine, Crescent Mine would eventually overtop the Ellis Shaft and flow out of the Hooper Tunnel.[71]  Studies commissioned by EPA and IDEQ, including one authored by Crescent Parties' retained expert, Mr. Beale, recognize "[f]low from the area of the flooded Crescent Mine along the cross cut at the 23-level" as a source of water within the Bunker

---

[68] Norton Dec. Ex. D (2001 RI/FS) at BHMC_001268; Ex. 2 (Stefanoff) at 21:22-22:6, 22:21-23:4, 42:22-43:11, 75:24-76:25, 80:1-81:9; Hogle Dec. (Dkt. 112-9) Ex. 10 (1999 CH2M Hill Study – Dep. Ex. 142) at BHMC_002091.

[69] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 46:18-22; *id.* Ex. 16 (Rosasco) at 66:1-10.

[70] *Id.* Ex. 16 (Rosasco) at 184:10-15.

[71] Norton Dec. Ex. N (1991 Pintlar Rep.) at 26; Hogle Dec. (Dkt. 112-9) Ex. 6 (P. Sala) at 35:3-6 *id.,* Ex. 18 (Beale) at 116:2-8.

Hill Mine.[72]  Even Crescent Parties' experts agree that there is a natural inflow of water to the Crescent Mine and a net contribution of water from the Crescent Mine to the Bunker Hill Mine through the Y-U Crosscut.[73]

All witnesses with knowledge of the matter testify, and Crescent Silver has insisted to potential investors, that the water level in both mines is controlled by pumping in the Bunker Hill Mine.[74]  That would be impossible if water from the Crescent Mine did not flow to the Bunker Hill Mine.[75]

Crescent Silver started recording water levels in the Crescent Mine in September 2023, and each reading indicates that the water level of the Crescent Mine is at an elevation higher than the water level in the Bunker Hill Mine, and pumping from the Bunker Hill Mine affects the water levels of both mines.[76]

---

[72] Ex. 3 (2003 Beale Rep. to IDEQ –Dep. Ex. 54) at BHMC_052543; Hogle Dec. (Dkt. 112-9) Ex. 10 (1999 CH2M Hill Study – Dep. Ex. 142) at BHMC_002091 ("[I]t is likely that some of the water being pumped by the No. 2 raise pumps [in the Bunker Hill Mine] is from the Crescent Mine.").

[73] Norton Dec. Ex. OO (Rosasco 6/24 Rep.) at 30; *id.* Ex. TT (Beale 6/24 Rep.) at 5 ("Considering all the available evidence, I estimate that a net contribution of 15-20 gpm of water may have flowed from the Crescent Mine to the Bunker Hill Mine since 1995.").

[74] Hogle Dec. (Dkt. 112-9) Ex. 1 (2015 Tetra Tech NI 43-101 Tech. Rep. – Dep. Ex. 51 at 24-1; *id.* Ex. 5 (Durick) at 55:1-8, 68:25-69:3, 85:17-23, 90:2-25; *id.* Ex. 6 (P. Sala) at 31:3-32:3; *id.* Ex. 7 (L. Sala) at 59:20-60:7; *id.* Ex. 8 (Fischer) at 21:4-22:4, 24:1-8; *id.* Ex. 9 (Groth) at 55:2-21; *id.* Ex. 2 (2/21/24 Crescent 30(b)(6)) at 54:19-55:5; *id.* Ex. 4 (Rigby) at 118:9-119:19.

[75] Morton Dec. ¶ 31.

[76] *Id.* ¶ 29, Ex. B at 16-17.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 16

Water follows Darcy's law and flows from high pressure (elevation) to low pressure (elevation), taking the easiest route.[77]  In this case, the lowest pressure is at the Bunker Hill Mine, and the easiest route is via the Y-U Crosscut.[78]

The Crescent Parties rely on certain portions of the Stefanoff deposition but ignore others.  They disregard Mr. Stefanoff's testimony that EPA concluded that, if the Y-U is still open, Crescent Mine water "would likely be pumped up and brought out the Bunker."[79]  He also testified that if there is no water pumping on the Crescent side, "then the only place for the water to go, assuming that [Y-U] crosscut is still open, is out the other bucket," meaning the Bunker Hill Mine, and that "would be true  if [the Crescent Mine] were producing 0.01 gallons per minute."[80]  He explained that "theoretically, if there's any water getting into the Crescent and if it doesn't evaporate and it doesn't get lost into the regional rock mass and . . . you're pumping the Bunker Hill, it's coming out of the Bunker Hill.  . . .  It's water level driven.  You could have one gpm going into the Crescent, and if that doesn't evaporate and if that doesn't enter the rock mass, the only place for that water to come out is the Bunker."[81]

---

[77] *Id*. ¶ 30.

[78] *Id*. ¶ 30.

[79] Ex. 2 (Stefanoff) at 21:22-22:6.

[80] *Id*. at 159:14-160:4.

[81] *Id*. at 163:23-164:20.

Even at inflow rates as low as the 15-20 gpm that Crescent Parties' experts now estimate,[82] the Crescent Mine would have flooded on its own no later than February 29th, 2000.[83] In addition, even assuming such low flow rates, the Crescent Mine water has been repeatedly flushed out through Bunker Hill Mine pumping since 1994.[84]  Even assuming the lowest conceivable inflow to the Crescent Mine, the water in the Crescent Mine when CM acquired it on or about June 26, 2012, would have flushed out any mine-impacted water from the Bunker Hill Mine.[85]

## ARGUMENT

**I.    CM'S TRESPASS CLAIM FAILS AS A MATTER OF LAW, BUT IF NOT, FACT ISSUES PRECLUDE SUMMARY JUDGMENT IN CM'S FAVOR.**

BHMC and Placer have moved for summary judgment on CM's trespass claims, which the Court should grant.  CM's trespass claims fail as a matter of law under the applicable statute of limitations and CERCLA §§ 113(h) and 122(e)(6), 42 U.S.C §§ 9613(h) and 9622(e)(6). Rather than repeat those points, set forth in BHMC's and Placer's Motions for Summary Judgment on Crescent Mine, LLC's Claims (Dkt. 108 and 112), they are incorporated herein.

CM's Motion stands on a different footing than BHMC's and Placer's.  Rather than invoke controlling statutes, like the statute of limitations and CERCLA, CM argues that there is no way to view the facts other than to conclude that both BHMC and Placer are liable for

---

[82] Norton Dec. Ex. OO (Rosasco 6/24 Rep.) at 30; *id.* Ex. TT (Beale 6/24 Rep.) at 5 ("Considering all the available evidence, I estimate that a net contribution of 15-20 gpm of water may have flowed from the Crescent Mine to the Bunker Hill Mine since 1995.").

[83] Morton Dec. ¶ 50, Ex. B at 22-26, 63, Appx. F.

[84] *Id*. ¶ 51.

[85] *Id*. ¶ 51, Ex. B at 22-26, Appx. F.

trespass.  If CM's trespass claims do not fail as a matter of law, fact questions preclude summary judgment in CM's favor on CM's trespass claims.

### A.    CM sustained no damages.

CM was well-aware of the flooding in the Crescent Mine before it acquired it.[86]  CM acquired the Crescent Mine in 2012.[87]  An affiliate of the Crescent Parties acquired 20% ownership in CM with a $2,462,704 contribution.[88]  In 2014, Crescent Silver acquired CM and the Crescent Mine for $7.5 million in debt forgiveness.[89]  "Absent misrepresentation or contractual privity, the purchaser of property bears the risk of defects existing in the land at the time of transfer, and he is expected to make his own inspections."[90]  CM assumed the risk of the flooding; it was priced-in.[91]  And CM is unable to identify a single instance in which water flowed from the Bunker Hill Mine to the Crescent Mine when CM owned it.[92]  CM's trespass claims for damages fail for that reason alone.

---

[86] Hogle Dec. (Dkt. 112-9) Ex. 4 (Rigby) at 111:12-112:11; *id*. Ex. 23 (Stiles Due Diligence Eval.) at CRES_00008704, 8707; Bugbee Dec. (Dkt. No. 79-2) ¶¶ 2, 6-7, 11.

[87] Ex. 12 (United Silver Corp. Rep. for 2012 – CRES_00064183-208) at 64184.

[88] *Id*.

[89] *Id*.; Hogle Dec. (Dkt. 112-9) Ex. 24 (2/22/24 Crescent 30(b)(6)) at 40:1-18; Ex. 25 (2014 Foreclosure Agr. – Dep. Ex. 77) at § 4.8; Ex. 26 (9/30/01 Val. Review) at 56562-63.

[90] *Wilson Auto Enterprises v. Mobil Oil Corp.*, 778 F. Supp. 101, 104 (D.R.I. 1991).

[91] *See Town of Superior, Mt. v. Asarco*, 874 F. Supp.2d 937, 943 (D. Mont. 2004) (holding that plaintiff failed to prove ascertainable damages when "the purchase price" of property included a source of water "in its current condition, *i.e.*, useable only as emergency backup" due to contamination).

[92] Ex. 13 (CM's response to Placer Interrogatory No. 24).

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 19

B.    **CM has not presented indisputable facts proving conclusively that Placer caused water to enter the Crescent Mine.**

CM acknowledges that Idaho trespass law requires an "entry" upon its land, and the alleged "entry" that forms the basis for CM's claim against Placer is that it "'caus[ed] some tangible thing to intrude upon the land.'"[93]  A factfinder could find that Placer did not cause water to intrude upon CM's land.  There is sufficient evidence for the factfinder to conclude that by the time Placer acquired the Bunker Hill Mine, the Crescent Mine was already flooded, either by water that the Crescent Mine itself generates or by the removal of pumps and the diversions caused by the owner of both mines, BHM (U.S.) Inc., prior to April 1992, when Placer acquired the Bunker Hill Mine.

As demonstrated above, there is plenty of evidence that shows the Crescent Mine flooded with its own water.  The pumps in the Crescent Mine were removed before the ones in the Bunker Hill Mine were shut off.[94]  Mr. Groth testified that when he was situated at the Y-U Crosscut Level in the Crescent Mine during the equipment salvage operation, he observed the Crescent Mine filling with water falling from the main shaft (the Ellis Shaft) on the opposite end of the mine from its connection to the Bunker Hill.[95]  He also observed that when the Bunker Hill Mine pumps were shut off, the water level in the Bunker Hill Mine was at the 25 or 25 and a half Level.[96]  A 1985 master's thesis, treated by EPA as the most reliable source on the Crescent Mine, reported a 0.5 cubic feet/second (or 225 gpm) rate by which the Crescent Mine contributed

---

[93] Memo. in Supp. (Dkt. 116-1) at 19 (quoting *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992)).

[94] Hogle Dec. (Dkt. 112-9) Ex. 5 (Durick) at 47:17-48:9, 134:4-23.

[95] *Id*. at 28:8-29:4, 32:5-33:6.

[96] *Id*. Ex. 9 (Groth) at 18:22-19:4, 24:17-22, 72:12-21.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 20

water to the Bunker Hill Mine through the Y-U Crosscut, which means that the Crescent Mine

generated at least that much water through its own infiltration.[97]  That reporting is consistent

with what "[m]ine staff who worked underground in the 1980s" indicated to Mr. Beale.[98]  At a

rate of 225 gpm, the Crescent Mine would have self-flooded in three-and-a-half months.[99]  If so,

CM's trespass claims fail because no Bunker Hill Mine water entered the Crescent Mine.

