Preston N. Carter, ISB No. 8462
Morgan D. Goodin, ISB No. 11184
Megann E. Meier, ISB No. 11948
GIVENS PURSLEY LLP
601 West Bannock Street
Post Office Box 2720
Boise, Idaho  83701-2720
Telephone  (208) 388-1200
Facsimile  (208) 388-1300
prestoncarter@givenspursley.com
morgangoodin@givenspursley.com
mem@givenspursley.com
18730810.3 [16454.1]

*Attorneys for Defendant Placer Mining Corporation*

IN THE DISTRICT UNITED DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| CRESCENT MINE, LLC | Case No. 2:21-cv-00310-DCN |
| Plaintiff, | |
| v. | PLACER MINING CORPORATION'S RESPONSE TO CRESCENT MINE LLC'S MOTION TO AMEND SECOND AMENDED COMPLAINT [DKT 117] |
| BUNKER HILL MINING CORPORATION; AND PLACER MINING CORPORATION (d/b/a New Bunker Hill Mining Co.), | |
| Defendants. | |

TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

LEGAL STANDARDS..........................................................................................................3

    1.   New plaintiffs can be added only upon a showing of "good cause," which requires diligence on the part of the moving party. ................................................................3

    2.   Punitive damages can be added only if the moving party provides substantial evidence of a bad act, committed with a bad state of mind, regarding a legally cognizable claim..........................................................................................................4

ARGUMENT .......................................................................................................................5

    1.   Crescent's request to add two new plaintiffs is two years late, isn't supported by good cause, and would severely prejudice Placer.....................................................5

    2.   Crescent's state-law claims aren't legally cognizable. Even if they are, Placer's diversion of water wasn't fraudulent, oppressive, or outrageous; it was approved by EPA. .............................................................................................................................9

        a.   Crescent's claims against Placer are not legally cognizable.............................15

        b.   Crescent doesn't present evidence of fraudulent, oppressive, or outrageous conduct, as necessary to claim punitive damages. ...........................................17

CONCLUSION...................................................................................................................19

Placer Mining Corporation (Placer) files this Memorandum in Response to Crescent Parties' Motion to Amend Second Amended Complaint [DKT 117].

## INTRODUCTION

Crescent Mine, LLC (Crescent) moves to amend its complaint in two significant ways. First, it seeks to add two new plaintiffs, Crescent Silver, LLC and Syringa Exploration, Inc., under F.R.C.P. 16(b).[1] Second, it seeks to add a claim for punitive damages against Placer and Bunker Hill Mining Corporation (BHMC) under I.C. § 6-1604(2). The motion should be denied in full.

The attempt to add two new plaintiffs is two years too late. As the Court instructed:

> All motions to amend pleadings and join parties, except for allegations of punitive damages, shall be filed on or before **November 15, 2022**. This deadline shall only be extended for good cause shown. All parties are entitled to know the claims and parties well-before trial rather than be forced to pursue or defend against a moving target. *Although this deadline precedes the general discovery deadline, the parties are directed to send out all discovery requests that might relate to amendment or joinder enough in advance of this amendment and joinder deadline to obtain the responses needed to make an informed decision on amendment or joinder.*

Dkt. 64, ¶2 (italics added).

Despite this warning, Crescent waited until the dispositive motion deadline on December 2, 2024—more than two years after the initial deadline and six months after the close of the discovery period—to make its request. Crescent doesn't offer any justification for the delay. For that reason alone, Crescent can't satisfy Rule 16(b)'s "good cause" standard, which requires a showing of diligence. *See Kamal v. Eden Creamery*, LLC, 88

---

[1] Crescent Silver and Syringa are also Crescent's co-defendants in the consolidated case (Case No. 2:21-cv-00209-DCN).

F.4th 1268, 1277 (9th Cir. 2023) (explaining that the movant's diligence in seeking amendment is the foremost consideration under Rule 16(b)).

To compound Crescent's lack of diligence, the addition of two new plaintiffs would severely prejudice Placer. The discovery period is closed. The dispositive motion deadline has expired. This matters because Placer litigated the case as it was pled. Placer propounded discovery, took depositions, crafted its arguments, and moved for summary judgment against the only plaintiff that asserted claims against it—Crescent Mine, LLC. Joining two new plaintiffs would deprive Placer of the right to litigate against those plaintiffs. This severe prejudice provides "additional reasons" to deny the addition of these new plaintiffs. *See id.*

As for Crescent's request to claim punitive damages under Idaho Code section 6-1604(2), Crescent alleges that "Placer intentionally diverted metals-laden acid mine drainage ('AMD') into the lower workings of the Bunker Hill Mine between 1993 and 1994" even though it knew its actions would flood the Crescent Mine. Dkt. 117-1 at 2.

