Wade C. Foster, ISB No. 11105
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000
Facsimile: (208) 389-9040
*wade.foster@stoel.com*

Maren R. Norton, admitted *pro hac vice*
Sean T. James, admitted *pro hac vice*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
*maren.norton@stoel.com*
*sean.james@stoel.com*

James T. Graves, admitted *pro hac vice*
GRAVES ENVIRONMENTAL
LAW PLLC
4736 NE 187th Place
Lake Forest Park, WA 98155
Telephone: (206) 889-2330
*james@gravesenvirolaw.com*

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CRESCENT MINE, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**BUNKER HILL MINING CORPORATION; PLACER MINING CORPORATION** (d/b/a New Bunker Hill Mining Co.),<br><br>Defendants. | **Case No. 2:21-cv-00310-DCN**<br><br>CRESCENT MINE, LLC'S RESPONSE IN OPPOSITION TO PLACER MINING CORPORATION'S AND BUNKER HILL MINING CORPORATION'S MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 108 and 112) |

COMES NOW Plaintiff Crescent Mine, LLC ("Crescent") by and through undersigned counsel, Stoel Rives LLP, and submits this memorandum in opposition to Placer Mining Corporation's ("Placer") Motion for Summary Judgment (ECF 108) (the "Placer Motion") and Bunker Hill Mining Corporation's ("BHMC") Motion for Summary Judgment (ECF 112) (the "BHMC Motion"). This memorandum is supported by Crescent's Statement of Disputed Material Facts filed concurrently herewith.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 1

## I. INTRODUCTION

BHMC and Placer's motions are divorced from reality. They fail to accurately represent both the record and applicable law in an attempt to avoid responsibility for the intentional flooding of the Crescent Mine, which is just one chapter in the long history of mismanagement of the acid mine drainage ("AMD") generated within the Bunker Hill Mine. Crescent has incurred, and will continue to incur, response costs, within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act, "CERCLA," 42 U.S.C. § 9601, *et seq.*, because of the Bunker Hill Mine AMD that has flooded into the lower Crescent Mine. Crescent's state law claims do not challenge the Environmental Protection Agency's ("EPA") orders, records of decision, or settlement agreement with BHMC – which Placer repeatedly ignored, consistently failed to comply with, and violated. Instead, Crescent seeks to hold Placer responsible for its damage to the Crescent Mine and seeks to hold BHMC liable, as the current owner of the Bunker Hill Mine, for its failure to remedy the flooding of the Crescent Mine caused by its predecessor-in-interest.

Placer and BHMC cannot credibly dispute the fact that the Crescent Mine is flooded with AMD from the Bunker Hill Mine. Instead, both argue that Crescent's CERCLA claims should be dismissed because Crescent purportedly has not incurred response costs because of this AMD. This argument is both factually and legally unsupportable and fails at the outset because Crescent Mine, LLC has incurred costs responding to the AMD that flooded into the Crescent Mine from the Bunker Hill Mine, which are documented, necessary, and consistent with the National Contingency Plan. These costs include renting equipment and purchasing supplies to facilitate essential sampling and monitoring of the AMD contamination from the Bunker Hill Mine. Under CERCLA, the critical inquiry is which party incurred the response costs, not necessarily which party paid them. Placer and BHMC's arguments challenging Crescent's response costs fail to grasp

this point and ignore well-established CERCLA case law that consistently holds defendants liable in such scenarios.

Crescent's requested relief will not impact EPA's selected remedy at all. Tellingly, BHMC has represented to both potential investors and EPA that it intends to dewater the Bunker Hill Mine to resume mining within its lower levels. These representations are inherently contradictory to BHMC's current arguments, as they demonstrate BHMC's acknowledgment of the feasibility and necessity of lowering the mine pool. In response, EPA has informed BHMC that its primary obligation under the EPA orders directed at the Bunker Hill Mine is to keep the Bunker Hill Mine pool no higher than the 10 Level, but that "[i]t's at the discretion of the mine operator to drain the mine pool lower" than the 10 Level if BHMC so chooses. Crescent's requested relief (whether monetary damages or injunctive relief) does not challenge, directly or indirectly, EPA's selected remedy for the Bunker Hill Mine. Instead, Crescent simply seeks redress for the flooding of the Crescent Mine, which is not addressed by EPA's selected remedy, orders, or agreements with Placer or BHMC. Thus, the requested relief is both reasonable and legally permissible under CERCLA and Idaho law.

Placer and BHMC's attempts to evade liability for Crescent's tort claims are equally unavailing. Placer takes issue with Crescent's tort claims because Crescent did not own the Crescent Mine when Placer flooded it with AMD. However, the timing of Crescent's acquisition is irrelevant under well-established principles of continuing trespass and nuisance and is not a defense. Under Restatement (Second) of Torts § 161, which Placer itself relies on, a claimant can bring suit for continuing trespass and nuisance based on contamination that predates the claimant's ownership of the property. *See* Restatement (Second) of Torts § 161 cmt. e (1965).

Placer also argues that Crescent's claims are not for continuing torts because the associated harm is not reasonably abatable and, even if it were, Crescent has not incurred actual damages within the statutory period. Neither assertion is correct. The estimated cost to dewater the Crescent Mine pales in comparison to both the current value of the Crescent Mine in its flooded condition and the additional value that will be added when Crescent is able to resume mining activities on the lower levels of the Crescent Mine. Further, as Placer concedes, whether abatement poses an unreasonable hardship is a question of fact to be decided at trial, not on summary judgment. Placer's related assertion that Crescent has not suffered economic damages ignores the fact that Crescent also seeks injunctive relief, is in the process of amending its complaint to seek punitive damages, and, for injuries to property, nominal damages are assumed. Therefore, even if Placer's characterization of Crescent's economic damages were correct, dismissal of Crescent's tort claims still would not be warranted.

For its part, BHMC argues that it is not liable for continuing trespass or nuisance because the flooding at issue predates its ownership of the Bunker Hill Mine. However, a trespass can be committed "by the continued presence on the land of a … thing which the actor's predecessor in legal interest … has tortiously placed there, if the actor … fails to remove the thing." Restatement (Second) of Torts § 161. Likewise, under Idaho Code § 52-109, "[e]very successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by a former owner, is liable therefor in the same manner as the one who first created it."  These principles of law unambiguously establish that BHMC cannot escape liability simply by blaming Placer or its predecessor for flooding the Crescent Mine.

Accordingly, for the reasons set forth below, both Placer's and BHMC's respective motions for summary judgment should be denied in their entirety.

## II.  POINTS AND AUTHORITIES IN OPPOSITION

**A.    Crescent Has Incurred CERCLA Response Costs.**

A party need only have incurred $1 in costs to have a CERCLA claim for response costs. *See, e.g.*, *Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co*., 358 F.3d 661, 668 n.4 (9th Cir. 2004) ("As soon as the [plaintiff] expended its first dollar, it could have sued [defendant] for this dollar."). It is immaterial whether a Crescent parent company ultimately paid the response costs. The question before the Court is: did Crescent Mine incur response costs?  The unequivocal answer is yes.

BHMC and Placer point to Paul Rosasco's testimony to argue that all response costs "were incurred by Crescent Silver, LLC," not Plaintiff Crescent Mine, LLC.[1] This argument misrepresents the legal standard and factual record. First, "a party may be found to have 'incurred' a cost without having actually paid for it," and "a finding that a cost has been 'incurred' may be based upon an existing legal obligation." *Trimble v. Asarco, Inc.*, 232 F.3d 946, 958 (8th Cir. 2000), *abrogated on other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005). "[P]laintiffs may 'incur' costs even if another entity actually pays for those costs" because "the relevant inquiry is 'who assumed a legal obligation to pay.'" *Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*, 222 F. Supp. 3d 757, 765 (D. Ariz. 2016) (quoting *Wilson Rd. Dev. Corp. v. Fronabargar Concreters, Inc.*, 971 F. Supp. 2d 896, 910 (E.D. Mo. 2013)). Here, Plaintiff Crescent Mine, LLC incurred costs that were necessary and consistent with the National Contingency Plan. For example, Crescent Mine, LLC was billed approximately $80 by The Rental Store for equipment rented to prepare for sampling the water in the Ellis Shaft.[2]

---

[1] BHMC Motion at 4-5; *see also* Placer Motion at 20.
[2] *See* ECF 116-45 (Rosasco August Report), Ex. 2 at 64-65. Notably most invoices are addressed to Crescent Silver, LLC, but these invoices are specifically addressed to Crescent Mine.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 5

Crescent Mine, LLC was also billed approximately $2,900 by MineFab, LLC for supplies to rehabilitate the Hooper Tunnel in order to prepare for sampling the water in the Ellis Shaft.[3] These expenditures demonstrate that Crescent Mine, LLC actively engaged in necessary preparatory and investigative work required to address the AMD contamination caused by the Bunker Hill Mine, and incurred associated "response costs," as defined under CERCLA. As explained by the court in *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205, 232 (N.D.N.Y. 2021), even a single invoice to the plaintiff is sufficient to satisfy the requirement that the plaintiff *incurred* costs.

Second, Mr. Rosasco testified that he believed the costs incurred were *paid* by Crescent Silver, LLC, but did not specifically know how payment was made.[4] As noted above, payment is not the critical inquiry; rather, the incurrence of a legal obligation to pay is the touchstone for "incurring costs" under CERCLA. *Trimble*, 232 F.3d at 958; *Roosevelt Irrigation Dist.*, 222 F. Supp. 3d at 765. Mr. Rosasco testified that the Crescent parties, including Crescent Mine, LLC, incurred costs consistent with the National Contingency Plan.[5] Under CERCLA jurisprudence, Crescent Mine, LLC's clear legal obligation to pay for costs incurred as a result of the release of

---

[3] *Id.* at 93-96.

