Preston N. Carter, ISB No. 8462
Morgan D. Goodin, ISB No. 11184
Megann E. Meier, ISB No. 11948
Givens Pursley LLP
601 West Bannock Street
Post Office Box 2720
Boise, Idaho 83701-2720
Telephone (208) 388-1200
Facsimile (208) 388-1300
prestoncarter@givenspursley.com
morgangoodin@givenspursley.com
mem@givenspursley.com
18743543.14 [16454.1]

*Attorneys for Defendant Placer Mining Corporation*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

CRESCENT MINE, LLC

Plaintiff,

v.

BUNKER HILL MINING CORPORATION; AND PLACER MINING CORPORATION (d/b/a New Bunker Hill Mining Co.),

Defendants.

Case No. 2:21-cv-00310-DCN

REPLY MEMORANDUM IN SUPPORT OF PLACER MINING CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DKT. 108)

## TABLE OF CONTENTS

ARGUMENT ........ 1

1. Crescent requests a remedial action that has not been authorized by EPA. ........ 1
2. Crescent's requested injunctive relief relates to the goals of, and will interfere with, EPA's selected remedy. So, the Court lacks jurisdiction under section 113(h). ........ 3
3. Crescent's claims for damages are barred by conflict preemption and section 113(h). ........ 5
4. Crescent's state-law claims are untimely because Crescent cannot show that the flooding is reasonably abatable, and, by extension, that the torts are continuing. ........ 6
5. Even if Crescent's state-law claims are continuing torts, Crescent hasn't provided sufficient evidence of damages. ........ 7
6. The proof offered by Crescent in support of its state-law claims does not account for the period of joint ownership. ........ 9
7. Crescent's CERCLA claims fail because it hasn't incurred response costs. ........ 10

CONCLUSION ........ 10

## ARGUMENT

### 1. Crescent requests a remedial action that has not been authorized by EPA.

CERCLA sites are centrally controlled "to ensure the careful development of a single EPA-led cleanup effort rather than tens of thousands of competing individual ones." *Atl. Richfield v. Christian*, 590 U.S. 1, 19 (2020). "[N]o potentially responsible party may undertake any remedial action" at a facility for which a remedial investigation/feasibility study has been initiated "unless such remedial action has been authorized by the President." 42 U.S.C. § 9622(e)(6)

An RI/FS has been undertaken, and a remedy selected, for the facility that includes the Bunker Hill and Crescent mines. Dkt. 110-1 ¶¶34, 36, 42. Bunker Hill and Placer implement the selected remedy under orders and agreements with EPA. *See* Dkt. 110-4 at CRES_00043728; Dkt. 111 at BHMC_000035. These orders allow Bunker Hill (and Placer) to store water in the combined mine pool to the 11 Level. *Id.*

Crescent seeks a Court order forcing Bunker Hill to dewater to the 23 Level and the entire Crescent Mine, including below the Y-U Crosscut. Alternatively, Crescent asserts, Bunker Hill should plug the Y-U Crosscut; construct an *entirely new treatment plant*; and pump, treat, and discharge Crescent's water from the Crescent side. Dkt. 112-1 (Cresc. Br.) at 14.

Crescent's proposals are "remedial action[s]." *See* 42 U.S.C. § 9601(24) (defining "remedial action"). Crescent hasn't sought, or obtained, authorization for either proposal. They are therefore barred. *See* 42 U.S.C. § 9622(e)(6).

Crescent argues that its requested relief "aligns with and does not contradict any EPA documents or directives." Cresc. Br. at 7, 14. But the question under section 122(e)(6) is one of *authority*, not *consistency*. EPA—and EPA alone—decides whether a PRP can undertake a

remedial action on the site. *See* 42 U.S.C. § 9622(e)(6). Crescent's requested relief isn't authorized by EPA and is therefore barred.

