Wade C. Foster, ISB No. 11105
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000
Facsimile: (208) 389-9040
*wade.foster@stoel.com*

Maren R. Norton, admitted *pro hac vice*
Sean T. James, admitted *pro hac vice*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
*maren.norton@stoel.com*
*sean.james@stoel.com*

Attorneys for Plaintiff

James T. Graves, admitted *pro hac vice*
GRAVES ENVIRONMENTAL
LAW PLLC
4736 NE 187th Place
Lake Forest Park, WA 98155
Telephone: (206) 889-2330
*james@gravesenvirolaw.com*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CRESCENT MINE, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**BUNKER HILL MINING CORPORATION; PLACER MINING CORPORATION** (d/b/a New Bunker Hill Mining Co.),<br><br>Defendants. | **Case No. 2:21-cv-00310-DCN**<br><br><br>**REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

I. INTRODUCTION ............................................................................................... 1

II. POINTS AND AUTHORITIES IN REPLY ....................................................... 2

    A.    Defendants Are Liable for Civil and Common Law Trespass............................. 2

        1.    Irrefutable Water Elevation Data Confirms That Placer Flooded the Crescent Mine. ......................................................................... 2

        2.    BHMC Is Liable for Civil and Common Law Trespass Because It Has Failed to Remove the Trespassory Bunker Hill Mine Water from the Crescent Mine. .................................................................... 5

        3.    Damages Are Not Required to Establish Liability for Civil and Common Law Trespass............................................................... 10

    B.    Defendants Are Liable for Crescent's Past and Future CERCLA Response Costs........................................................................................... 11

        1.    Crescent's CERCLA Claims Are Not Premature. ................................. 11

        2.    Crescent Mine Has Incurred Response Costs. ........................................ 17

        3.    Bunker Hill Mine Releases and Disposals Caused Crescent to Incur Response Costs................................................................... 17

        4.    Crescent's Response Costs Were Necessary. ......................................... 24

        5.    Crescents' Removal Actions Are Consistent with the NCP. .................. 27

        6.    Summary Judgment on Crescent's CERCLA Section 113(g)(2) Claim for Declaratory Judgment Should Be Granted. ............................ 28

    C.    BHMC's and Placer's CERCLA Section 113(f) Contribution Claims Should Be Dismissed. ........................................................................ 29

III. CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A & W Smelter & Refiners, Inc. v. Clinton*,
   146 F.3d 1107 (9th Cir. 1998) ..............................................................19

*Artesian Water Co. v. Gov't of New Castle Cnty.*,
   851 F.2d 643 (3d Cir. 1988)...................................................................22

*Aztec Ltd. v. Creekside Inv. Co.*,
   100 Idaho 566, 602 P.2d 64 (1979).................................................10, 11

*Bob's Beverage, Inc. v. Acme, Inc.*,
   264 F.3d 692 (6th Cir. 2001) .................................................................24

*Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*,
   840 F.2d 691 (9th Cir. 1988) ...........................................................14, 27

*Cal. River Watch v. Fluor Corp.*,
   119 F. Supp. 3d 1108 (N.D. Cal. 2015) .................................................24

*California Department of Toxic Substances Control v. NL Industries., Inc.*,
   636 F. Supp. 3d 1092 (C.D. Cal. 2022) ...........................17, 18, 22, 29

*Calmat Co. v. San Gabriel Valley Gun Club*,
   809 F. Supp. 2d 1218 (C.D. Cal. 2011) .................................................16

*Carson Harbor Village., Ltd. v. Unocal Corp.*,
   270 F.3d 863 (2001)...................................................................24, 25, 26

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
   287 F. Supp. 2d 1118 (C.D. Cal. 2003), *aff'd sub nom. Carson Harbor Vill. v.*
   *County of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006) ....................12, 18

*Castaic Lake Water Agency v. Whittaker Corp.*,
   272 F. Supp. 2d 1053 (C.D. Cal. 2003) .................................................18

*City of Colton v. Am. Promotional Events, Inc.-W.*,
   614 F.3d 998 (9th Cir. 2010) ...........................................................13, 28

*City of Moses Lake v. United States*,
   458 F. Supp. 2d 1198 (E.D. Wash. 2006).............................................11

*City of Portland v. Boeing Co.*,
   179 F. Supp. 2d 1190 (D. Or. 2001) ..........................................22, 29, 30

# TABLE OF AUTHORITIES
(continued)

Page

*In re Dant & Russell, Inc.*,
  951 F.2d 246 (9th Cir. 1991) .................................................................17

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
  889 F.2d 1146 (1st Cir. 1989).................................................................22

*Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*,
  No. 3:24-CV-00681-IM, 2024 WL 4751519 (D. Or. Nov. 11, 2024) ....................14

*Fairchild Semiconductor Corp. v. U.S. E.P.A.*,
  769 F. Supp. 1553 (N.D. Cal. 1991), *aff'd*, 984 F.2d 283 (9th Cir. 1993) ............13

*Goe Engineering Co. v. Physicians Formula Cosmetics*,
  No. CV 94-3576-WCK, 1997 WL 889278 (C.D. Cal. 1997) .................................23

*Goldingay v. Progressive Cas. Ins. Co.*,
  306 F. Supp. 3d 1259 (D. Or. 2018) ...................................................5, 6

*Henke v. Arco Midcon, L.L.C.*,
  750 F. Supp. 2d 1052 (E.D. Mo. 2010).................................................6

*Hous. Auth. of City of Los Angeles v. PCC Tech. Indus., Inc.*,
  No. 11-1626 FMO (CWX), 2015 WL 13654008 (C.D. Cal. Jan. 26, 2015) ..........14

*Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*,
  976 F.2d 1338 (9th Cir.1992) ..............................................................11

*Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*,
  4 F.3d 1209 (3d Cir. 1993).................................................................22

*Mid Valley Bank v. N. Valley Bank*,
  764 F. Supp. 1377 (E.D. Cal. 1991).......................................................27

*Mission Linen Supply v. City of Visalia*,
  No. 1:15-CV-0672 AWI EPG, 2019 WL 446358 (E.D. Cal. Feb. 5, 2019),
  *aff'd*, 817 F. App'x 336 (9th Cir. 2020).................................................27

*Mock v. Potlatch Corp.*,
  786 F. Supp. 1545 (D. Idaho 1992) .......................................................3

*Mueller v. Hill*,
  158 Idaho 208, 345 P.3d 998 (2015).................................................5, 6

*NutraSweet Co. v. X-L Eng'g Corp.*,
  933 F. Supp. 1409 (N.D. Ill. 1996), *aff'd sub nom. NutraSweet Co. v. X-L
  Eng'g Co.*, 227 F.3d 776 (7th Cir. 2000) ..............................................19

## TABLE OF AUTHORITIES
(continued)

Page

*Orange Cnty. Water Dist. v. Sabic Innovative Plastics US, LLC*,
   14 Cal. App. 5th 343, 222 Cal. Rptr. 3d 83 (2017) ..................................................7

*Otay Land Co. v. U.E. Ltd., L.P.*,
   440 F. Supp. 2d 1152 (S.D. Cal. 2006), *vacated on other grounds sub nom.*
   *Otay Land Co. v. United Enters. Ltd.*, 338 F. App'x 689 (9th Cir. 2009) ..............................15

*Otay Land Co. v. United Enterprises, Ltd.*,
   338 F. App'x 689, 2009 WL 2179739 (9th Cir. 2009) (unpublished) ..............................15, 16

*Pakootas v. Teck Cominco Metals, Ltd.*,
   905 F.3d 565 (9th Cir. 2018) ........................................................................................15, 25

*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
   99 F.4th 458 (9th Cir. 2024) ...........................................................................................12

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008) ........................................................................................21

*State v. Superior Court of Riverside Cnty.*,
   78 Cal. App. 4th 1019, 93 Cal. Rptr. 2d 276 (2000) ........................................................7

*Town of Superior, Mt. v. Asarco*,
   874 F. Supp. 2d 937 (D. Mont. 2004) .......................................................................10, 11

*United Alloys, Inc. v. Baker*,
   797 F. Supp. 2d 974 (C.D. Cal. 2011) ................................................................... passim

*United States v. Placer Mining Co.*,
   No. 2:04-CV-00126-EJL, 2018 WL 7352423 (D. Idaho June 19, 2018) ...............................26

*United States v. Spear*,
   No. 2:22-CV-00439-BLW, 2023 WL 6463039 (D. Idaho Oct. 4, 2023) .................3, 9, 10, 11

*United States v. Stringfellow*,
   661 F. Supp. 1053 (C.D. Cal. 1987) ...............................................................................27

*United States v. W.R. Grace & Co.-Conn.*,
   280 F. Supp. 2d 1149 (D. Mont. 2003) ...........................................................................28

*Vill. of DePue v. Viacom Int'l, Inc.*,
   713 F. Supp. 2d 774 (C.D. Ill. 2010) ...............................................................................6