Assuming that the Bunker Hill Mine pool was at the 23 Level, as CM insists, and

according to the Crescent Parties' experts Bunker Hill Mine infiltration rate and void space

computations, the Crescent Mine would have filled while it and the Bunker Hill Mine were

owned by the same company, BHM (U.S.) Inc.   If so, CM's trespass claims fail because nothing

prevented a company from transferring water from one part of its property to another.

"Contaminating one's own property . . . is not, and cannot be, continuing trespass."[100]  It was

---

[97] Ex. 2 (Stefanoff) at 22:21-23:4, 42:22-43:11.

[98] Ex. 3 (2003 Beale Rep. to IDEQ – Dep. Ex. 54) at § 4.7.

[99] Morton Dec., Ex. B at 41.

[100] *One Wheeler Rd. Assocs. v. Foxboro Co*., 843 F. Supp. 792, 798 (D. Mass. 1994); *Moore v. Texaco, Inc*. 244 F.3d 1229 (10th Cir. 2001); *Wellesley Hills Realty Tr. v. Mobil Oil Corp*., 747 F. Supp. 93, 99 (D. Mass. 1990) ("Mobil owned and was in possession of the property when it allegedly released the oil causing the contamination. Thus, Mobil's releases of oil were not unprivileged, and Mobil clearly was not intruding on land in the possession of another."); *325-343 E. 56th Ct. Corp. v. Mobil Oil Corp*., 906 F. Supp. 669, 681 (D.D.C. 1995) ("In the present case, the affected property is not that of another but property that was either leased or owned by the defendants when the alleged trespass occurred. Accordingly, Count two [for trespass] must be dismissed."); *55 Motor Avenue Company v. Liberty Industrial Finishing Corp.*, 885 F. Supp. 410, 423-424 (E.D.N.Y. 1994)  (holding that there was no trespass committed by defendant that left contamination on its own property); *Wilson Auto Enterprises*, 778 F. Supp. at 104 ("[T]he common law does not . . . support the imposition of a duty on an owner of land to maintain his or her property in a certain condition or to refrain from any activity affecting the property which would extend to future owners of the land. . . .  Absent misrepresentation or contractual privity, the purchaser of property bears the risk of defects existing in the land at the time of transfer, and he is expected to make his own inspections." (internal quotations, citations, and footnote omitted)); *Hanlin Group, Inc. v. International Minerals & Chemical Corporation*, 759 F. Supp.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 21

common in the mining industry to divert water from one part of a mine to another part of a mine.[101]  CM's experts are aware of nothing that disallowed it.[102]

Even if the Crescent Mine had somehow not completely flooded by the time BHM (U.S.) transferred it in June 1992, its flooding was unstoppable until pumping could resume.  The only way to stop the Crescent Mine from flooding from Bunker Hill water was to restart pumping, which Placer was in no position to do until it replaced the salvaged pumping and electrical equipment.[103]  CM's experts agree that prior to November 1994, there was no requirement that pumping resume at the Bunker Hill Mine.[104]  They have no basis to opine that Placer was even able to resume pumping until then.  CM's own expert concludes that the Crescent Mine would have flooded regardless of any water diversions by Placer.[105]

Based on the foregoing, a reasonable factfinder could conclude that nothing Placer did caused water to intrude upon the Crescent Mine.  Accordingly, the Court should deny the Motion as to CM's trespass claim against Placer.

---

925, 937 (D. Maine 1990) (rejecting trespass action by the subsequent owner against the prior owner of the property, who caused the intruding chemicals to be placed on the property during its lawful occupation); *Hanna v. ARE Acquisitions, LLC*, 929 A.2d 892, (Md. 2007) (holding that no trespass occurs where the thing which intrudes actually entered the land during the "trespasser's" possession and the plaintiff took possession of the land subsequent to the "intrusion").

[101] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 46:18-22.

[102] *Id*. Ex. 16 (Rosasco) at 56:13-19.

[103] *Id*. at 67:20-69:4; *id*. Ex. 18 (Beale) at 91:2-4, 125:12-19.

[104] *Id*. Ex. 18 (Beale) at 143:6-24; *id*. Ex. 16 (Rosasco) at 66:18-67:7.

[105] *Id*. Ex. 16 (Rosasco) at 184:10-15.

**C.     CM invokes the Restatement (Second) of Torts § 161 as support for its trespass claim against BHMC, but its evidence does not satisfy § 161's elements.**

CM's trespass claim against BHMC is predicated on BHMC owing a duty to remove water that allegedly trespassed into the Crescent Mine 30 years before BHMC acquired the Bunker Hill Mine.  CM asserts that after BHMC acquired the Bunker Hill Mine in 2022, BHMC should have pumped dry the Bunker Hill Mine down to its 23 Level, the 3.7-mile connection to the Crescent Mine, and all the lower levels of the Crescent Mine.  No such duty exists under Idaho law (and as demonstrated in support of BHMC's summary judgment motion, CERCLA § 122(e)(6), 42 U.S.C. § 9622(e)(6), negated such a duty).

CM cites no Idaho law on point.  Instead, it points to Restatement (Second) Torts § 161 which provides:

> (1)  A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it.

> (2)  A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor's predecessor in legal interest therein has tortiously placed there, if the actor, having acquired his legal interest in the thing with knowledge of such tortious conduct or having thereafter learned of it, fails to remove the thing.

Subsection (1) does not apply because BHMC did not place anything on CM's property. The Crescent Mine flooded 30 years before BHMC acquired the Bunker Hill Mine.

Subsection (2) is also inapplicable.  Restatement § 161(2) applies only if, inter alia, the defendant "acquired [a] legal interest in [a] thing" that was "tortiously placed" on the plaintiff's property, and the defendant had "knowledge of such tortious conduct."  CM has not shown (a) that BHMC acquired a legal interest in the water in the Crescent Mine; (b) the water was

"tortiously" placed on CM's land; and (c) BHMC acquired a legal interest in the water "with knowledge of such tortious conduct."

First, BHMC acquired no ownership interest in the water that allegedly flowed into the Crescent Mine. For that reason alone, § 161(2) is inapplicable.

CM relies on *Goldingay v. Progressive Cas. Ins. Co.*, 306 F. Supp. 3d 1259 (D. Or. 2018), in which the Court held that an actionable trespass claim was properly pled against the current owner of property from which contamination left by the owner's predecessor continued to migrate to the plaintiff's property. The Court looked to § 161 of the Restatement (Second) of Torts, which, according to the Court, provides that "a trespass may be committed by the continued presence on the land of a 'thing' that a landowner's predecessor in interest tortiously placed there, if the landowner fails to remove the thing after having learned of it."[106]

The *Goldingay* Court, however, left out an element of § 161: "(2) A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor's predecessor in legal interest therein has tortiously placed there, if the actor, *having acquired his legal interest in the thing with knowledge of such tortious conduct or having thereafter learned of it*, fails to remove the thing."[107] Ownership of property from which contamination has migrated is not enough.[108]

---

[106] 306 F. Supp. 3d at 1266.

[107] Restatement (Second) of Torts § 161(2) (emphasis added).

[108] *Village of DePue v. Viacom Int'l, Inc.*, 713 F. Supp. 2d 774, 778 (C.D. Ill. 2010); *Village of DePue v. Viacom Int'l, Inc.*, 632 F. Supp. 2d 854, 865 (C.D. Ill. 2009) (allegation of migration of hazardous substances was insufficient to state a claim for trespass because it did not allege tortious conduct by the defendant).

In this case, CM makes no attempt to show that BHMC acquired a legal interest in the supposedly trespassing water in the Crescent Mine. CM is unable to do so. BHMC could have acquired no ownership interest in the water that allegedly flowed into the Crescent Mine. Under Idaho law, "all water under the surface of the ground whatever may be the geological structure in which it is standing or moving" is owned by the State of Idaho.[109] These statutes apply to groundwater flowing from mines.[110]

Second, a factfinder could find that the Crescent Mine self-flooded or that the allegedly trespassing water was "placed" in the Crescent Mine by BHM (U.S.) Inc. when it owned both the Bunker Hill and the Crescent Mines. Either way, no water has been "tortiously" placed in the Crescent Mine. As shown above, nothing prevented a mining company from allowing its own mine to flood. Thus, the placement of water in the Crescent Mine was not "tortious."

Third, Crescent has offered no evidence that BHMC knew Bunker Hill Mine water was tortiously placed in the Crescent Mine. Citing a 2004 complaint against Placer and Robert Hopper, CM argues that BHMC "has been fully aware of the contaminated Bunker Hill Mine water in the Crescent Mine since before it purchased the Bunker Hill Mine."[111] Nothing in the 2004 complaint alleged that any Bunker Hill Mine water entered the Crescent Mine, let alone tortiously.[112] In any case, the allegations in the 2004 complaint are just that—allegations in a

---

[109] *See* Idaho Code § 42-230(a) (defining "Ground water"), 42-226 ("All ground waters in this state are declared to be the property of the state. . . . .").

[110] *See In re General Determination of Rights to Use Surface & Ground Waters of Payette River Drainage Basin*, 687 P.2d 1348, 1352 (Idaho 1984) ("The water emanating from the mine portal falls clearly within this definition of ground water.").

[111] Memo. in Supp. (Dkt. 116-1) at 24.

[112] Norton Dec. Ex. Q at 5-6.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 25

complaint. They were never proven; the case settled "without the admission of adjudication of any issue of fact or law."[113]

CM also quotes from Dr. Morton's July 2024 report, but CM leaves out an important part of what Dr. Morton wrote. CM asserts, "According to BHMC's own expert, '[t]he Crescent mine Ellis shaft water level mimics that of Bunker Hill No 2 shaft water level.'"[114] Actually, Dr. Morton wrote: "The Crescent mine Ellis shaft water mimics that of the Bunker Hill No 2 shaft water level, *always being higher in elevation*."[115] On the same page, Dr. Morton writes, "*Bunker Hill No 2. shaft water level is always lower than Crescent mine Ellis shaft water level*" and on the following page, Dr. Morton included a table that graphically demonstrates that the elevation of water in the Crescent Mine has been higher than in the Bunker Hill Mine.[116] Dr. Morton also wrote in her July 2024 report that the Crescent Mine "self-flooded" and, based on the higher elevation of the water level in the Crescent Mine and the topographical slope from the Crescent Mine to the Bunker Hill Mine, the groundwater flow is from the Crescent to the Bunker Hill.[117] Neither this evidence, nor any other CM can muster, shows that BHMC "has been fully aware of the contaminated Bunker Hill Mine water in the Crescent Mine since before it purchase the Bunker Hill Mine"[118] and that such mine water was placed in the Crescent Mine "tortiously."

---

[113] Ex. 14 (2018 Consent Decree) at BHMC_000037.

[114] Memo. in Supp. (Dkt. 116-1) at 24.

[115] Morton Dec., Ex. B at 16 (emphasis added).

[116] *Id.* at 16-17 (emphasis added).

[117] *Id.* at 12-13, 22-28, 31, 36-37, 58-59, 63, 65, Appx. B and F.

[118] Memo. in Supp. (Dkt. 116-1) at 24.

For these reasons, Restatement § 161 is inapplicable, and CM's trespass claim against BHMC fails.

## II.    CM'S CERCLA § 107(a) CLAIM FAILS AS A MATTER OF LAW, BUT IF NOT, FACT ISSUES PRECLUDE SUMMARY JUDGMENT IN CM'S FAVOR.