But this conduct wasn't tortious, much less egregious enough to support a claim for punitive damages. *See, e.g., Seiniger L. Off., P.A. v. N. Pac. Ins. Co.,* 145 Idaho 241, 249–250 (2008). EPA—which retained, and still retains, supervisory authority over the Bunker Hill Superfund Site—specifically approved the diversions. In March 1993, before the diversions at issue occurred, EPA authorized Placer to "[d]ivert all of the mine drainage from the Reed Tunnel and the Kellogg Tunnel back into the mine there is no discharge at all." Dkt. 110-2, Ex. 10 at 1. EPA permitted Placer to do so even though EPA "recognize[d] this action will speed up the rate of flooding of the Bunker Hill mine." *Id.*

EPA's approval of in-mine diversions in 1993–1994 is consistent with its course of conduct afterward. For example, EPA has repeatedly asked Placer to divert water into the mine pool to perform maintenance at the Central Treatment Plant (CTP), Dkt. 110-2, Ex. 30 at 53:15–54:8, and EPA specifically oversaw the construction of facilities to divert AMD into the lower levels of the Bunker Hill Mine, *see* Jan. 10, 2024 C. Hogle Dec., Ex. 2 (Stefanoff Dep.) at 227:7–323:8; *id.*, Ex. 39 (Apr. 2011 email chain) at CRES_00045891–45898. EPA then went further: it made in-mine storage an express legal requirement of its 2001 Amendment to the 1992 Record of Decision (ROD), Dkt. 110-1, ¶¶42–43; the Unilateral Administrative Order on Consent (UAO) directed to Placer in 2017, *id.* at ¶45; and the 2018 Settlement Agreement and Order on Consent entered into between BHMC and the United States, *id.* at ¶¶46–50.

In short, Placer acted with EPA's oversight and approval. This precludes a finding that Placer's conduct "constituted an extreme deviation from standards of reasonable conduct." *Seiniger,* 145 Idaho at 250**.** For this and other reasons, Crescent's request to add punitive damages must be denied. Placer cannot be subjected to damages at all—much less punitive damages—for conduct consistent with EPA's orders. *See Bartlett v. Honeywell Int'l Inc.*, 737 F. App'x 543, 548–49 (2d Cir. 2018).

## LEGAL STANDARDS

**1. New plaintiffs can be added only upon a showing of "good cause," which requires diligence on the part of the moving party.**

Untimely motions to amend a scheduling order are governed by Federal Rule of Civil Procedure 16(b)(4), which requires a showing of "good cause." Dkt. 64 at ¶2 n. 2 (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F. 2d 604 (9th Cir. 1992)). This good cause standard considers, foremost, the movant's diligence in seeking amendment. *E.g.*,

*Kamal,* 88 F.4th at 1277 (quoting *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013)).

"[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson,* 975 F.2d at 609. If the movant was not diligent, "the [good cause] inquiry should end." *Id.*; *Kamal*, 88 F.4th at 1277 (same).

   **2. Punitive damages can be added only if the moving party provides substantial evidence of a bad act, committed with a bad state of mind, regarding a legally cognizable claim.**

"Punitive damages are not favored in the law and should be awarded in only the most unusual and compelling circumstances." *Seiniger,* 145 Idaho at 249. Accordingly, claimants cannot initially seek punitive damages in their complaint; they must produce evidence and seek specific permission from the court. I.C. § 6-1604(2).

Motions to amend to seek punitive damages are subject to section 6-1604(2)'s high standard. *E.g., Davis v. Blast Properties, Inc.,* 551 P.3d 706, 709 (Idaho 2024). Under the statute, a claimant may seek punitive damages only if "after weighing the evidence presented, the court concludes that, the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." I.C. § 6-1604(2). This means the movant must present "substantial" evidence that the defendant (1) committed a "bad act," and did so with (2) a "bad state of mind." *See Davis,* 551 P.3d at 710–711; *Seiniger,* 145 Idaho at 250 ("The issue of punitive damages revolves around whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind." (internal quotation marks omitted)).

In other words, there must be substantial evidence that the defendant acted "in a manner that was an extreme deviation from reasonable standards of conduct," *Seiniger,*

145 Idaho at 250, and in a state of mind that was "extremely harmful," *id.*, such as by being "oppressive, fraudulent, malicious or outrageous," I.C. § 6-1604(1); *Vendelin v. Costco Wholesale Corp.,* 140 Idaho 416, 430 (2004). This standard is very high. "[G]ross negligence or deliberate or willful conduct is not sufficient for and award of punitive damages." *Cummings v. Stephens*, 157 Idaho 348, 363 n. 5 (2014).