[4] ECF 112-25 (Rosasco Dep.) at 176:16-20

[5] *See id.* at 140:18-24. Because Crescent Mine, LLC has incurred response costs, both its CERCLA § 107 and § 113(g)(2) claims should be allowed to proceed to trial. Separately, it is undisputed that Crescent Silver, LLC has also incurred response costs, and the Crescent parties have submitted a motion to amend to join Crescent Silver as a plaintiff. However, even if that motion is denied, Crescent Silver can (1) file a stand-alone complaint against BHMC and Placer under CERCLA §§ 107 and 113(g)(2) to achieve resolution on the merits, or (2) assign its CERCLA claims to Crescent Mine, LLC. *See First Edwards, LP v. Union Pac. R.R. Co.*, No. CV H-08-1573, 2009 WL 10693830, at *8 (S.D. Tex. Mar. 16, 2009) (holding CERCLA claims are assignable); *Moraine Props., LLC v. Ethyl Corp.*, No. 3:07-CV-229, 2008 WL 4758692, at *4 (S.D. Ohio Oct. 27, 2008) ("Common sense dictates that § 107(a) is the appropriate vehicle for a party that, as an assignee, 'stands in the shoes' of the true plaintiff in a § 107(a) claim.").

AMD from the Bunker Hill Mine satisfies the foundational requirement for a cost recovery claim under CERCLA.

There can be no dispute regarding the fact that Crescent Mine, LLC was invoiced and assumed a legal obligation to pay certain costs, which Mr. Rosasco opined to be necessary and consistent with the National Contingency Plan under CERCLA.[6]  The defendants' arguments fail to refute this legal and factual certainty. Thus, Crescent has incurred the minimum of $1 in response costs necessary for a CERCLA cost recovery claim. Accordingly, Crescent's cost-recovery claim satisfies the statutory threshold and must proceed to resolution on the merits.

**B.    Crescent's State Law Claims Are Not Preempted by CERCLA.**

BHMC and Placer attempt to hide behind the various EPA orders and settlement agreements to suggest that CERCLA preempts Crescent's state law claims. However, this contention is entirely baseless, as Crescent's requested relief aligns with and does not contradict any EPA documents or directives.

As summarized in the 2018 Settlement Agreement and Order on Consent for Response Action by Bunker Hill Mining Corp. (the "2018 SAOC"), EPA requires the owner of the Bunker Hill Mine to: (1) "keep the mine pool pumped to an elevation ***below*** the level of the South Fork Coeur d'Alene River (***at or below*** Level 11 of the Mine) to prevent discharges to the river," (2) "convey mine water to the CTP for treatment," and (3) "provide for emergency mine water storage within the mine."[7] Additionally, EPA requires the owner of the Bunker Hill Mine to "control mine water flows to the CTP during needed upgrades at the CTP and in high flow periods," and must keep the elevation of the Bunker Hill Mine pool at or below 10 Level "during [such] diversion

---

[6] ECF 116-45 (Rosasco August Report) at 49-55.
[7] ECF 116-21 (2018 SAOC) at ¶ 21 (emphasis added).

events."[8] Dewatering the lower Crescent Mine does not conflict with any of these obligations. In fact, Crescent's proposed relief is entirely consistent with these objectives.

BHMC and Placer characterize Crescent's requested relief as requiring pumping of both the Bunker Hill and Crescent Mines, which BHMC and Placer suggest would interfere with EPA's selected remedy for the Bunker Hill Mine. However, even assuming that pumping out the lower Crescent Mine via the Bunker Hill Mine would interfere with EPA's remedy (a premise Crescent vehemently denies), BHMC's former VP of Sustainability has stated that BHMC "can seal" the Y-U Crosscut "no problem" and it would not be "cost-prohibitive" to do so.[9] BHMC's CEO testified that BHMC has looked into sealing the Y-U Crosscut while the mines are flooded and was informed by a mining consultant that it is "theoretically possible, but technically challenging."[10] These admissions directly undermine BHMC's claim that Crescent's requested relief is unfeasible or cost-prohibitive. Sealing the Y-U Crosscut would make it possible to pump the Crescent dry from the Crescent side without affecting the water level in the Bunker Hill Mine.

Crescent's expert evaluated the cost of pumping to the CTP, but there is no reason that water could not be pumped up the Ellis Shaft, through the Hooper Tunnel to a new treatment plant. Indeed, EPA's directives provide sufficient flexibility to allow for innovative approaches like this without interfering with the current remedy.[11] BHMC itself has explored plans to build a new water treatment plant to handle water taken from the Bunker Hill Mine and Crescent Mine pools.[12]

---

[8] *Id.*

[9] Declaration of Maren Norton ("Norton Decl."), Ex. A (2/23/21 Barnett Email).

[10] *Id.*, Ex. B (Sam Ash Deposition Transcript) at 227:2-10.

[11] ECF No. 116-21 (2018 SAOC) at 10 (allowing BHMC to divert water to CTP until alternative treatment, including a new treatment plant, is established).

[12] Norton Decl., Ex. C (August 2021 BHMC Email Chain) at 1 ("In the [Preliminary Economic Analysis], it was contemplated that [BHMC] would build [its] own water treatment system"); Norton Decl., Ex. D (June 2020 BHMC Email Chain) at 1 ("Another scenario we will

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 8

Crescent has also evaluated installation of a water treatment plant near the outlet of the Hooper Tunnel.[13] Crescent's original evaluation was for a treatment plant that would solely treat water being discharged naturally from the upper levels of the Crescent Mine,[14] but there is no reason why the design could not be expanded to treat water pumped up from the lower levels of the Crescent Mine as well.

Sealing the Y-U Crosscut and dewatering the Crescent Mine from the Crescent side would not conflict with EPA's selected remedy, settlement agreements, or other orders. Neither the 2018 SAOC, EPA's various unilateral administrative orders, nor its Record of Decision ("ROD") for management of Bunker Hill Mine AMD prescribe remedial action for the Crescent Mine or even meaningfully address the mine. The fact that these documents neither analyze nor impose any obligations on the Crescent Mine further demonstrates the absence of any conflict with Crescent's requested relief. The primary focus of the EPA orders that BHMC and Placer attempt to hide behind is preventing environmental contamination from AMD spilling out of the Bunker Hill Mine or rising high enough within the mine that it could be transported via groundwater to the nearby river.[15] EPA's 1992 ROD only mentions the Crescent Mine for background purposes and the 2001 ROD amendment addressing Bunker Hill Mine water does not mention the Crescent Mine at all.[16] The selected remedy for the Bunker Hill Mine was for "[a]ll acid mine drainage [to] be conveyed

---

have to include in our de-watering analysis is the one where … we get our own discharge permit for a water treatment facility.").

[13] *See generally* Norton Decl., Ex. E (Crescent Mine Water Treatment Memo).

[14] *See id.*

[15] *See*, *e.g.*, ECF 112-28 (1994 UAO); ECF 116-21 (2018 SAOC) at ¶ 21 (summarizing obligations imposed by 1994 and 2017 Unilateral Administrative Orders).

[16] ECF 112-26 (1992 ROD) at 2-3, 2-4; *see generally* ECF 112-21 (2001 ROD Amendment).

to the CTP for pre-treatment."[17] EPA's selected remedy for addressing the Bunker Hill Mine's AMD problem does not address the Crescent Mine or preclude dewatering the Crescent Mine.

Even if dewatering from the Crescent side were not feasible (which it is), there is nothing in the relevant EPA orders that prohibits or limits BHMC's ability to lower the level of the Crescent Mine pool or the Bunker Hill Mine pool. Paragraph 29 of the 2018 SAOC provides that "[BHMC] shall construct an In-Mine Diversion System and manage the mine pool such that diverted flows of Mine Waters … will be stored within the mine or discharged at a controlled rate, and not result in uncontrolled discharge to the environment."[18] Paragraph 29.b further specifies that "[BHMC] shall provide storage volume using all void space (the mine workings) from *a minimum* of 30 feet below the sill of the 11 Level at the No. 2 Raise to the sill of the 10 Level at the No. 2 Raise."[19] As explained by Ed Moreen, the EPA remedial manager overseeing the Bunker Hill Mine site, in response to a question from BHMC staff regarding BHMC's ability to dewater below the 11 Level:

> The intent of paragraph 29.b was to allow the Bunker Hill Mine operator to store *up to* the sill of 10 Level as needed for mine water storage during diversion activities. It's *at the discretion of the mine operator to drain the mine pool lower*, but at no point should it exceed the sill of 10 level. As always coordination with the CTP operator is a critical task to be incorporated into draw down and/or filling activities as there may be a shift [in] water quality.[20]

EPA's selected remedial actions for the Bunker Hill Mine (as set forth in its orders and its Record of Decision) solely prohibit raising the mine pool of the Bunker Hill Mine *above* the 10 Level and prohibit uncontrolled releases of AMD to the environment. They do not prohibit BHMC from lowering the Bunker Hill Mine pool, as BHMC and Placer now contend. Rather, the EPA

---

[17] ECF 112-26 (1992 ROD) at 9-9.
[18] ECF 116-21 (2018 SOAC) at ¶ 29.
[19] *Id.* at ¶ 29.b (emphasis added).
[20] Norton Decl., Ex. F (8/13/23 Ed Moreen Email) at 1 (emphasis added).

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 10
127537426.2 0065623-00004

has expressly stated that BHMC has "discretion … to drain the mine pool lower[.]"[21] And, as explained below, that is exactly what BHMC has repeatedly told its investors it intends to do. EPA has never suggested that dewatering the mines would require amending the various orders, agreements, or records of decision relating to the Bunker Hill Mine.[22]

To the extent that BHMC or Placer raise concerns that dewatering would "overwhelm" the CTP,[23] those concerns are unfounded. Between 2017 and 2021, the CTP underwent a major upgrade that increased the plant's water treatment capacity from 2,500 gallons per minute ("gpm") to 8,000 gpm, and future expansion will accommodate 10,000 gpm.[24] In 2023, the CTP received approximately 2,140 gpm on average,[25] which means the CTP has capacity to receive an additional 5,860 gpm. Of the 2,140 gpm average flow, 52% (1,113 gpm) was water from the Bunker Hill Mine and 48% (1,027 gpm) was water from EPA's Groundwater Collection System.[26] Dr. Neal Rigby has opined that the Bunker Hill Mine and Crescent Mine can both be dewatered at a pumping rate of just 2,000 gpm.[27] That would require Bunker Hill to pump only an additional 973 gpm to dewater both mines, raising the total average flow rate to the CTP (relative to 2023) from 2,140 gpm to 3,113 gpm, which is still nearly 5,000 gpm below the CTP's maximum capacity. Thus, any assertion that dewatering the mines would overwhelm the CTP is baseless.