Crescent drums up an eight-year-old, one-paragraph email that it holds out as EPA approval. Cresc. Br. at 14. This isn't "authoriz[ation] by the President" under section 122(e)(6). The email is a two-sentence, informal, general inquiry about dewatering below the 11 Level of the Bunker Hill Mine. Dkt. 133-8 at BHMC_030105. It doesn't purport to describe Crescent's proposal: Court-ordered dewatering; 20-hour-per-day pumping for 550-plus days; increased flows to the CTP; a legal requirement to keep water at or below the 23 Level; and so on. Much less construction of a new treatment plant and dewatering from the Crescent side.

The email doesn't authorize the proposed dewatering campaign. It confirms that Bunker Hill has "discretion" to pump down the mine below the 11 Level. *Id.* An order from the Court would remove that discretion and change the 2018 SAOC from "Bunker Hill *may* dewater the mine below the 11 Level" to "Bunker Hill *must* dewater the mine to the 23 Level." Crescent hasn't sought, or obtained, authorization for this.

And EPA's email contains an important caveat. Dewatering may result in "a shift to water quality." Dkt. 133-8 at BHMC_030105. EPA's consent decree prohibits "any significant change in water quality or quantity." Dkt. 111 at BHMC_000048. The email thus highlights *inconsistency* between Crescent's proposal and EPA's orders: dewatering is subject to oversight, and prohibited if it changes water quality or quantity.

Crescent tries to distinguish *Atlantic Richfield* because there "the restoration plan explicitly went beyond the remedy selected by EPA." Cresc. Br. at 15. The same is true here. EPA did not require cleanup (or dewatering) of the Crescent Mine; EPA's selected remedy gives Bunker Hill (and Placer) the discretion to do so, subject to certain conditions. Crescent wants the

Court to compel what EPA did not: cleanup of the Crescent Mine by dewatering through the Bunker Hill Mine. Crescent thus seeks to go beyond, and to improve upon (from Crescent's perspective), EPA's selected remedy. This is conceptually no different from requesting excavation of an extra foot of contaminated soil. *See Atl. Richfield*, 590 U.S. at 10.

**2. Crescent's requested injunctive relief relates to the goals of, and will interfere with, EPA's selected remedy. So, the Court lacks jurisdiction under section 113(h).**

CERCLA withdraws federal jurisdiction over "any challenges to removal or remedial action selected under" CERCLA. 42 U.S.C. § 9613(h). A claim "challenges" the selected removal or remedial action "if it is related to the goals of the cleanup," *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995), or if it "interferes with even the most tangential aspects of a cleanup," *Anacostia Riverkeeper v. Wash. Gas Light Co.*, 892 F.Supp.2d 161, 173 (D.D.C. 2012) (cleaned up).

Courts do not wield a scalpel to carve out an injunction around or within EPA's selected remedy. *Razore*, 66 F.3d at 239 (rejecting plaintiff's argument that "the district court could have fashioned RCRA and CWA remedies that will not interfere with" EPA's CERCLA order). Section 113(h) is "blunt;" applying it, courts compare the goals of the selected remedy and the plaintiff's claim, and dismiss the non-CERCLA claim if the goals are the same, or upon even minor interference. *Id.*; *McLellan Ecol. Seep. Sit. v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995).

Crescent's requested relief relates to the goals of EPA's selected remedy. Under EPA's remedy, contaminated water is stored in the combined mine pool, at or below the 11 Level, and is pumped and treated at the CTP subject to EPA's authority to require diversion to in-mine storage. Dkt. 111 at BHMC_26888, -26894, -26809–09 (2017 UAO provisions related to in-mine storage); Dkt. 110-4 at CRES_00043736–40 (2018 SAOC provisions related to in-mine storage).