*Wickland Oil Terminals v. Asarco, Inc.*,
   792 F.2d 887 (9th Cir. 1986) ...............................................................................14, 15, 22

## TABLE OF AUTHORITIES
(continued)

Page

*Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.,*
   778 F. Supp. 101 (D.R.I. 1991)..................................................................................10

**Statutes**

42 U.S.C. § 6972(a)(1)(B) ..........................................................................................16

42 U.S.C. § 9601(14) ..................................................................................................25

42 U.S.C. § 9601(23) ..........................................................................................12, 27

42 U.S.C. § 9604(a) ....................................................................................................13

42 U.S.C. § 9607 ........................................................................................................30

42 U.S.C. § 9607(a) ......................................................................................11, 12, 20

I.C. § 6-202(1)(d) ..........................................................................................................3

CERCLA, § 101(23) ...................................................................................................16

CERCLA, § 107 ..................................................................................................passim

CERCLA, § 107(a) ..............................................................................................14, 16

CERCLA, § 107(a)(2)(B) ...........................................................................................14

CERCLA, § 113 ..................................................................................................12, 17

CERCLA, § 113(f) ..............................................................................................29, 30

CERCLA, § 113(g)(2) .........................................................................................28, 29

**Rules**

Fed. R. Civ. P. 30(b)(6).....................................................................................3, 7, 9, 10

Fed. R. Civ. P. 56 .........................................................................................................1

Local Civil Rule 7.1(c)(1)..............................................................................................1

**Regulations**

40 C.F.R. § 300, *et seq.*...............................................................................................2

40 C.F.R. § 302.4 .......................................................................................................25

## TABLE OF AUTHORITIES
(continued)

**Page**

**Other Authorities**

Bunker Hill Mining Corp., News & Media (Dec. 13, 2024),
　　https://www.bunkerhillmining.com/news-and-media/news-releases/bunker-
　　hill-announces-updated-forecast-for-mine-restart-and-revised-financing-plan......................23

Restatement (Second) of Torts § 158............................................................................................10

Restatement (Second) of Torts § 161 ........................................................................................5, 6

Restatement (Second) of Torts §161(1)........................................................................................10

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7.1(c)(1), Crescent Mine, LLC ("Crescent"), Crescent Silver, LLC and Syringa Exploration, Inc. (the "Crescent Parties") respectfully submit this reply in support of the Crescent Parties' Motion for Partial Summary Judgment (ECF No. 116).

## I. INTRODUCTION

Bunker Hill Mining Corporation ("BHMC") and Placer Mining Corporation ("Placer") (collectively, "Defendants") deliberately distort both the facts and legal standards involved in this case. Their misrepresentations, however, cannot obscure the straightforward reality of this case. Between 1993 and 1994, Placer intentionally diverted over 700 million gallons of contaminated water into the lower workings of the Bunker Hill Mine as part of a calculated effort to avoid paying EPA required treatment costs. According to Defendants' own expert, the Bunker Hill Mine received only 277 million gallons of contaminated water during this period. A large percentage of the remaining water inundated the Crescent Mine, filling it with acid mine drainage ("AMD") including heavy metals. This contamination event, initiated by Placer and continued by BHMC every time it turns its pumps off, forms the core of Defendants' liability.

Placer is liable for trespass for flooding the Crescent Mine with contaminated water without consent, and BHMC is liable for trespass due to its continued failure to remediate or remove the trespassing contaminants. It is well-established under Idaho law that a plaintiff need not prove actual damages for a finding of trespass liability. Thus, Defendants' repeated attempts to refute Crescent's trespass claim on the basis of damages remain ineffective. Undeterred by the absence of any supporting evidence, Defendants argue that the Crescent Mine was "already flooded" before Placer purchased the Bunker Hill Mine in April 1992. This assertion is factually inaccurate and directly contradicted by Defendants' own experts. As Defendants' experts recognize, the mine pools rise and fall together and Placer's diversion of water raised the Bunker Hill Mine pool from

the 15 Level to the 11 Level, which inevitably raised the Crescent Mine pool by approximately the same amount. BHMC's attempt to disclaim liability on the grounds that it did not actively cause the trespass is equally unavailing because a landowner is liable for continuing trespass when they fail to remove a tortious intrusion caused by their predecessor in interest, regardless of whether they originally placed it there.

Defendants are also liable under CERCLA because the flooding of the Crescent Mine with contaminated water from the Bunker Hill Mine "facility" in the 1990s constitutes "releases" and "disposals" of "hazardous substances," which have caused Crescent to incur response costs. As the current and past owner of that "facility," Defendants are each liable for such releases and disposals. Crescent's cost recovery and declaratory relief claims are fully ripe for adjudication because it has incurred substantial costs for investigatory response actions that are both necessary and consistent with the *applicable* provisions of the National Contingency Plan ("NCP"), 40 C.F.R. § 300, *et seq*. Lastly, with respect to causation, Defendants have the burden to *disprove* that the releases (or threatened releases) and disposals in question caused Crescent to incur response costs, and they have failed to do so. Accordingly, Defendants are liable under CERCLA as a matter of law, with a full determination of recoverable response costs to be decided at trial.

## II. POINTS AND AUTHORITIES IN REPLY

### A.    Defendants Are Liable for Civil and Common Law Trespass.

Defendants are each liable for civil and common law trespass because contaminated water from the Bunker Hill Mine was deliberately diverted into the Crescent Mine between 1993 and 1994, which continues to pollute the mine to this day.

#### 1.    Irrefutable Water Elevation Data Confirms That Placer Flooded the Crescent Mine.

To establish liability for civil and common law trespass, a claimant must establish "(1) that

the defendant went upon the plaintiff's land, [and] (2) that the plaintiff did not consent to defendant's entry on plaintiff's land[.]" *United States v. Spear*, No. 2:22-CV-00439-BLW, 2023 WL 6463039, at *6 (D. Idaho Oct. 4, 2023). The first element is satisfied by "causing any … substance … to go upon or over real property." I.C. § 6-202(1)(d); *see also Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992). Here, the undisputed facts confirm that Placer flooded the Crescent Mine when it knowingly diverted hundreds of millions of gallons of contaminated water into the Bunker Hill Mine's lower workings in 1993 and 1994. Defendants' assertion that "the Crescent Mine was already flooded" by the time Placer acquired the Bunker Hill Mine[1] is refuted by the evidence on record and their own experts' opinions.

It is undisputed that between October 1993 and December 1994 Placer stopped conveying any water to the Central Treatment Plant ("CTP") for treatment and instead redirected all Bunker Hill Mine water into the mine's lower workings.[2] When Placer first shut down "the mine water line to the CTP" in October 1993, "***the water level was still below the 15 Level***[.]"[3] By December 1994, when EPA forced Placer to start pumping the Bunker Hill Mine pool, the water had risen to just below the 11 Level.[4] Thus, by diverting all water into the Bunker Hill Mine's lower workings between October 1993 and December 1994, Placer caused the water level in the Bunker Hill Mine to rise from approximately the 15 Level to the 11 Level, where it remains today.[5]

---

[1] Joint Opp. at 20.

[2] ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 90:7-91:18; *see also id.* at 76:4-77:16, 79:2-80:5, 120:12-121:22, 148:16-149:25; ECF 133-4 (Sam Ash Dep. Transcript) at 83:4-12; ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 10.

[3] ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 10 (emphasis added).

[4] ECF 112-28 (1994 UAO) at 7 ("This diverted water is nearing the Level 11."); *see also* ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 10 ("In December 1994, the pumps at the 11 Level were started and all water was again discharged to the CTP for treatment.").

[5] *See* ECF 129-5 (Morton 7/8/24 Report) at 84-89 (showing water in both mines rising from an elevation equal to the 15 Level of the Bunker Hill Mine in October 1993 to an elevation just below the 11 Level in December 1994 and remaining at an elevation near the 11 Level ever since).

There is no dispute that, once the Y-U Crosscut was underwater, the water level in the Crescent Mine has been functionally tied to, and has risen in tandem with, the water level in the Bunker Hill Mine.[6]  According to Defendants' own expert, Dr. Kym Morton, because the Crescent Mine and Bunker Hill Mine are hydraulically connected by the Y-U Crosscut, "[t]he water levels in both shafts mimic each other, which indicates the mines and the Yreka tunnel are behaving like a U tube."[7] Thus, as the water level in the Bunker Hill Mine rose from the 15 Level to the 11 Level between 1993 and 1994, the Crescent Mine pool followed suit, reaching an equivalent elevation at approximately the same time. Indeed, Dr. Morton's report shows the water elevation in both mines rising in unison between October 1993 and December 1994 as Placer diverted hundreds of millions of gallons into the Bunker Hill Mine's lower workings. [8] During this time period, as over 1,300 gallons of water entered the Bunker Hill Mine pool each minute,[9] only a small fraction of that amount was entering on the Crescent Mine side.[10] It is thus indisputable that Bunker Hill Mine

---

[6] *Id.* at 21 (opining the water level in the mines "mimic" one another), 33 (same), 40 (same), 97 (same).