CM moves for summary judgment on its CERCLA § 107(a) cost recovery claims.  To establish a prima facie case under § 107(a), the plaintiff must show that (1) the property at issue is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" has occurred; (3) the "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a).[119]  Private parties have the burden of proving that their costs of response are necessary and consistent with the National Contingency Plan to recover those costs under CERCLA.[120]  Expenses incurred in preparation for litigation cannot be recovered as response costs unless they significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs."[121]

For at least five independent reasons, CM's Motion with respect to its § 107(a) claim should be denied: (1) CM has not incurred response costs; (2) CM has not shown with incontrovertible evidence that releases from the Bunker Hill Mine caused CM to incur response

---

[119] *Ascon Properties, Inc. v. Mobil Oil Co*., 866 F.2d 1149, 1152 (9th Cir. 1989).

[120] *Carson Harbor Vill., Ltd. v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) (citations omitted) (citing 42 U.S.C. § 9607(a)(4)(B)); *Carson Harbor Vill., Ltd. v. Unocal Corp,*, 270 F.3d 863, 870-871 (9th Cir. 2001) (en banc); *Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 800 (9th Cir. 1995).

[121] *Key-Tronic Corp. v. U.S.*, 511 U.S. 809, 819-21 (1994).

costs; (3) CM has not shown with incontrovertible evidence that the response costs on which its claims are based were "necessary"; (4) CM's § 107(a) claims are premature; and (5) CM has not shown with incontrovertible evidence that the alleged costs on which its claims are based are consistent with the National Contingency Plan ("NCP"). Each of these reasons are explained below.

### A.    CM has not incurred response costs.

BHMC and Placer have moved for summary judgment on CM's CERCLA claims because CM has not itself incurred response costs. The expert who CM engaged to present the costs it seeks to recover, Paul Rosasco, admitted that rather than CM, *Crescent Silver* incurred the costs on which CM's § 107(a) claim is based.[122] Indeed, CM could not have incurred any such costs because, according to Mr. Gross, CM's 30(b)(6) deposition designee, it has no employees and no contracts.[123]

CM seems to suggest that Crescent Silver incurred the costs "on behalf of Crescent Mine."[124] That is insufficient. The plaintiff itself must have incurred the costs on which its § 107 claim is based. In *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013), the Ninth Circuit held that "Congress implicitly conveyed the intent, through the plain language of section 107(a), that a derivative incurment of response costs was not contemplated under section 107(a)."[125] It reasoned that "[t]he requirement that a party incur response costs

---

[122] Hogle Dec. (Dkt. 112-9) Ex. 16 (Rosasco) at 140:18-24, 176:8-11.

[123] *Id*. Ex. 2 (2/21/24 Crescent 30(b)(6)) at 15:14-16, 63:21-24, 190:21-191:5, 248:23-249:15.

[124] Gross Dec. (Dkt. 116-55) ¶ 7.

[125] *Id*. at 967; *see also Gallagher & Kennedy, P.A. v. City of Phoenix*, No. 23-15938, 2024 U.S. App. LEXIS 22106, *5-6, 2024 WL 4003040 (9th Cir. Aug. 30, 2024) (holding that § 107(a) claim was properly dismissed because the plaintiff did not itself incur the response costs on

itself . . . makes sense because that party is ultimately liable for the cleanup and remains liable for any subsequent pollution."[126]

The *Chubb* Court cited favorably *Basic Management, Inc. v. U.S.*, 569 F. Supp. 2d 1106, 1120-21 (D. Nev. 2008), which held that a plaintiff had not itself incurred response costs when a third-party paid those costs on its behalf.[127]  The *Basic Management* Court reasoned that "the term ['incurred'] should include the requirement that the Responsible Party has or will actually incur the specific cost for which it seeks contribution.  Otherwise, they are only obtaining a contribution windfall for a cost which they will never incur or have to pay."[128]

Because CM did not itself incur any response costs, its CERCLA claims fail as a matter of law.

### B.    The flooding that caused CM to allegedly incur response costs occurred from the Crescent Mine's own natural inflow.

To prevail on its § 107(a) claim, CM must show that a release for which Placer and BHMC are responsible caused CM to incur response costs.[129]

Section 9607(a)(4) expressly requires that a release or threatened release exist "*which causes* the incurrence of response costs."  Thus, the plain language of the statute declares that there must be a connection, a relationship, a direct and analogous event, which links the leaching of hazardous materials to the necessary response costs expended by the plaintiff. The courts, while holding that CERCLA imposes strict liability, have consistently required a plaintiff to demonstrate

---

which its claim was based; rather, such costs were paid from a fund to which plaintiff did not contribute).

[126] *Chubb Custom Ins.*, 710 F.3d. at 962.

[127] *Id.* at 964.

[128] *Basic Mgmt.*, 569 F. Supp. 2d at 1120.

[129] 42 U.S.C. § 9607(a)(4).

unequivocally causation between the alleged wrong and the incurrence of necessary response costs.[130]

Generally, causation questions are ineligible for resolution on a summary judgment motion.

> As a general rule, causation questions are grist for the factfinder's mill. . . . Where causation is in issue, 'not only ordinary fact questions, but also "evaluative applications of legal standards . . . to the facts" are properly [for the factfinder].' . . . We see nothing about the issue of causation in a CERCLA case that would serve to sidetrack these principles or to reconfigure their application.[131]

In *Goe Eng'g Co. v. Physicians Formula Cosmetics*, Case No. CV 94-3576-WCK, 1997 U.S. Dist. LEXIS 23627, 1997 WL 889278 (C.D. Cal. 1997), the Court denied the CERCLA claimant's summary judgment motion due to fact issues surrounding the cause of the costs it incurred. The claimant was the lessee of property where there was a cleanup action and the operator of adjacent property where it manufactured cosmetics. The Court denied the motion because the claimant "has not conclusively established that the response costs it has incurred are the result of the spills which occurred while [the defendant] owned the . . . Property [subject to the cleanup action], rather than the result of migrating contamination from the . . . Property [that the claimant operated]."[132]

---

[130] *Rhodes v. County of Darlington*, 833 F. Supp. 1163, 1191 (D.S.C. 1992) (emphasis in original) (quoting 42 U.S.C. § 9607(a)(4)); *see also Carson Harbor*, 270 F.3d at 870-871; *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1182 (9th Cir. 2000) ("CERCLA conditions liability on causation . . . . CERCLA provides that a party that releases a hazardous substance is liable for another's response costs, but only if its releases caused the other party to incur those response costs. . . .").

[131] *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, (1st Cir. 1992) (citations omitted) (alterations in original) (quoting *Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir. 1987)).

[132] *Goe Eng'g Co.*, 1997 U.S. Dist. LEXIS 23627 *54-55.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 30

CM's Motion should be denied for the same reason.  CM's claim is based on the idea that the only water in the Crescent Mine came from the Bunker Hill Mine.  But the Crescent Mine has its own infiltration.  When the pumps were removed in 1991, Mr. Groth personally observed water accumulating under the Ellis shaft and on the 3100 Level in the Crescent Mine on the opposite side of the mine from the Y-U connection to the Bunker Hill.[133]  CM's own experts opine that there is a natural inflow of water into the Crescent Mine and a net contribution of water from the Crescent Mine to the Bunker Hill Mine through the Y-U Crosscut.[134]  Dr. Morton opines that the Crescent Mine self-flooded.[135]  She also opines that if any water entered into the Crescent Mine from the Bunker Hill Mine, it was pumped out and replaced at least twice by Cresent Mine water before CM acquired the Crescent Mine in 2012, and long before CM's alleged response costs were incurred.[136]  If so, CM's alleged response costs were incurred due to releases from within the Crescent Mine and not any releases for which Placer and BHMC are responsible.

*Bob's Bev., Inc. v. Acme, Inc.*, 264 F.3d 692 (6th Cir. 2001), is analogous.  There, the owner of a facility sued both the Merkel Defendants, which had sold the facility to the claimant, and the Merkel Defendants' predecessor in interest for response costs under CERCLA § 107(a).  After a bench trial, the Merkel Defendants were exonerated because no release that occurred during the Merkel Defendants' ownership caused any increase in response costs the plaintiffs

---

[133] Hogle Dec. (Dkt. 112-9) Ex. 9 (Groth) at 28:8-29:4, 32:5-33:6.

[134] Norton Dec. Ex. OO (Rosasco 6/24 Rep.) at 30; *id.* Ex. TT (Beale 6/24 Rep.) at 5 ("Considering all the available evidence, I estimate that a net contribution of 15-20 gpm of water may have flowed from the Crescent Mine to the Bunker Hill Mine since 1995.").

[135] Morton Dec. ¶¶ 53-55, Ex. B at 22-27, Appx. B and F.

[136] *Id*. Ex. B at 22-26, Appx. F.

later incurred.  "'CERCLA focuses on whether the defendant's release or threatened release caused harm to the plaintiff in the form of response costs.'"[137]

A reasonable fact finder could likewise conclude in this case that any disposal that occurred before CM acquired the Crescent Mine did not cause CM to incur any increase in response costs.

In support of its Motion regarding BHMC's CERCLA claims, CM relies on *City of Portland v. Boeing Co*., 179 F. Supp. 2d 1190 (D. Or. 2001), but that case is more applicable to CM's claims.  There, the defendants asserted that the plaintiff was liable for defendants' response costs because there were hazardous substances that had migrated to the plaintiff's groundwater from other, third-party facilities.[138] The court rejected the defendants' argument, explaining that "[d]efendants have presented no evidence that it [sic] incurred response costs as a result of the migration of hazardous wastes onto Plaintiff's property from sources other than themselves."[139]

A factfinder could find that, if CM ever became concerned with "an actual and real threat to human health or the environment"[140] and incurred costs in relation to that threat, by the time it did so, all the mine-impacted water in the Crescent Mine came from within the mine itself.

---

[137] *Id*. at 696 (quoting *Control Data Corp. v. S.C.S.C. Corp*., 53 F.3d 930, 935 (8th Cir. 1995), which is cited favorably in *Boeing Co.*, 207 F.3d at 1185 ); *see also Acushnet Co. v. Coaters Inc*., 937 F. Supp. 988, 992–1001 (D. Mass. 1996) (dismissing CERCLA claim because plaintiff failed to prove that defendant's waste caused or contributed to incurrence of response costs); *New Jersey Turnpike Authority v. PPG Industries*, 197 F.3d 96, 110 (3rd Cir. 1999) (claims against CERCLA defendants were properly dismissed where state plaintiff failed to present evidence linking defendants' wastes to the sites that required cleanup).

[138] *Boeing Co.,*179 F. Supp. 2d at 1201.

[139] *Id*. (emphasis added).

[140] *Carson Harbor*, 270 F.3d at 871.

According to CM, the Crescent Mine has been flooded with Bunker Hill Mine water since the early 1990s. But even at the low infiltration rates that Crescent Parties' experts espouse, the Crescent Mine would have filled on its own, regardless of any inflow from the Bunker Hill Mine, by the time CM's alleged response costs were incurred. Because the water has not overtopped the Ellis Shaft and poured out of the Hooper Tunnel, the water must have flowed to the Bunker Hill Mine via the Y-U Crosscut; it has nowhere else to go.[141] That necessarily means that Bunker Hill pumping since 1994 has flushed out any water that could have crossed over to the Crescent Mine through the Y-U Crosscut in the early 1990s. According to Dr. Morton's calculations, even at 15-20 gpm inflow rates, Bunker Hill pumping since 1994 would have flushed out the Crescent Mine twice between 1994 and 2012, when CM acquired the Crescent Mine. The response costs on which CM's § 107(a) claim is based were first incurred in 2018. Accordingly, a reasonable factfinder could conclude that CM's alleged response costs were caused by releases from within the Crescent Mine itself, just like the response costs in *City of Portland.*

    **C.**    **The costs that CM seeks to recover were not "necessary."**

To prevail in a private cost recovery action, a plaintiff must establish . . . such 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary'. . . ."[142] Response costs are recoverable under CERCLA "only if 'necessary.' It is generally agreed that this standard requires that *an actual and real threat to human health or the environment* exist

---

[141] Ex. 2 (Stefanoff) at 21:22-22:6, 159:14-160:4, 163:23-164:20.