Punitive damages are not free-standing claims; they can be sought only for a legally cognizable cause of action. *See, e.g.*, *Davis,* 551 P.3d at 710–711. Thus, "a motion to amend to include a request for punitive damages should be denied" if the underlying claim is "legally insufficient." *Id.* at 711 (citing *Duffin v. Idaho Crop Imp. Ass'n,* 126 Idaho 1002, 1013–14 (1995)).

**ARGUMENT**

1. **Crescent's request to add two new plaintiffs is two years late, isn't supported by good cause, and would severely prejudice Placer.**

In the context of an untimely motion to amend, Rule 16(b)(4) "requires a party to establish 'good cause' for its failure to timely amend under the scheduling order deadlines." *E.g.*, *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1294 (9th Cir. 2000). The principal factor in this analysis is the movant's diligence. *Kamal,* 88 F.4th at 1277. When a movant seeks to add new parties in a pleading filed after the deadline has passed, courts primarily consider when the movant was put on notice of the proposed party's potential relevance in relation to the filing date of the motion to amend. *E.g., id*. Although a lack of diligence can itself be dispositive, *Johnson,* 975 F.2d at 609, "the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny" untimely motions to amend, *Kamal*, 88 F.4th at 1277.

Two cases are particularly instructive. In *Kamal*, the Ninth Circuit affirmed the district court's denial of a motion to join an additional defendant when the movant had knowledge of that party's potential relevance before the deadline past, and at least eight months before the motion was filed. *Kamal*, 88 F.4th at 1277.

In *Johnson*, the Ninth Circuit affirmed the district court's denial of an untimely motion to amend when the nonmovant had repeatedly informed the movant, through its answers to the complaint and responses to interrogatories, that another defendant needed to be named. *Johnson*, 975 F.2d at 609–610 ("Failing to heed clear and repeated signals that not all the necessary parties had been named in the complaint does not constitute diligence.")

Here, Crescent moves to amend the scheduling order to add two corporate entities, Crescent Silver, LLC and Syringa Exploration, Inc., as plaintiffs. This motion comes more than two years after the scheduling order's November 15, 2022, deadline to join parties, Dkt. 64 at ¶2, a deadline Crescent never sought to extend despite four prior extensions of other deadlines, *see* Dkts. 69–70, 78, 81, 97–98, 103–104. It also comes two and one-half years since the Court granted the parties' stipulated motion to consolidate this case with Case No. 2:21-cv-00209-DCN, the action in which Crescent Silver and Syringa are Crescent's co-defendants and counterclaimants against BHMC. *See* Dkt. 54.

Crescent hasn't demonstrated diligence. Indeed, Crescent's motion doesn't substantively address diligence at all. *See generally* Dkt. 117-1 at 16–17. Crescent certainly doesn't explain why it waited more than *two years* to move to join these parties as plaintiffs. *See id*. Nothing suggests that, for example, new and unexpected information

obtained near the end of the discovery period prompted its belated motion.[2] And there's no explanation for what new development could warrant Crescent Silver and Syringa being added as plaintiffs on *all six* causes of action that Crescent alleges against Placer. *See id.*, Exs. A & B. Instead, Crescent simply says that adding Crescent Silver and Syringa would "avoid duplicative litigation, be an efficient use of judicial resources, and avoid potential conflicting results." *Id.* at 17. That's the rationale that prompted this Court's consolidation order on April 19, 2022. But it has nothing to do with Crescent's diligence, or lack thereof, in adding new plaintiffs to its case against Placer.

Without an explanation to justify the lateness of its motion, Crescent cannot show that it was diligent in moving to amend the scheduling order to add Crescent Silver and Syringa as plaintiffs. For this reason alone, Crescent's motion must be denied. *E.g., Johnson,* 975 F.2d at 609 ("If th[e] party was not diligent, the inquiry should end.").