EPA has indicated that there would need to be coordination with the operator of the CTP when dewatering occurs, but this also assumes that water is pumped to the CTP instead of a

---

[21] *Id.*

[22] *See*, *e.g.*, Norton Decl., Ex. G (3/3/22 Ed Moreen Email).

[23] Placer Motion at 6.

[24] Norton Decl., Ex. J (10/21/21 Idaho DEQ Article).

[25] *Id.*, Ex. M (2/7/24 Water Treatment Bill) at 6, Table 4 (showing the CTP received 1,126,520,000 gallons of water in 2023, which equates to 2,142 gpm).

[26] *Id.*

[27] ECF 112-12 (Dr. Rigby 6/7/24 Report) at 13-14.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 11

different water treatment facility.[28] BHMC itself has proposed to build a new water treatment plant to handle water taken from the Bunker Hill and Crescent mine pools.[29] Crescent has also evaluated installation of a water treatment plant near the outlet of the Hooper Tunnel.[30] The original evaluation was for a treatment plant that would solely treat water being discharged naturally from the upper levels of the Crescent Mine,[31] but there is no reason why the design could not be expanded to treat water pumped up from the Crescent Mine pool as well.

The inaccurate assertion that dewatering the mines would conflict with EPA's selected remedy and related orders is squarely refuted by the fact that BHMC itself plans to dewater the Bunker Hill Mine. Since obtaining control of the Bunker Hill Mine in 2018, BHMC has repeatedly touted its plans to dewater the mine. In a 2021 investor presentation, BHMC laid out plans to develop the lower workings of the Bunker Hill Mine below the 23 Level, which necessarily requires dewatering the lower workings.[32] Dewatering the Bunker Hill Mine is fundamental to BHMC's business model.[33]

---

[28] Norton Decl., Ex. G (3/3/22 Ed Moreen Email).

[29] Norton Decl., Ex. C (August 2021 BHMC Email Chain) at 1 ("In the [Preliminary Economic Analysis], it was contemplated that [BHMC] would build [its] own water treatment system…."); Norton Decl., Ex. D (June 2020 BHMC Email Chain) at 1 ("Another scenario we will have to include in our de-watering analysis is the one where … we get our own discharge permit for a water treatment facility.").

[30] Norton Decl., Ex. E (Crescent Mine Water Treatment Memo).

[31] *Id.*

[32] Norton Decl., Ex. H (January 2021 BHMC Corporate Presentation) at 12.

[33] *See id.*; *see also* Norton Decl., Ex. C (August 2021 BHMC Email Chain); Ex. D (June 2020 BHMC Email Chain); Ex F. (8/13/23 Ed Moreen Email); Norton Decl. Ex. O (BHMC Pre-Feasibility Study) (describing plans to dewater in stages for access as deep as Level 26); Ex. P (BHMC Preliminary Economic Assessment) (same); Ex. Q (BHMC Draft Business Plan) at 20, 26 (describing plan to dewater for deep level access); Ex. R (BHMC Draft Document) at 5 (noting potential for discovery of "major silver resources" once the mine "is completely dewatered and rehabilitated at depth"); Ex. H (January 2021 BHMC Corporate Presentation) at 12 (identifying phases of mine development down to 23 Level, which requires dewatering); Ex. I (January 2025 BHMC Corporate Presentation) at 8 (same); Ex. T (March 2021 Corporate Presentation) at 14 and

Indeed, one investor pitch, which was sent to 31,000 recipients,[34] touts the "very significant ore that could be accessed after a dewatering process takes place below the 4,000-foot depth level."[35]  BHMC's most recent corporate presentation, dated January 2025, describes BHMC's plans to dewater the mine, build additional infrastructure on the currently flooded 16 Level, and build a new access ramp down to the 25 Level "to gain access to deeper silver ore-zones."[36]  Not only has BHMC long planned to dewater the Bunker Hill Mine and been expressly informed by EPA that it has the right to do so,[37] BHMC has also evaluated dewatering the Crescent Mine if it is able to obtain ownership.[38]

Paradoxically, BHMC and Placer argue that dewatering the mines would conflict with EPA's requirement that the Bunker Hill Mine "maintain in-mine storage for AMD."[39]  As explained previously, the only requirement in the SAOC regarding the water level in the Bunker Hill Mine is that it remain below the 10 Level.[40] Further, pumping the Bunker Hill Mine pool to the 25 Level would provide for significantly more in-mine AMD storage than currently exists, not less, as BHMC and Placer contend. Dewatering the Bunker Hill Mine to the 25 Level would free up 200 vertical feet of mine workings below the Y-U Crosscut in which AMD could be stored without threatening to flood the Crescent Mine. Moreover, BHMC could opt to temporarily dewater the mine below the 23 Level, long enough to plug the Y-U Crosscut in an unflooded state,

---

17 (same); Ex. U (April 8, 2021 Investor Presentation) at 14 and 17 (same); Ex. V (April 13, 2021 Investor Presentation) at 14 and 17 (same).

[34] Ex. W (10/6/2021 Wiens Email and Investor Pitch) at 1.

[35] *Id.* at 5.

[36] Norton Decl., Ex. I (BHMC January 2025 Corporate Presentation) at 8.

[37] *Id.*, Ex. G.

[38] *Id.*, Ex. K (BHMC Evaluation of Crescent Mine) at 3 (noting that obtaining the Crescent Mine "enables joint Crescent and Bunker Hill **de-watering** strategy") (emphasis in original).

[39] Placer Motion at 7 (citing 2018 SAOC).

[40] Norton Decl., Ex. F (8/13/23 Ed Moreen Email).

and then re-flood the Bunker Hill Mine to as high a level as EPA will allow. Above all, as BHMC's own plans and correspondence with EPA make clear, there is nothing in the SAOC or other EPA orders that would limit BHMC's ability to dewater the Crescent Mine.

### 1.    Crescent's Requested Relief Is Not Preempted by CERCLA § 122(e)(6).

CERCLA section 122(e)(6) deals with "special notice procedures" and requires, in pertinent part, a liable party like BHMC to obtain EPA authorization before undertaking any "remedial action" at a site after entering into a site agreement with EPA such as (in this case) the 2018 Settlement Agreement and Order on Consent.  BHMC argues that "EPA has never authorized BHMC to pump dry the Bunker Hill Mine down to the 23 Level, the Y-U Crosscut, and the Crescent Mine. Any effort by BHMC to do so would have violated CERCLA § 122(e)(6)."[41] This argument is fundamentally flawed. First, plugging the Y-U Crosscut and dewatering the Crescent Mine from the Crescent side would have no impact on the water level in the Bunker Hill Mine pool. Therefore, this relief is entirely consistent with and does not conflict in any way with EPA's orders for the Bunker Hill Mine.

Second, BHMC's assertion is belied by EPA's clear statement (in response to BHMC's question as to whether it may dewater) that BHMC has "discretion … to drain the mine pool lower."[42] This EPA correspondence unequivocally confirms that BHMC has flexibility in managing water levels below the prescribed ceiling at 10 Level and reinforces the feasibility of Crescent's requested relief. Draining the Bunker Hill Mine pool, and concurrently, the Crescent

---

[41] BHMC Motion at 13 (citations omitted).

[42] Norton Decl., Ex. F (8/13/23 Ed Moreen Email) (emphasis added). EPA would reasonably insist that BHMC engage in dewatering carefully and with appropriate communications with EPA and CTP operators (*see*, *e.g.*, Ex. G), but such caveats must be read in the context of EPA having explicitly stated that BHMC has "discretion" to dewater, and such caveats nowhere state or even imply that dewatering would interfere with EPA's remedy or otherwise constitute an "unauthorized" activity in violation of CERCLA section 122(e)(6).

Mine pool, is within the remedial action selected by EPA for the Bunker Hill Mine. This demonstrates that Crescent's requested relief aligns directly with EPA's selected remedial framework and does not represent a departure or conflict. Therefore, there is no conflict between Crescent's requested injunctive relief and the remedy selected by EPA.[43]

BHMC and Placer's reliance on *Atlantic Richfield Co. v. Christian*, 590 U.S. 1 (2020), is misplaced. In *Christian*, the Court held that a group of Montana landowners were potentially responsible parties and could not implement their own restoration plan, or recover costs of implementing their own restoration plan, without EPA approval. *Id.* at 26. There, the restoration plan explicitly went beyond the remedy selected by EPA to clean up the Anaconda Copper Smelter. *Id.* at 5. Unlike *Christian*, Crescent's requested relief does not propose a competing or unauthorized remedy. Instead, Crescent seeks relief that complements and operates within EPA's existing remedial goals.

Likewise, in *Bartlett v. Honeywell International Inc.*, 260 F. Supp. 3d 231 (N.D.N.Y. 2017), *aff'd*, 737 F. App'x 543 (2d Cir. 2018), the plaintiffs directly challenged the sufficiency of remedial action through state tort claims. *Id.* at 243. As the *Bartlett* court explained, "state-law claims that create an actual conflict with CERCLA are preempted," meaning that relief that is inconsistent with the consent decree, or other EPA order, is preempted. *Id.* at 242-43. Unlike the claims in *Bartlett*, Crescent's requested relief neither challenges the sufficiency of EPA's remedial orders nor conflicts with the directives outlined in the 2018 SAOC or related EPA decisions.

---

[43] Or, put another way, insofar as BHMC pumping down the Bunker Hill Mine pool might be considered a "remedial action" within the ambit of CERCLA § 122(e)(6), EPA has indicated in writing that BHMC has discretion to do so, and thus, such dewatering has been "authorized" for purposes of CERCLA § 122(e)(6).