Crescent would have the Court order Bunker Hill to clean up the Crescent Mine by

dewatering the Bunker Hill through a 550-plus day, 20-hour-per-day, sustained pumping-and-treatment campaign to the 23 Level and to the Crescent Mine levels below the Y-U Crosscut.[1] Dkt. 110-5, Ex. 35 (Rigby Rep.) at 13–17. The relief relates to—indeed, completely overlaps with—the remedy selected by EPA: storage, pumping, and treatment of contaminated water in the combined mine pool.

Crescent's requested relief will interfere with the EPA-selected remedy. EPA retains the authority to tell Bunker Hill (and Placer) to stop pumping and divert water to in-mine storage. Dkt. 110-1 ¶¶45–48. A Court-ordered, 20-hour-per-day, 550-plus-day dewatering campaign interferes with this authority. EPA's orders prohibit Placer from significantly altering the chemistry of the water pumped to the CTP. Dkt. 111 at BHMC_000048. Complete dewatering will "lead to more acidic and metal laden AMD increasing the treatment requirement." *Id.*, Ex. 14 at BHMC_051523; *see* Dkt. 133-8 (noting that, with drawdown, "there may be a shift [in] water quality"). Bunker Hill pumping is "expressly subject to continued EPA approval and oversight." Case. No. 2:04-cv-0126-EJL, Dkt. 86 at 7. A Court-ordered dewatering campaign would place the Court—not EPA—in control of storage, pumping, and treatment of contaminated water in the mine. And these are just the obvious cases of interference. EPA retains the ability to review and alter the remedy and adjust to site conditions as they evolve. An order requiring permanent, complete dewatering will straightjacket EPA's discretion.

Crescent argues that there's no direct conflict between the requested injunctive relief and EPA's orders. Cresc. Br. at 16–19. That's the wrong standard. Under the correct standard—

[1] Crescent proposes that Bunker Hill plug the Y-U Crosscut, construct an entirely new treatment plant, and dewater from the Crescent side. Cresc. Br. at 9. Not a lick of expert testimony supports this proposal. And it directly conflicts with EPA's selected remedy, which requires pumping and treatment *at the CTP*, not some as-yet-to-be-constructed plant.

"relates to" or "interferes with," *Razore*, 66 F.3d at 239; *McClellan*, 47 F.3d at 330—Crescent's claims fail.

Crescent argues that it does not try to "improve upon" or "add to" the cleanup. Cresc. Br. at 17. Not so. EPA didn't require cleanup of the Crescent Mine. Crescent seeks a court order requiring precisely that. Crescent thus wants "to improve the CERCLA cleanup," at least from the Crescent's perspective. *McClellan*, 47 F.3d at 330.

Crecent complains that its claims could be precluded for hundreds of years. Crescent Br. at 17. That's true: section 113(h) may bar the claims "for years, if not permanently." *McLellan*, 47 F.3d at 329. But this policy argument "is for legislators, and not judges, to address." *Id.* The result isn't "absurd," *see* Cresc. Br. at 17; it's compelled by binding authority.

**3. Crescent's claims for damages are barred by conflict preemption and section 113(h).**

Crescent seeks up to $27 million in damages for Placer's diversion of water into the lower levels of the Bunker Hill Mine in 1993–1994.[2] EPA specifically authorized this diversion.[3] In 1993, the then-owner of the CTP intended to stop treating acid mine drainage from the mine. *See* Dkt. 111 at BHMC_051616. EPA identified "two short-term solutions." The first: "1. *Divert all of the mine drainage* from the Reed Tunnel and the Kellogg Tunnel back into the mine so there will be no discharge at all." *Id.* at BHMC_051616 (emphasis added). EPA incorporated

[2]Crescent apparently recognizes it can't hold Placer liable for Bunker Hill Mining Company (U.S.) Inc.'s decision to flood its own mines, and thus identifies the 1993–1994 diversion of water as the factual basis for its state-law claims. Cresc. Br. at 31–33.