[7] *Id.* at 97. Dr. Kym Morton has opined that, from 2014 to 2024, the water elevation in the Crescent Mine has been approximately 27 to 39 feet higher than the water level in the Bunker Hill Mine.  ECF 129-5 at 89. This assertion is irrelevant to the issue of trespass liability, particularly because Placer flooded the Crescent Mine primarily in 1993 and 1994. Dr. Morton's opinion is also founded on bad data created by BHMC's failed attempt to calculate changes in vertical elevation along a sloped plane.

[8] *See* ECF 129-5 (Morton 7/8/24 Report) at 84-89.

[9] ECF 116-30 (Expert Report of Richard Baker) at 8 (1,333 gpm on average).

[10] Defendants cite a 1985 Kathlene Hampton thesis to assert that 225 gpm were pumped from Crescent Mine to the Bunker Hill Mine during mining operations. Joint Opp. at 20-21. The individual Kathlene Hampton cited as the source for her 225 gpm estimate has provided a sworn affidavit stating "[n]o more than sixty (60) to eighty (80) gallons per minute of water was consistently pumped from the Crescent Mine to the Bunker Hill Mine" and "[a] portion of that water was fresh water that was being pumped from the surface into the Crescent Mine for daily use by the miners for activities associated with the mining operation[.]" ECF 116-33 (Swanson Affidavit) at 3; *see also* ECF 116-31 (Crescent Mine Cooling System) at 5 ("The Crescent, located in the valley's 'dry belt' makes only 10 gallons per minute."); ECF 116-35 (Affidavit of Paul Sala) at 7 ("In the absence of the water introduced from Big Creek during operations, I would estimate that the lower Crescent Mine naturally produces . . . 15 to 25 [gpm]."); ECF 116-36 (P. Sala Dep.

water flooded into the Crescent Mine during this period of Placer ownership and deliberate AMD diversion.

> **2.    BHMC Is Liable for Civil and Common Law Trespass Because It Has Failed to Remove the Trespassory Bunker Hill Mine Water from the Crescent Mine.**

Defendants rehash the same unfounded defenses that BHMC made in its Motion for Partial Summary Judgment that (1) "BHMC did not place anything on CM's property," (2) BHMC has not "acquired a legal interest in the water in the Crescent Mine," and (3) "the water was not 'tortiously' placed on CM's land."[11] These arguments misrepresent well-established principles of continuing trespass and liability for migrating contamination and only confirm that there is no genuine issue of material fact regarding Defendants' liability for trespass.

The "failure to remove a thing tortiously placed on the land constitutes a continuing trespass for the entire time during which it is on the land." *Mueller v. Hill*, 158 Idaho 208, 214, 345 P.3d 998 (2015) (citation omitted). Thus, where "the ownership of the thing tortiously placed on the land is transferred . . . such transferee upon knowledge that the thing is wrongfully on the land comes under a duty to the possessor to remove the thing" and is liable for trespass if the item is not removed. Restatement (Second) of Torts § 161 cmt f (1965). BHMC's argument that it cannot be liable for trespass because it did not personally place the contaminated water in Crescent's mine is legally incorrect. The relevant question for the current owner of a property from which contamination has migrated "is not whether [it] caused the contamination, but whether it knew or should have known that the contamination was causing a trespass or nuisance and failed to abate it." *Goldingay v. Progressive Cas. Ins. Co.*, 306 F. Supp. 3d 1259, 1266 (D. Or. 2018);

---

Transcript) at 84:14-16 ("I doubt if [the Crescent Mine] produces more than maybe 25 [gpm] or so. It's a pretty dry mine."). But even using Defendants' inflated and refuted 225 gpm estimate, there is no dispute that the Bunker Hill Mine received more than 1,000 more gallons of water per minute compared to the Crescent Mine during this period.

[11] Joint Opp. at 23-26.

*see also Henke v. Arco Midcon, L.L.C.*, 750 F. Supp. 2d 1052, 1058 (E.D. Mo. 2010) (relying on Restatement § 161 to reject argument that current owners of property are not liable for trespass because contamination occurred under prior ownership).

Defendants do not dispute that the facts and legal issues in *Goldingay* are analogous to this case. Instead, they summarily dismiss *Goldingay* by claiming that the court "misinterpreted" Restatement § 161 because "[o]wnership of property from which contamination has migrated is not enough."[12] Notably, however, Defendants cite no authority supporting their strained and overly technical reading of Restatement § 161.[13] BHMC's liability does not hinge on whether it "owns" or "caused" the contamination, but rather on its continued failure to remediate it. *Goldingay*, 306 F. Supp. 3d at 1266; *Henke*, 750 F. Supp. 2d at 1058. BHMC indisputably has knowledge of the trespassing contamination but has done nothing to remediate it. BHMC's failure to act renders it liable under the continuing trespass doctrine.[14]

---

[12] *Id.* at 24.

[13] *Vill. of DePue v. Viacom Int'l, Inc.*, 713 F. Supp. 2d 774, 778 (C.D. Ill. 2010), did not interpret Restatement § 161 and is not instructive. There, the court held that the continuing tort doctrine was inapplicable because, **under Illinois law**, "a continuing tort 'is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation.'" *Id.* (citation omitted). Therefore, the plaintiff's trespass claim was time barred because the defendants' final tortious act occurred outside the statutory period. *Id.* However, under Idaho law, the "actor's failure to remove a thing tortiously placed on the land constitutes a continuing trespass ***for the entire time during which it is on the land***." *Mueller*, 158 Idaho at 214 (emphasis added; citation omitted). Further, unlike the plaintiff in *Village of DePue*, Crescent's claims do "result from the actions of Defendants [and their] corporate predecessors in accumulating the contaminants on the Site." 713 F. Supp. 2d at 778. And BHMC water continues to enter the Crescent Mine each time that BHMC turns off its pumps because of the hydraulic connection created by the Y-U Crosscut. *Compare* ECF 116-51 (Morton Dep. Transcript) at 61:8-13 ("the pumps go on and off") *with* ECF 116-14 (Stefanoff Dep. Transcript) at 38:8-17, 96:22-25 (Explaining that "it's like having two buckets and [the] bottom connect[s] the buckets and you pull down or add water to one side, it's going to go up or go down on the other side.").

[14] Defendants' argument that there is "no evidence that BHMC knew Bunker Hill Mine water was tortiously placed in the Crescent Mine" is nonsensical. Joint Opp. at 25. Even ignoring BHMC's pre-purchase knowledge of the fact that Placer diverted millions of gallons of water into the Bunker Hill Mine's lower workings, which are connected to the Crescent Mine by the Y-U

Defendants' related assertion that BHMC cannot be liable for trespass because the State of Idaho "owns" the Bunker Hill Mine water that has flooded the Crescent Mine is also unavailing. The State of Idaho only "'owns' the groundwater in a regulatory, supervisory sense, but it does not own it in a possessory, proprietary sense." *State v. Superior Court of Riverside Cnty.*, 78 Cal. App. 4th 1019, 1033, 93 Cal. Rptr. 2d 276 (2000) (interpreting analogous statute).[15] Thus, the State's regulatory authority over groundwater does not shield private companies from liability for the intentional flooding of a neighboring property.

Defendants next assert that the water that flooded into the Crescent Mine was not "tortiously placed" there *by Placer*.[16]  However, Defendants' own data and expert reports confirm that *Placer's* intentional diversion of contaminated water into the Bunker Hill Mine's lower workings directly caused the Crescent Mine to flood. Defendants' expert, Richard White, reports that between 2000 and 2023, the Bunker Hill Mine discharged approximately 1,333 gallons per minute on average from the Kellogg Tunnel.[17]  It is undisputed that Placer intentionally diverted all such water into the Bunker Hill Mine's lower workings for a little over one year from approximately October 30, 1993 to early December 1994.[18]  At an average rate of 1,333 gallons per minute, Placer directed approximately 700 million gallons of contaminated water into the

---

Crosscut, BHMC has been repeatedly made aware of the fact that Placer flooded the Crescent Mine throughout the litigation.  For example, Placer's corporate representative testified that he has no reason to disagree that water from the Bunker Hill Mine flooded into the Crescent Mine between 1992 and 1994, and that same water remains in the Crescent Mine today. ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 90:19-91:18.

[15] *See also Orange Cnty. Water Dist. v. Sabic Innovative Plastics US, LLC*, 14 Cal. App. 5th 343, 406, 222 Cal. Rptr. 3d 83 (2017) (interpreting analogous statute and explaining that the "State … has no general propriety (i.e., property) interest in groundwater; its interest is regulatory and supervisory").

[16] Joint Opp. at 25.

[17] ECF 116-30 (Expert Report of Richard White) at 8.