[142] *Carson Harbor*, 270 F.3d at 871.

before initiating a response action."[143]  "In determining whether response costs are 'necessary,'
we focus . . . on whether there is a threat to human health or the environment *and whether the
response action is addressed to that threat*."[144]

"[N]ecessity is a factual question."[145]  CM's own authority recognizes that "[w]hether the
response costs allegedly incurred by the plaintiffs . . . were in fact necessary and consistent with
the national contingency plan, as required for CERCLA recovery under section 9607(a)(4)(B),
presents factual issues to be resolved at trial."[146]

Here, no response action by CM, and hence no response costs allegedly incurred by it,
was necessary.  The threat to human health or the environment was extensively investigated by
the EPA, and in two RODs, it found that the remedy it selected—controlled discharge from the
Bunker Hill Mine and treatment at the CTP—was sufficiently protective.[147]  Per the most recent
five-year review, the remedy is functioning as intended and addressing direct exposure pathways
through the treatment of contaminated water and AMD at the CTP.[148]  Under  this Court's
decision that approved the 2018 Consent Decree, *U.S. v. Placer Mining Co., Inc.*, No. 2:04-CV-

---

[143] *Id*. at 871 (emphasis added); *Chubb Custom Ins. Co.*, 710 F.3d at 961 ("Response costs are
deemed 'necessary' when '"an actual and real threat to human health or the environment
exist[s]."'" (quoting *City of Colton v. Am. Promotional Events, Inc.-W*., 614 F.3d 998, 1003 (9th
Cir. 2010)).

[144] *Carson Harbor*, 270 F.3d at 872 (emphasis added).

[145] *Id.* (citing *Cadillac Fairview/California, Inc. v. Dow Chemical Co*., 840 F.2d 691, 695 (9th
Cir. 1988)).

[146] *Murray v. Bath Iron Works Corp*., 867 F. Supp. 33, 40 (D. Me. 1994).

[147] Hogle Dec. (Dkt. 112-9) Ex. 17 (1992 ROD) at CRES_00021235; *id.* Ex. 12 (2001 ROD
Am.) at CRES_00019313, 19315.

[148] Ex. 15 (2021 EPA Fifth Five-Year Review Rep.) at CRES_00064058, CRES_00064063.

00126-EJL, 2018 WL 7352423 (D. Idaho June 19, 2018), "BHMC's continued or future use of the Bunker Hill Mine . . . is expressly subject to EPA continued approval and oversight."

"[A]n actual agency cleanup order is highly relevant and, in some cases, compelling on the necessity question."[149]  In this case, the EPA decisions and orders in place conclude that the status quo (in which both the Bunker Hill and the Crescent Mines are flooded to about the 11 Level in the Bunker Hill Mine) is sufficiently protective of human health and the environment. Indeed, CM's response cost expert, Mr. Rosasco, testified that he does not know if CM's alleged costs would be necessary if the Bunker Hill Mine water level is kept at about the 11 Level, as EPA directed.[150]

CM wants the Court to believe that the water level in the Crescent Mine is problematic, but if it is, the reasons have more to do with CM's new desire for a dewatered mine and less to do with human health and the environment.  The Crescent Parties knew for years that their mine was flooded, and they did nothing to investigate it until confronted with BHMC's claim for water treatment costs in February 2021.  Almost all of the alleged costs—99% of them—were incurred after BHMC sent its February 3, 2021, demand for Crescent's share of water treatment payments.  On January 21, 2021, a couple of weeks before BHMC's demand, Crescent Silver swore in an insurance renewal application that there had been no emissions, discharges, releases, or escapes of pollutants or other substances above permissible levels at the Crescent Mine.[151] After February 3, 2021, Crescent Silver suddenly became concerned about releases.

---

[149] *Carson Harbor*, 270 F.3d at 872.

[150] Hogle Dec. (Dkt. 112-9) Ex. 16 (Rosasco) at 168:5-20.

[151] Ex. 16 (1/21/21 Application – Dep. Ex. 72) at CRES_00052486; Hogle Dec. (Dkt. 112-9) Ex. 24 (2/22/24 Crescent 30(b)(6)) at 27:15-28:11.

CM stretches to find costs incurred before 2021 that it could try to fit into a § 107 claim. The descriptions of the 2018 labor in Mr. Rosasco's expert report, in context, show that the costs were not incurred in any response action. The summary describes Mr. Gross' review of maps and internal and on-line documents and a conversation with John Ryan in July 2018, but his contemporaneous emails indicate that his efforts were related to exploring a disposal option for mine water that Crescent had been sending to the Sunshine Mine (costs of which are not claimed as response costs, likely because there was no public participation associated with that endeavor, and no EPA authorization of it) and to discuss with John Ryan a potential sale of the Crescent Mine to BHMC.[152] These efforts have nothing to do with addressing a threat to human health and the environment.

All other alleged response labor begins in July 2020, but that time was not spent investigating a potential response to a release. It was spent trying to prepare for the day when BHMC would "come after us [ ] for our portion of the water treatment plant costs."[153] Except for the instances in July 2018, all of the labor characterized as response costs occurred after Mr. Gross' July 21, 2020, email to his boss about how the Crescent Parties' liability to BHMC was keeping him awake.

For these reasons, a reasonable fact finder could conclude that the costs on which CM's § 107 claim is predicated are not "necessary."

---

[152] Ex. 17 (July 2018 emails – CRES_00050169, 52955-57, 55735, 61752).

[153] Ex. 1 (7/21/20 Gross email – Dep. Ex. 55).

**D.    Even if CM had incurred necessary response costs, CM's § 107 claim is premature.**

In *Otay Land Co. v. United Enterprises, Ltd*., 338 Fed. Appx. 689 (9th Cir. 2009), the Ninth Circuit affirmed summary judgment dismissal of a CERCLA claim for response costs that, the Court found, were "speculative and were calculated without regard to the requirements of the National Contingency Plan."[154]   The NCP, the Court observed, "'is designed to make the party seeking response costs choose a *cost-effective* course of action to protect public health and the environment. . . . [T]he [NCP] requires that the party seeking recovery provide an opportunity for public comment and participation, conduct a remedial site investigation, and prepare a feasibility study."[155]   The Court reasoned that "[a]bsent a reliable basis to determine the clean-up costs, [the claimant's] action was premature. . . . The plaintiffs also have not shown that the property, which no public agency has indicated needs remediation, currently poses 'an imminent and substantial endangerment to health or the environment.'"[156]

In *Calmat Co. v. San Gabriel Valley Gun Club*, 809 F. Supp. 2d 1218 (C.D. Cal. 2011), the Court followed *Otay* to dismiss a CERCLA claim analogous to CM's.   The claimant in *Calmat Co.* supposedly incurred costs at a site for which "no public agency . . . indicated the need for remediation, and . . . it has not begun cleanup or incurred cleanup costs."[157]   It had been years since the alleged contamination occurred, yet the claimant had failed to even conduct a

---

[154] *Id*. at 691.

[155] *Id.* (quoting *Carson Harbor Vill.*, 433 F.3d at 1265 (citations and internal quotation marks omitted) (emphasis in original).

[156] *Id*.

[157] *Id*. at 1221.

remedial investigation/feasibility study. The Court concluded that the CERCLA claim was not ripe for review and granted summary judgment dismissal of it.

Likewise, in this case, CM has never provided an opportunity for public comment and participation, conducted a remedial site investigation, or prepared a feasibility study, let alone planned or completed a cleanup.[158] Moreover, there is no indication that CM ever will.[159] It has been years since CM became aware of the flooding of its mine, and until it received BHMC's demand letter for water treatment costs, it had done nothing to investigate the water.[160] Furthermore, CM has not involved any governmental environmental protection agency, which would not only help ensure that CM follows appropriate procedures and take necessary steps, but would also hold CM to applicable requirements.[161] Thus, like the Court in *Calmat Co*., this Court should dismiss CM's CERCLA claims as unripe.

CM cites *Cal ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co*., 358 F.3d 661, 668 n.4 (9th Cir. 2004), for the assertion that a single dollar of necessary and NCP-consistent response costs is all it needs to show. That case, however, dealt with when a § 107 claim accrues for purposes of the applicable statute of limitations. The case did not analyze whether a single dollar's worth of costs could be both necessary and consistent with the NCP. In *Stanton Rd. Assocs. v. Lohrey Enters*., 984 F.2d 1015, 1021 (9th Cir. 1993), the court held that a

---

[158] Dec. of Brian Henthorn in Supp. of BHMC's Opp. to Crescent Parties' Mot. for Part. S.J. ("Henthorn Dec.") ¶¶ 81-86.

[159] *Id*. ¶ 86.

[160] *Id*. ¶ 63.

[161] *Id*. ¶¶ 49-51; Ex. 18 (Haney) at 35:25-36:9, 60:2-61:6; Hogle Dec. (Dkt. 112-9) Ex. 5 (Durick) 36:12-18, 63:4-64:12, 110:10-111:3; *id*. Ex. 24 (2/22/24 Crescent 30(b)(6)) at 27:10-14; *id*. Ex. 16 (Rosasco) at 174:13-17.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 38

plaintiff that "had not cleaned up its property at the time the district court entered its judgment . . . failed to meet its burden of proving . . . that its expenses were necessary and incurred in a manner consistent with the national contingency plan."

CM cites *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751 (7th Cir. 2021), for the assertion that investigations are types of response actions that have been found necessary and NCP-consistent. It is true that in *Von Duprin*, investigation costs were part of the claimant's recovery under CERCLA, but unlike CM, the claimant did not just stop at an "investigation." The claimant had performed an actual remediation, and it had involved a governmental environmental protection agency.[162]

Though in *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 889 (9th Cir. 1986), and *CNH America, LLC*, 863 F. Supp. 2d at 799, there had not yet been a cleanup, a governmental environmental protection agency had been directly involved. Such involvement lent assurance that the claimant would actually undertake a cleanup. In *Wickland*, the investigation work had been required by state agencies.[163] In *CNH America, LLC*, the claimant itself notified the state agency of the contamination.[164] CM has never involved an environmental protection agency in its so-called investigations.

---

[162] 12 F.4th at 757, 771 ("In 2013, the [Indiana Department of Environmental Management] informed [claimant] that it could be a potentially responsible party or PRP under Indiana law. [Claimant] then began its own investigation into the contamination. In time the company entered Indiana's cleanup program and performed remediation in the area." "And throughout the effort, the company worked with IDEM.").

[163] 792 F.2d at 889.

[164] 863 F. Supp. 2d at 799.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 39

In this case, there is no indication that CM will undertake the steps laid out in the NCP to effectuate a CERCLA-quality cleanup. Virtually none of the alleged costs on which CM's claim is based were incurred until after BHMC's sent its February 2021 demand for water treatment cost reimbursement. A few weeks before then, Crescent Silver swore in an insurance renewal application that there had been no emissions, discharges, releases, or escapes of pollutants or other substances above permissible levels at the Crescent Mine.[165] All signs indicate that CM's alleged response costs are performative, for show. As in *Otay* and *Calmat*, the facts surrounding CM's claims indicate they are premature, and they should be dismissed.