Adding two new plaintiffs at this stage of the case would also severely prejudice Placer. *Kamal*, 88 F.4th at 1277. Placer has litigated this entire case against the only party that asserted a claim against it—Crescent Mine, LLC. For example, Placer asserted a counterclaim against only Crescent Mine, LLC; it propounded discovery only upon

---

[2] It could be that Crescent realizes that it hasn't met the elements of its cost-recovery claim against Placer. Cost-recovery claims can only be brought by the party that directly incurred the response costs, *Asarco LLC v. Atlantic Richfield Co.*, 866 F.3d 1108, 1116 (9th Cir. 2017), and during deposition, one of Crescent's experts admitted that all of Crescent's claimed response costs were incurred by Crescent Silver. Dkt. 110-2, Ex. 34 at 176:8–17. However, *even if* this deposition testimony has motivated Crescent's motion to some degree, it wouldn't explain why Crescent also seeks to join Syringa. Nor, at bottom, could this information provide the Court with a basis to add new parties two years after the amendment deadline when that information was necessarily available to Crescent since this litigation began. *See Johnson,* 975 F.2d at 609 ("[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.").

Crescent Mine, LLC; it conducted a 30(b)(6) deposition only of Crescent Mine, LLC. Placer retained experts related to Crescent's claims against Placer. Placer moved for summary judgment only against Crescent Mine, LLC, and only against the claims asserted by Crescent Mine, LLC.

By contrast, Crescent Silver and Syringa never asserted claims against Placer. So Placer did not assert counterclaims against them; it did not propound discovery on them; it did not conduct 30(b)(6) depositions against them; it did not retain experts related to their (as-yet-unasserted) claims; and it never moved for summary judgment against them. If two new plaintiffs are added, Placer would need the right to litigate those claims. That would require re-doing the case, as to Placer.

The period for conducting fact discovery closed on May 31, 2024. Dkt. 98 at 1. The period for conducting expert discovery closed on September 19, 2024. Dkt. 104, ¶2(a). The dispositive motion deadline expired on December 2, 2024. *Id*., ¶2(c). This matters because, contrary to Crescent's assertions, the joinder of Crescent Silver and Syringa to all of Crescent's claims against Placer significantly expands the legal and factual issues attendant to those claims.

Take the cost-recovery claim in Count 1. Because the response costs a party may recover under CERCLA § 107 must be incurred by that party directly, the joinder of two additional plaintiffs means that claim now seeks response costs allegedly incurred by Crescent Silver and Syringa, too. *See Asarco LLC,* 866 F.3d at 1116. Whether these costs were validly incurred should have been the subject of factual and expert witness discovery. Similarly, that Syringa has an ownership interest in Crescent, and Crescent Silver in turn has an ownership interest in Syringa, raises a host of issues when those entities now assert

tort claims against Placer for alleged trespasses, nuisances, and negligence affecting Crescent's real property. These sorts of complexities are presumably why, in the portion of the scheduling order governing joinder, this Court instructed that "All parties are entitled to know the claims and parties well-before trial rather than be forced to pursue or defend against a moving target." Dkt. 64 at ¶2.

Crescent also argues that adding two new plaintiffs won't prejudice Placer because Placer already "agreed in a stipulated motion to consolidating this case with a case where Syringa and Crescent Silver are parties." Dkt. 117-1 at 17. Not so. That Placer stipulated to the consolidation of this case with Case No. 2:21-cv-00209-DCN did not expand the universe of claims for which Placer could be held liable. And, despite the consolidation, the only claims ever asserted against Placer were asserted by Crescent; Crescent Silver and Syringa were not parties to this case against Placer, nor did they assert third-party claims against Placer in Case No. 2:21-cv-00209-DCN.

In sum, Crescent brings its motion to amend two years too late—and after the expiration of the discovery and dispositive motion deadlines—without any justification for its delay. And adding two new parties at this stage of the case would severely prejudice Placer. Crescent's attempt to add two new plaintiffs to the claims against Placer under Rule 16(b)(4) must be denied.

**2. Crescent's state-law claims aren't legally cognizable. Even if they are, Placer's diversion of water wasn't fraudulent, oppressive, or outrageous; it was approved by EPA.**

Crescent's attempt to seek punitive damages against Placer must be denied for at least two reasons. First, because none of its causes of action against Placer are legally sufficient, Crescent has no claim upon which to attach a punitive damages remedy.

Second, because Crescent lacks evidence that Placer acted maliciously, fraudulently, oppressively, or outrageously by diverting water into the lower levels of the Bunker Hill Mine between 1993 and 1994, it cannot satisfy section 6-1604(2)'s strict amendment standard.