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 15

Here, the relief requested by Crescent – dewatering the Crescent Mine – would either have no effect on EPA's selected remedy for the Bunker Hill Mine or be entirely consistent with the 2018 SAOC. Crescent's proposal operates within EPA's established parameters while also addressing the AMD contamination that has unfairly plagued the Crescent Mine for decades in a controlled and effective manner. Simply stated, dewatering the mines is entirely consistent with EPA's requirement that BHMC keep the water level in the Bunker Hill Mine below the 10 Level. EPA has set a ceiling on the elevation of the Bunker Hill Mine pool to ensure that AMD does not escape into the environment, but EPA has explicitly not imposed a floor restricting how low the mine pool can be pumped. Contrary to BHMC and Placer's assertions, while dewatering would require proper oversight and coordination with EPA and IDEQ,[44] EPA has not prohibited lowering the mine pool below the 10 Level, and Crescent's requested relief is consistent with EPA's selected remedy for the Bunker Hill Mine.

### 2.    Crescent's Requested Injunctive Relief Is Not Preempted by CERCLA § 113(h).

CERCLA section 113(h) is a jurisdictional provision withholding federal court jurisdiction (subject to exceptions) for any challenge to an EPA-selected remedial action or removal action until after it has been implemented. Congress intended for this jurisdictional provision to allow for prompt implementation of cleanups of contaminated sites, and to prevent litigation from stalling vital environmental remediation efforts. Here, EPA has long since achieved its remedial goal of keeping the Bunker Hill Mine pool at a level that prevents contaminated water from flowing via groundwater transport to the nearby South Fork of the Coeur d'Alene River, or otherwise escaping from the mine. For section 113(h) purposes, the remedy has been implemented and is now just being maintained. Thus, Crescent's claims do not "challenge" an EPA-selected remedy but rather

---

[44] *See* Norton Decl., Ex. G (3/3/22 Ed Moreen Email).

seek injunctive relief that operates in harmony with the EPA's objectives. Indeed, because the mine will continue to produce AMD "for hundreds or thousands of years,"[45] under BHMC's expansive but misguided reading of section 113(h), this Court would have no jurisdiction over the present dispute for hundreds or thousands of years. Statutory interpretations that entail absurd results, such as this, should be discarded. *Salazar v. McDonald's Corp.*, 944 F.3d 1024, 1032 (9th Cir. 2019).

Moreover, CERCLA does not preclude state law remedies that address harms unrelated to EPA orders. "Congress did not intend CERCLA to completely preempt state laws related to hazardous waste contamination." *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1244 (10th Cir. 2006). CERCLA "preserve[s] a quantum of state legislative and common law actions and remedies related to the release and cleanup of hazardous waste." *Id*. at 1246. "'Congress did not want § 113(h) to serve as a shield against litigation that is unrelated to disputes over environmental standards.'" *ARCO Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Mont.*, 213 F.3d 1108, 1115 (9th Cir. 2000) (quoting *Fort Ord Toxics Project, Inc. v. Cal. Env't Prot. Agency*, 189 F.3d 828, 831 (9th Cir. 1999)).

BHMC argues that Crescent "'wants more' than the extent of water pumping that EPA requires" and therefore Crescent's requested injunctive relief is barred by CERCLA § 113(h).[46] This argument is factually and legally flawed. The fundamental problem with BHMC's argument is that BHMC itself is planning to dewater the Bunker Hill Mine, which in turn will necessarily dewater the Crescent Mine.[47] EPA has never suggested that BHMC's own plans to dewater the

---

[45] ECF 112-21 (2001 ROD Amendment) at 17.

[46] BHMC Motion at 14.

[47] *See* footnotes 32-36, *supra* (describing BHMC's plans to dewater both mines).

mines are beyond the scope of, or would require an amendment to, the selected remedy.[48] Further, plugging the Y-U Crosscut and dewatering from the Crescent side is completely unrelated to EPA's remedy requiring BHMC to maintain the Bunker Hill Mine pool below the 10 Level to prevent environmental contamination from the Bunker Hill Mine. This demonstrates that Crescent's requested relief poses no conflict with EPA directives and is fully permissible.

BHMC's cited authority is not to the contrary. In *Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1217 (9th Cir. 2011), a CERLCA citizen suit, not a state law tort claim, the citizen plaintiffs sought to obtain penalties *that were owed to EPA* (not the plaintiffs) for the polluter's past violations of EPA's orders. However, EPA had, in the meantime, settled with the polluter and agreed to defer seeking penalties so long as the polluter cleaned up the contamination. *Id.* at 1217-18. In essence, the Ninth Circuit held that an attempt to enforce penalties that EPA had explicitly reserved its authority to enforce was a challenge to the settlement and cleanup order. *Id.* at 1221-22. Likewise, in *Anacostia Riverkeeper v. Washington Gas Light Co.*, 892 F. Supp. 2d 161, 171 (D.D.C. 2012), the plaintiffs attempted to use the Resource Conservation and Recovery Act to impose more stringent cleanup standards at the site covered by EPA's remedial orders.  Neither case supports BHMC's position because Crescent does not seek to impose new or conflicting cleanup standards but merely requests abatement of AMD flooding the Crescent Mine, which does not interfere with EPA's selected remedy for Bunker Hill.

Here, Crescent does not challenge the sufficiency of EPA's orders. It simply asks for the flooding of the Crescent Mine to be abated. This can be achieved by plugging the Y-U Crosscut and pumping from the Crescent side, which will have no effect on EPA's selected remedies for

---

[48] Norton Decl., Ex. F (8/13/23 Ed Moreen Email); Norton Decl., Ex. G (3/3/22 Ed Moreen Email).

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 18

the Bunker Hill Mine. Additionally, Crescent's relief aligns with BHMC's own stated intentions in numerous investor presentations filed with the SEC to dewater the mines, which BHMC itself has argued is technically feasible and economically viable. Alternatively, Crescent is simply asking for what BHMC is already planning to do, which is consistent with the 2018 SAOC and all remedial orders – dewater both mines. As EPA itself has acknowledged, nothing about this requested relief is beyond the scope of the 2018 SAOC. Therefore, there is no conflict between Crescent's requested injunctive relief and CERCLA section 113(h).

### 3. Crescent's Damages Claims Are Not Barred by CERCLA.

"A 'challenge' to a CERCLA cleanup must seek more than the mere payment of money to compensate an affected property owner." *Waukegan Port Dist. v. N. Shore Gas Co.*, 371 F. Supp. 3d 452, 457 (N.D. Ill. 2019) (citing *Taylor Farm Ltd. Liab. Co. v. Viacom Inc.*, 234 F. Supp. 2d 950, 976 (S.D. Ind. 2002)).[49]  This principle is echoed in the Ninth Circuit's decision in *Stanton Road Associates v. Lohrey Enterprises*, 984 F.2d 1015 (9th Cir. 1993), which is particularly instructive regarding tort damages. In that case, the Ninth Circuit held that CERCLA does not preclude a plaintiff from recovering remediation damages or other tort damages, even where the plaintiff also brings a cost recovery claim. *Id.* at 1021-22. In *Stanton Road*, the Ninth Circuit clarified:

> CERCLA provides that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d). CERCLA further precludes a plaintiff from recovering cost of repair damages under both CERCLA and state law. 42 U.S.C. § 9614(b). Thus, the express language of the statute defeats [defendant's] contention that

---

[49] *See also Abbo-Bradley v. City of Niagara Falls*, No. 13-CV-487-JTC, 2013 WL 4505454, at *8 (W.D.N.Y. Aug. 22, 2013) ("CERCLA does not completely preempt plaintiffs' nuisance or trespass claims, or otherwise foreclose plaintiffs from relying on common law theories for the relief they seek.").

> CERCLA preempts a state law recovery. *See Manor Care, Inc. v. Yaskin*, 950 F.2d 122, 127 (3d Cir.1991) (the prohibition in 42 U.S.C. section 9614(b) against double recovery for removal costs "would be unnecessary and inexplicable if ... costs that may be recovered under CERCLA may not be recovered under state law").

*Id.*

Placer relies on *Pakootas*, 646 F.3d 1214, and *New Mexico*, 467 F.3d at 1250, to support its argument that damages are not available under state law. Both cases are distinguishable. In *Pakootas*, which was a citizen suit brough under CERCLA, not a state law tort claim, the citizen plaintiffs sought civil penalties that were owed to EPA (not the plaintiffs) for alleged violations of EPA's orders, despite EPA explicitly deferring enforcement of those penalties pending compliance with a settlement agreement. 646 F.3d at 1221. Most notably, the monetary damages sought by the plaintiffs were *for the same contamination* that was at issue in EPA's settlement with the defendants. Not so here, where Crescent seeks damages for the trespassing water introduced into, and presently remaining within, the lower Crescent Mine, which is not the contamination (*i.e.*, AMD discharged from the Bunker Hill Mine) at issue in the 2018 SAOC between BHMC and EPA. *Pakootas* does not stand for the principle that a party who has settled with EPA for certain contamination and its associated costs is forever insulated from *all tort liability whatsoever*, including tort claims against the party for other contamination, damages, and tortious conduct *not* at issue in the EPA settlement.

The *New Mexico* case is similarly distinguishable. Placer cites this case as support for its assertion that "[d]amages claims are barred under section 113(h) when they interfere with EPA's ability to enforce a settlement agreement or its ability to oversee the cleanup."[50] Specifically, Placer quoted the court as holding that "section 113(h) would 'not permit the State to achieve

---

[50] Placer Motion at 6.

indirectly through the threat of monetary damages, … what it [could not] obtain directly through mandatory injunctive relief incompatible with the ongoing CERCLA-mandated remediation.'"[51] The case is inapposite for several reasons.

First, as noted above, Crescent's requested injunctive relief is compatible with EPA's ongoing CERCLA efforts to prevent AMD from escaping the Bunker Hill Mine into the environment. Thus, Crescent is not seeking to achieve through the threat of monetary damages something that it cannot obtain through injunctive relief because the latter is incompatible with EPA's selected remedy. Moreover, neither Crescent's requested injunctive relief nor its claim for monetary damages for trespassing water in the lower Crescent Mine "interferes" with "EPA's ability … to oversee the cleanup" of keeping Bunker Hill AMD from escaping into the environment. As noted, EPA has explicitly stated that BHMC has "discretion" to pump down the Bunker Hill Mine pool. If, according to EPA itself, such injunctive relief does not interfere with EPA's ability to oversee Bunker Hill Mine AMD management, then potential monetary damages in lieu of such injunctive relief likewise do not interfere with EPA's oversight and authority. In *New Mexico*, by contrast, the court specifically concluded that "the State's lawsuit calls into question the EPA's remedial response plan" and therefore constituted a "'challenge' to the cleanup" under section 113(h). 467 F.3d at 1249. Crescent's lawsuit and its claim for monetary damages in no way call into question EPA's remedial response plan for Bunker Hill AMD management.