[3] Crescent asserts that EPA's letter required permission for the diversions. Cresc. Br. at 23. This is a gross misrepresentation of the letter. EPA expressly authorized diversions to the lower levels of the mine—no permission from anyone was required. Dkt. 111 at BHMC_ 051616. Separately, EPA "encourage[d] [Placer] to take measures to reduce infiltration into the mine up and above the Reed Tunnel." *Id.* at BHMC_051617. These measures could include altering drainage patterns *on the surface*. *These* measures required separate permission from EPA, the Idaho Department of Health and Welfare, and neighboring property owners. *Id.*

diversion to in-mine storage in its later orders. *Id.* at BHMC_026906–07.

Imposing damages for EPA-approved conduct "pose[s] an obstacle to the accomplishment and execution of Congress's full purposes and objectives" by "substitut[ing] a federal court's judgment for the authorized judgment of the expert government agencies." *Honeywell v. Bartlett*, 737 F. App'x 543, 550 (2d Cir. 2018). Crescent seeks just that. Its attempt to impose tort liability on EPA-approved actions is preempted.

Damages also impermissibly challenge EPA's orders. In *Pakootas*, the court explained that civil penalties challenge a CERCLA order because they displace EPA's negotiated "hammer" to compel compliance with its order; divert the defendants' funds away from a cleanup; and create a risk of bankruptcy. 646 F.3d at 1222.

Crescent seeks damages, not penalties. But the result is the same: damages will remove EPA's hammer; will divert Bunker Hill's (or Placer's) funds away from the cleanup and into Crescent's pocket; and could create a threat of bankruptcy, certainly to Placer. As with the penalties in *Pakootas*, damages here would upend EPA's balance of cleanup obligations with the financial viability of mineral extraction. The claim for damages is barred by section 113(h).

**4. Crescent's state-law claims are untimely because Crescent cannot show that the flooding is reasonably abatable, and, by extension, that the torts are continuing.**

To characterize its tort claims as continuing—the only way to survive dismissal under the statutes of limitation—Crescent must prove that the flooding of the Crescent Mine is reasonably abatable. Dkt. 110 at 11–12. It attempts to do so by arguing: 1) its property is worth $91 million, making the $13.8+ million cost of abatement reasonable; 2) the CTP has been updated to handle greater volumes of AMD, so it won't take 550 days of constant pumping; 3) its expert's calculations are based on dewatering *both* the Crescent Mine and the Bunker Hill Mine, and dewatering the Crescent Mine alone won't take as long or be as expensive; 4) a plug can be

installed in Y-U Crosscut, allowing the Crescent Mine to be dewatered in isolation; and 5) BHMC can construct a second water treatment facility to ease the burden on the CTP. Cresc. Br. at 8–9, 11–12, 34–37.

All but the first of these argument assert facts not supported by expert testimony. Crescent argues a plug can be placed in the Y-U Crosscut to allow the Crescent Mine to be dewatered from the Crescent side. *Id*. at 35. But it hasn't provided expert testimony on the cost or feasibility of doing so. Crescent also suggests that BHMC can construct a second water treatment facility. *Id.* at 8–9. Same problem: it hasn't provided expert testimony on the cost or feasibility of this plan. And while Crescent downplays the $13.8 million dewatering cost cited by Placer because it relates to the dewatering of *both* mines, rather than just the Crescent, Crescent's damages expert offered an opinion on that point *only*. Rigby Rep. at 13–17. Crescent didn't present evidence on the cost of dewatering just the Crescent Mine.

All this is on top of the fact that Crescent hasn't obtained permission from EPA to dewater the Crescent Mine, plug the Y-U Crosscut, or construct a second water treatment plant, rendering Crescent's proposed abatement methods barred by section 122(e)(6), as discussed above. Thus, Crescent hasn't come forward with sufficient evidence that the flooding is reasonably abatable. All of its tort claims must be dismissed as untimely.