[18] ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 10.

lower workings of the Bunker Hill Mine. It is also undisputed that, during this period, the water level in the Bunker Hill Mine rose from the 15 Level to the 11 Level.[19]  According to Dr. Morton, based on the amount of material that has been removed from the Bunker Hill Mine, there is space for approximately 276.8 million gallons of water between the 15 Level and the 11 Level.[20]  Stated differently, it would take only 276.8 million gallons of water to raise the water level in the Bunker Hill Mine from the 15 Level to the 11 Level.[21]

Thus, Placer diverted over 700 million gallons of contaminated water into the Bunker Hill Mine's lower workings between October 1993 and December 1994 but only 276.8 million gallons of water accumulated in the Bunker Hill Mine pool during this period. The volume of water unaccounted for within the Bunker Hill Mine is striking. At the same time, the water elevation in the Crescent Mine rose in direct proportion to the water elevation of the Bunker Hill Mine.[22] The only plausible conclusion, supported by Defendants' own data and expert reports, is that much of this water traveled through the Y-U Crosscut and flooded into the Crescent Mine.

There is some evidence suggesting that water from the Bunker Hill Mine *began* flooding into the Crescent Mine as early as November 1991, several months before Placer completed its purchase of the Bunker Hill Mine in April 1992.[23] However, there is no evidence that the flooding stopped when Placer acquired the mine nor is there any credible basis to argue that the Crescent Mine was unaffected by the hundreds of millions of gallons of *additional* water that Placer diverted

---

[19] *Id.*; *see also* ECF 129-5 (Morton 7/8/24 Report) at 84-89.

[20] ECF 129-5 (Morton 7/8/24 Report) at 91.

[21] *Id.*

[22] *Id.* at 84-89.

[23] ECF 116-17 (November 1991 Pintlar Report) at 7 ("The Crescent mine might have been preserved as an independent future resource if a pressure plug had been installed in the Y-U X-cut.  It may be too late for such a project now because water may already be spilling across the Y-U from Bunker Hill.").

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 8

into the Bunker Hill Mine's lower workings. Quite the opposite—as Placer has conceded, its deliberate actions caused contaminated water to flood into the Crescent Mine, which remains there today.[24] Additionally, historical records indicate that, before it was flooded, the Crescent Mine's lower workings produced a negligible 10 gallons per minute of water infiltration.[25] Thus, while it is possible that a small amount of water accumulated in the Crescent Mine before Placer's diversion, there is no credible evidence suggesting that the Crescent Mine filled *entirely* with its own water before Placer flooded both mines with contaminated AMD.

Indeed, Defendants implicitly acknowledge that Bunker Hill Mine water flooded into the Crescent Mine during Placer's ownership but argue that "[t]he only way to stop the Crescent Mine from flooding from Bunker Hill water was to restart pumping, which Placer was in no position to do [so] until it replaced the salvaged pumping and electrical equipment."[26]  This argument ignores the fact that a party is liable for trespass even if it did not willfully or intentionally trespass. *See Spear*, 2023 WL 6463039, at *6 n.7. Further, the assertion that pumping was not possible is contradicted by the fact that Placer resumed pumping just one month after EPA ordered it to do so.[27] And Placer did not simply inherit a bad situation. Rather, Placer has admitted that it deliberately *chose* to divert water into the Bunker Hill Mine's lower workings instead of sending

---

[24] ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 90:7-91:18 (admitting that Placer has no basis to dispute that (1) water flooded into the Crescent Mine from the Bunker Hill Mine during Placer's ownership of the Bunker Hill Mine, and (2) the same water that flooded the Crescent Mine during this period remains there today).

[25] ECF 116-31 (Crescent Mine Cooling System) at 5.

[26] Joint Opp. at 22.

[27] *Compare* ECF 112-28 (1994 UAO) (dated 11/1/94) *with* ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 10 ("In December 1994, the pumps at the 11 Level were started and all water was again discharged to the CTP for treatment.").

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 9

it to the CTP as part of a calculated effort to evade paying EPA water treatment costs.[28]   There is

no credible argument that Placer's flooding of the Crescent Mine was anything but tortious.

### 3.    Damages Are Not Required to Establish Liability for Civil and Common Law Trespass.

Defendants' assertion that Crescent has not sustained damages is both incorrect and

immaterial to the determination of liability.[29] Idaho case law is clear that "in cases of trespass to

land, the plaintiff need not prove actual harm in order to recover nominal damages. Nominal

damages are presumed to flow naturally from a wrongful entry upon land." *Aztec Ltd. v. Creekside

Inv. Co.*, 100 Idaho 566, 570, 602 P.2d 64 (1979) (reversing trial court's order dismissing trespass

claim due to lack of actual damages).   Therefore, a plaintiff is *not* required to prove actual harm to

establish liability for trespass. *See Spear*, 2023 WL 6463039, at *6. The sole focus of this motion

is Defendants' liability for trespass. The extent of Crescent's damages is a separate issue that will

be addressed at trial.

Defendants' reliance on *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*, 778 F. Supp.

101 (D.R.I. 1991), and *Town of Superior, Mt. v. Asarco*, 874 F. Supp. 2d 937, 943 (D. Mont. 2004),

is misplaced. In *Wilson,* the court held that the rule of "caveat emptor" protected the former lessee

of the seller from the purchaser's negligence claims because the purchaser failed to inquire or test

the property for contamination. 778 F. Supp at 105. This rule is irrelevant here because neither

Placer nor BHMC ever owned, leased, or transferred the Crescent Mine.[30]

In *Asarco*, a town in Montana sued a mining company for contaminating the town's water

---

[28] ECF 116-11 (Placer FRCP 30(b)(6) Dep. Transcript) at 76:4-77:16, 79:2-80:5, 120:12-121:22.

[29] Joint Opp. at 19.

[30] Further, the case actually supports Crescent's trespass claim, as the court held that the plaintiff successfully stated a claim for continuing trespass because the lessee left machinery on the property. *Wilson,* 778 F. Supp at 106 (citing Restatement (Second) of Torts §§ 158, 161(1)).

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

supply. 874 F. Supp. 2d at 939-40. The court dismissed the town's negligence claim largely because any increase in the cost of providing water from an alternative source would be passed on to consumers and the town had not incurred damages from the contamination. *Id.* at 944.[31] This holding is inapplicable here because Crescent's claims are based on trespass, not negligence, and under Idaho law, actual damages are not required for trespass claims. *Spear*, 2023 WL 6463039, at *6; *Aztec Ltd.*, 100 Idaho at 570.

**B.    Defendants Are Liable for Crescent's Past and Future CERCLA Response Costs.**

Defendants do not dispute that the first three elements required to establish liability on Crescent's CERCLA cost recovery and contribution claims are met.[32] Their sole challenge relates to whether the release and threatened release of AMD from the Bunker Hill Mine caused Crescent to incur response costs, and whether such costs were necessary and consistent with the NCP. As set forth below, there is no genuine dispute of material fact that Crescent has incurred substantial, recoverable response costs and that Defendants are liable for both Crescent's past and future CERCLA response costs as a matter of law.

**1.    Crescent's CERCLA Claims Are Not Premature.**

Defendants argue that Crescent's CERCLA claims are premature because Crescent has not "provided an opportunity for public comment and participation, conducted a remedial site investigation, … prepared a feasibility study" or "involved any governmental environmental

---

[31] The town's trespass claim survived summary judgment. *Asarco,* 874 F. Supp. 2d at 949-50.

[32] To obtain summary judgment on a cost recovery or contribution claim under CERCLA, a claimant must establish that: "1) the defendant falls within one of the four classes of persons subject to liability under 42 U.S.C. § 9607(a); 2) the contaminated 'site' is a 'facility' under CERCLA; 3) a 'release' or 'threatened release' of a 'hazardous substance' occurred at the 'facility;' and 4) the release or threatened release caused the plaintiff to incur response costs." *City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1224 (E.D. Wash. 2006) (quoting *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir.1992)).

protection agency."[33]  However, none of these procedural steps is required for Crescent to establish liability for past investigative response costs under CERCLA Section 107 or to obtain a declaratory judgment as to Defendants' responsibility for future response costs under CERCLA Section 113. Defendants' argument is simply an attempt to create procedural barriers where none exist.

"There are two separate response actions that a private party may engage in that will entitle it to relief under CERCLA, 42 U.S.C. § 9607(a): (1) remediation actions and (2) removal actions." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 478 (9th Cir. 2024). "Remediation refers to actions that permanently remedy the harm caused by the release or threatened release of hazardous contaminants," while "[r]emoval actions are short-term and meant to mitigate any immediate risk or harm caused by hazardous contamination." *Id*. Importantly, "removal" is broadly defined under CERCLA to include actions that may be "necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," *i.e.*, investigatory actions. *United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 995 (C.D. Cal. 2011) (citing 42 U.S.C. § 9601(23)).