### E.    The alleged costs on which CM's claim is based are not consistent with the NCP.

To prevail in a private cost recovery action, a plaintiff must establish . . . such 'release' or 'threatened release' has caused the plaintiff to incur response costs that were . . . 'consistent with the national contingency plan.'"[166] "The national contingency plan requires 'accurate accounting of . . . private party costs incurred for response actions.'"[167]

In this case, CM has presented no accurate accounting of the alleged costs on which CM's claim is based. Critically, no one wants to own the summary that CM has presented. CM's CEO Roger Gross avers in his declaration that CM's expert, Paul Rosasco, "prepared a summary of the costs incurred prior to February 2024."[168] Mr. Rosasco, however, disclaims it.[169]

---

[165] Ex. 16 (1/21/21 Application – Dep. Ex. 72) at CRES_00052486; Hogle Dec. (Dkt. 112-9) Ex. 24 (2/22/24 Crescent 30(b)(6)) at 27:15-28:11.

[166] *Carson Harbor*, 270 F.3d at 871.

[167] *Boeing Co.*, 207 F.3d at 1186 (quoting 40 C.F.R. § 300.160(a)(1) (1998)).

[168] Gross Dec. (Dkt. 116-55) ¶ 7.

[169] Hogle Dec. (Dkt. 112-9) Ex. 16 (Rosasco) at 35:14-36:4, 174:18-176:7, 177:24-178:8.

Not only does he deny preparing it, but he also did nothing to verify it; he "ha[d] to take their [meaning Crescent Silver's] representation of that."[170]  Regardless, Mr. Rosasco concedes that the summary is not sufficient to satisfy NCP requirements.[171]

## III.    BECAUSE CM IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CERCLA § 107(a) COST RECOVERY CLAIMS, IT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CERCLA § 113(g)(2) CLAIMS FOR DECLARATORY JUDGMENT.

A § 113(g)(2) declaratory judgment is available only for a claimant who is entitled to recovery under CERCLA.[172]  Because CM is not entitled to judgment as a matter of law on its § 107(a) cost recovery claims, neither is it entitled to judgment as a matter of law on its § 113(g)(2) claims for declaratory judgment.

## IV.    SUBSTANTIAL EVIDENCE SUPPORTS BHMC'S AND PLACER'S CERCLA § 113(f) CONTRIBUTION CLAIMS.

Under CERCLA § 113(f)(1), "Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during . . . any civil action . . . under section 107(a)."  Both BHMC and Placer assert CERCLA § 113(f) contribution claims, and the Motion seeks their dismissal.

BHMC's claim seeks to recover "expenses paid under a settlement agreement or a judgment."[173]  "A person who has resolved its liability to the United States . . . for some or all of

---

[170] *Id*. at 177:24-178:8.

[171] *Id*. at 153:25-154:4.

[172] *See* 3/2/22 Memo. Dec. and Order (Dkt. 49) at 12 ("Accordingly, because Crescent fails to state a claim under CERCLA § 107, Crescent does not have a substantive claim for relief upon which to base a declaratory judgment claim. . . ."); *see also* 42 U.S.C. § 9613(g)(2); *City of Colton*, 614 F.3d 998.

[173] *Whittaker Corp. v. U.S.*, 825 F.3d 1002, 1009 (9th Cir. 2016).

a response action or for some or all of the costs of such action in an administrative . . . settlement agreement may seek contribution from any person who is not a party to a settlement referred to in paragraph (2)."[174]  Though BHMC could also advance its § 107(a) claim for any response costs it incurred,[175] in this case, BHMC only seeks to recover the Crescent Parties' share of costs that BHMC has incurred under the SAOC.  Accordingly, BHMC will advance only its § 113(f) claim for contribution.  BHMC's § 113(f) claim is asserted against all the Crescent Parties.

Placer's contribution claim is asserted only against CM for defensive purposes. Placer's claim is asserted to prevent the imposition of joint and several liability.  (BHMC's claim is asserted for a recovery, but it has the same effect.)  In connection with its § 107(a) claim, CM argues that BHMC and Placer are subject to joint and several liability, citing *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 588 (9th Cir. 2018).[176]  *Pakootas*, however, did not involve a case where the plaintiff was itself a Potentially Responsible Party ("PRP"), as CM is here. "'CERCLA, itself, checks overreaching liable parties: if a plaintiff attempted to use § 107 to recover more than its fair share of reimbursement, a defendant would be free to counterclaim for contribution under § 113(f).'"[177]  BHMC's and Placer's § 113(f) contribution counterclaims effectively subject CM's § 107(a) to equitable allocation.[178]

---

[174] 42 U.S.C. § 9613(f)(3)(B).

[175] *Id.* at 1010.

[176] Memo. in Supp. (Dkt. 116-1) at 25-26.

[177] *Kotrous v. Goss-Jewett Co. of N. Cal*., 523 F.3d 924, 933 (9th Cir. 2008) (quoting *Atl. Research Corp. v. U.S.*, 459 F.3d 827, 835 (8th Cir. 2006), *aff'd*, 551 U.S. 128 (2007)); *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 168 (4th Cir. 2013) ("[A] PRP may mitigate the sting of CERCLA's imposition of joint and several liability by . . . allocation of harm" "also known as contribution. . . .").

[178] *See* 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.");

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 42

To assert a § 113(f) contribution claim in response to a § 107(a) claim, the claimant need not have incurred any costs of response consistent with the NCP.  In essence, the response costs incurred would be those the § 107(a) claimant seeks to recover from the § 113(f) counterclaimant.[179]  Instead, the claimant must show that (1) the property at issue is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" has occurred; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a).

Substantial evidence supports each element BHMC's and Placer's claims, and BHMC's claim is also supported by recoverable costs that it has incurred.  Accordingly, the Motion should be denied due to genuine issues of material fact.

---

*U.S. v. Alt. Research Corp.*, 551 U.S. 128, 140 (2007) ("Resolution of a 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action."); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 121n.8 (2d Cir. 2010) (While § 107(a) permits recovery of all remedial costs, it does not preclude defendant potentially responsible party from asserting counterclaims (or cross-claims) for contribution under § 113(f)(1), effectively converting the § 107(a) action into an apportionment of liability among jointly and severally liable parties.).

[179] *See Atlantic Research Corp.*, 551 U.S. at 138-39 ("Section 113(f) explicitly grants PRPs a right to contribution.  . . .  The statute authorizes a PRP to seek contribution 'during or following' a suit under § 106 or § 107(a).  . . .  When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs or response.  Rather, it reimburses other parties for costs that those parties incurred."); *Kotrous*, 523 F.3d at 932-33("CERCLA § 113(f) grants an explicit right to contribution to PRPs 'with common liability stemming from an action instituted under § 106 or § 107(a).'  . . .  Under *Atlantic Research*, a PRP . . . that incurs costs voluntarily, without having been subject to an action under § 106 or § 107, may bring a suit for recovery of its costs under § 107(a). . . .  Any of the defendants sued by such a PRP may seek contribution under § 113(f) because they now will have been subject to an action under § 107." (quoting *Atlantic Research*, 551 U.S at 139)).

A.    **The Crescent Mine and the Bunker Mine are both "facilities" within the meaning of CERCLA.**

The Crescent Parties admit that the Crescent Mine and the Bunker Hill Mine are both "facilities."[180]  The mines could also be considered one "facility" because they are connected by the Y-U Crosscut, and together, they comprise an "area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."[181]

B.    **Releases and disposals of hazardous substances have occurred from the Crescent Mine.**

The Crescent Parties also admit that "discharges of AMD and other mining wastes at and from mines constitute 'releases' and 'disposals' of 'hazardous substances' under CERCLA."[182] That describes the mine-impacted water that flows from the Crescent Mine to the Bunker Hill Mine.  Crescent Parties' expert Rosasco expects that sampling of water in the lower levels of the Crescent Mine will show the presence of hazardous substances.[183]

Moreover, Crescent Silver's recent sampling has identified substances in the Crescent Mine water that are "hazardous" under CERCLA, namely copper, iron, manganese, nickel, cadmium, and arsenic.[184]  Though such substances were found in samples taken of water in the

---

[180] Memo. in Supp. (Dkt. 116-1) at 35.

[181] *See* 42 U.S.C. § 9601(9).

[182] Memo. in Supp. (Dkt. 116-1) at 27.

[183] Hogle Dec. (Dkt. 112-9) Ex. 16 (Rosasco) at 148:25-149:11.

[184] Ex. 6 (6/24 Donahue Rep. – Dep. Ex. 20) at 5-8; Ex. 7 (7/24 Donahue Rep. – Dep. Ex. 21) at 1-3; Ex. 8 (Donahue) at 8:3-15, 31:15-23; Ex. 9 (2018 Gross email – Dep. Ex. 115); Ex. 10 (2021 Gross email – Dep. Ex. 117); Ex. 11 (Klepfer) at 23:8-9, 27:7-24, 31:22-33:1.

Crescent Mine at and above the Hooper Tunnel, a portion of that water infiltrates the Crescent Mine's lower levels.[185]

Under CERCLA § 101(14), "hazardous substance" is defined by reference to other statutes, including the Clean Water Act and the Clean Air Act.[186] The EPA has consolidated those statutory lists into Table 302.4 at 40 CFR § 302.4.[187] Arsenic, cadmium, copper, nickel, zinc, and compounds thereof are all hazardous substances under the Clean Water Act and, thus, under CERCLA as well.[188] Manganese compounds are considered hazardous air pollutants under the Clean Air Act and, thus, are hazardous substances under CERCLA.[189]

As the Crescent Parties acknowledge, "for CERCLA liability, [q]uantity or concentration of hazardous substance released is not a factor. . . ."[190] The Ninth Circuit has ruled that "CERCLA's definition of hazardous substance has no minimum level requirement."[191]

The Crescent Parties assert that since the Crescent Mine has been flooded with Bunker Hill Mine water, the Crescent Mine generates no AMD.[192] Their argument relies on their controverted theory that the Crescent Mine contains no water other than water that spilled over

---

[185] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 149:7-14; *id*. Ex. 16 (Rosasco) at 128:15-129:1; Norton Dec., Ex. UU (Beale 8/24 Rep.) at 15-16.

[186] 42 U.S.C. § 9601(14).

[187] *See U.S. v. Alcan Aluminum Corp*., 990 F.2d 711, 720 (2d Cir. 1993) ("Pursuant to § 9602(a), the EPA has designated certain substances as hazardous in 40 C.F.R. § 302.4 (1992) and the accompanying table.").

[188] *See* 40 CFR § 302.4; 40 CFR § 401.15.

[189] *See* 40 CFR § 302.4; 42 U.S.C. § 7412(b)(1).

[190] Memo. in Supp. (Dkt. 116-1) at 28 n.104 (internal quotations omitted) (citing *Alcan Aluminum Corp*., 990 F.2d at 720).

[191] *A&W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir. 1998).

[192] Memo. in Supp. (Dkt. 116-1) at 36.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 45

from the Bunker Hill Mine in the early 1990s. Their argument also disregards the abundant

evidence of hazardous substances that Crescent Silver itself found present in the Crescent Mine.

C.    **Since 1994, there have been releases and disposals of hazardous substances from the Crescent Mine to the Bunker Hill Mine.**

The evidence shows that there have been releases of such hazardous substances from the

Crescent Mine to the Bunker Hill Mine through the Y-U Crosscut. CERCLA gives term

"release" a broad definition, which includes "any spilling, leaking, pumping, pouring, emitting, .