To begin to explain why, it is important to briefly review the evidence. For most of this litigation, Crescent alleged that, beginning in 1991, Placer diverted AMD generated at the Bunker Hill Mine into that mine's lower levels, causing the adjacent Crescent Mine to flood with contaminated water. *E.g.*, Dkt. 51 at ¶¶17–19. According to Crescent, this flooding was made possible because, before its allegedly wrongful diversions, Placer neglected to install a plug in Y-U Crosscut—the 3.7-mile long tunnel connecting the Bunker Hill Mine's 23-Level to the Crescent Mine's 3100-Level—thereby ensuring that the Crescent Mine would flood in tandem with the Bunker Hill Mine. *Id.* at ¶¶13, 20. And because the lower levels of the Crescent Mine have remained inaccessible since the principal flooding events of 1991 to 1994, Crescent has demanded that Placer fully dewater the Crescent Mine by "pumping out all of the AMD-contaminated water within the Crescent Mine's lower levels," in addition to other remedies. *Id.,* Prayer for Relief at ¶3.

The evidence doesn't support Crescent's allegations. Now that discovery has been conducted, it's clear that the Bunker Hill and Crescent mines began flooding in the summer of 1991 when the mines' joint owner, Bunker Hill Mining Company (U.S.), Inc. (Bunker Hill Mining Co.), filed for bankruptcy and began a months-long salvage operation in which it removed all pumps and transformers from the mines—beginning with the Crescent Mine—and then shut off the power. Dkt. 110-1 at ¶¶1, 3, 15–19. Bunker Hill

Mining Co. did so, in part, at the direction of EPA, which required that all PCB transformers be removed from the mines before they inevitably flooded when the pumps and power were disconnected. *Id*. at ¶¶14–15.

As soon as Bunker Hill Mining Co. removed the pumps, transformers, and hoists from both mines and shut off the power, the mines immediately began to flood. *Id*. at ¶19. In fact, the water elevation is suspected to have reached the Y-U Crosscut by October or November 1991. *Id*. at ¶¶20–21. So by the time Placer took ownership of the Bunker Hill Mine on April 28, 1992, *id*. at ¶5; Dkt. 116-2 at ¶8, there was no electricity to the mine, no pumps or hoists in the lower levels of the mine, and, consequently, Placer had no ability to access the mine below the 9-Level, Dkt. 110-1 at ¶22. At this point, plugging the (already flooded) Y-U Crosscut would have been impossible, Dkt. 110-2, Ex. 30 at 58:14–20, and it took several months for Placer to reestablish power and resume even partial pumping of the Bunker Hill mine pool, Dkt. 110-1 at ¶23.

To be clear, Placer never—ever—staged materials in the Y-U Crosscut to institute a plug. That would've been impossible. It never happened, and there's not a shred of evidence to support that allegation. *Contra* 2d. Am. Compl. (Dkt. 51) ¶20 (alleging that Placer moved materials in the mine to construct a plug, but then failed to install the plug).

Against this background, Crescent scaled back its argument. Now Crescent argues only that Placer's diversions of AMD between 1993 and 1994 were wrongful. But even these scaled-back arguments aren't supported by the evidence. Crescent relies significantly on EPA's 1991 UAO. But that order was issued to Bunker Hill Mining Co. and its corporate affiliates, not Placer. Dkt. 110-4, Ex. 45 at BHMC_024897 (1991 UAO issued to Bunker Limited Partnership; B.H. Properties, Inc.; Bunker Hill Mining Company (U.S.),

Inc.; and Minerals Corporation of Idaho). Nor does anything in that 1991 UAO purport to bind Bunker Hill Mining Co.'s successors-in-interest; Crescent doesn't even argue that it does.[3] *See generally, id.*

Crescent also argues that the '93–'94 diversions violated the 1992 ROD. But the 1992 ROD didn't prohibit Placer from diverting water into the lower levels of the Bunker Hill Mine. Instead, the 1992 ROD adopted a remedial measure that required treatment of mine-impacted water "*if discharging*." Dkt. 110-2, Ex. 3 at CRES_00021189, -21200 (emphasis added); *see also id.* at CRES_00021208–21209. Read in context, the 1992 ROD prohibited Placer from discharging AMD *from the mine* without treatment at the CTP. Confirming this interpretation, an engineering consultant who did extensive work for EPA at the CTP and Bunker Hill Mine Complex testified that Placer wasn't required to route "all acid mine drainage" to the CTP; only "the water that need[ed] to be treated," such as water going out of the Kellogg Tunnel, had to be sent to the CTP. *See* Jan. 10, 2024 C. Hogle Dec., Ex. 2 (Stefanoff Dep.) at 234:4–15**,** 236:2–237:3.