Second, in *New Mexico*, the state sought "unrestricted" money damages (*id.* at 1223) under state law for groundwater contamination that EPA had been studying and remediating for decades. *Id.* at 1226. The claim was a state natural resource damage ("NRD") claim brought by New Mexico

---

[51] *Id.* at 9 (quoting *New Mexico*, 467 F.3d at 1250).

in its sovereign capacity; it was not a private-party tort claim. The court held that the state NRD claim was preempted by "CERCLA's carefully crafted NRD scheme." *Id.* at 1247.[52] Here, Crescent has asserted state law and CERCLA claims that have nothing to do with NRD, which is a separate section of CERCLA from the section dealing with "response costs" and remediation.

Third, in *New Mexico*, the state tried and failed to convince the district court that there was some additional groundwater contamination beyond that being addressed by EPA. The court found evidence of such contamination utterly lacking, likening the alleged contamination to "Scotland's famed Loch Ness monster . . . 'down there somewhere'" but basically no more than "a theory unsupported by facts," or "a concept built largely upon conjecture masquerading as inference." *Id.* at 1241 (internal quotation marks and citations omitted). Here, BHMC and Placer do not dispute the contaminated AMD in the lower Crescent Mine.[53] And despite BHMC and Placer's efforts to try to somehow shoehorn the lower Crescent Mine into BHMC's 2018 settlement with EPA, it is not to be found there – not even mentioned once.[54]

Above all, *Pakootas* involved a federal CERCLA citizen suit and *New Mexico* involved a state law NRD claim brought by a state in its sovereign capacity. Neither involved a private-party state law tort claim. And neither stands for the proposition that a party, once settling with EPA for certain contamination and costs, is insulated from *all tort liability whatsoever*, including tort claims for monetary damages against the party that involve *other* contamination, damages, and tortious conduct *not* at issue in the EPA settlement.

---

[52] *See N.J. Dep't of Env't Prot. v. Minn. Mining & Mfg. Co.*, No. 06-2612 (NLH), 2007 WL 2027916, at *3 n.4 (D.N.J. July 5, 2007) (distinguishing *New Mexico* and allowing plaintiff's state law tort claims to proceed).

[53] *See, e.g.*, ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 90:7-91:18; ECF No. 58 (Placer First Amended Counterclaim), at p. 14, ¶¶ 11-13; Case 2:21-cv-00209-REP, ECF No. 16 (BHMC Pre-Consolidation Second Amended Complaint), at ¶¶ 8, 67.

[54] *See generally* ECF 116-21 (2018 SAOC).

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 22

Placer's tortious conduct in the 1990s cannot be nullified by inaccurately characterizing such conduct as somehow mandated by EPA. The selected remedy for the Bunker Hill Mine was for "[a]ll acid mine drainage [to] be conveyed to the CTP for pre-treatment."[55] Although that remedy was updated in the 2001 ROD amendment to allow temporary storage of AMD in the Bunker Hill Mine, EPA warned Placer in March 1993, prior to its deliberate diversion of all Bunker Hill AMD into the lower mine and flooding of the lower Crescent Mine, that any "short term" actions it took, including in-mine AMD storage, that affected neighboring property must be approved by the neighboring property owner.[56] Only a few months later, in late October 1993, Placer ceased conveying *any* AMD to the CTP and instead diverted *all* of it into the lower Bunker Hill Mine and lower Crescent Mine.[57] Despite EPA's warnings, there is no indication that Placer obtained or even sought permission from Fausett International (then owner of the Crescent Mine) to flood the lower Crescent. Placer's diversion of AMD into the Bunker Hill Mine and flooding of the Crescent Mine was contrary to the 1992 ROD's selected remedy, and therefore not in compliance with EPA's remedial action. Placer's actions thus constitute independent violations and cannot be shielded by the EPA's remedial framework.

Crescent's requested relief will not "interfere with the ability to perform [the] cleanup." *Pakootas*, 646 F.3d at 1222. Crescent is not seeking damages because it believes EPA's selected remedy is insufficient. Instead, Crescent seeks damages for Placer's willful damage to Crescent's property and BHMC and Placer's failure to abate such damage. The extent of Placer's compliance with EPA's orders and the ultimate availability of damages under Crescent's tort claims are issues

---

[55] ECF 112-26 (1992 ROD) at 9-9.

[56] ECF 110, Declaration of Preston Carter, Exhibit 25 (3/4/93 EPA Letter).

[57] *See*, *e.g.*, ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 76:4-77:16, 79:2-80:5, 120:12-121:22.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 23

of fact to be resolved at trial. Accordingly, these claims should proceed to trial, as the record amply supports Crescent's entitlement to relief under both CERCLA and state law.

**C.    As the Current Owner of the Bunker Hill Mine, BHMC Is Liable for Civil and Common Law Trespass for Failing to Abate the Trespass of Its Predecessor-in-Interest.**

BHMC and Placer acknowledge that Idaho follows Restatement (Second) of Torts § 161 and the continuing tort doctrine.[58] Therefore, there is no dispute that a trespass can be "'committed by the continued presence on the land of a … thing which the actor has tortiously placed there[.]'" *Bliss v. Minidoka Irrigation Dist.*, 167 Idaho 141, 150, 468 P.3d 271 (2020) (quoting Restatement (Second) of Torts § 161(1)). It is also undisputed that a trespass can be committed "by the continued presence on the land of a … thing which the actor's predecessor in legal interest therein has tortiously placed there, if the actor … fails to remove the thing." Restatement (Second) of Torts § 161(2). And the "failure to remove" the trespassory item or substance "'constitutes a continuing trespass for the entire time during which it is on the land.'" *Mueller v. Hill*, 158 Idaho 208, 214, 345 P.3d 998 (2015) (quoting 75 Am. Jur. 2d Trespass § 40 (2007)); *accord* Restatement § 161 cmt. b.

However, BHMC contends that Restatement § 161 is not applicable to the facts of this case because "BHMC did not tortiously place anything on Plaintiff's land" and "did not acquire ownership of the water in the Crescent Mine."[59] This interpretation distorts and fundamentally misreads Restatement § 161 and ignores how liability is assessed against successive property owners for a continuing trespass.  Faced with analogous facts, the court rejected a similar argument in *Goldingay v. Progressive Casualty Insurance Co.*, 306 F. Supp. 3d 1259 (D. Or. 2018).

---

[58] Placer Motion at 11-12; BHMC Motion at 6-7.
[59] BHMC Motion at 8.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 24

In *Goldingay*, Progressive purchased a property from Chevron in 2005, which had previously been used as a "petroleum bulk plant." *Id.* at 1264. In 2010, the plaintiffs purchased the neighboring property, discovered petroleum contamination in their groundwater, then sued Progressive for trespass and nuisance in 2017. *Id.* Like BHMC, Progressive argued that these "claims fail because [plaintiffs] have not identified any action by Progressive that caused the contamination, and Progressive therefore has no duty to prevent the trespass or nuisance." *Id.* at 1265. The court rejected this argument, explaining:

> [S]ection 161 of the Restatement provides that a trespass may be committed by the continued presence on the land of a "thing" that a landowner's predecessor in interest tortiously placed there, if the landowner fails to remove the thing after having learned of it. Restatement (Second) of Torts § 161 (1965). ***The question as to Progressive's liability for the migrating contamination, therefore, is not whether Progressive caused the contamination, but whether it knew or should have known that the contamination was causing a trespass or nuisance and failed to abate it***.

*Id.* at 1266 (emphasis added). The fact that the petroleum contamination was likely caused by the prior owner of Progressive's property did not shield Progressive from liability for failing to abate the contamination. And it is reasonable to assume that Progressive did not expressly purchase the petroleum contamination that had migrated to the plaintiffs' property under Chevron's ownership.

Like Progressive, BHMC's liability stems from its failure to address the contamination caused by its predecessor, which originated on the property BHMC now owns.[60] Indeed, Placer has admitted in this litigation that (1) it has no basis to dispute that water flooded into the Crescent Mine from the Bunker Hill Mine during Placer's ownership of the Bunker Hill Mine, and (2) the

---

[60] Additionally, under BHMC's ownership, water also flows from the Bunker Hill Mine to the Crescent Mine during periods when BHMC stops pumping water from its mine pool. *See infra* at p. 28 and footnotes 66 and 67.

same water that flooded the Crescent Mine during this period remains there today.[61] BHMC has similarly admitted that Placer ceased sending any water to the CTP and, instead, diverted all AMD into the Bunker Hill Mine's lower workings from October 30, 1993 to December 1994.[62]  BHMC cannot credibly dispute these key facts. BHMC's assertion that it did not also flood the Crescent Mine and therefore does not "own" the contaminated water in the mine is not a defense to liability, much less a basis to dismiss Crescent's claims as a matter of law on summary judgment.

BHMC's related assertion that it cannot be liable for continuing trespass because the State of Idaho owns the Bunker Hill Mine water that flooded the Crescent Mine is nonsensical.[63]  First, as evidenced by *Goldingay*, BHMC does not need to "own" the contamination at issue in the traditional sense to be liable for continuing trespass. Rather, BHMC is liable because it is the current owner of the property from which the water originated and it has failed to abate the flooding.   Second, this argument conflates the State's regulatory and supervisory interest in groundwater with a traditional ownership interest. "The State 'owns' the groundwater in a regulatory, supervisory sense, but it does not own it in a possessory, proprietary sense." *State v. Superior Court of Riverside Cnty.*, 78 Cal. App. 4th 1019, 1033, 93 Cal. Rptr. 2d 276 (2000) (interpreting analogous statute).  Thus, "the State's power under the Water Code is the power to

---

[61] ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 90:7-91:18; *see also id.* at 76:4-77:16, 79:2-80:5, 120:12-121:22, 148:16-149:25; ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 2-6; ECF 116-13 (Morton 7/8/24 Expert Report) at Appendix C1, p. 97 of 137 (BHMC and Placer's own expert opines that the Crescent and Bunker Hill Mines are hydraulically connected such that the elevation of the mine pool in the Crescent Mine "mimics" the elevation of the mine pool in the Bunker Hill Mine.); ECF 116-18 (L. Sala Dep. Transcript) at 81:7-16 ("It was a known fact that the Crescent Mine would flood if the Bunker Hill Mine quit dewatering."), 88:18-24 ("[A]t the time the Bunker Hill Mine all dewatering ceased, water would have been flowing from the Bunker Hill Mine to the Crescent Mine, not the other way around."); ECF 116-14 (Stefanoff Dep. Transcript) at 100:15-23, 168:16-24.