**5. Even if Crescent's state-law claims are continuing torts, Crescent hasn't provided sufficient evidence of damages.**

Even if the Court finds that Crescent's state-law claims are continuing torts, Crescent is limited to damages incurred within the applicable limitations periods. *Woodland v. Lyon*, 78 Idaho 79, 83 (1956) (explaining that if the tort "alleged is not a single wrong, but a continuing one . . . [the claimant] may, if the evidence supports his claim, recover for all injuries occurring *within the statutory period*."). It is also limited to damages incurred during its period of

ownership, which began in 2014. That's because, absent an assignment of claims, property owners lack standing to pursue damages for trespasses and nuisances suffered by their predecessors in interest. *See Axelrod v. Reid Ltd. P'ship*, 551 P.3d 777, 789–90 (Idaho 2024) ("Ownership of the land and timing of the alleged trespass are key inquiries. . . . RLP did own the land in 2018, when the Miller Easement road was constructed, and therefore has standing to assert a claim for alleged damage incurred . . . until transfer of the land was completed in 2019."); *Radford v. Van Orden*, 168 Idaho 287, 300–01 (2021) (discussing the need for assignment).

These principles are an obstacle for Crescent because none of its disclosed damages bear any relationship to either of these time periods. Rather, all of its expert testimony regarding damages is based on a comparison of the mine in its current, flooded state versus its unflooded state in 1990 or 1991. *See* Rigby Rep. at 9, 13. To be clear, the mine pool in the Bunker Hill and Crescent mines "has not materially dropped below the 11 Level" since 1994. Dkt. 116-2 ¶22. Accordingly, damages based on the cost of fully dewatering the Crescent Mine or which compare the mine's value with and without flooding aren't relevant to the damages actually available to Crescent if its tort claims are continuing.[4] *Woodland*, 78 Idaho at 83. Nor do they relate to the damages incurred by Crescent since 2014. *Axelrod*, 551 P.3d at 789–90.

For these reasons, Crescent's state-law claims must be dismissed to the extent they require proof of actual damages. This includes Crescent's civil trespass with damage claim in Count 4 and its negligence claim in Count 6. As for Crescent's remaining tort claims, although common-law trespass and nuisance claims may be predicated upon nominal damages alone,

[4]Even if Crescent seeks damages for loss of use of the lower levels of the mine due to flooding, that loss-of-use calculation must be limited to losses suffered since 2017 or 2018. Crescent hasn't disclosed expert valuations to support an argument along these lines.

Crescent must be prohibited from seeking more than nominal damages on these claims.

**6. The proof offered by Crescent in support of its state-law claims does not account for the period of joint ownership.**

As Placer argued in its opening brief, Placer cannot be liable for trespasses, nuisances, and negligence perpetuated by the Bunker Hill and Crescent mines' prior joint owner. Dkt. 110 at 17–20. Crescent appears to concede this point by narrowing the scope of its tort claims to in-mine diversions between October 1993 and December 1994. *See* Dkt. 116-1 at 19.

This creates separate, but equally fatal, problems. First, even if Crescent could prove that Placer's diversions between 1993 and 1994 were wrongful,[5] to prove causation and damages, it must differentiate between the flooding that occurred under Bunker Hill Mining Co.'s joint ownership from that allegedly caused by Placer between 1993 and 1994. It must also differentiate between flooding caused by Placer's in-mine diversions from water that naturally infiltrated the mine pool during this same period. Finally, Crescent must prove the damages it has incurred as a result of the water Placer diverted into the mine pool between 1993 and 1994.