The NCP requires "a party initiating ***a remedial action*** . . . to conduct a remedial site evaluation . . . and complete an RI/FS ***before selecting the appropriate remedy***[.]" *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1156 (C.D. Cal. 2003), *aff'd sub nom. Carson Harbor Vill. v. County of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006) (emphasis added). The NCP does not require a party to complete a Remedial Investigation/Feasibility Study ("RI/FS") before initiating an investigation or conducting monitoring activities. First, actions that "may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" qualify as removal actions, not remedial actions for which an RI/FS is required. 42 U.S.C. § 9601(23).

---

[33] Joint Opp. at 38.

Second, even for remedial actions, an RI/FS is only required "before selecting the appropriate remedy." *Carson Harbor Vill., Ltd.*, 287 F.2d at 1156. While CERCLA actions can involve both removal and remedial components, "[r]emoval action is taken before remedial action" and involves investigating the contamination at issue. *Fairchild Semiconductor Corp. v. U.S. E.P.A.*, 769 F. Supp. 1553, 1555 (N.D. Cal. 1991), *aff'd*, 984 F.2d 283 (9th Cir. 1993) (citing § 9604(a)). This is exactly what has occurred here. Defendants' assertion that Crescent must perform an RI/FS *before* even beginning an investigation defies both logic and the plain language of CERCLA and the NCP.

Nor is Crescent required to perform an RI/FS before obtaining a ruling that Defendants are liable for past and future response costs. CERCLA cost recovery and declaratory relief claims are ripe "so long as there has been a release [or threatened release] of hazardous substances, and the plaintiff spends some money responding to it[.]" *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1005 (9th Cir. 2010). When "a plaintiff successfully establishes liability for the response costs . . . it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions." *Id.* at 1007. Critically, "it is not necessary to determine the nature and amount of future response costs prior to awarding a declaratory judgment." *United Alloys, Inc.*, 797 F. Supp. 2d at 1003-04. It is beyond dispute that Crescent has incurred investigatory response costs caused by the release and threatened release of hazardous substances at and from the Bunker Hill Mine.[34] Thus, Crescent's CERCLA claims are ripe as a matter of law.

Contrary to Defendants' assertion, "public participation is not a prerequisite to the recovery of investigatory costs." *United Alloys, Inc.*, 797 F. Supp. 2d at 997 (holding defendant liable for contamination of property under CERCLA Section 107 based on investigatory response costs). If

---

[34] *Infra* at 17.

Defendants' position were correct, private parties would be forced to unnecessarily delay critical early investigative work while awaiting public comment. Fortunately, this is not the law. *Id*.[35]

In *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887 (9th Cir. 1986), the Ninth Circuit rejected the same ripeness arguments that Defendants now assert. First, the court held that "an authorized governmental cleanup program" was not "a prerequisite to Wickland's claim for damages under section 107(a) of CERCLA." *Id.* at 892. Next, the court held that "testing expenses" are "recoverable under section 107(a)(2)(B)" because CERCLA expressly permits recovery of costs incurred "'to monitor, assess, and evaluate the release or threat of release of hazardous substances.'" *Id.* (citation omitted). Finally, the court held "that Wickland's claim for declaratory relief is ripe" because "[t]he essential fact establishing Wickland's right to declaratory relief—the alleged disposal of hazardous substances at the Selby site at the time Asarco owned and operated the smelting facility—has already occurred." *Id.* at 893.[36]

The same facts are present here. Crescent has incurred investigatory costs that are recoverable under CERCLA Section 107(a),[37] and Crescent's claim for declaratory relief is ripe

---

[35] *See also Hous. Auth. of City of Los Angeles v. PCC Tech. Indus., Inc.*, No. 11-1626 FMO (CWX), 2015 WL 13654008, at *11 (C.D. Cal. Jan. 26, 2015) (granting motion for summary judgment on CERCLA liability and noting "defendants' argument that [plaintiff's] CERCLA claim against them is not ripe for adjudication … is plainly without merit" because it was "undisputed that [plaintiff] retained [an environmental consultant] to perform assessment and investigation into environmental contamination at the Site"); *Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, No. 3:24-CV-00681-IM, 2024 WL 4751519, at *14 (D. Or. Nov. 11, 2024) (holding public comment provisions "are plainly inapplicable" and "other public information and community relations requirements, regulate various aspects of the cleanup effort itself and are likewise irrelevant to an action seeking only to recover the costs of an initial investigation").

[36] The court also clarified that "[t]he absence of government enforcement actions" does not render a claim for declaratory relief premature, as Defendants have argued here. *Wickland*, 792 F.2d at 893; *see also Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 840 F.2d 691, 694 (9th Cir. 1988) ("[T]here is nothing in the plain language of section 107(a) that indicates that a party seeking to recover its costs of response must await approval of or action by a state or local governmental entity.").

[37] *Infra* at 17.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 14

because the essential fact underlying the claim—contaminated Bunker Hill Mine water flooding into the Crescent Mine—has already occurred.[38]  Crescent is not required to have "planned or completed a cleanup" for its CERCLA claims to be ripe, as Defendants argue,[39] because the Ninth Circuit has "read CERCLA's cost recovery provisions as making no distinction between cleanup and investigatory costs." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 581 (9th Cir. 2018). Thus, investigatory and assessment costs—such as those incurred by Crescent—are sufficient to establish liability under CERCLA.

Defendants rely on *Otay Land Co. v. United Enterprises, Ltd.*, 338 F. App'x 689, 2009 WL 2179739 (9th Cir. 2009) (unpublished), to argue that Crescent's cost recovery claim is premature because Crescent has not completed certain procedural steps that Defendants incorrectly claim are prerequisites to CERCLA liability.[40]  As previously noted, public comment and an RI/FS are not required to establish that Defendants are liable for Crescent's past and future response costs. *United Alloys, Inc.*, 797 F. Supp. 2d at 997; *Wickland Oil Terminals*, 792 F.2d 892-93. Moreover, *Otay* is distinguishable. Unlike Crescent's claims, which are based on investigative "removal" costs, *Otay* concerned "remedial action" costs, which require distinct procedural steps. 338 F. App'x at 691. Further, the district court determined that there had been no release or threatened release of hazardous substances to support CERCLA liability, whereas in the present case, there is no question that hazardous substances were released at and from the Bunker Hill Mine. *Otay Land Co. v. U.E. Ltd., L.P.*, 440 F. Supp. 2d 1152, 1171-73 (S.D. Cal. 2006), *vacated on other grounds sub nom. Otay Land Co. v. United Enters. Ltd.*, 338 F. App'x 689 (9th Cir. 2009). Lastly, the court's (and Defendants') reference to "an imminent and substantial endangerment" pertained

---

[38] *See* discussion on Crescent flooding *supra* at 3-5, 7-9.
[39] Joint Opp. at 38.
[40] *Id.* at 37.

to an RCRA requirement, which is inapplicable to CERCLA liability. *Otay*, 338 F. App'x at 691

(citing 42 U.S.C. § 6972(a)(1)(B)). Crescent's claims are based on actual contamination and

ongoing environmental harm not speculation, as in *Otay*.

     *Calmat Co. v. San Gabriel Valley Gun Club*, 809 F. Supp. 2d 1218 (C.D. Cal. 2011), also

does not support Defendants' position. In fact, it directly refutes many of their arguments. The

court in *Calmat Co.* noted that "a governmentally authorized cleanup program is not a prerequisite

to a private action under Section 107(a) of CERCLA" and "a party does not have to complete a

cleanup prior to bringing a CERCLA action," as Defendants have argued.[41] *Id.* at 1222-23. Rather,

the correct standard is that "a plaintiff must 'take some positive action' and incur some response

costs prior to filing suit," which Crescent has done here. *Id.* at 1223. Unlike Crescent, the plaintiff

in *Calmat Co.* had not incurred *any* response costs. *Id.* The only "investigative" work consisted of

a "Vulcan employee . . . walking around the Property and observing bullets and casings." *Id.* at

1224. Thus, the court found the plaintiff's CERCLA claim unripe. *Id.* at 1222. Crescent's case is

fundamentally different. Crescent has incurred substantial costs for actions that are "necessary to

monitor, assess, and evaluate the release or threat of release of hazardous substances," as explicitly

contemplated by CERCLA Section 101(23), including rehabilitating the Hooper Tunnel to reach

the flooded Ellis Shaft in preparation for water sampling, [42] and engaging environmental experts,

such as Haley & Aldrich, to prepare a water sampling and analysis plan.[43]

     In short, CERCLA requires "that, before suing, CERCLA plaintiffs will spend some money

responding to an environmental hazard. They can then go to court and obtain reimbursement for

their initial outlays, as well as a declaration that the responsible party will have continuing liability

---

[41] Joint Opp. at 38-39.
[42] ECF 116-45 (Rosasco August Report) at 64-65, 93-96.
[43] ECF 116-44 (Rosasco June Report) at 53.

for the cost of finishing the job." *In re Dant & Russell, Inc.*, 951 F.2d 246, 249-50 (9th Cir. 1991). That is precisely what has occurred here. Crescent's claims for response costs under CERCLA Section 107 and for declaratory judgment as to Defendants' responsibility for future response costs under CERCLA Section 113 are fully ripe for adjudication and summary judgment.