. . discharging, . . . escaping, . . . or disposing into the environment. . . ."[193] "[T]he passive

migration of hazardous substances into the environment from where hazardous substances have

come to be located is a release under CERCLA."[194]

Unquestionably some amount of water containing hazardous substances is released from

the Crescent Mine to the Bunker Hill Mine through the Y-U Crosscut. Even the Crescent

Parties' experts agree that there is a natural inflow of water into the Crescent Mine and a net

contribution of water from the Crescent Mine to the Bunker Hill Mine through the Y-U

Crosscut.[195] Mr. Groth testified that when he was situated at the Y-U Crosscut level in the

---

[193] 42 U.S.C. § 9601(22).

[194] *Pakootas v. Teck Cominco Metals*, Ltd., 452 F.3d 1066, 1074-1075 (9th Cir. 2006) (citing *A&W Smelter & Refiners, Inc.*, 146 F.3d at 1111 (holding that wind blowing particles of hazardous substances from a pile of waste was a CERCLA release); *U.S. v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998) (affirming summary judgment where the Government presented evidence that corroding drums were leaking hazardous substances into the soil); *see also Coeur d'Alene Tribe v. Asarco, Inc.*, 280 F. Supp. 2d 1094, 1113 (D. Idaho 2003) ("Th[e] passive movement and migration of hazardous substances by mother nature (no human action assisting in the movement) is still a 'release' for purposes of CERCLA in this case.")).

[195] Norton Dec. Ex. OO (Rosasco 6/24 Rep.) at 30; *id.* Ex. TT (Beale 6/24 Rep.) at 5 ("Considering all the available evidence, I estimate that a net contribution of 15-20 gpm of water may have flowed from the Crescent Mine to the Bunker Hill Mine since 1995."); Ex. 3 (2003 Beale Rep. to IDEQ –Dep. Ex. 54) at BHMC_052543 (identifying "[f]low from the area of the

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 46

Crescent Mine during the equipment salvage operation, he observed the Crescent Mine filling with water falling from the Ellis Shaft on the opposite end of the mine from its connection to the Bunker Hill.[196]  If it could not flow to the Bunker Hill Mine, Crescent Mine water would overtop the Ellis Shaft and flow out of the Hooper Tunnel, which has not happened since the Y-U Crosscut was constructed.[197]

Crescent Silver insisted to potential investors and others that the water level in both mines is controlled by pumping in the Bunker Hill Mine.[198]  That would be impossible if water from the Crescent Mine did not flow to the Bunker Hill Mine.[199]

Crescent Silver started recording water levels in the Crescent Mine in September, 2023, and each reading indicates that the water level of the Crescent Mine is at an elevation higher than the water level in the Bunker Hill Mine, and Bunker Hill pumping affects the water levels of both mines.[200] The water must follow Darcy's law and flow from high pressure (elevation) to low pressure (elevation), taking the easiest route.[201]  In this case, the lowest pressure is at the Bunker Hill Mine, and the easiest route is via the Y-U Crosscut.[202]

---

flooded Crescent Mine along the cross cut on the 23-level" as a "source[] of water entering the [Bunker Hill] mine").

[196] Hogle Dec. (Dkt. 112-9) Ex. 9 (Groth) at 28:8-29:4, 32:5-33:6.

[197] Norton Dec. Ex. N (1991 Pintlar Rep.) at 26; Hogle Dec. (Dkt. 112-9) Ex. 6 (P. Sala) at 35:3-6 *id.* Ex. 18 (Beale) at 116:2-8.

[198] Hogle Dec. (Dkt. 112-9) Ex. 1 (2015 Tetra Tech NI 43-101 Tech. Rep. – Dep. Ex. 51 at 24-1; *id.* Ex. 2 (2/21/24 Crescent 30(b)(6)) at 54:19-55:5; *id.* Ex. 4 (Rigby) at 118:9-119:19.

[199] Morton Dec. ¶ 31.

[200] *Id.* ¶ 28, Ex. B at 16-17.

[201] *Id.* ¶ 30.

[202] *Id.* ¶ 30; Ex. 2 (Stefanoff) at 21:22-22:6, 159:14-160:4, 163:23-164:20.

The Crescent Parties assert that the Crescent Mine is a "dry" mine that produces hardly any water, and any mine-impacted water released from the Crescent Mine to the Bunker Hill Mine through the Y-U Crosscut was originally released from the Bunker Hill Mine. Substantial evidence refutes these assertions.

When conducting the 2001 Remedial Investigation/Feasibility Study, the EPA's team relied on a 1985 master's thesis that identified a 225 gpm rate of flow from the Crescent Mine to the Bunker Hill Mine and concluded that, if the Y-U were still a conduit, acidic water would likely flow from the Crescent Mine to the Bunker Hill Mine.[203]

Before he was retained by the Crescent Parties for this case, Mr. Beale, reported to his client, IDEQ, in 2003: "Mine staff who worked underground in the 1980s indicated they thought the flow into Bunker Hill workings from the Crescent mine along the Yreka crosscut on the 23-Level was about 200-250 gpm."[204]

Contrary to the Crescent Parties' assertions, the Crescent Mine is not, and has never been, a "dry" mine.[205] Just to the surface, Crescent Mine discharges between 175 to 320 gpm.[206] Since 2023, all of that water has been reinjected into the Crescent catchment to prevent its flow to Big Creek.[207]

---

[203] Ex. 2 (Stefanoff) at 21:22-22:6, 22:21-23:4, 42:22-43:11, 75:24-76:25, 80:1-81:9; Hogle Dec. (Dkt. 112-9) Ex. 10 (1999 CH2M Hill Study – Dep. Ex. 142) at BHMC_002091; Norton Dec. Ex. D (2001 RI/FS) at BHMC_001268.

[204] Ex. 3 (2003 Beale Rep. to IDEQ – Dep. Ex. 54) at § 4.7; Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 16:14-19:1, 19:13-16, 19:21-20:16.

[205] Morton Dec. ¶¶ 36-44, Ex. B at 3-22, 27-29, 41-57.

[206] *Id*. ¶ 36, Ex. A at iii, 11, 20-24, Ex. B at 10, 38-39, 50-51, 62.

[207] *Id*. ¶ 36; Hogle Dec. (Dkt. 112-9) Ex. 2 (2/21/24 Crescent 30(b)(6)) at 56:4-9, 57:11-16, 60:5-12.

A portion of the water that enters the Crescent Mine from the surface infiltrates to the Crescent Mine's lower levels.[208]  The entire Crescent Mine is hydraulically connected by over a mile of vertical or diagonal shafts and raises, with horizontal tunnels and drifts branching therefrom.[209]  In addition, the Crescent has scores of unplugged exploration drill holes that allow water to infiltrate to its lower levels.[210]

The notion that the Crescent Mine is "dry" is refuted by the "pretty extensive" system of at least 14 pumps installed in the lower levels of the Crescent Mine and maintained by five full time employees when it was in operation.[211]  A "dry" mine isn't equipped with 14 pumps maintained by 5 employees.[212]

Based on eye-witness testimony that the water level in the Bunker Hill Mine was below the 25 Level when the pumps shut off, Bunker Hill Mine and Crescent Mine void calculations, and inflow rates more realistic than the ones the Crescent Parties' promote, Dr. Morton has opined that the Crescent Mine self-flooded in 1991.[213]

But even if all the water in the Crescent Mine came from the Bunker Hill Mine, as the Crescent Parties contend, the Crescent Parties are still liable.  "[T]he mere migration of contaminants from adjacent land constitutes disposal for the purposes of CERCLA, and passive

---

[208] Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 149:7-14; *id.* Ex. 16 (Rosasco) at 128:15-129:1; Norton Dec., Ex. UU (Beale 8/24 Rep.) at 15-16.

[209] Morton Dec. ¶ 38, Ex. B at 14, 21.

[210] *Id.* ¶ 39, Ex. B at 10-12, 58; Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 159:17-160:9.

[211] Morton Dec.  ¶ 41, Ex. B at 13-14, 21, 48-49; Hogle Dec. (Dkt. 112-9) Ex. 6 (P. Sala) at 9:16-10:14, 21:2-7, 22:8-14; Ex. 4 (Pump Schematic – Dep. Ex. 150).

[212] Morton Dec. ¶ 41.

[213] *Id.* ¶ 55, Ex. B at 22-28, Appx. B and F.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 49

downstream landowners are liable for the cleanup costs resulting from their neighbor's activities."[214]  CERCLA defines "release" broadly, with a definition that includes "any spilling, leaking, pumping, pouring, emitting, . . . discharging, . . . escaping, . . . or disposing into the environment. . . ."[215]  It does not matter how the hazardous substances came to be located at a facility; as long as there is a release from the facility, the owners and operators of the facility are liable under CERCLA.[216]  Thus, even if the water that has been released from the Crescent Mine to the Bunker Hill Mine since 1994 came from the Bunker Hill Mine before 1994, the owners and operators of the Crescent Mine are liable.

---

[214] *Reichhold Chems, Inc. v. Textron, Inc.* 888 F. Supp. 1116, 1129 (N.D. Fla. 1995).

[215] *42 U.S.C.* § 9601(22).

[216] *PCS Nitrogen Inc.*, 714 F.3d at 185; *see also Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923, 929 (9th Cir. 2013) ("CERCLA imposes strict liability on all entities that have owned or operated 'facilities' at which hazardous substances were 'disposed.' . . . The current owner of any facility at the time of cleanup is also strictly liable for any 'release' of hazardous substances from the facility, *see* 42 U.S.C. § 9601(22) (defining 'release' broadly), unless the owner satisfies the 'narrowly applicable' 'innocent landowner' defense. . . ." (citations and footnote omitted); *Pakootas*, 452 F.3d at 1078 n.17 ("Section 107(a) imposes strict liability on all PRPs, even if those persons are in fact not responsible for any pollution at all."); *U.S. v. Burlington Northern & Santa Fe Ry.*, 520 F.3d 918, 927 (9th Cir. 2008) ("Unlike the Restatement's common law causation, CERCLA affixes liability based upon its PRP provisions, which define classes of liable parties based upon a party's statutorily-defined nexus to the contaminated site.").

### D. The Crescent Parties are among the classes of persons subject to liability under § 107(a).

1. <u>CM and Crescent Silver are liable as the current owner and operator of the Crescent Mine</u>.

"Section 9607(a)(1) renders current owners and operators strictly liable for response costs regardless of their culpability."[217]  As the present owner and operator of the Crescent Mine, CM and Crescent Silver are liable for "releases" of mine-impacted water from the Crescent Mine.

CM is the current owner of the Crescent Mine,[218] and is thus a liable party under § 107(a)(1).  Under CERCLA, "[t]he current owner of any facility at the time of cleanup is . . . strictly liable for any 'release' of hazardous substances from the facility, *see* 42 U.S.C. § 9601(22) (defining 'release' broadly)."[219]  CM is the owner of a facility from which there have been releases of a hazardous substance.  There is no requirement that a release be active, intentional, knowing, or negligent.[220]

Crescent Silver is the operator of the Crescent Mine, and as such, it too is strictly liable for any "release" of hazardous substances from the Crescent Mine.  To be liable under §

---

[217] *PCS Nitrogen Inc.*, 714 F.3d at 185 (footnote omitted); *Litgo N.J., Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 381 (3rd Cir. 2013) ("[CERCLA] does not require a showing that the operator was directly responsible for the release of a hazardous substance for PRP liability to attach. . . .  The plaintiff need only show that the party engaged in operations related to pollution and that a 'release' of hazardous substances occurred, a requirement that can be met by showing that there was a passive migration of waste."); *U.S. v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188, 1198 (E.D. Cal. 2008) (holding that property owner was a responsible party under CERCLA because its property tested positive contamination with a arsenic—a hazardous substance).