Third—and directly contrary to Crescent's punitive damages theory—EPA expressly *approved* Placer's diversion of AMD into the lower levels of the Bunker Hill Mine in 1993. Indeed, in March 1993, EPA met with Placer's representative, Robert Hopper, and sent a

---

[3] And, *even if* the 1991 UAO applied to Placer, Placer did not violate it. Crescent offers no evidence that Placer discharged AMD from the mine anywhere except to the CTP. Nothing in the 1991 UAO prohibited transfers of AMD from one area of the mine to another, and nothing in the UAO required that AMD be conveyed *outside* of the mine. *See generally, id.*; Dkt. 110-2, Ex. 34 at 66:1–10. It was common in the mining industry to divert water from one part of the mine to another, Dkt. 110-2, Ex. 38 at 46:18–22, and the 1991 UAO didn't attempt to limit or intrude on that practice.

follow-up letter identifying two acceptable options for managing contaminated water at the mine. The first option—which Placer chose—was to:

> 1. Divert all of the mine drainage from the Reed Tunnel and the Kellogg Tunnel back into the mine there is no discharge at all. We recognize this action will speed up the rate of flooding of the Bunker Hill mine, and eventually you will still need to treat the mine drainage once the mine is flooded to a level that results in discharge from the Kellogg Tunnel.

Dkt. 110-2, Ex. 10 at 1.

As this letter indicates, EPA specifically approved Placer's diversion of AMD into the lower levels of the mine so long as the water was eventually treated at the CTP. And EPA's letter again confirms that Placer wasn't required to treat the *in-mine* AMD at the CTP; Placer was required to treat the AMD ultimately being "discharge[d] *from* the Reed Tunnel and the Kellogg Tunnel." *Id.*

Fourth, early in 1993, Pintlar Corporation, which owned the CTP at the time, notified Placer that Pintlar would cease treating Bunker Hill Mine's water. *See* Dkt. 110-2, Ex. 25 at BHMC_051575. This prompted the March 1993 meeting between Placer and EPA. *See id.* (EPA responding to Placer's understanding that "Bunker Limited Partnership and Pintlar Corporation would *no longer be providing . . . treatment of the Bunker Hill mine drainage at the Central Treatment Plant* (CTP)." (emphasis added)).

Finally, after the 1993–1994 period addressed in Crescent's arguments, EPA repeatedly approved—and in fact required—Placer to divert water into the lower levels of the Bunker Hill Mine. For example, EPA has asked Placer to divert water down the No. 2 Raise (and into the mine pool) to perform maintenance at the CTP between two and four times per year, for periods ranging from 24-hours to several days. Dkt. 110-2, Ex. 30 at

53:15–54:8. Then, in December 2002, EPA itself supervised the construction of facilities to divert water into the lower levels of the Bunker Hill Mine for purposes of in-mine storage. *See* Jan. 10, 2024 C. Hogle Dec., Ex. 2 (Stefanoff Dep.) at 227:7–323:8; *id.*, Ex. 39 (Apr. 2011 email chain) at CRES_00045891–45898.

These actions are consistent with EPA's orders and agreement with Placer, and later BHMC, requiring that the Bunker Hill Mine maintain the capacity to divert and store AMD in the lower levels of the mine. For example, in the 2001 Amendment to the 1992 ROD, EPA stated that Placer would be required to construct "a new gravity diversion system" in the mine to "route water from the upper workings of the mine into the mine pool for storage" when necessary. Dkt. 110-2, Ex. 13 at CRES_00019310; *see also id.* at CRES_00019313, § 8.1 (explaining that EPA's selected remedy would "permit more significant in-mine storage").

For another, EPA's 2017 UAO required Placer to control the flow rate of mine water to the CTP during upgrades and high flows and to construct an in-mine diversion system "such that diverted flows of Mine Waters . . . will be stored within the mine or discharged at a controlled rate." Dkt. 110-2, Ex. 16 at BHMC_026888–026909. For yet another, BHMC executed a *Settlement Agreement and Order on Consent for Response Action* (SAOC) with the United States, requiring BHMC to, amongst other things, provide in-mine storage and activate an in-mine storage system upon EPA direction. Dkt. 110-2, Ex. 18 at CRES_00043736.

In sum, the acts that Crescent claims are extreme deviations from the standard of care were, in fact, approved by EPA. And they form part of a consistent, decades-long history of EPA-overseen and EPA-required diversion of AMD to lower levels of the

Bunker Hill Mine. This raises serious problems of proof for Crescent on its underlying claims; this conduct just isn't tortious. It also belies the idea that Placer acted in "extreme deviation from reasonable standards of conduct," as would be necessary to support punitive damages. *Seiniger,* 145 Idaho at 250.