[62] Norton Decl., Ex. B (Sam Ash Dep. Transcript) at 83:4-12.

[63] BHMC Motion at 8.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 26

control and regulate use; such a power is distinct from the concept of 'ownership' as used in the Civil Code and in common usage." *Id*. at 1030; *see also Orange Cnty. Water Dist. v. Sabic Innovative Plastics US, LLC*, 14 Cal. App. 5th 343, 406, 222 Cal. Rptr. 3d 83 (2017) (interpreting analogous statute and holding that water district could not sue for trespass and nuisance based on groundwater contamination because the "State … has no general propriety (i.e., property) interest in groundwater; its interest is regulatory and supervisory."). BHMC's attempt to twist the State's regulatory authority over public waters into a defense for a private corporation's contamination of a neighboring property, although creative, is futile.[64]

BHMC's argument that it is not liable for trespass because it did not "enter" or "remain" on Crescent's property is equally tenuous.[65] Under Idaho law, "[a]n entry may take the form of the defendant … causing some tangible thing to intrude upon the land." *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992). Further, Idaho Code § 6-202(1)(d) defines "enter" to include "causing any … substance … to go upon or over real property." Therefore, causing water to enter a neighboring property is a form of trespass. *See Mueller*, 158 Idaho at 213; *Beavertail, Inc. v. United States*, No. 4:12-cv-610-BLW, 2017 WL 3749446, at *10 (D. Idaho Aug. 29, 2017). And, as noted, BHMC is liable as the current owner of the Bunker Hill Mine for failing to abate the contaminated water that BHMC's predecessor-in-interest tortiously caused to enter the Crescent Mine. Restatement (Second) of Torts § 161(2); *Goldingay*, 306 F. Supp. 3d at 1266.

---

[64] If BHMC's position were correct, no landowner could sue for trespass or nuisance based on contamination of groundwater because the wrongdoer would be automatically absolved of liability by virtue of the State's regulatory authority over groundwater. Not surprisingly, BHMC is unable to cite any authority to support this novel argument because it is not an accurate statement of the law.

[65] BHMC Motion at 8-9.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 27

BHMC's assertion that it is has not independently trespassed upon the Crescent Mine property also ignores the fact that, during periods when BHMC stops pumping its mine pool, which is a regular occurrence,[66] the water that accumulates equalizes between the Bunker Hill Mine and the Crescent Mine via the Y-U Crosscut.[67] Thus, BHMC's assertion that it is not liable because it did not independently cause any flooding of the Crescent Mine both misunderstands the applicable legal framework and is factually inaccurate.

## D.    As the Current Owner of the Crescent Mine, Crescent Has Viable Continuing Tort Claims Against Placer for Flooding the Mine.

Placer argues that "because Crescent acquired the mine in 2014 … it hasn't suffered damages and is instead seeking a windfall at Defendants' expense."[68] This claim that Crescent is seeking an impermissible "windfall" is unsupported and factually incorrect. Placer has admitted that, for over a year, it diverted 100% of the Bunker Hill Mine's AMD into the lower workings of the Bunker Hill Mine (and ultimately into the Crescent Mine via the Y-U Crosscut) to avoid paying the EPA for water treatment costs.[69] Additionally, Placer does not dispute that this water remains in the Crescent Mine today.[70] This water has effectively rendered the Crescent Mine unusable, and continues to impose significant economic and environmental burdens on Crescent. Thus, it is Placer and BHMC who seek a windfall through dismissal of Crescent's claims, as they have used

---

[66] The Bunker Hill Mine pool pumps are cycled on and off to maintain the mine pool at approximately the 11 Level. *See, e.g.*, ECF 116-51 (Morton Dep. Transcript) at 61:8-13, 104:6-9.

[67] ECF 116-13 (Morton 7/8/24 Expert Report) at Appendix C1, p. 97 of 137 (opining that the elevation of the mine pool in the Crescent Mine "mimics" the elevation of the mine pool in the Bunker Hill Mine); ECF 116-14 (Stefanoff Dep. Transcript) at 38:8-17, 96:22-25, 100:15-23.

[68] Placer Brief at 15.

[69] ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 76:4-77:16, 79:2-80:5, 120:12-121:22.

[70] *Id.* at 90:91:18.

the Crescent Mine as an unauthorized AMD storage tank for decades to the immediate detriment of Crescent, all at no cost.[71]

Placer's assertion that Crescent cannot seek redress because it did not own the Crescent Mine when the flooding initially occurred is contrary to the rule stated in the Restatement (Second) of Torts § 161, which Placer concedes is the applicable legal standard.[72] Rather, where "the possessory interest in the land has been transferred subsequent to the actor's placing of the thing on the land, the transferee of the land may maintain an action for its continuance there[.]" Restatement (Second) of Torts § 161 cmt. e. Therefore, in jurisdictions such as Idaho that follow Restatement § 161, "[i]f a trespass is continuing, any person in possession of the land at any time during its continuance may maintain an action for trespass." *Rosenthal v. City of Crystal Lake*, 171 Ill. App. 3d 428, 435-36, 525 N.E.2d 1176 (1988) (holding that, "[s]ince the sewer here is a continuing trespass …, the fact that plaintiff did not own the property at the time it was first installed does not prohibit his present claim for trespass").[73]

---

[71] Even accepting, *arguendo*, Placer's inaccurate characterization of Crescent's claims as somehow seeking a "windfall," dismissal of Crescent's claims would still be inconsistent with the general principle that when faced with the question of "who shall receive the benefit of a windfall[,] … [a]s between the injured person and the tortfeasor, the former's claim is the better." *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir. 1962).

[72] Placer Brief at 11.

[73] *See also Murray v. Bath Iron Works Corp.*, 867 F. Supp. 33, 48 (D. Me. 1994) ("To the extent that the plaintiffs can show that wastes from the site continue to be present on their land, regardless of when they entered, they can maintain an action for a continuing trespass … since that tort would be continually occurring for statute of limitations purposes."); *Cal. Dep't of Toxic Substances Control v. Payless Cleaners, Coll. Cleaners*, 368 F. Supp. 2d 1069, 1082 (E.D. Cal. 2005) (denying motion to dismiss continuing trespass claim where plaintiffs alleged that the defendant "deposited … PCE laden wastewater on their property and that it failed to remove the contaminants after they came into possession of the land"); *Regan v. Cherry Corp.*, 706 F. Supp. 145, 150 (D.R.I. 1989) (relying on Restatement § 161 to reject argument "that because plaintiffs did not own the property at the time of the alleged dumping, plaintiffs may not maintain a trespass action"); *JBG/Twinbrook Metro Ltd. P'ship v. Wheeler*, 346 Md. 601, 627-28, 697 A.2d 898 (1997) (rejecting Chevron's argument that it is only liable for gasoline contamination that occurred after the plaintiff acquired the property because "Chevron's contention ignores the continuing

Crescent need not have owned the Crescent Mine when it was initially flooded to maintain this action. Rather, the "'failure to remove a thing tortiously placed on the land constitutes a continuing trespass for the entire time during which it is on the land,'" *Mueller*, 158 Idaho at 214 (citation omitted). Therefore, as "the transferee of the land" trespassed upon, Crescent "may maintain an action for its continuance there[.]" Restatement (Second) of Torts § 161 cmt. e. Placer's argument that Crescent cannot seek relief is legally baseless and contravenes longstanding tort principles. Crescent's claims for trespass and continuing harm are well-founded under the facts of this case and the applicable law.

**E.      Under Idaho Code § 52-109, BHMC Is Liable for Failing to Abate the Continuing Nuisance Caused by Its Predecessor-in-Interest.**

BHMC contends that it is not liable for continuing nuisance because "[t]he flooding of the Crescent Mine occurred in the early 1990s, long before BHMC acquired the Bunker Hill Mine in 2022."[74] However, Idaho Code § 52-109 plainly states that "[e]very successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by a former owner, is liable therefor in the same manner as the one who first created it." As the current owner of the Bunker Hill Mine, BHMC is liable for continuing nuisance for failing to abate the flooding of the Crescent Mine caused by Placer. This statutory provision unambiguously imposes liability on BHMC as the current owner, regardless of when the nuisance originated.

In an effort to evade the plain language of Idaho Code § 52-109, BHMC selectively quotes *Brose v. Twin Falls Land & Water Co.*, 24 Idaho 266, 133 P. 673 (1913), to argue that it is not

---

nature of the trespass"); *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504, 508 (Me. 1996) (Rejecting argument that plaintiffs had to have possession of property when contamination occurred to maintain continuing trespass claim and holding "the plaintiffs' present possessory interest is sufficient to maintain this action.").

[74] BHMC Motion at 9.

liable for a nuisance that was caused before its ownership of the Bunker Hill Mine.[75] However, BHMC's reliance on *Brose* is misplaced. In fact, *Brose* suggests that damages for a continuing nuisance can be apportioned between the prior and current owners of the property from which the nuisance arose, but clarifies that the predecessor to Idaho Code § 52-109 "preclude[s] the purchaser of property containing a nuisance [from] defending against an action for damages or to abate the same, on the ground that he did not create the nuisance[.]" *Id.* at 676. Thus, *Brose* actually refutes BHMC's assertion that it cannot be liable for a nuisance that predates its ownership of the Bunker Hill Mine. While *Brose* may be relevant later as to the proper apportionment of damages and/or costs of abatement between BHMC and Placer, those issues should be resolved at trial and, in any event, do not provide grounds to dismiss Crescent's continuing nuisance claim as a matter of law at this time. As the current owner of the Bunker Hill Mine, under Idaho Code § 52-109, BHMC is liable for the abatement of this continuing nuisance to the same extent as Placer.