Crescent hasn't disclosed more than a scintilla of evidence on any of these issues. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) ("A '*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." (cleaned up)). In support, Crescent offers evidence that the mine pool increased from the 15 Level to the 11 Level of the Bunker Hill Mine during this period. But this increase was from water infiltration in *both* the Bunker Hill and Crescent mines. Crescent's own experts agree that the Crescent Mine experiences natural inflow,

[5] As discussed at length in Placer's opposition to the pending motion to amend to add a claim for punitive damages, EPA expressly *approved* Placer's in-mine diversions during this period. This fact alone will make it exceedingly difficult for Crescent to prove that Placer's diversions amount to tortious conduct.

which makes a net contribution to the mine pool elevation. Dkt. 116-3, Ex. 00 at 30; *id*., Ex. TT at 5. And Placer's diversions only affected water from *above* the Kellogg Tunnel, not natural infiltration *below* the Tunnel, *see* Dkt. 110-3 at BHMC_002073, -002088–92, -002094; Dkt. 129-7, Ex. 2 at 246:3–24. The mines were rapidly flooding by November 1991, well *before* the diversions, Dkt. 110-4 at CRES_00003378; Sunshine_000013–14. Crescent presents no evidence to differentiate between these various sources of flooding, much less evidence of damages tied to the 1993–1994 diversions. *At most*, these diversions would have added some incremental-but-unproven amount of water to the mine pool, and Crescent's own expert testified that the Crescent Mine would have flooded regardless of Placer's diversions. Dkt. 110-5, Ex. 34 at 184:10–15.

Without admissible evidence that Placer's 1993–1994 diversions *caused* Crescent damage, and without admissible evidence of the *amount* of those damages within the limitations period, Crescent's tort claims must be dismissed.

**7. Crescent's CERCLA claims fail because it hasn't incurred response costs.**

Pointing to two invoices addressed to Crescent Mine, LLC, Crescent argues that it has incurred costs consistent with the NCP. Cresc. Br. at 5–6. Not so. While a CERCLA claimant needn't have *paid* response costs, it must "commit[] resources to meet" such costs. *See Trimble v. ASARCO, Inc.*, 232 F.3d 946, 948 (8th Cir. 2000) (citing *Dant & Russel, Inc.*, 951 F.2d 246, 249 (9th Cir. 1991)). Crescent hasn't produced evidence that it committed resources to meet the claimed costs. To the contrary: Crescent has no employees and no contracts.[6] *See* 12/2/24 Hogle Dec., Ex. 2 at 15:14–16, 63:21–24; 190: 21–191:5. Crescent's CERCLA claims fail on this basis.

**CONCLUSION**

Placer requests that the Court grant its Motion for Summary Judgment.

---

[6] Hypothesized future events, *see* Cresc. Br. at 6 n.5, don't substitute for evidence that the party to this case—Crescent Mine, LLC—is entitled to relief on its claims.

Dated: February 7, 2025.

GIVENS PURSLEY LLP
By */s/ Preston N. Carter*
Preston N. Carter, Megann E. Meier
Attorneys for Placer Mining Corporation

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 7, 2025, a true and correct copy of the foregoing document was served by the method indicated below upon the following party(ies):

Murray D. Feldman — MFeldman@hollandhart.com
Christopher C. McCurdy — ccmccurdy@hollandhart.com
Holland & Hart LLP
800 W. Main St., Ste. 1750
Boise
*Attorneys for Bunker Hill Mining Corporation*

Christopher R. Hogle (Admitted pro hac vice) — crhogle@hollandhart.com
Sarah M. Perkins (Admitted pro hac vice) — smperkins@hollandhart.com
Holland & Hart LLP
222 S. Main St., Ste. 2200
Salt Lake City, UT 84101
*Attorneys for Bunker Hill Mining Corporation*

Wade C. Foster — wade.foster@stoel.com
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
*Attorneys for Crescent Mine, LLC*

Maren R. Norton (Admitted pro hac vice) — maren.norton@stoel.com
Sean T. James (Admitted pro hac vice) — sean.james@stoel.com
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101
*Attorneys for Crescent Mine, LLC*

James T. Graves (Admitted pro hac vice) — james@gravesenvirolaw.com
Graves Environmental Law PLLC
4736 NE 187th Place
Lake Forest Park, WA 98155
*Attorneys for Crescent Mine, LLC*

*/s/ Preston N. Carter*
Preston N. Carter