### 2.    Crescent Mine Has Incurred Response Costs.

Defendants continue to inaccurately assert that Crescent Mine has not incurred response costs.[44] This argument is contradicted by the undisputed evidence in the record. As explained in Crescent's opposition to BHMC's and Placer's motions for summary judgment,[45] and as detailed in Mr. Rosasco's expert reports, Crescent Mine has incurred costs for essential investigative and preparatory work, including renting equipment and purchasing necessary supplies to rehabilitate the Hooper Tunnel, enabling access to the Ellis Shaft for critical water sampling.[46] Crescent Silver has also incurred nearly $200,000 in other documented costs to rehabilitate the Hooper Tunnel and to obtain a mine water sampling and analysis plan from Haley & Aldrich, which is now being implemented.[47] Without these steps, sampling and analysis of the contaminated water in the lower Crescent Mine would not be possible. Therefore, these expenditures are necessary and recoverable under CERCLA, as attested to by Crescent's expert, Mr. Rosasco.[48]

### 3.    Bunker Hill Mine Releases and Disposals Caused Crescent to Incur Response Costs.

As discussed at length by *California Department of Toxic Substances Control v. NL*

---

[44] Joint Opp. at 28.

[45] ECF 133 (Crescent MSJ) at 5-6.

[46] ECF 116-44 (Rosasco June Report) at 53; ECF 116-45 (Rosasco August Report) at 64-65, 93-96; Declaration of Roger Gross at ¶ 16.

[47] ECF 116-55 (Declaration of Roger Gross) at ¶ 11; ECF 116-45 (Rosasco August Report) at 56-57.

[48] ECF 116-44 (Rosasco June Report) at 51-52; ECF 116-45 (Rosasco August Report) at 36-37.

*Industries., Inc.*, 636 F. Supp. 3d 1092, 1102-14 (C.D. Cal. 2022), CERCLA does not require "unequivocal" causation. Rather, CERCLA's causation standard requires only that a plaintiff "must establish a 'plausible,' 'objectively reasonable,' or 'justified,' theory of contamination to satisfy CERCLA's causation requirement." *Id.* at 1112; *see also Carson Harbor Vill., Ltd.*, 287 F. Supp. 2d at 1186.

Defendants fundamentally misstate the legal standard governing causation in CERCLA cases.[49] To establish causation in cases where hazardous substances are alleged to have migrated from a release site to a neighboring site, commonly referred to as "two-site cases," the plaintiff must only 1) identify a contaminant at its site, 2) identify the same, or similar, contaminant at the defendant's site, and 3) provide evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1066 (C.D. Cal. 2003) (collecting cases and describing standard). Once a plaintiff has done so, the burden shifts to the defendant to disprove causation. *Id.*

Defendants carefully avoid this standard because there is no dispute that water containing metal contaminants is present in both the flooded lower Crescent Mine and the flooded lower Bunker Hill Mine,[50] and that the Y-U Crosscut is a "plausible migration pathway" by which such contaminated water could have traveled from the Bunker Hill Mine into the Crescent Mine.[51] Thus, the burden shifts to BHMC and Placer to *disprove* causation. *Castaic Lake Water Agency*, 272 F. Supp. 2d at 1066. And they have not done so. Defendants merely speculate as to how the Crescent

---

[49] Joint Opp. at 29.
[50] *See*, *e.g.*, ECF 56 (BHMC Answer to Second Amended Complaint) at ¶ 9; ECF 58 (Placer Answer and Second Amended Counterclaim) at ¶ 9.
[51] ECF 129-5 (Morton 7/8/24 Report) at 97.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 18

Mine "could" have "self-flooded" entirely on its own, [52] which is refuted by their own data and experts and falls well short of *disproving* causation.

Defendants suggest that CERCLA causation is generally "ineligible for resolution on a summary judgment motion."[53] However, courts routinely decide CERCLA liability and causation on summary judgment while leaving damages for trial. *See*, *e.g.*, *NutraSweet Co. v. X-L Eng'g Corp.*, 933 F. Supp. 1409, 1419-23 (N.D. Ill. 1996), *aff'd sub nom. NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776 (7th Cir. 2000).

Defendants assert that Crescent's "claim is based on the idea that the *only* water in the Crescent Mine came from the Bunker Hill Mine."[54] That is also false. Crescent has consistently acknowledged the lower Crescent Mine's own water infiltration, while noting that the infiltration rate is and was a tiny fraction of the Bunker Hill Mine's rate of infiltration. Further, the insinuation that Crescent's CERCLA claim requires that "the *only* water in the Crescent Mine came from the Bunker Hill Mine" is plainly false as a matter of law. Any amount of hazardous substances released from the Bunker Hill Mine into the Crescent Mine would suffice for establishing liability,[55] and liability is established by a "threatened release" even if no Bunker Hill Mine water molecules entered the Crescent.

Defendants suggest that Jon Groth observed the Crescent Mine flooding up to the 3100 level in 1991,[56] which is incorrect. Mr. Groth described only isolated water on the 3100 level of the Crescent Mine, near the Ellis Shaft, in 1991,[57] which he stated was "not an uncommon

---

[52] Joint Opp. at 25.
[53] *Id*. at 30.
[54] *Id.* at 31 (emphasis added).
[55] *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1111 (9th Cir. 1998) (no minimum concentration required).
[56] *Id*.
[57] ECF 112-18 (Groth Dep. Transcript) at 28:8-25, 63:16-21.

occurrence."[58] However, he explicitly clarified that no water was visible in the Crescent No. 2 Shaft *below* the 3100 Level "because it was way down there."[59] Mr. Groth's testimony provides no evidence that the Crescent Mine "self-flooded" without any water from the Bunker Hill Mine. Indeed, even after the pumps were turned off in 1991, the water level in the lower Crescent was still below the 4100 level, which is approximately 1,000 feet below the Yreka Crosscut.[60]

At the same time, the surface of the mine pool in the Bunker Hill Mine was at the 23 Level, which is also the level of the Y-U Crosscut.[61] Thus for Bunker Hill Mine water to enter the Y-U Crosscut and pour into the Crescent Mine, the mine pool in the Bunker Hill Mine would have only needed to rise a few feet. In contrast, the mine pool in the Crescent Mine would have needed to rise nearly 1,000 feet, from the 4100 Level to the 3100 Level, to even reach the level of the Y-U Crosscut. This information further disproves Defendants' claims that the Crescent Mine "self-flooded" without *any* water from the Bunker Hill Mine.

Even if the lower Crescent Mine began filling with Bunker Hill Mine water before Placer took full ownership of the Bunker Hill Mine in April 1992,[62] that flooding still constitutes a "release" at and from the Bunker Hill Mine for which Defendants are liable under CERCLA. 42 U.S.C. § 9607(a). Further, as explained above,[63] according to Defendants' own data, Placer diverted more than 700 million gallons of contaminated water into the Bunker Hill Mine's lower workings between October 1993 and December 1994, but only 277 million gallons of water were

---

[58] *Id.* at 32:13-16.

[59] *Id.* at 32:21-33:6.

[60] ECF 116-15 (Durick Dep. Transcript) at 58:17-59:8 (explaining how he visited the 4100 level of the Crescent Mine with an EPA employee after the pumps had been shut off in 1991).

[61] ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 9 ("The deepest pump station prior to the shutdown was located at the 23 Level, which was the top of the mine pool at that time.").

[62] ECF 116-17 (November 1991 Pintlar Report) at 7.

[63] *Supra* at 7-8.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 20

added to the Bunker Hill Mine pool during this period. At the same time, the water elevation in the Crescent Mine rose at approximately the same rate as the water elevation of the Bunker Hill Mine. Defendants' own data thus confirms that a portion of the contaminated water that Placer diverted into the Bunker Hill Mine's lower workings necessarily flooded into the Crescent Mine via the Yreka Crosscut as the diverted water equalized between the two mines. The lower Crescent did not "self-flood" without any Bunker Hill water.