[218] Sec. Am. Cmplt. (Dkt. 51) ¶ 11; Hogle Dec. (Dkt. 112-9) Ex. 2 (2/21/24 Crescent 30(b)(6)) at 44:5-45:19.

[219] *Anderson Bros., Inc.*, 729 F.3d at 929.

[220] *Bob's Beverage, Inc. v. Acme, Inc.*, 169 F. Supp. 2d 695, 730 (N.D. Ohio 1999).

107(a)(1) as an "operator," a party "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[221]  CM has no employees or contracts; operation of the Crescent Mine falls to Crescent Silver.[222]  Crescent Silver's operations include dealing with disposals and releases of mine-impacted water from the Crescent Mine, including a mine water disposal option involving the Bunker Hill Mine.[223]  Thus, Cresent Silver is liable as the Crescent Mine's operator.

> 2.  Syringa is liable for disposals of hazardous substances that occurred during the times when it was an owner and operator of the Crescent Mine.

"[A]ny person who at the time of a disposal of any hazardous substance owned or operated a facility at which such hazardous substances were disposed of" is liable under CERCLA.[224]  Syringa was a past owner and operator when disposals of hazardous substances occurred at the Crescent Mine.[225]

"[T]he mere migration of contaminants from adjacent land constitutes disposal for the purposes of CERCLA, and passive downstream landowners [as the Crescent Parties claim to be]

---

[221] *U.S. v. Bestfoods*, 524 U.S. 51, 67-68 (1998).

[222] Hogle Dec. (Dkt. 112-9) Ex. 2 (2/21/24 Crescent 30(b)(6)) at 15:14-16, 63:21-24, 190:21-191:5, 248:23-249:15.

[223] Ex. 11 (Klepfer) at 13:5-14:3, 14:21-18:16, 20:12-21:25, 33:18-35:8, 38:11-43:19, 45:18-47:19, 49:1-51:17; Ex. 19 (2018 Scope – Dep. Ex. 114); Ex. 20 (2021 Gross email – Dep. Ex. 118); Ex. 21 (2020 Mtg. Notes – Dep. Ex. 119); Ex. 22 (2022 Tech. Memo. – Dep. Ex. 121); Ex. 23 (2022 Gross email – Dep. Ex. 61).

[224] 42 U.S.C. § 9607(a)(2).

[225] Hogle Dec. (Dkt. 112-9) Ex. 24 (2/22/24 Crescent 30(b)(6)) at 32:22-33:14; Ex. 24 (Syringa Deed) at CRES_00026669-76; Ex. 27 (Mtg./Security Agr.) at CRES_00026680-94; Ex. 28 (2012 Settlement Agr.) at CRES_00027118-58; Ex. 29 (Am. and Rest. Dev. Agr. – Dep. Ex. 74) at BHMC_057473-74, 57487; Ex. 30 (Stmt. of Net Profit on Mines) at CRES_00050604.

are liable for the cleanup costs resulting from their neighbor's activities."[226]  Liability under §
9607(a)(2) is *not* limited to the initial disposal of a hazardous substance or even to active
participation in disposal,[227] and it extends to "discharging," "spilling," and "leaking."[228]

      In this case, a factfinder could find that the Crescent Mine flooded from (a) the natural
inflow into the Crescent Mine (not from the Bunker Hill Mine); and/or (b) the actions of the
Crecent Parties' predecessor, BHM (U.S.) Inc. removing the pumping and electrical equipment
from the mines.  The factfinder could also conclude that the water "discharges," "leaks," and
"spills" from the Crescent Mine into the Bunker Hill Mine through Y-U Crosscut.  After
pumping resumed in 1994, the water pumped from the Bunker Hill Mine pool necessarily
includes Crescent Mine water.  That is sufficient to prove "disposal."

      The Crescent Parties argue that they never owned or operated the Bunker Hill Mine.[229]
That is irrelevant.  Whether their mine is part of the property for which BHMC sued them is
irrelevant; the relevant question is whether their property and operations are part of a "facility"

---

[226] *Reichhold Chems, Inc.,* 888 F. Supp. at 1129.

[227] *See, e.g., Kaiser Aluminum and Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342-43
(9th Cir. 1992) (holding that term "disposal" is "not limit[ed] . . . to the initial introduction of
hazardous material onto property" and "should be read broadly to include subsequent
'movement, dispersal, or release[] [of such substances]. . . ." (quoting *Tanglewood East
Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988)).

[228] 42 U.S.C. § 9603(3); *Carson Harbor*, 270 F.3d at 877, 881, 885 ("Congress did not limit
'disposal' to the initial introduction of hazardous material onto property."  Rather, "it is evident
that CERCLA's primary targets included spills and leaks from abandoned sites — sites at which
there was no longer any affirmative human activity." "[I]f 'disposal' is interpreted to exclude all
passive migration, there would be little incentive for a landowner to examine his property for
decaying disposal tanks, prevent them from spilling or leaking, or to clean up contamination
once it was found."); *U.S. v. Sterling Centrecorp, Inc.*, 960 F. Supp. 2d 1025, 1051-52 (E.D. Cal.
2013) (holding that spilling and leaking of arsenic-laden tailings and water resulting from a
partial collapse of a dam caused a "disposal").

[229] Memo. in Supp. (Dkt. 16-1) at 41.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT
OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
(DKT. 116)** - 53

as defined by CERCLA.[230]  "The boundaries of [a] facility do not necessarily reflect property boundaries, and liability can extend beyond what . . . defendants actually own."[231]  In this case, the "facility" at issue could be construed as both the Bunker Hill and Crescent Mines because they are connected by the Y-U Crosscut, and together they comprise an "area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."[232]

Also irrelevant is whether the Crescent Parties took intentional steps to dispose of mine-impacted water.[233]  CERCLA "impose[s] liability on classes of persons . . . without reference to whether they caused or contributed to the release or threat of release.  The release or threat of release need only have emanated from a facility which [defendant] owned."[234]  "CERCLA imposes liability on the past or present owner of a facility at which hazardous wastes were released or disposed of... 'Mere ownership of the property on which the release took place is sufficient to impose liability under § 107(a), regardless of any control or lack of control over the disposal activities.'"[235]

The Crescent Parties themselves cite *Goe Eng'g Co.*, in which the operator of land adjacent to the § 113(f) claimant's property was denied summary judgment on the claim because

---

[230] *PCS Nitrogen Inc.*, 714 F.3d at 178.

[231] *U.S. v. Capital Tax Corp.*, 545 F.3d 525, 535 (7th Cir. 2008).

[232] *See* 42 U.S.C. § 9601(9).

[233] Memo. in Supp. (Dkt. 16-1) at 41.

[234] *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1153 (1st Cir. 1989); *U.S. v. Sterling Centrecorp Inc.*, 977 F.3d 750, 753–55 (9th Cir. 2020) (affirming district court holding that potentially responsible parties for mine facility were liable for response costs addressing groundwater contamination in areas beyond mine facility that were impacted by releases of mining wastes from mine).

[235] *U.S. v. Honeywell Int'l, Inc*., 542 F. Supp 2d at 1198(alteration in original) (quoting *Lincoln Prop., Ltd. v. Higgins*, 823 F. Supp. 1528, 1533 (E.D. Cal. 1992)).

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 54

the claimant's expert "believes contamination has migrated from the [operator's] Property to the . . . Property [that the claimant is cleaning up], and several [water quality control board] letters to [the operator] state that [the operator] may be a responsible party under CERCLA."[236]  Due to "the possibility that [the operator] itself is responsible for a portion of the contamination of the [claimant] Property through its alleged contamination of the [operator's] Property," summary judgment dismissal of the claimant's CERCLA claims was denied.[237]

Likewise, in this case, BHMC's and Placer's experts opine that contaminated water flows from the Crescent Mine to the Bunker Hill Mine through the Y-U Crosscut.  And it's not just BHMC's and Placer's experts.  The Crescent Parties' experts do as well.[238]

### E. Releases of hazardous substances from the Crescent Mine caused BHMC to incur the portion of the water treatment costs that BHMC seeks to recover from the Crescent Parties.

BHMC's evidence proves a causal connection between releases of mine-impacted water from the Crescent Mine and an increase in BHMC's water treatment costs.

---

[236] *Goe Eng'g Co.*, 1997 U.S. Dist. LEXIS 23627 at *49.

[237] *Id.* at *55.

[238] Norton Dec. Ex. TT (Beale 6/24 Rep.) at 5 ("Considering all the available evidence, I estimate that a net contribution of 15-20 gpm of water may have flowed from the Crescent Mine to the Bunker Hill Mine since 1995."); Ex. 3 (2003 Beale Rep. to IDEQ – Dep. Ex. 54) at § 4.1 ("If a connection exists on the 23-level, water would be drawing from the Crescent workings to the Bunker Hill on a year-round basis."); Hogle Dec. (Dkt. 112-9) Ex. 3 (6/7/24 Rigby Rep.) at 13-14 (relying on 2010 Brackebusch memo); *id.* Ex. 4 (Rigby) at 118:9-119:19; *id.* Ex. 25 (11/17/10 Brackebusch Memo –Dep. Ex. 29) at CRES_00011128-30 (describing dewater plan as involving pumping water from the Bunker Hill Mine pool); *id.* Ex. 16 (Rosasco) at 148:25-149:11 (testifying that it is unlikely that sampling of water in the lower levels of the CM will show the absence of hazardous substances).

The SAOC obligates BHMC to pay for past and future water treatment costs, and as of June 2024, BHMC paid $12.8 million.[239]  The cost is largely based on the volume of water treated at the CTP.[240]  The water treatment costs that BHMC pays pursuant to the SAOC are presumptively necessary costs of response consistent with the NCP.[241]  A portion of the costs that BHMC pays is due to water from the Crescent Mine.  It is indisputable that water flows from the Crescent Mine into the Bunker Hill Mine pool via the Y-U Crosscut, and the Bunker Hill Mine pool must be pumped from the Bunker Hill Mine to the CTP for treatment in compliance with EPA orders and the SAOC.  The Crescent Mine water released into the Bunker Hill Mine is mine-impacted and in need of treatment, and the CTP is the only treatment facility available.[242] The treatment costs that BHMC pays, therefore, are caused, at least in part, by releases from the Crescent Mine.

BHMC offers a volumetric allocation of liability based on the quantity of mine-impacted water released from the Crescent Mine into the Bunker Hill Mine, with an adjustment for certain costs based on the quality of water from the Flood-Stanley Ore Body in the Bunker Hill Mine.[243]

---

[239] Ex. 31 (6/24 White Rep. – Dep. Ex. 32) at 45-47; *Asarco LLC v. Atl. Richfield Co*., 975 F.3d 859, 866 (9th Cir. 2020) ("'[A] finding that a cost has been 'incurred' may be based on an existing legal obligation.'" (quoting *Trimble v. Asarco, Inc*., 232 F.3d 946, 958 (8th Cir. 2000)).

[240] Norton Dec. Ex. R (SAOC) ¶¶ 38-39; Ex. 4 to Ash Dec. (First Am. to SAOC – BHMC_00008-000034) ¶ 3; Ex. 31 (6/24 White Rep. – Dep. Ex. 32) at 43-47; Ex. 32 (White) at 9:12-21.

[241] *See* 40 C.F.R. § 300.700(c)(3)(ii); *Boeing Co.*, 920 F. Supp. at 1132.