    **a.  Crescent's claims against Placer are not legally cognizable.**

Before a party may amend its complaint to seek punitive damages, it must have a "legally cognizable" claim. *E.g.*, *Davis*, 551 P.3d at 710.

Placer recently moved for summary judgment challenging the sufficiency of all of Crescent's claims. *See* Dkt. 110. Rather than inundate the Court with repetitious briefing, Placer incorporates its arguments challenging the viability of Crescent's claims, including, but not limited to, its argument about (i) CERCLA sections 113(h) and 122(e)(6), (ii) the expiration of the applicable limitations periods, (iii) Crescent's failure to disclose recoverable damages, and (iv) Crescent's failure to incur qualified response costs. *Id.* at 3–20.

That said, the narrowing of Crescent's claim to the '93–'94 diversions significantly strengthens these arguments. As Placer pointed out, the damages calculations offered by Crescent's expert are based entirely on the assumption that the Crescent Mine would be dry (and therefore accessible) but-for the flooding that occurred between 1991 and 1994. *Id.* at 13–16. Specifically, Crescent's expert opined that it would cost approximately $13.8 million to fully dewater the Crescent Mine, as necessary to put the Crescent Mine in the condition it was in *before 1991*, and that the diminution in value between the Crescent Mine's fully-flooded, present state and its *pre-flooding* (1991) state is approximately $27 million. Dkt. 110-2, Ex. 35 at 9, 13–19.

As the record demonstrates, however, the Bunker Hill Mine and Crescent Mine's joint owner knowingly flooded the mines in 1991, up to and beyond the Y-U Crosscut. Crescent has not disclosed *any* damages calculations that attempt to parse the damages caused by Placer's allegedly tortious acts and the activities of the mines' joint owner. In other words, Crescent doesn't provide any evidence of damages damages tied to the state of the Crescent Mine before and after the wrongful acts that now supports its state-law claims: the diversions that occurred in 1993–1994.

This is a significant omission given that, as a matter of law, an owner's activities upon its real property cannot give rise to trespass, nuisance, and negligence claims by a successor-in-interest. Dkt. 110 at 17–20. It is also problematic given that, when a claimant such as Crescent alleges a continuing tort, it can only recover for damages incurred *within the limitations period. Id.* at 14–16.

Crescent has not disclosed damages incurred after July 2018 to substantiate its trespass claims, *see* I.C. § 5-218, and it hasn't disclosed damages incurred after July 2017 to substantiate its nuisance and negligence claims, *see* I.C. § 5-224. To be clear, to prevail on its tort claims, Crescent must establish with "reasonable certainty" the damages it incurred, within the limitations period, from Placer's diversions between 1993 and 1994. *E.g.*, *Greenfield Fam. Tr. V. Olive Fountain Land Co., LLC*, 170 Idaho 672, 681 (2022); *Spanbauer v. J.R. Simplot Co.*, 107 Idaho 42, 45 (1984). Crescent has not disclosed any such damages. With the fact and expert witness discovery periods now closed, Crescent simply lacks the evidence necessary to support its tort claims against Placer. On this basis alone, Crescent is not qualified to seek punitive damages in conjunction with its trespass, nuisance, and negligence claims. *See Davis,* 551 P.3d at 710–711.

**b. Crescent doesn't present evidence of fraudulent, oppressive, or outrageous conduct, as necessary to claim punitive damages.**

To seek punitive damages, a claimant must present evidence to convince the court that it has a "reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." I.C. § 6-1604(2). According to the Idaho Supreme Court, this standard requires that the claimant have "substantial" evidence to prove that the defendant (1) committed a "bad act" with (2) a "bad state of mind" (*i.e.*, an oppressive, fraudulent, wanton, malicious, or outrageous state of mind). *See Davis,* 551 P.3d at 711; *Seiniger,* 145 Idaho at 250. Crescent doesn't meet this standard.

First, the evidence does not establish that Placer committed a "bad act" when it diverted AMD into the Bunker Hill Mine's lower levels between 1993 and 1994. A "bad act" is performed "in a manner that was an extreme deviation from reasonable standards of conduct." *Seiniger,* 145 Idaho at 250. For example, in *Vendelin v. Costco Wholesale Corp*., the Idaho Supreme Court found that a jury had sufficient evidence that Costco acted in "extreme deviation from reasonable standards" when, despite having prepared over 900 accident reports involving falling merchandise, Costco failed to train its staff regarding proper stacking procedures. 140 Idaho at 431.