BHMC further argues that it is not liable for continuing nuisance because Bunker Hill Mining Co. (U.S.) Inc. purportedly flooded the Crescent Mine when it owned both the Bunker Hill Mine and the Crescent Mine.[76] Placer also seeks dismissal of all of Crescent's tort claims based on the same misleading assertion that the Crescent Mine flooded when it was under common ownership with the Bunker Hill Mine.[77] This argument is factually and legally untenable. This argument ignores the undisputed fact that, between October 1993 and December 1994, ***when the mines were no longer under common ownership***, Placer stopped sending *any* Bunker Hill Mine water to the CTP and, instead, diverted all of it – hundreds of millions of gallons of contaminated

---

[75] *Id.* at 9-10.
[76] *Id.* at 10.
[77] Placer Motion at 17-20.

mine water – into the lower workings of the Bunker Hill Mine.[78] Because the mines are connected by the Y-U Crosscut, it is beyond dispute that this diversion of contaminated water also flooded the Crescent Mine and raised the water level in both mines in tandem.[79] This independent action by Placer eliminates any basis for BHMC or Placer to shift blame to a prior owner.

BHMC and Placer's blatant misrepresentation of when the flooding occurred is particularly incredible given that Placer's flooding of the Bunker Hill Mine was expressly noted in the EPA's complaint against Placer and various other EPA orders. *See*, *e.g.*, ECF 116-20 (EPA First Amended Complaint) at ¶ 18 ("Shortly after assuming ownership of the Mine, Defendants [Robert Hopper Sr. and Placer] began to divert some of the AMD flow into the lower workings of the Mine, causing significant flooding of the Mine workings and raising the water level inside the Mine to approximately the levels of the [South Fork of the Coeur D'Alene River.]").

_____

[78] *Compare* Placer Statement of Facts at ¶ 5 ("On April 28, 1992, Placer acquired full surface and mineral rights to Bunker Hill Mine.") *and* ¶ 7 ("Bunker Hill Mining Co. continued to own the Crescent Mine until it quitclaimed its mineral interests to Fausett International, Inc. on June 17, 1992.") *with* ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 120:6-121:22 (explaining that Placer diverted AMD into the Bunker Hill Mine's lower workings in 1993 and 1994 to avoid paying EPA water treatment costs). In addition, before Placer diverted AMD into the Bunker Hill Mine's lower workings, Bunker Hill Mine water also flooded into the lower Crescent Mine under Placer's ownership from April 1992 to October 1993. During that time, although some water was conveyed by gravity to the CTP, no pumping of the mine pool was occurring, and it was therefore filling with hundreds of gallons of AMD per minute seeping down from the upper Bunker Hill Mine, which would equalized between the Bunker Hill Mine and the Crescent Mine via the Y-U Crosscut. *See* ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 2-5 – 2-6 (explaining that no water was pumped from the Bunker Hill Mine from July 25, 1991 to December 1994); Norton Decl. Ex. N (March 1993 Placer Letter) at 12, BHMC_051633 (stating that "all of the water coming from the K.T., at the moment, is all surface water").

[79] *See* documents and deposition testimony cited *supra* at footnotes 61 and 62; and *compare* BHMC Motion at 1 ("Once the pumps were removed, the mines started to flood. By the end of 1994, when pumping resumed, the water had risen to near the 11 Level in the Bunker Hill Mine and about 700 feet below the Hooper Tunnel [in the Crescent Mine].") *with* ECF 116-13 (Morton 7/8/24 Expert Report) at Appendix C1, p. 97 of 137 (opining that the elevation of the mine pool in the Crescent Mine "mimics" the elevation of the mine pool in the Bunker Hill Mine).

Although Bunker Hill and Placer want to shift blame entirely to the defunct entity that previously owned both mines, the evidence does not support this argument. It is undisputed that Placer independently caused a large volume of contaminated water to flood into the Crescent Mine during Placer's ownership of the Bunker Hill Mine, which remains there today and interferes with Crescent's use of the Crescent Mine.[80] By attempting to distance themselves from this clear chain of liability, Placer and BHMC seek to evade accountability for decades of misconduct, the consequences of which Crescent continues to endure. These consequences include, among other harms, the inability to mine the deeper Crescent workings, resulting in the loss of tens of millions of dollars in unrealized revenue; ongoing and substantial response costs required to address the contamination; and the reputational and economic harm inflicted by BHMC's claims, which BHMC has admitted were intentionally designed to derail Crescent's sales process after Crescent rejected BHMC's offer. Placer and BHMC's strained efforts to frame Crescent's tort claims as claims against the previous Bunker Hill Mine owner that filed for bankruptcy in 1991 are a deliberate mischaracterization of the relevant facts and evidence.  The record clearly establishes that Placer's actions were independent and intentional, directly contributing to the flooding of the Crescent Mine and the ongoing contamination that remains unaddressed to this day.

**F.    Crescent's Tort Claims Are Not Time Barred Because the Flooding of the Crescent Mine Is Reasonably Abatable.**

When a tort "is temporary and continuing in nature, the statute of limitations does not run and an action may be brought at any time to recover damages occurring within the previous limitation period." *State of Idaho v. Hanna Mining Co.*, 699 F. Supp. 827, 834 (D. Idaho 1987), *aff'd*, 882 F.2d 392 (9th Cir. 1989). A tort is temporary and continuing "'if the cause of injury is abatable or preventable and the injury capable of rectification by reasonable restoration.'" *Id*.

---

[80] ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 90:91:18.

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 33

(quoting *Alesko v. Union Pac. R.R. Co.*, 62 Idaho 235, 109 P.2d 874, 876 (1941)). An injury is reasonably abatable if the property can be restored "without unreasonable hardship and expense." *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 518 (9th Cir. 2005) (cleaned up). Generally, "whether the injury was temporary or permanent" is a question of fact that must be resolved at trial. *Alesko*, 109 P.2d at 877; *see also Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504, 508 (Me. 1996) (reversing summary judgment on trespass and nuisance claims because "[t]he abatability of the materials currently on [the property] is a question of fact" and the plaintiffs raised a genuine issue of material fact "by producing a 1992 … compliance order requiring the responsible parties to submit a remediation feasibility study … include[ing] … the option of the removal of all wastes and contaminated soils from the site."). Here, the flooding of the Crescent Mine is demonstrably temporary and abatable, as expert testimony and technical evaluations establish the feasibility of removing the water without imposing unreasonable costs.

Placer has argued that its flooding of the Crescent Mine is not reasonably abatable and Crescent's claims for trespass, nuisance, and negligence are therefore barred by the applicable statutes of limitation because Dr. Neal Rigby "estimated that it will cost $13.8 million to dewater the Crescent Mine" and "Crescent acquired the mine for roughly $7.5 million in 2014[.]"[81] This argument mischaracterizes both Dr. Rigby's analysis and the value of the Crescent Mine, which has a current valuation of approximately $91 million at spot silver prices of $31.21 per ounce, which would be approximately $27 million higher if the deep Crescent were not flooded by BHMC's water.[82]

---

[81] Placer Motion at 13.
[82] ECF 112-12 (Dr. Rigby 6/7/24 Report) at 19-23.

First, Dr. Rigby estimated that it will cost $13.8 million to dewater both mines, not just the Crescent Mine.[83] Given the size discrepancy between the two mines and the corresponding discrepancy between the volume of water within each mine, the vast majority of these anticipated costs are for removing water from the Bunker Hill Mine.[84] Additionally, BHMC's former VP of Sustainability has indicated that BHMC "can seal" the Y-U Crosscut "no problem" and it would not be "cost-prohibitive" to do so.[85] Sealing the Y-U Crosscut would make it possible to pump the Crescent Mine for much less than the amount indicated by Dr. Rigby because the much larger volume of water in the Bunker Hill Mine could be left alone. Thus, Placer's reliance on the $13.8 million figure to argue that the flooding of the Crescent Mine is not reasonably abatable is both factually and analytically flawed.

Second, the value of the Crescent Mine easily exceeds the anticipated cost to dewater it many times over. Crescent acquired the Crescent Mine out of receivership following litigation via a consensual foreclosure agreement.[86] This acquisition occurred under distressed conditions. The mine was not acquired in an arm's length transaction and the size of the debt that was forgiven to acquire it out of receivership is not an accurate measure of its fair market value. Indeed, before this litigation, BHMC itself calculated the net present value of the Crescent Mine at $67 million based on a silver price of just $20.60 per ounce (more recently, the spot price for silver has hovered around $30 per ounce) and offered to purchase the mine for $37 million.[87] Separately, as noted in Dr. Rigby's report, a 1985 review of proven, probable, possible, contingent, and expected ore

---

[83] *Id.* at 13-18.
[84] ECF 51 (Crescent Second Amended Compl.) at ¶ 10 ("Measured by tonnage produced, the Crescent Mine is approximately 2.4% the size of the Bunker Hill Mine.").
[85] Norton Decl., Ex. A (2/23/21 Barnett Email).
[86] ECF 79-2 (Declaration of Daniel J. Bugbee) at ¶¶ 10-11; *see also* Placer Statement of Facts at ¶ 11.
[87] ECF 116-47 (01/15/2020 BHMC Purchase Offer)

CRESCENT'S RESPONSE IN OPPOSITION TO PLACER'S AND BHMC'S MOTIONS FOR SUMMARY JUDGMENT - 35

reserves indicates there are over 469,000 tons of mineable silver in the lower Crescent Mine.[88] Dr. Rigby estimates the value of this ore reserve at more than $180 million.[89] This valuation and BHMC's interest in purchasing the Crescent Mine underscore the economic viability of abating the flooding and restoring the mine to its full operational potential.