Defendants contend that all of the Bunker Hill AMD that flowed into the Crescent Mine "has been repeatedly flushed out through Bunker Hill Mine pumping since 1994."[64] They cite to the Declaration of Dr. Morton for this proposition,[65] which contains the same conclusory assertion without explanation or analysis.[66] "Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008). Further, a quick review of Dr. Morton's "flushing" theory demonstrates its fundamental flaws. Dr. Morton opines that "[f]rom when pumping started (at 790 gpm), from within the Bunker Hill's No. 2 shaft, if . . . water flowed over the Yreka tunnel into Crescent mine, it would have taken about 13.64 days for Bunker Hill mine to pump out all the water that potentially crossed over the Yreka crosscut (about 15,512,676.27 gallons) into the Crescent mine."[67] However, Dr. Morton has only calculated the number of days it would take to pump 15.5 million gallons of water at a rate of 790 gallons per minute.[68] Dr. Morton's flawed analysis assumes that 100% of the water being pumped up the No. 2 shaft of the Bunker Hill Mine is exclusively from the

---

[64] Joint Opp. at 18.
[65] *Id.* at 18 n.84
[66] ECF 129-3 (Norton Decl.) at ¶ 51.
[67] ECF 129-5 (Morton 7/8/24 Report) at 136.
[68] 790 gpm (1440 minutes per day) = 1.14 million gallons pumped per day. 1.14 million gallons per day (13.64 days) = 15.5 million gallons.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 21

Crescent Mine, while ignoring the location of the pumps at the surface of the Bunker Hill Mine pool, the water contained in the Bunker Hill Mine pool, and the continued replenishment of the Bunker Hill Mine pool by hundreds, and sometimes thousands, of gallons of additional contaminated water per minute. Dr. Morton's flushing theory also ignores the fact the Bunker Hill Mine pool is only pumped intermittently, as she previously testified.[69] This intermittent pumping means that any contamination "flushed" from the Crescent Mine is immediately replaced by new influxes of AMD from the Bunker Hill Mine when the pumps are turned off and the inflow to the Bunker Hill Mine equalizes between the two mines.[70]

Additionally, CERCLA liability attaches for the release *or threatened release* of hazardous substances at or from the Bunker Hill Mine that caused Crescent to incur response costs. *Cal. Dep't of Toxic Substances Control*, 636 F. Supp. 3d at 1108. Indeed, courts have held that a plaintiff need not discover any contamination to recover response costs incurred investigating a threatened release.[71] The AMD that continuously replenishes the Bunker Hill Mine pool, which is hydraulically connected to the Crescent Mine, continues to pose a significant threatened release to the Crescent Mine, and Crescent is entitled to recover its costs for both investigating the release *and* the ongoing threat of release of hazardous substances from the Bunker Hill Mine. *Wickland Oil Terminals*, 792 F.2d at 892; *see also City of Portland v. Boeing Co.*, 179 F. Supp. 2d 1190, 1999-1202 (D. Or. 2001) (holding defendants liable for plaintiff's response costs incurred

---

[69] ECF 116-51 (Morton Dep. Transcript) at 61:8-13, 104:6-9.
[70] ECF 116-50 (Beale August Report) at 62-63.
[71] *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1218-19 (3d Cir. 1993) ("It is well-established that under this provision a plaintiff can recover its monitoring and evaluation costs from a release or threatened release without proving that its property was actually contaminated by the defendant.") (citing *Artesian Water Co. v. Gov't of New Castle Cnty.*, 851 F.2d 643, 651 (3d Cir. 1988); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1153-54 (1st Cir. 1989); *Wickland Oil Terminals*, 792 F.2d at 892).

investigating the threat of hazardous releases, irrespective of whether defendants had contaminated plaintiff's monitoring wells).

There is no dispute that the Bunker Hill Mine continues to pose a threat of release to the Crescent Mine. As Defendants acknowledge, because the two mines are connected, if Crescent were to pump the Crescent Mine pool, water from the Bunker Hill Mine pool would rush into the Crescent, adding further hazardous substances. Further, a BHMC news release indicates that BHMC has spent much of its funding for the restart of the Bunker Hill Mine and is now attempting to raise an additional $30 million but "there is no certainty that the Company will be able to raise the funds required to complete the necessary development work needed to restart operations and advance the ongoing mine plan adjustments."[72]  If BHMC declares bankruptcy, the company may halt all pumping operations, allowing contaminated Bunker Hill Mine water to once again flood into the Crescent Mine. For a multitude of reasons, it is imperative for Crescent to investigate and understand the full extent of the existing contamination, assess the threat of additional flooding from the Bunker Hill Mine, and evaluate the potential consequences of dewatering before engaging in any remedial actions.

Defendants' reliance on *Goe Engineering Co. v. Physicians Formula Cosmetics*, No. CV 94-3576-WCK, 1997 WL 889278 (C.D. Cal. 1997), is misplaced. In that case, the court found there was *no evidence* that the defendants had contaminated the plaintiff's property, concluding that the claims were based on "unbridled speculation." *Id.* at *11-12. This stands in stark contrast to Crescent's case, where extensive documentation, expert testimony, and Defendants' own data confirm that hazardous substances released and disposed at and from the Bunker Hill Mine have

---

[72]    Bunker  Hill  Mining  Corp.,  News & Media  (Dec.  13,  2024),  https://www.bunkerhillmining.com/news-and-media/news-releases/bunker-hill-announces-updated-forecast-for-mine-restart-and-revised-financing-plan.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 23

entered into the lower Crescent Mine.

The case of *Bob's Beverage, Inc. v. Acme, Inc.*, 264 F.3d 692 (6th Cir. 2001), is also inapposite. There, the court held the prior owners of a contaminated property were not liable under CERCLA because "there [was] no evidence that any active human conduct on the part of the [prior owners] resulted in any additional contamination to the Property." *Id.* at 697. Here, there is no dispute that Placer disposed of AMD at and from the Bunker Hill Mine when it owned the mine in the 1990s. Nor does this case help BHMC because "CERCLA expressly contemplates that current owners of contaminated property are strictly liable for cost recovery, even if they did not cause the contamination, subject only to certain affirmative defenses" that BHMC has not asserted, and which are not applicable. *Cal. River Watch v. Fluor Corp.*, 119 F. Supp. 3d 1108, 1114 (N.D. Cal. 2015).

### 4.    Crescent's Response Costs Were Necessary.

Defendants argue that Crescent's response costs are not necessary because EPA has issued orders requiring Defendants to address releases of hazardous substances at the Bunker Hill Mine, and because Crescent's actions were allegedly driven by business or litigation motives rather than environmental concerns.[73] Neither of these assertions negates the reality that Crescent's costs are necessary and recoverable under CERCLA.

"In determining whether response costs are 'necessary,'" courts in the Ninth Circuit "focus not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat." *Carson Harbor Vill., Ltd. v. Unocal*, 270 F 3d at 872. Additionally, "[a]gency inaction is not dispositive of the question whether contamination presents an environmental risk

---

[73] Joint Opp. at 34-35.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 24

worthy of response." *Id.* Defendants ignore this controlling precedent, which establishes that "the touchstone for determining the necessity of response costs is whether there is an actual threat to human health or the environment" and "that necessity is not obviated when a party also has a business reason for the cleanup." *Id.* at 867. Thus, even if Crescent has a financial interest in remediating the contamination, that fact is legally irrelevant to the determination of necessity under CERCLA.

Likewise, the fact that Crescent incurred some costs "after BHMC's [*sic*] sent its February 2021 demand for water treatment cost reimbursement"[74] is immaterial to whether those costs are recoverable under CERCLA. The Ninth Circuit has rejected objections to cost recovery based on proximity to litigation or other alleged ulterior motives. *See, e.g.*, *Pakootas*, 905 F.3d at 581-82. "Recoverable investigation costs do not transform into unrecoverable costs if the information obtained is later used to help prove a PRP's liability." *Id.*

*United Alloys, Inc.*, 797 F. Supp. 2d at 996, is instructive. There the court held that TCE and PCE are both hazardous substances under CERCLA and therefore pose an actual and real threat to public health and the environment. The court looked no further than the fact that TCE and PCE are hazardous substances and were present in the soil at levels requiring remediation to determine that the response costs were necessary. *Id.* Here, there is no dispute that the AMD and heavy metals that flooded into the Crescent Mine are hazardous substances under CERCLA.[75] These substances include arsenic, lead, cadmium, and zinc, which are well-documented environmental and human health hazards requiring remediation.[76]

---

[74] *Id*. at 35.

[75] *See* ECF 116-1 (Crescent MSJ) at 35-38 n.103; *see also* 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4.

[76] *See, e.g.*, ECF 112-28 (1994 UAO) at 7 ("The drainage from the Bunker Hill Mine contains low-pH water combined with metal loadings of cadmium, copper, lead, mercury and zinc.").

EPA has not addressed the hazardous substances that have migrated to the Crescent Mine.[77] Although EPA has addressed releases at the Bunker Hill Mine, EPA's work has focused on mitigating offsite contamination and treating water within Bunker Hill's direct control. Neither EPA's previous investigations, the Unilateral Administrative Orders, nor the 2018 Consent Decree entered in *United States v. Placer Mining Co., No.* 2:04-CV-00126-EJL, 2018 WL 7352423 (D. Idaho June 19, 2018), contain any provisions explicitly addressing the hazardous substances that have infiltrated the Crescent Mine. Indeed, EPA's RI/FS only mentions the Crescent Mine in passing and does not contain any substantive analysis of the extent of contamination within the Crescent Mine's lower workings.[78] EPA has conducted no investigation or monitoring of the Crescent Mine, nor has it implemented any remedial measures specific to the contamination at issue in this case.