[242] Ex. 6 (6/24 Donahue Rep – Expert Dep. Ex. 20) at 5–8; Ex. 33 (Sandy Rep. – Dep. Ex. 68) at 2-3; Ex. 34 (Sandy) at 11:14-12:7; Hogle Dec. (Dkt. 112-9) Ex. 2 (2/21/24 Crescent 30(b)(6)) at 56:4-9, 57:11-16, 104:15-101:4, 106:19-107:18; *id.* Ex. 24 (2/22/24 Crescent 30(b)(6)) at 45:15-46:16; Norton Dec. Ex. R (SAOC) ¶¶ 29, 33.

[243] Ex. 29 (6/24 White Rep. – Dep. Ex. 32) at 49-57; Ex. 35 (8/24 White Rep.) at 3.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 56

The Court may use volume as the primary or exclusive basis for allocation.[244]  The flow rate of water from the Crescent Mine to the Bunker Hill Mine has been, on average, a third of the flow sent to the CTP since 1996.[245]

The Crescent Parties argue that BHMC's $20 million commitment to the EPA is a portion of the purchase price for the Bunker Hill Mine.[246]  The "purchase price" paid for the Bunker Hill Mine is conclusively identified in § 2.2 of the Purchase and Sale Agreement for the mine, and it nowhere identifies any amount to be paid to EPA as part of the purchase price.[247]  This Court's decision approving the 2018 Consent Decree makes clear that the $20 million that BHMC is obligated to pay is to "be paid by BHMC directly to EPA."[248] That fact distinguishes the remittance from a purchase price.

The Crescent Parties argue that, since 1994, the Bunker Hill Mine has pumped on average 400-450 gpm from the mine pool, which is water mostly from the upper workings of the Bunker Hill Mine.[249]  This assertion disregards records that show that on average, 721 gpm have been pumped from the mine pool.[250]  In his 2003 Report to IDEQ, Mr. Beale found that "[t]he

---

[244] *Boeing Co.*, 207 F.3d at 1188; *see also In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 901 (5th Cir. 1993) (holding that "volume may be a reasonable means of apportioning liability."); *U.S. v. Davis*, 261 F.3d 1, 30 (1st Cir. 2001) ("The chief factor in the court's determination was the volume of waste disposed at the . . . site that could be attributed to each defendant. . . .").

[245] Morton Dec. ¶ 48, Ex. A.

[246] Memo. in Supp. (Dkt. 116-1) at 14.

[247] Norton Dec., Ex. S (Purchase and Sale Agr.) at § 2.2, BHMC_002773-74.

[248] *U.S. v. Placer Mining Co., Inc.*, No. 2:04-CV-00126-EJL, 2018 WL 7352423, *2 (D. Idaho June 19, 2018); Ex. 14 (2018 Consent Decree) at BHMC_000040.

[249] Memo. in Supp. (Dkt. 116-1) at 36.

[250] Ex. 36 (Flow Chart – Dep. Ex. 56); Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 59:5-19.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 57

total pumped flow rate from the mine pool averages about 700-800 gpm."[251]  The Crescent

Parties have presented no evidence indicating the portion of the water pumped from the mine

pool that originates from the upper levels of the Bunker Hill Mine.

    The Crescent Parties argue that pumping in the Bunker Hill Mine is what causes BHMC

to incur response costs because the pumping draws Crescent Mine water into the Bunker Hill

Mine that would otherwise remain within the Crescent Mine.  The argument is specious for at

least two reasons.

    First, under CERCLA, the Crescent Parties are liable for the response costs incurred due

to "release[s]" of mine-impacted water from the Crescent Mine,[252] and "release[s]" include

"any spilling, leaking, pumping, pouring, emitting, . . . discharging, . . . escaping, . . . or

disposing into the environment. . . ."[253]  Substantial evidence indicates that there have been

"release[s]" of hazardous substances in the form of mine-impacted water from the Crescent Mine

to the Bunker Hill Mine.  The Crescent Mine accumulates water on its own, and the topography

and higher water level in the Crescent Mine means that Crescent Mine water "spill[s]," "leak[s],"

"pour[s]," or "emit[s]" from the Crescent Mine through the Y-U Crosscut to the Bunker Hill

Mine.  Otherwise, the water would flow out of the Hooper Tunnel.[254]

---

[251] Ex. 3 (2003 Beale Rep. to IDEQ – Dep. Ex. 54) at § 4.9; Hogle Dec. (Dkt. 112-9) Ex. 18 (Beale) at 26:25-28:12, 57:4-14, 59:16-19; *see also* Norton Dec. Ex. D (2001 RI/FS) at BHMC_001267 ("The discharge from this pump system enters the 9 Level at the Loadout Area (9LA). The flow rate is fairly constant and averages between 600 and 900 gpm.").

[252] 42 U.S.C. § 9607(a).

[253] *Id*. § 9601(22).

[254] Norton Dec. Ex. N (1991 Pintlar Rep.) at 26; Hogle Dec. (Dkt. 112-9) Ex. 6 (P. Sala) at 35:3-6; *id*. Ex. 18 (Beale) at 116:2-8.

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 58

It does not matter that Bunker Hill Mine pumping keeps the water level in the Bunker Hill Mine at around the 11 Level. If BHMC did not maintain the water level at around the 11 Level and instead let the water rise and flow out the Kellogg Tunnel, the water level in the Crescent Mine would still be higher because, aside from the Y-U Crosscut, the lowest outlet for water in the Crescent Mine is the Hooper Tunnel, which is about 300 feet higher in elevation than the Kellogg Tunnel.[255] Thus, the mine-impacted water would flow from the Crescent Mine to the Bunker Hill Mine through the Y-U, even if there were no pumping in the Bunker Hill Mine.[256]

Second, the Crescent Parties' argument ignores EPA requirements put in place to protect human health and the environment. Since November 1994, the Bunker Hill Mine has been under EPA orders to pump the mine pool to maintain the water elevation in the Bunker Hill Mine at about the 11 Level.[257] The EPA has found that such pumping is necessary to protect human health and the environment.[258] In following EPA orders, the Bunker Hill Mine must pump mine-impacted water released from the Crescent Mine through the Y-U Crosscut. But for the release of Crescent Mine water into the Bunker Hill Mine, BHMC would pay less for water treatment costs. BHMC's evidence is sufficient to satisfy CERCLA's causation requirement.

---

[255] Hogle Dec. (Dkt. 112-9) Ex. 8 (Fischer) at 28:23-29:1; *id.* Ex. 7 (L. Sala) at 59:19-60:7; Norton Dec. Ex. D (2001 RI/FS) at BHMC_001268.

[256] Morton Dec. ¶ 34.

[257] Norton Dec. Ex. I (1994 UAO) ¶ 9.1; *id.* Ex. R (SAOC) ¶¶ 28-34; Ex. 2 to Ash Dec. (2017 UAO) ¶ 36 and Appx. D; Ex. 4 to Ash Dec. (First Am. to SAOC).

[258] Norton Dec. Ex. I (1994 UAO) ¶ 3.9; Hogle Dec. (Dkt. 112-9) Ex. 12 (2001 ROD Am) at CRES_19300, 19307, 19313, 19315; Ex. 2 to Ash Dec. (2017 UAO) ¶ 26.i.; Norton Dec. Ex. R (SAOC) ¶ 23.e.

In sum, substantial evidence supports BHMC's and Placer's § 113(f) contribution claims. The Crescent Parties attempt to argue that BHMC's claims lack merit because they have been asserted, not only to achieve a recovery, but to gain advantage in negotiations with Crescent Silver to purchase the Crescent Mine. The Crescent Parties are grasping at straws. Those purposes are wholly consistent. The stronger the claim, the more leverage it provides. The Crescent Parties' argument reveals nothing more than the weakness of their Motion.

## V.   THE MOTION WITH RESPECT TO BHMC'S AND PLACER'S § 113(g)(2) CLAIMS FOR DECLARATORY JUDGMENT SHOULD BE DENIED.

The Ninth Circuit has held that § 113(g)(2), the declaratory judgment provision of CERCLA, applies to § 113(f) contribution actions.[259] Thus, if BHMC and Placer prevail on their § 113(f) contribution claims, they are entitled to "a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."[260] BHMC and Placer have presented sufficient evidence to overcome the Crescent Parties' Motion with respect to their contribution claims. Accordingly, the Court should deny the Motion with respect to BHMC's and Placer's § 113(g)(2) declaratory judgment claims.

## VI.   BHMC'S INDEMNITY, SUBROGATION AND CONTRIBUTION CLAIMS ARE ACTIONABLE IF THE COURT IS INCLINED TO DISMISS BHMC'S CERCLA CLAIMS.

Notwithstanding their Motion for summary judgment dismissal of BHMC's CERCLA claims, the Crescent Parties argue that BHMC has an adequate remedy under CERCLA, so BHMC's claims for indemnity, subrogation and contribution should be dismissed. BHMC

---

[259] *Boeing Co.*, 207 F.3d at 1191.

[260] 42 U.S.C. § 9613(g)(2).

agrees that it has an adequate remedy under CERCLA because it has demonstrated that it is entitled to advance its CERCLA § 113(f) contribution claims and recover from the Crescent Parties' their share of the water treatment costs that BHMC has incurred under the SAOC. If the Court agrees, BHMC has an adequate remedy under CERCLA, and BHMC need not advance its Idaho law-based claims for indemnity, subrogation and contribution. If the Court holds otherwise, then BHMC has no remedy under CERCLA, and it should be allowed to advance its indemnity, subrogation and contribution claims.

## CONCLUSION

The Crescent Parties' Motion lacks merit and should be denied. CM's claims fail as a matter of law, for the reasons BHMC and Placer demonstrated in their summary judgment motions. If they survive BHMC's and Placer's motions, fact issues preclude summary judgment on them in CM's favor. BHMC's and Placer's claims withstand the Motion for the same reason. For these reasons, the Court should deny the Motion.

DATED this 10th day of January, 2025.

HOLLAND & HART LLP

By: */s/Christopher R. Hogle*
    Christopher R. Hogle
    Sarah M. Perkins

By: */s/Christopher C. McCurdy*
    Murray D. Feldman
    Christopher C. McCurdy

*Attorneys for Defendant, Counterclaimant, and Third-Party Plaintiff Bunker Hill Mining Corporation*

**BUNKER HILL MINING CORPORATION AND PLACER MINING CORPORATION'S JOINT OPPOSITION TO CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 116)** - 61

DATED this 10th day of January 2025.

GIVENS PURSLEY LLP


By:*/s/Preston N. Carter*
      Preston N. Carter
      Morgan D. Goodin
      Megann E. Meier

*Attorneys for Placer Mining Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of January, 2025, I filed the foregoing electronically

through the CM/ECF system, which caused the following parties or counsel to be served by

electronic means as more fully reflected on the Notice of Electronic Filing:

Wade C. Foster
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
wade.foster@stoel.com

Maren R. Norton (*Admitted pro hac vice*)
Sean T. James (*Admitted pro hac vice*)
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA  98101
maren.norton@stoel.com
sean.james@stoel.com

James T. Graves (*Admitted pro hac vice*)
GRAVES ENVIRONMENTAL LAW PLLC
4736 NE 187th Place
Lake Forest Park, WA  98155
james@gravesenvirolaw.com

*Attorneys for Plaintiff*

Preston N. Carter
Morgan D. Goodin
GIVENS PURSLEY LLP
601 W. Bannock Street
P. O. Box 2720
Boise, ID  83701-2720
prestoncarter@givenspursley.com
morgangoodin@givenspursley.com

*Attorneys for Defendant,*
*Placer Mining Corporation*

/s/ Christopher C. McCurdy
Christopher C. McCurdy
for Holland & Hart LLP

33969147_v4