Here, the record shows that EPA expressly instructed Placer that it *could* divert AMD into the lower levels of the Bunker Hill Mine in 1993, even though doing so would increase the rate of flooding of the mine pool. Dkt. 110-2, Ex. 10 at 1. In addition, Crescent's own experts have agreed that Placer was not under an obligation to pump water from the Bunker Hill Mine until EPA issued another UAO in 1994, at which point EPA required Placer to keep the water elevation at the 11 Level. *Id*., Ex. 34 at 67:4–7; *id*., Ex. 38 at 143:14–144:9.

Actions taken with EPA's permission, on an EPA-regulated Superfund site, cannot be considered an extreme deviation from reasonable standards. Indeed, Placer can't be held liable for *any* state-law damages, much less punitive damages, based on conduct consistent with EPA's orders on a CERCLA site. *See Bartlett*, 737 F. App'x at 548–49.

Second, the evidence doesn't support the idea that Placer diverted AMD into the mine pool between 1993 and 1994 with an "oppressive, fraudulent, malicious or outrageous" state of mind. I.C. § 6-1604(1). On this point, Crescent merely alleges that Placer "intentionally diverted all AMD into the lower levels of the mine . . . to avoid paying water treatment costs." Dkt. 117-1 at 5. While Placer does not dispute that, in October 1993, Robert Hopper wrote a letter expressing relief that Pintlar Corporation was no longer willing to treat Bunker Hill Mine's water, Dkt. 110-2, Ex. 25, Placer's relief at avoiding (or at least postponing) water treatment costs is a far cry from "oppressive, fraudulent, malicious or outrageous" conduct. As discussed, EPA had already told Placer that it *could* divert AMD into the mine pool. *Id.*, Ex. 10.

Nor is it clear that Placer had any other realistic option. As reflected in Hopper's letter, and recognized by EPA's letter, Pintlar had indicated its intent to stop treating Bunker Hill's AMD at the CTP. *See id.*; Dkt. 110-2, Ex. 25 at BHMC_051575 (EPA responding to Placer's understanding that "Bunker Limited Partnership and Pintlar Corporation would *no longer be providing . . . treatment of the Bunker Hill mine drainage at the Central Treatment Plant* (CTP)." (emphasis added)). In response to Pintlar's cessation of treatment, routing AMD into the lower levels of the mine was clearly superior to discharging it, untreated, to surface waters. This is why EPA approved the practice. *See*

*id.* That Placer was relieved to save water-treatment costs is not evidence of "an extremely harmful state of mind." *Seiniger,* 145 Idaho at 250.

To amend its complaint, Crescent must come forward with substantial evidence to support an award of punitive damages under section 6-1604. Crescent has not done so. Instead, the evidence conclusively establishes that EPA permitted Placer to divert AMD into the mine pool between 1993 and 1994, and has repeatedly required such diversions in the many years since. Punitive damages can be awarded "only in the most unusual and compelling circumstances." *Id.* at 249. This isn't one of them. Crescent's attempt to seek punitive damages must be denied.

CONCLUSION

For these reasons, Crescent's motion to amend should be denied.

Dated: January 10, 2025.

GIVENS PURSLEY LLP

By ___*/s/ Preston N. Carter*_____
        Preston N. Carter
        Morgan D. Goodin
        Megann E. Meier
        Attorneys for Placer Mining
        Corporation

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 10, 2025, a true and correct copy of the foregoing document was served by the method indicated below upon the following parties:

Murray D. Feldman                                    MFeldman@hollandhart.com
Christopher C. McCurdy                               ccmccurdy@hollandhart.com
Holland & Hart LLP
800 W. Main St., Ste. 1750
Boise
*Attorneys for Bunker Hill Mining Corporation*

Christopher R. Hogle (Admitted pro hac vice)         crhogle@hollandhart.com
Sarah M. Perkins (Admitted pro hac vice)             smperkins@hollandhart.com
Holland & Hart LLP
222 S. Main St., Ste. 2200
Salt Lake City, UT 84101
*Attorneys for Bunker Hill Mining Corporation*

Wade C. Foster                                       wade.foster@stoel.com
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
*Attorneys for Crescent Mine, LLC*

Maren R. Norton (Admitted pro hac vice)              maren.norton@stoel.com
Sean T. James (Admitted pro hac vice)                sean.james@stoel.com
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101
*Attorneys for Crescent Mine, LLC*

James T. Graves (Admitted pro hac vice)              james@gravesenvirolaw.com
Graves Environmental Law PLLC
4736 NE 187th Place
Lake Forest Park, WA 98155
*Attorneys for Crescent Mine, LLC*


  */s/ Preston N. Carter*
Preston N. Carter