PMC's reliance on *Skokomish Indian Tribe*, 410 F.3d 506, is misplaced.[90] There, the plaintiffs' own expert estimated that their land was worth just $2.2 million before the flooding at issue, which would cost more than $3.7 million to remediate. *Id.* at 519. There was no dispute that the cost to restore the property to its pre-flooding condition greatly exceeded the total value of the property. Here, by contrast, Dr. Rigby has opined that the Crescent Mine is currently worth more than $91 million in its flooded condition and dewatering the mine will add an additional $27 million in value.[91] Given the current value of the Crescent Mine and the substantial additional value that will be added by dewatering the mine, the cost to dewater the mine is not unreasonable and the flooding of the Crescent Mine is reasonably abatable. Presumably, this is why BHMC attempted to purchase the Crescent Mine and has continued to express interest in purchasing the mine during this litigation. *Skokomish* is therefore inapposite, as Crescent's claims involve a far more favorable cost-benefit analysis than in that case.

The EPA requirement that BHMC provide in-mine storage for water when the CTP and conveyance line are being repaired does not mean that the flooding of the Crescent Mine is not reasonably abatable.[92] To dewater the Crescent Mine from the Bunker Hill side, it is only necessary to pump the Bunker Hill Mine below the 23 Level where the Y-U Crosscut connects the two mines.

---

[88] ECF 112-12 (Dr. Rigby 6/7/24 Report) at 20.
[89] Norton Decl., Ex. L (Dr. Rigby 8/2/24 Report) at 12.
[90] Placer Motion at 12-13.
[91] ECF 112-12 (Dr. Rigby 6/7/24 Report) at 23, Table 5-6.
[92] *See* Placer Motion at 13.

BHMC could still use the void space below the 23 Level for in-mine water storage when the CTP or maintenance line is being repaired.[93] Indeed, as previously noted, BHMC has repeatedly represented that its long-term plan is to dewater the Bunker Hill Mine to access the lower levels that are currently underwater.[94] This acknowledgment by BHMC reinforces the feasibility of dewatering the Crescent Mine without interfering with EPA's requirements. Thus, any assertion that the Bunker Hill Mine cannot be dewatered because of EPA requirements is simply not true.

## G.    Dismissal of Crescent's Tort Claims Is Not Warranted Based on Placer's Unfounded Assertion That Crescent Does Not Have Any Cognizable Damages.

In the alternative, Placer argues that Crescent's torts claims should be dismissed because Crescent can only recover damages for injuries that occurred within the statutory period preceding this action.[95] Placer is correct that a continuing tort claimant can recover economic damages that occurred within the statutory period. *See Beavertail*, 2017 WL 3749446, at *10. However, Placer's contention that this standard requires dismissal of Crescent's tort claims as a matter of law misinterprets pertinent Idaho case law and fails to recognize the scope of relief to which Crescent is entitled.

For claims involving injury to property, nominal damages are assumed, and economic damages are not required to establish liability. *See*, *e.g.*, *Taysom v. Taysom*, 82 Idaho 58, 64, 349 P.2d 556, 560 (1960) ("Nominal damage need not be proved, but naturally flows from a wrongful entry."); *Radford v. Van Orden*, 168 Idaho 287, 300, 483 P.3d 344, 357 (2021) (holding "the [plaintiffs] were entitled, at the very least, to nominal damages" for trespass), *as amended* (Mar. 22, 2021); *United States v. Spear*, No. 2:22-CV-00439-BLW, 2023 WL 6463039, at *7 (D. Idaho Oct. 4, 2023) (Holding "the government has established that under Idaho law, Mr. Spear and Ms.

---

[93] *See* ECF 116-1 (Crescent Motion for Partial Summary Judgment) at Appendix 1.
[94] *See supra* at 12-13, footnotes 32-36.
[95] Placer Motion at 14-16.

Gerke are liable for common law and statutory trespass. However, to be clear, the government has not established that the trespass has resulted in any specific harm to the government other than that which is presumed to flow naturally from a wrongful entry upon land."). Indeed, Placer concedes that nominal damages and equitable relief are available for injuries to property such as trespass and nuisance.[96]

*Aztec Ltd. v. Creekside Investment Co.*, 100 Idaho 566, 602 P.2d 64 (1979), is instructive and confirms that, even if Placer's position on economic damages were correct (which it is not), Crescent's claims still are not subject to dismissal on summary judgment. There, the plaintiff sued for trespass and "prayed for general and punitive damages as well as injunctive relief." *Id.* at 568. At the close of the plaintiff's case at trial, the trial court granted the defendant's motion for involuntary dismissal in part, ruling "that since the plaintiff Aztec had in any event failed to prove any actual damage, it would not be entitled to monetary relief." *Id.* The Supreme Court of Idaho reversed on several grounds that apply with equal force here, explaining:

> The trial court below dismissed appellant's claim for damages before it determined whether or not there did exist a trespass. The court did so on the grounds that no actual damages were proven. However*, in cases of trespass to land, the plaintiff need not prove actual harm in order to recover nominal damages. Nominal damages are presumed to flow naturally from a wrongful entry upon land*. *Taysom v. Taysom*, 82 Idaho 58, 349 P.2d 556 (1960); *Paurley v. Harris*, 77 Idaho 336, 292 P.2d 765 (1956). Moreover, … [t]he appellant … may be entitled to punitive damages. *See Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972). *This Court has in the past held that a plaintiff may recover punitive damages without proving that he is entitled to more than nominal damages*. *Village of Peck v. Denison*, 92 Idaho 747, 450 P.2d 310 (1969); *Crystal Dome Oil & Gas Co. v. Savic*, 51 Idaho 409, 6 P.2d 155 (1931). *The appellant also requested injunctive relief*, which request was foreclosed by the trial court's finding that there was no trespass committed by Creekside. On remand the trial court must resolve these issues.

---

[96] *Id.* at 16.

*Id.* at 570 (emphasis added). Similarly, here, Crescent's tort claims are not subject to dismissal at the summary judgment stage because (1) Crescent is entitled, at a minimum, to nominal damages, (2) Crescent is in the process of amending its complaint to seek punitive damages,[97] and (3) Crescent has requested injunctive relief.[98] Placer's attempt to dismiss Crescent's claims at this stage of the litigation based on a purported lack of recoverable economic damages ignores established Idaho precedent and must be rejected.

Placer's argument regarding *Spanbauer v. J.R. Simplot Co.*, 107 Idaho 42, 685 P.2d 271 (1984), also misses its mark for several reasons, including the procedural posture of the case.[99] In *Spanbauer*, the court reversed a judgment that was awarded after a full trial because there was "a lack of substantial competent evidence to support the jury's verdict[.]" *Id.* at 43. The court's holding centered on the claimant's burden of proof at trial and does not support Placer's attempt to prevent Crescent from even presenting its damages case at trial.

*Spanbauer* is also distinguishable because it involved "[t]he measure of damages recoverable for permanent injury to land," whereas this case involves a temporary (*i.e.*, continuing) injury to the Crescent Mine. *Id.* at 45. While Placer contends that Crescent's injury should be deemed permanent because of the cost of abatement, Placer rightly concedes that this is an issue of fact that generally must be resolved at trial.[100]

For temporary injuries to land, "the owner is entitled to recover the amount necessary to repair the injury and put the land in the condition it was at the time immediately preceding the injury." *Bumgarner v. Bumgarner*, 124 Idaho 629, 639, 862 P.2d 321 (Idaho Ct. App. 1993).

---

[97] ECF 117-1 (Memo in Support of Motion to Amend) at 10-16.
[98] ECF 51 (Crescent Second Amended Compl.) at 29-30.
[99] *Id.* at 14-15.
[100] *Id.* at 12.

Accordingly, Dr. Rigby has estimated the cost to dewater the Crescent Mine,[101] which further distinguishes *Spanbauer* where the only evidence the plaintiff offered was testimony regarding "the present value of his land, with and without the fluoride damage." *Spanbauer*, 107 Idaho at 45. Here, Dr. Rigby will testify to both the reduced value of the Crescent Mine caused by the flooding and the cost to abate the flooding.[102]

Additionally, in *Spanbauer*, the plaintiff sought only economic damages for the injury to his property, likely because the injury was permanent and abatement was not possible, so the lack of evidence of recoverable damages at trial required reversal of the jury verdict. *Id.* at 44. Even ignoring the dissimilar procedural setting, Crescent seeks both economic damages and injunctive relief.[103] This critical distinction renders *Spanbauer* inapplicable and further underscores the inappropriateness of dismissing Crescent's claims at this stage. *See Aztec Ltd.*, 100 Idaho at 570.

### III. CONCLUSION

For the foregoing reasons, BHMC's and Placer's motions for summary judgment should be denied.

---

[101] ECF 112-12 (Dr. Rigby 6/7/24 Report) at 13-18.

[102] *See generally* ECF 112-12 (Dr. Rigby 6/7/24 Report). Under Idaho law, the diminution in value caused by a defendant's tortious conduct **can** "place[] a cap on the amount of damages that the landowner is entitled to recover[.]" *Farr W. Invs. v. Topaz Mktg. L.P.*, 148 Idaho 272, 276, 220 P.3d 1091, 1095 (2009). However, the Supreme Court of Idaho has held that "[b]ecause the goal of the law of compensatory damages is reimbursement of the plaintiff for the actual loss suffered, the rule precluding recovery of restoration costs in excess of the diminution in value is not of invariable application." *Nampa & Meridian Irrigation Dist. v. Mussell*, 139 Idaho 28, 34, 72 P.3d 868, 874 (2003). Indeed, "more recent Idaho decisions have relaxed the rules in determining trespass damages." *Adams v. United States*, 823 F. Supp. 2d 1074, 1082 (D. Idaho 2011). Whether restoration costs or diminution in value is the appropriate measure of damages is a fact-intensive inquiry that is not presently before the Court and should be resolved at trial, as neither BHMC nor Placer has raised this issue in their respective motions and therefore should be precluded from doing so on reply. *See Health Freedom Def. Fund, Inc. v. US Freedom Flyers, Inc.*, No. 4:23-CV-00380-AKB, 2024 WL 3332768, at *4 (D. Idaho July 2, 2024).

[103] ECF 51 (Crescent Second Amended Compl.) at 29-30.

DATED this 10th day of January 2025.

STOEL RIVES LLP


_/s/ Maren Norton_ _____
Wade C. Foster, ISB No. 11105
Maren R. Norton, admitted _pro hac vice_
Sean James, admitted _pro hac vice_
Attorneys for Plaintiff