BHMC's and Placer's argument that Crescent's response costs are not necessary because they were not government-mandated ignores Ninth Circuit precedent and the plain text of CERCLA. Courts have consistently rejected attempts to impose an "agency action" requirement on private-party response actions. *See*, *e.g.*, *Carson Harbor Vill., Ltd.*, 270 F.3d at 872 (agency oversight not required to establish necessity under CERCLA).[79] As explained at length by Mr. Rosasco, Crescent has incurred costs to investigate, assess and evaluate the hazardous substances that were released by Placer and remain present under BHMC's ownership.[80] These response costs are essential to addressing the real and ongoing environmental risks posed by AMD and heavy metals that were released from the Bunker Hill Mine to the Crescent Mine's lower

---

[77] ECF 116-45 (Rosasco August Report) at 34-35.
[78] ECF 116-7 (Bunker Hill Mine Water Management RI/FS) at 17.
[79] BHMC Opp. at 34-35.
[80] ECF 116-45 (Rosasco August Report) at 30-38.

workings, soils, and groundwater. Because Crescent's response costs directly address these ongoing threats, they are recoverable under CERCLA and fully satisfy the statutory "necessity" requirement.

### 5.    Crescents' Removal Actions Are Consistent with the NCP.

Defendants' assertion that Crecent's response costs are not consistent with the NCP is incorrect for multiple reasons. First, "a failure to comply with the NCP is not a defense to liability but goes only to the issue of damages." *Mid Valley Bank v. N. Valley Bank*, 764 F. Supp. 1377, 1389 (E.D. Cal. 1991) (citing *Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 840 F.2d 691, 695 (9th Cir. 1988); *see also United States v. Stringfellow*, 661 F. Supp. 1053, 1062 (C.D. Cal. 1987) (Noting "failure to comply with the national contingency plan" is "not [a] defense[] to liability, although . . . [it] may be [a] relevant factor[] to consider with respect to damages."). Second, the removal response actions that Crescent has undertaken, including "conducting site investigations, . . . extracting . . . groundwater samples, and paying consultant fees" are "consistent with the NCP because they are essential to assessing, evaluating, monitoring, and identifying a remedy for the release" of AMD at the Crescent Mine. *United Alloys, Inc.*, 797 F. Supp. 2d at 995.[81]

Defendants inaccurately assert that "no one wants to own the [cost] summary that [Crescent Mine] has presented."[82] In reality, Ann Sluka (Crescent) prepared a cost spreadsheet, which was amended per Mr. Rosasco's review, including certain costs being removed, and Mr. Rosasco included the revised spreadsheet as the summary of costs that he deemed to be necessary and NCP-

---

[81] In fact, because CERCLA expressly defines "removal" to include actions that may be "necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" under Section 9601(23), "[m]ost courts hold that consistency with the NCP [] need not be established with respect to initial investigation and monitoring costs." *Mission Linen Supply v. City of Visalia*, No. 1:15-CV-0672 AWI EPG, 2019 WL 446358, at *13 (E.D. Cal. Feb. 5, 2019), *aff'd*, 817 F. App'x 336 (9th Cir. 2020) (collecting cases).

[82] Joint Opp. at 40.

consistent.[83] Defendants further mischaracterize Mr. Rosasco's testimony by suggesting that he questioned whether Crescent's investigative response costs "satisfy NCP requirements."[84] In fact, Mr. Rosasco merely noted that certain employee time entries would require additional documentation for full reimbursement—not that Crescent's response costs were inconsistent with the NCP in their entirety.[85]

The NCP does not define "accurate accounting," or otherwise elaborate on what constitutes "sufficient" cost documentation. Courts have held that a plaintiff need only provide underlying invoices, with a description of what each cost was for and when the cost was incurred. *See United States v. W.R. Grace & Co.-Conn.*, 280 F. Supp. 2d 1149, 1179 (D. Mont. 2003). Here Crescent has provided invoices for the response costs incurred, a detailed description of each cost and its purpose, and the documentation showing the date on which each cost was incurred.[86] This documentation satisfies CERCLA's evidentiary requirements for response costs.

### 6. Summary Judgment on Crescent's CERCLA Section 113(g)(2) Claim for Declaratory Judgment Should Be Granted.

When "a plaintiff successfully establishes liability for . . . response costs . . . it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions." *Colton*, 614 F.3d at 1007. Defendants argue only that Crescent is not entitled to declaratory judgment under CERCLA Section 113(g)(2) if its Section 107 claims fail.[87] As described above, Crescent has established a prima facie case for response costs under Section 107.[88] Accordingly,

---

[83] ECF 116-45 (Rosasco August Report) at 31; Declaration of Roger Gross at ¶ 17.

[84] Joint Opp. at 41.

[85] ECF 112-25 (Rosasco Dep. Transcript) at 153:20-154:7 (discussing documentation of labor costs).

[86] ECF 116-45 (Rosasco August Report) at 54-57 (summary of response costs), 59-99 (invoices and receipts documenting response costs).

[87] Joint Opp. at 41.

[88] *See also* ECF 116-1 (Crescent MSJ) at 33-41.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 28

Crescent is also entitled to declaratory judgment for future response costs under Section 113(g)(2).

## C.    BHMC's and Placer's CERCLA Section 113(f) Contribution Claims Should Be Dismissed.

Defendants assert that because the Crescent Mine naturally produces some water, the Crescent Parties must be liable for response costs associated with the treatment of hazardous substances that Defendants claim are flowing back across the Y-U Crosscut from the Crescent Mine to the Bunker Hill Mine.[89] This argument is unsupported by evidence and contrary to CERCLA's causation principles. Although CERCLA's causation standard requirement is liberal, it is not without limits. *See Cal. Dep't of Toxic Substances Control v. NL Indus., Inc.*, 636 F. Supp. 3d 1092, 1110 (C.D. Cal. 2022).

Under CERCLA, Defendants bear the burden of proof to establish that releases or threatened releases of hazardous substances from the Crescent Mine caused them to incur response costs. *Id*. Despite theorizing about possible contaminants migrating from the Crescent Mine, Defendants have failed to provide any credible evidence that 1) the Crescent Mine independently contributes hazardous substances to the Bunker Hill Mine pool beyond what entered the Crescent Mine as a direct result of Placer's intentional diversion of water,[90] or 2) any such hazardous substances caused BHMC or Placer to incur response costs. Defendants' allegations are not based on scientifically supported findings or verified environmental assessments but rather on speculation that ignores the source of the contaminated water in the Crescent Mine: releases and disposals at and from the Bunker Hill Mine, including Placer's flooding of both mines.

A party cannot recover response costs that it incurred because of its own contamination. In *City of Portland*, 179 F. Supp. 2d at 1200-01, the defendants argued that the plaintiff was also a

---

[89] Joint Opp. at 58.
[90] *Supra* at 3-5, 7-9.

PRP because contamination was present on the plaintiff's property, regardless of whether the plaintiff was the source of that contamination. The court rejected this argument because the "[d]efendants . . . presented no evidence that [they] incurred response costs as a result of the migration of hazardous wastes onto Plaintiff's property *from sources other than themselves*. The fact that Plaintiff owns property contaminated by other sources does not make it a liable party under section 9607 in this action." *Id.* at 1201 (emphasis added). Similarly, here, Placer's and BHMC's CERCLA claims fail because they have not incurred costs as a result of the migration of hazardous substances "from sources other than" the Bunker Hill Mine. *Id.* Instead, the evidence is clear that Bunker Hill mining methods, mine water mismanagement, and intentional diversion of AMD are the true cause of Defendants' costs.

Although there may have been some historical acid generation in the lower levels of the Crescent Mine, once the mine flooded, the lack of oxygen created an anoxic environment preventing any additional AMD generation beyond what had entered from the Bunker Hill Mine.[91] Simply stated, the "releases" in question originated at and from the Bunker Hill Mine, including Placer's intentional diversion of hundreds of millions of gallons of AMD into the lower workings of the Bunker Hill Mine that forced AMD into the Crescent Mine. There is nothing inconsistent with CERCLA's liability framework in requiring the owners of the Bunker Hill Mine to remediate their own releases.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Crescent's motion for summary judgment in its entirety and dismiss Defendants' CERCLA Section 113(f) contribution claims with prejudice.

---

[91] ECF 116-50 (Beale August Report) at 61.

REPLY MEMORANDUM IN SUPPORT OF CRESCENT PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT - 30

DATED: February  7, 2025.

STOEL RIVES LLP


/s/Maren Norton
Wade C. Foster, ISB No. 11105
Maren R. Norton, admitted *pro hac vice*
Sean James, admitted *pro hac vice*


GRAVES ENVIRONMENTAL LAW PLLC


/s/James  Graves
James T. Graves, admitted *pro hac vice*

Attorneys for Plaintiff