1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

CRESCENT MINE, LLC,                          Case No. 2:21-CV-310-DCN

      Plaintiff,

  vs.                                        Coeur d'Alene, Idaho
                                             June 23, 2025
BUNKER HILL MINING CORPORATION;              1:34 p.m.
and PLACER MINING CORPORATION
(d/b/a New Bunker Hill Mining
Co.),

      Defendants.

---

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE DAVID C. NYE
CHIEF UNITED STATES DISTRICT COURT JUDGE

---

APPEARANCES:

For the Plaintiff:      MS. MAREN R. NORTON
                        MR. SEAN T. JAMES
                        Stoel Rives, LLP
                        600 University Street, Suite 3600
                        Seattle, Washington  98101

                        MR. WADE CHARLES FOSTER
                        Stoel Rives, LLP
                        101 S. Capitol Boulevard, Suite 1900
                        Boise, ID 83702

For the Defendant       MR. CHRISTOPHER R. HOGLE
Bunker Hill Mining:     Holland & Hart LLP
                        222 South Main, Suite 2200
                        Salt Lake City, Utah 84101

```
For the Defendant        MR. PRESTON N. CARTER
Placer Mining:           Givens Pursley, LLP
                         601 West Bannock Street
                         Boise, Idaho  83702



Court Reporter:          MS. ANNE BOWLINE, RMR, CRR
                         Anne_Bowline@id.uscourts.gov
```

*Proceedings recorded by stenography.  Transcript produced by computer-aided transcription.*

<u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

<u>MOTIONS</u>                                                      <u>PAGE</u>

motions for Summary Judgment
    Mr. Carter                                                 4
    Mr. Hogle                                                 21
    Ms. Norton                                                30
    Mr. Carter                                                47
    Mr. Hogle                                                 55
    Ms. Norton                                                59

1          (Proceedings commenced at 1:34 p.m., June 23, 2025.)

2          THE COURT:  Please be seated.

3          THE COURTROOM DEPUTY:  The Court will now hear the

4    motion hearing in Case Number 2:21-CV-310, Crescent Mine, LLC,

5    versus Bunker Hill Mining Corporation, et al.

6          Counsel, please state your appearance for the record,

7    beginning with counsel for the plaintiffs.

8          MS. NORTON:  Maren Norton, Stoel Rives, for the

9    plaintiff, the Crescent parties, joined by my colleague Sean

10   James and my client, Roger Gross.

11         MR. HOGLE:  Your Honor, for Bunker Hill Mining

12   Corporation, I'm Chris Hogle.  And with me is Chris McCurdy

13   and client representative, Sam Ash.

14         MR. CARTER:  Your Honor, Preston Carter for defendant

15   Placer Mining Corporation.  And joining me on video are

16   several of my colleagues.

17         THE COURT:  Thank you.

18         Counsel, just so we're all on the same page, I know

19   there's several different motions pending.  My intention today

20   was only to hear argument on summary judgment motions.

21   Everything else I'll issue a decision on without argument.

22   And I believe because of the jurisdictional issue raised, we

23   decided Crescent -- Placer should go first.  Right?

24         MR. CARTER:  That's my understanding as well.

25         THE COURT:  All right.  You may do so then.

1          MR. CARTER:  Thank you, Your Honor.  Preston Carter

2    with Givens Pursley for defendant Placer Mining Corporation.

3    Placer Mining Corporation is a defendant in Case Number

4    21-CV-310.  These cases are consolidated, but Placer is a

5    party only to that one case.

6          So the Court has a lot of documents in front of it.

7    I made sort of a short binder that has excerpts of some of the

8    key documents to support our motion for summary judgment which

9    I might refer to today.  All of these documents --

10         THE COURT:  Just so I'm -- this is what you're

11   talking about?

12         MR. CARTER:  That is correct.

13         THE COURT:  Okay.

14         MR. CARTER:  Those documents are already in the

15   record, but I just excerpted them for purposes of argument

16   today.

17         So Placer, my client, owned the Bunker Hill Mine from

18   1992 until 2022, when it sold the mine to Bunker Hill Mining

19   Company.  I'm going to start with a short summary of the

20   facts.  These historical facts are not critical for the Court

21   to grant summary judgment to our client.  I'm just going to

22   provide an overview to sort of situate the Court in place and

23   in time.

24         So the Bunker Hill Mine and the Crescent Mine are

25   located in the Bunker Hill Mining and Metallurgical Complex

1    Superfund Site.  The two mines are connected by a tunnel

2    called the Y-U Crosscut deep underground at the 23 level of

3    the Bunker Hill Mine.  There's a graphic in the binder that

4    was Exhibit A to Bunker Hill's statement of facts.

5              So historically, the Bunker Hill Mine and the

6    Crescent Mines were jointly owned and operated.  In January of

7    1991 the owner of both mines declared bankruptcy, removed all

8    the pumps, removed all the electrical equipment from both

9    mines and sold that equipment at auction.  Water naturally

10   infiltrates both mines.  When the pumps stopped, the mines

11   immediately started to flood.

12             That flooding started at the latest in July 1991.  At

13   that time the mines were still owned by the same owner.  We

14   know it was July 1991 at the latest because that's when the

15   salvaged equipment was sold at the bankruptcy auction.  So the

16   flooding started immediately.  In going through the record, we

17   know that was at the latest July '91 because that's when

18   those -- the auction was held.

19             Placer acquired the Bunker Hill Mine in April of

20   1992.  At this time both mines were actively flooding and had

21   been actively flooding for at least eight months.  All the

22   pumps had been removed.  All the electrical infrastructure had

23   been removed.  There was no way to stop the flooding at that

24   time.

25             At that time the central treatment plant, which

Mr. Carter                                                          6

1    treats the water pumped from the Bunker Hill Mine, was

2    operated by a private company.  In March of 1993 Placer met

3    with EPA to discuss what to do if the CTP stopped receiving

4    and treating water from the Bunker Hill Mine.

5            In a letter after that meeting, EPA identified two

6    options for Placer.  The first option was for Placer to divert

7    water that would otherwise flow out what's called the Kellogg

8    tunnel, which is the main entrance to the Bunker Hill Mine.

9    So EPA gave the option to divert that water to the lower

10   levels of the mine.  In other words, dam the Kellogg tunnel,

11   prevent water from leaving the tunnel, and force that water

12   into the lower levels of the mine.  EPA recognized that

13   diversion would speed up the flooding of the mine, but it

14   authorized the diversion anyway so long as Placer eventually

15   treated the water at the CTP.  EPA's letter authorizing this

16   diversion is in the binder, and it's Exhibit 3 to my

17   declaration.

18           That's exactly what Placer did.  It diverted water

19   from the upper levels of the mine that would have otherwise

20   drained out the Kellogg tunnel, diverted that water into the

21   lower levels of the mine.  This occurred for a few months in

22   1993 to 1994, and this is the action that Crescent contends is

23   tortious.

24           So the mines continued to flood.  In 1994, as the

25   water in the mine pool approached the Kellogg tunnel, EPA

1    issued a unilateral administrative order that required Placer

2    to start pumping to maintain the water below the 11 level in

3    the Bunker Hill Mine.  By then Placer had reestablished power

4    to the mine.  Upon receiving the UAO, Placer started pumping

5    water to the CTP for treatment, and it's been that way ever

6    since.

7             The owner of the Bunker Hill Mine has pumped water

8    from the combined mine pool for treatment at the CTP, and the

9    water level has been maintained at around the 11 level ever

10   since.  Now, I used the term "combined mine pool."  Because

11   the Bunker Hill Mine and the Crescent Mine are hydrologically

12   connected at the Y-U Crosscut, the water in both mines acts as

13   a single unit.  The water level in the Crescent Mine is

14   controlled by pumping at the Bunker Hill Mine.  So the owner

15   of the Bunker Hill Mine pumps water from the combined mine

16   pool up to the Kellogg tunnel, where it goes to the CTP for

17   treatment.

18             This isn't disputed.  It's in what's called an

19   NI 43-101 document, which is an exhibit to my declaration.

20   And it's actually evidence from Crescent's own proposal, which

21   is dewater the Crescent Mine by pumping the water from the

22   Bunker Hill Mine and treating that water at the CTP.  So

23   there's a combined mine pool, the level of which is controlled

24   by pumping at the Bunker Hill.

25             So I'm going to move to the present, and this is what

Mr. Carter                                                            8

1     the Court needs for summary judgment for my client, Placer.

2     Both Placer and Bunker Hill Mining Company are subject to

3     orders issued by EPA under CERCLA.  So Placer's subject to a

4     2017 unilateral administrative order and a 2018 consent

5     decree.  These are in the binder and in the records as

6     Exhibits 16 and 17 to my declaration.  Bunker Hill is subject

7     to a 2018 settlement agreement and consent order, also in the

8     binder and the record as Exhibit 18.

9            These orders -- these orders govern the storage,

10    pumping, and treatment of water at the Bunker Hill Mine.

11    Among other things, the orders require the owner of the mine

12    to maintain the mining pool below the 11 level, to provide

13    in-mine storage between the 10 and 11 levels at the Bunker

14    Hill, to stop discharging to the CTP, and to divert all water

15    from the Kellogg tunnel into the lower levels of the mine at

16    EPA's command.  This is paragraph 28 of the 2018 SAOC.

17           Basically, this allows EPA to tell the mine owner to

18    stop discharging to the CTP.  The mine owner will then put a

19    dam in the Kellogg tunnel.  The water will go to the lower

20    levels of the mine.  And that allows EPA to use the CTP for

21    other purposes, whether that's repair, whether that's giving

22    it a break so the treatment processes are improved, or whether

23    that's to use the capacity in the CTP to treat other sources,

24    because the CTP treats all the water from the Bunker Hill Mine

25    but also water from other areas of the site.

1          So one last piece.  The Bunker Hill Superfund Site

2     was a heavily studied, heavily regulated CERCLA site.  It's

3     been that way for over 40 years.  It was listed as a Superfund

4     site in 1983.  EPA and private parties have conducted multiple

5     remedial investigations and feasibility studies on the site.

6     The RI/FSes are listed in the EPA orders.  They're

7     specifically listed in the 2017 UAO to Placer.

8          It's a -- the site has a long history.  There's a

9     helpful list of all of the RI/FSes and the selected remedies

10    in a document called the 2021 Five-Year Review on pages 14 to

11    16.  That's Exhibit 2 to my declaration.  Again, that goes

12    through and identifies the remedial investigation and

13    feasibility studies as well as the remedies that EPA has

14    selected for various portions of the site.  We've also

15    included the 2021 Remedial Investigation/Feasibility Study in

16    the record as Exhibit 5.

17         Both the Bunker Hill Mine and the Crescent Mine are

18    within the Superfund site.  EPA selected a remedy for the

19    Bunker Hill Mine in the 1992 Record of Decision.  That 1992

20    Record of Decision, which is in the record, has been amended

21    several times since.  And EPA implements the remedies that

22    were selected in the '92 ROD and the amendments through the

23    orders and agreements with Placer and Bunker Hill.  The 1992

24    ROD as implemented and the implementing orders are the

25    EPA-led, CERCLA-mandated cleanup plan for the site.

1          So Crescent Mine, LLC, which is the plaintiff against

2    my client, brings four state law claims for injunctive relief.

3    Those state law claims also seek damages.  They also brought a

4    CERCLA Section 107 claim paired with it, a claim for

5    declaratory relief.  Placer's entitled to summary judgment on

6    all those claims.

7          The state law claims for injunctive relief are barred

8    by Section 122(e)(6) of CERCLA.  That's 42 U.S.C. Section

9    9622(e)(6).  Despite all the documents before the Court, this

10   argument's pretty straightforward.

11         Section 122(e)(6) is one of several tools in CERCLA

12   that ensures the careful development of a single EPA-led

13   cleanup effort rather than multiple competing individual

14   cleanup efforts.  That's from the *Atlantic Richfield* case.

15   This case was decided by the United States Supreme Court in

16   2020.  We think this is the seminal case that requires

17   dismissal of the state law claims for injunctive relief.

18         Specifically, Section 122(e)(6) prohibits a

19   potentially irresponsible party from undertaking a remedial

20   action at a CERCLA site unless EPA has authorized that

21   remedial action.  That's true even if the remedial action is

22   packaged as injunctive relief for a state law tort claim.

23         This is clear from *Atlantic Richfield*.  That case

24   involved a historical mining site in Montana.  After an RI/FS,

25   EPA selected a remedy and issued CERCLA orders to the mining

1    companies which had contaminated the soil with arsenic.  The

2    order required soil cleanup to a certain standard of arsenic

3    and removal of the top of 1 foot of contaminated soil from

4    residential lots.  The owners of those contaminated

5    residential lots brought state law claims for trespass,

6    nuisance, and strict liability.  Those owners sought cleanup

7    to a more strict standard of arsenic, a lower standard of

8    arsenic, and removal of 2 feet of contaminated soil.

9          The Supreme Court applied Section 122(e)(6) just in a

10   very straightforward way, consistent with its plain language.

11   Number one, the site was a CERCLA site for which an RI/FS had

12   been initiated.  Number two, plaintiffs' requested relief

13   wasn't remedial action even though it was packaged in a way

14   that it was injunctive relief under state law.  It wasn't

15   actually injunctive relief there.  It was damages, but damages

16   under Montana law had to be used for a cleanup plan.  So it

17   was the equivalent of injunctive relief.  And EPA had not

18   authorized the proposed actions, and the plaintiffs' claims

19   were therefore barred.

20         The same analysis applies here.  We check all those

21   boxes.  First, multiple RI/FSes have been conducted at the

22   Bunker Hill Superfund Site.  These RI/FSes are the basis for

23   the 1992 ROD and the subsequent amendment.  I'll just list

24   some of them.  The 2012 interim ROD amendment, which is

25   Exhibit 15 to my declaration, specifically addresses what's

1    called Operable Unit 2, which is where the Bunker Hill Mine is

2    located.  It also addresses Operable Unit 3, which is where

3    the Crescent Mine is located.  The Crescent Mine admits that

4    it is in Operable Unit 3 in paragraph 29 of its response to

5    our statement of facts on summary judgment.

6            The 2021 five-year report at pages 14 to 16, which is

7    Exhibit 2 to my declaration, also contains sort of a helpful

8    chart that lists all the RI/FSes and all the selected remedies

9    for this site.  And again, the 2017 UAO to my client

10   identifies the RI/FS and the remedies that were selected in

11   the ROD and ROD amendments.  That box is checked because it's

12   a CERCLA site where an RI/FS had been initiated.

13           Second, Crescent's proposed injunctive relief is a

14   remedial action.  Crescent asks the Court to order Bunker Hill

15   to dewater the Crescent Mine by pumping water from the Bunker

16   Hill Mine for treatment at the CTP and to permanently maintain

17   the water level below the Y-U Crosscut.  This is described in

18   the expert report of Neal Rigby, which is in the binder and

19   Exhibit 35 to my declaration.

20           This is a remedial action.  Under the statute, a

21   remedial action is an action consistent with a permanent

22   remedy to prevent or minimize the release of hazardous

23   substances.  The term specifically includes off-site treatment

24   of hazardous substances.  This is also demonstrated by the

25   subject matter.  The storage, pumping, and treatment of Bunker

Mr. Carter                                                    13

1   Hill water is the subject of the 2017 UAO, the 2018 consent

2   decree, the 2018 SAOC, which are themselves remedial actions.

3   Crescent seeks precisely that, which is an order from the

4   Court ordering the permanent dewatering of the Bunker Hill

5   Mine and of the Crescent Mine through pumping at the Bunker

6   Hill Mine and treatment of that water at the CTP.  That is a

7   remedial action.

8           And third, Crescent has not obtained EPA's

9   authorization to perform this remedial action.  Crescent makes

10  some arguments on this, which I'll touch on further.  But

11  Crescent hasn't provided evidence that its proposed dewatering

12  campaign, which is 550 straight days of 24/7 pumping,

13  prevents -- provides no evidence that that campaign has been

14  presented to EPA much less that EPA has authorized that.

15          Fourth, Crescent requests the Court to order Bunker

16  Hill and Placer to perform that dewatering campaign.  Bunker

17  Hill and Placer are PRPs, as established by EPA's orders.

18          So, Your Honor, all the boxes are checked.  This is a

19  Superfund site where RI/FSes have been initiated.  Crescent

20  seeks that a PRP carry out a remedial action.  EPA has not

21  authorized it.  Just as in *Atlantic Richfield*, the state law

22  claims for injunctive relief must be dismissed.

23          I'm going to touch quickly -- Crescent points to a

24  one-paragraph email from a EPA employee as, quote,

25  authorization to permanently dewater the mines.  This email's

Mr. Carter                                                14

1    Exhibit F to the Norton declaration.  It's in the binder.

2    This email is not authorization by the president under

3    Section 122(e)(6).

4           We address these in the briefing.  I'll just point

5    out EPA's very own order indicates that informal guidance from

6    EPA employees can't be relied upon.  This is paragraph 77 of

7    the 2018 SAOC.  It says no informal advice, guidance,

8    suggestion or comment by any EPA representative providing

9    reports, plans, specifications, schedules, or any other

10   writings submitted by Bunker Hill can amend the consent order

11   unless the consent order is formally modified.  So EPA's own

12   order precludes reliance on the sort of informal advice that

13   was given in this email.

14          And I'll also point out when permanent watering [sic]

15   was proposed to EPA way back in 1998, EPA expressed serious

16   concerns with the idea of permanent dewatering.  This is

17   embodied in a memo that's Exhibit 14 to my declaration.  It's

18   also in the binder.  It's a memo from EPA's consultant

19   analyzing the problems with permanent dewatering.  Most

20   notable to me is this:  Dewatering would, quote, lead to more

21   acidic and metal-laden AMD, increasing the treatment

22   requirement, end quote.  That's Bates number BHMC-051523.

23          And here the EPA's consultant -- so the chemical

24   reaction that generates AMD requires oxygen.  So when the

25   lower workings of a mine are filled with water, that decreases

1    the oxygen available and it decreases the generation of AMD.

2    When the water is pumped out, that increases the amount of

3    oxygen and it thus increases the generation of acid mine

4    drainage and metal-laden waters.  Those are the contaminants

5    of concern here.  So as EPA's consultant pointed out,

6    dewatering the mine actually will increase the generation of

7    AMD.

8            EPA's email actually identifies this as well.  Sort

9    of in a sentence he says -- the EPA employee says there may be

10   a shift to water quality if there is dewatering.  He's

11   correct.  As EPA's consultant noted, the permanent dewatering

12   will actually increase the generation of AMD.  And so EPA has

13   not authorized Crescent's requested permanent dewatering.

14   There are serious concerns about that that EPA would have to

15   resolve if it were to actually be presented with the

16   dewatering proposal.

17           THE COURT:  If I could interrupt for just a minute.

18           MR. CARTER:  Yes.

19           THE COURT:  If I'm following what you're telling me

20   correctly, why wouldn't that email create a factual issue?

21           MR. CARTER:  Yes.  So a couple responses to that.

22   Number one, the procedures for authorizing a remedial action

23   at a CERCLA site are set forth in the statute.  It's

24   Section 117(c) of CERCLA.  And that basically requires the EPA

25   to analyze and publish -- so if a remedial action for the site

1    has already been decided upon, if EPA's going to authorize

2    another remedial action under 117(c) of the statute, it has to

3    publish that remedial action.  It has to determine whether

4    there are any sort of changes from the previously selected

5    action to the remedial action that it's proposing to initiate.

6    And then if it does -- if it does decide that there's sort of

7    a material difference between the remedial action that was

8    originally selected and the remedial action that is proposed,

9    it has to actually amend the record of decision.

10         And so all this is to say this site has been studied

11   for years.  The remedial actions that were selected by EPA

12   were chosen in the 1992 ROD, which came after significant --

13   there was the remedial investigation, a feasibility study.

14   There were actually public notification requirements, public

15   meetings, public input.  And then EPA has to choose the remedy

16   in what's called the record of decision.  That record of

17   decision has been amended through that formal process several

18   times since.

19         And you can kind of see this in the *Atlantic*

20   *Richfield* case itself.  So *Atlantic Richfield* basically starts

21   by noting the significant public involvement that EPA goes

22   through in order to select the remedy in what's called the

23   record of decision.  And then Chief Justice Roberts, writing

24   for the Court, says once the remedy is selected, the time for

25   debate ends and the time for implementation begins.

Mr. Carter                                                    17

1          And so that public, sort of very formal process that

2     underlies the remedial actions means that if a subsequent

3     remedial action is going to be authorized, those same

4     processes have to be followed as well.  And I guess that's a

5     long way of saying this email, as a matter of law, does not

6     comply with the procedures that are required to authorize a

7     remedial action when a remedial action has already been

8     selected for the site.  So as a matter of law, it does not

9     constitute authorization.

10         So let me just summarize there.  Crescent's requested

11    injunctive relief is a remedial action at a CERCLA site.  It

12    hasn't been authorized by EPA.  Those claims are barred by

13    Section 122(e)(6).

14         Crescent also brings state law claims for damages.

15    Section 122(e)(6) comes into play regarding these claims but

16    in a little bit more of an indirect way.  So Crescent's state

17    law claims are subject to a three- or a four-year statute of

18    limitations.  They're based on acts that occurred in 1993 and

19    1994.  These are barred by the statute of limitations.

20         So Crescent tries to seize upon an exception to the

21    statute of limitations under which an injury that is

22    temporary, rather than permanent, is deemed a continuing tort

23    and you can proceed to recover damages incurred during the

24    limitations period.  However, that exception applies only if

25    the injury is continuing and that an injury is continuing only

1    if it is reasonably abatable.

2            And here the only actions that Crescent presents to

3    sort of for the Court to determine that the flooding is

4    reasonably abatable is pumping of the Crescent Mine --

5    emptying of the Crescent Mine through the Bunker Hill Mine and

6    plugging the mine at Prescott.  But that action is barred by

7    122(e)(6).

8            And so the flooding is permanent.  It is not

9    reasonably abatable because the actions that Crescent says

10   should be taken to abate the injury are barred by

11   Section 122(e)(6).  Placer and Bunker Hill can't do it.  The

12   injury is not reasonably abatable.  The flooding is permanent,

13   and the claims are barred by the statute of limitations.

14           I'll also note there's another basis for summary

15   judgment on that ground as well.  Crescent hasn't presented

16   expert evidence to support the actions that they claim are

17   necessary to abate the flooding.  So in other words, Crescent

18   says the flooding is temporary, not permanent, because, you

19   know, the mine's going to be dewatered through the Bunker Hill

20   and the Y-U Crosscut plugged.

21           Crescent hasn't presented any expert testimony on the

22   technical feasibility of plugging the Y-U Crosscut.  It hasn't

23   presented any expert testimony on the cost of plugging the Y-U

24   Crosscut.  Those are the factual predicates or the evidentiary

25   predicates for a finding of reasonable abatability.

Mr. Carter                                    19

1    Therefore, Crescent hasn't raised a genuine issue of material

2    fact as to the reasonable abatability of the flooding.

3    Therefore, the flooding is permanent.  The tort is permanent,

4    and the claims are barred by the statute of limitations.

5           Let me just briefly raise as well, even if the tort

6    is continuing, under Idaho law -- and this is in a case called

7    the *Spanbauer* case as well as the *Hannah Mining* case.  Even if

8    the torts are continuing -- and we don't think they are.  We

9    think the torts are permanent and barred by the statute of

10   limitations.  But even if the torts are continuing, Crescent

11   can only recover for injuries sustained during the limitations

12   period.  That is the three to four years prior to the

13   assertion of the claim.

14          Crescent hasn't provided any expert testimony of

15   damages incurred during that period.  Crescent's damages

16   calculations are in the expert report of Neal Rigby, and

17   there's two methods.  One is diminution in value; the second

18   is restoration costs.  For diminution in value, Mr. Rigby

19   compares the current state of the Crescent Mine, which is

20   flooded, to the Crescent Mine in an unflooded state.  In other

21   words, they act as though the Crescent Mine had no water in

22   it.  The problem is Crescent Mine was unflooded in 1991.  That

23   is not evidence of damages during the limitations period.

24          THE COURT:  Can they recover nominal damages?

25          MR. CARTER:  So I would say at most -- so if the

Mr. Carter                                          20

1    Court determines that sort of -- that the tort is continuing,

2    if the Court determines that -- which depends on a

3    determination that it's reasonably abatable and if the Court

4    determines that there's adequate evidence of reasonable

5    abatability.  So if the Court determines that the tort is

6    continuing, Crescent may be able to proceed on nominal damages

7    only on the common law trespass claim, the statutory trespass

8    claim under Idaho Code 6-202(a), and the nuisance claim,

9    nominal damages only.

10            And if that's the case, Your Honor, we would ask that

11   the Court clearly delineate that so everyone knows what it is

12   at trial.  But again, we don't believe the Court gets there

13   because we think it's barred by statute of limitations because

14   the actions that would abate the flooding are legally

15   prohibited under 122(e)(6), and Crescent hasn't presented

16   sufficient expert evidence on the technical feasibility or the

17   cost of plugging the Y-U Crosscut.

18            Your Honor, I'll reserve the remaining time for

19   rebuttal.  The 107 claim and the dec judgment claim, I'll rest

20   on the briefing for that.  On the negligence claim, Placer

21   moved for summary judgment on the negligence claim.  Crescent

22   didn't respond with evidence or argument, so that one must be

23   dismissed.  And I'll rest on the briefing for the response to

24   Crescent's motion for summary judgment.

25            THE COURT:  Okay.  Thank you.

1          I'm assuming Bunker Hill is going to follow.

2          MR. HOGLE:  Yes, Your Honor.  Your Honor, Chris Hogle

3    for Bunker Hill Mining Corporation.  I'm not going to repeat

4    what Mr. Carter said.  I'll just adopt what he said and focus

5    on -- I'll focus primarily on things he did not cover.

6          First, I'll start with Bunker Hill's motion for

7    partial summary judgment, which seeks dismissal of the

8    plaintiff's CERCLA claims and Idaho law claims, which all

9    assert that Bunker Hill is responsible for flooding of the

10   Crescent Mine that occurred over 30 years before Bunker Hill

11   acquired the Bunker Hill Mine and over 20 years before the

12   plaintiff acquired the Crescent Mine.

13         All of the plaintiff's claims arise from flooding in

14   1991, when both the Bunker Hill and the Crescent Mine were

15   owned by the same company, Bunker Hill Mining Co. U.S, Inc.

16         THE COURT:  And this is probably a question for

17   Crescent Mine, but I'll just throw it out now anyway.  I'm

18   struggling on the trespass claims with how you can have

19   trespass when the entity that owned both mines at the time is

20   the one that put the water in there.  I struggle with that.

21         MR. HOGLE:  Right.

22         THE COURT:  So I guess you don't have to answer that

23   question because I know what your answer's going to be, but

24   Crescent Mine's going to have to answer it.

25         MR. HOGLE:  And that's a really good question,

Mr. Hogle

1    because if you take their own evidence from their own expert,

2    Geoffrey Beall, he says in early 1991, when the pumps were

3    removed from both mines, the water started flooding the Bunker

4    Hill at a rate of 1,500 gallons per minute.  And at that rate

5    and using the void calculations that another one of their

6    experts relies on, Dr. R, for his damages, if all that's true,

7    it flooded in about two weeks.  Two weeks, in 1991.  So it --

8    it's a really good question.  And you can't trespass by

9    putting water in your own mine.

10             THE COURT:  That's the problem I'm having.

11             MR. HOGLE:  Yeah.  And then -- and then there's no

12    CERCLA liability either because the water was all from the

13    joint owner, the owner of the joint mines.

14             Okay.  I'm going to address -- first let me address

15    their CERCLA claims that we raise -- the arguments that

16    we raised -- that Bunker Hill raised in its motion for summary

17    judgment.  The 107 claim -- and, Your Honor, I'd point out I'm

18    not bringing up anything new.  These are all points that we

19    raised in 2022 in connection with 12(b)(6) motions.  All these

20    points, all this law was what Your Honor identified in Your

21    Honor's memorandum and decision in 2022.  Nothing's changed.

22    Here we are three years later, after all this discovery, and

23    they still can't make out a claim.

24             So first, CERCLA Section 107(a), the Court's 2022

25    decision points out that a plaintiff must incur necessary

Mr. Hogle

1    costs of response.  And the plaintiff didn't -- Crescent

2    didn't itself incur response.

3            Now, Crescent relies on this case out of the Eighth

4    Circuit, *Trimble v. Asarco*, Inc., 232 F.3d 946, and two

5    invoices totaling approximately $3,000 sent to Crescent but

6    paid by somebody else.  The reliance on the *Trimble* case is an

7    odd choice because the *Trimble* court affirmed dismissal of

8    CERCLA claims because the claimants had not committed any

9    resources to meet response costs.  And that's the same here.

10           And the *Trimble* court relied on a Ninth Circuit Court

11   of Appeals decision, which is controlling here.  It's the *In*

12   *Re Dant & Russell* case, 951 F.2d 246, a 1991 Ninth Circuit

13   decision which holds that, quote, under CERCLA's scheme for

14   private action, response costs may not be recovered when there

15   has been no commitment of resources for beating these costs.

16   And that's what we have here.  Crescent's own 30(b)(6)

17   representative testified in the 30(b)(6) deposition that it

18   has no employees.  It has no contracts.  So how could it have

19   committed any resources?

20           And of course, on this motion, which invokes the

21   *Celotex* standard, the burden shifts over to the plaintiff to

22   identify admissible evidence supporting their 107 claim, and

23   they haven't -- they haven't provided any.  They've got these

24   two invoices that were paid by somebody else.  Their expert

25   Paul Rosasco, who's their expert on their response costs, he

1    admits they were paid by somebody else.

2            THE COURT:  Just so I'm clear on that point, because

3    I was a little confused.  So what you're telling me is those

4    invoices went to the plaintiff, but they're not the ones that

5    actually -- what was the language you used?  Not incurred

6    but --

7            MR. HOGLE:  They were --

8            THE COURT:  Somebody else covered them?

9            MR. HOGLE:  Yes.  Somebody else paid them.  Crescent

10   Silver, LLC, paid them.  Crescent Silver's the operator of the

11   Crescent Mine, and it's the one that paid it.  Crescent Mine

12   did not.  And their own expert, Mr. Rosasco, admitted to that

13   in his deposition.

14           I want to reference the *Chubb Custom Insurance*

15   *Company* case, 710 F.3d 946, a Ninth Circuit 2013 decision that

16   says, quote, a derivative incurment, end quote, of response

17   costs is not contemplated under Section 107(a).  That's what

18   we're talking about here, a derivative incurment.  You have

19   to, yourself, incur these response costs to be a CERCLA claim.

20           *Basic Management Inc., v. United States*, 569 F. Supp.

21   2d 1106, a 2008 District of Nevada case, the same thing.  The

22   plaintiff in that case had not incurred response costs when a

23   third party paid them on the plaintiff's behalf, and so the

24   claim was dismissed.  And the Court said that if plaintiffs

25   may seek recovery without themselves having incurred response

Mr. Hogle

1    costs, quote, they are only obtaining a contribution windfall

2    for a cost which they will never incur or have to pay.

3            The 107 claim that Crescent asserts should be

4    dismissed on that ground alone.  And with a -- with a

5    dismissal of the 107(a) claim, so goes their Section 113(g)(2)

6    claim for declaratory judgment, because as this Court pointed

7    out in the 2022 decision, you've got to have a viable 107(a)

8    claim to have a 113 claim for declaratory judgment.

9            I'm going to now turn to the Idaho law claims,

10   trespass.  In 2022 this Court held that plaintiff's trespass

11   claims, quote, trespass claims against Bunker Hill are fatally

12   flawed because Bunker Hill is not responsible for the alleged

13   trespass.  Bunker Hill started -- acquired the mine, the

14   Bunker Hill Mine, in 2022.  It leased it at the end of 2017

15   and first had involvement with it in 2018.  All of this

16   flooding occurred over 25 years before Bunker Hill had

17   anything whatsoever to do with this mine.

18           Under Idaho law, which controls on the trespass

19   claim, plaintiff must show -- and this was pointed out in Your

20   Honor's decision back in 2022, citing to *Thomas v. Thomas*,

21   2015 Westlaw WL 1467207.  The plaintiff has to show, quote, an

22   invasion -- I'm skipping the second one.  The third one, an

23   invasion which is a direct result of some act committed by the

24   defendant.  There's no evidence that Bunker Hill did anything.

25   This flooding happened over 30 years ago.

Mr. Hogle

1        Now, they rely on the Restatement, Restatement

2    (Second) of Torts Section 161.  Subsection (1) doesn't apply.

3    That one deals with situations where an actor, the defendant,

4    tortiously places something on somebody -- on the plaintiff's

5    property.  Well, Bunker Hill didn't do anything.  They didn't

6    tortiously place anything on Crescent's property.  So they

7    don't -- Subsection (1) is not applicable at all.

8        And neither is Subsection (2) because -- I mean,

9    they've been really sort of misperceiving this.  It is not --

10   Subsection (2) is not a rule of landowner liability.  It is a

11   rule of thing owner liability.  It says, quote, a trespass may

12   be committed by the continued presence on the land of a

13   structure, chattel, or other thing which the actor's

14   predecessor in legal interest therein has tortiously placed

15   there if -- if -- the actor, having acquired his legal

16   interest in the thing with knowledge of such tortious conduct

17   or having thereafter learned of it, fails to remove the thing.

18   So this isn't landowner liability.

19        Reconciling this with Idaho law on the essential

20   elements of trespass, which requires proof of an invasion

21   committed by the defendant, an invasion, what this means is

22   the defendant, the actor, has to come to own the thing that is

23   invading the plaintiff's property.  And there's no evidence of

24   that.  Bunker Hill didn't acquire the water.  It acquired the

25   Bunker Hill Mine.

1          Statutory trespass:  There's no evidence that they've

2    presented that Bunker Hill either entered or remained upon the

3    real property of the Crescent Mine as defined in Idaho Code

4    Section 6-202.

5          Nuisance:  In its 2022 decision the Court ruled that,

6    quote, Crescent's nuisance claims similarly fail against

7    Bunker Hill because Bunker Hill did not initiate the nuisance.

8    There's still no evidence -- nothing's come forward, and they

9    haven't presented anything -- that Bunker Hill initiated any

10   nuisance.

11         Negligence:  They don't -- they don't come forward to

12   defend their negligence claim because, as we pointed out,

13   there's no duty under Idaho law to keep pumping.  Bunker Hill

14   doesn't owe Crescent Mine a duty to pump their mine free of

15   water for free forever.

16         Mr. Carter touched on the 122(e)(6) and 113(h)

17   arguments under CERCLA, so I won't repeat that.  Your Honor, I

18   think I'm going to turn to the motion as it relates to Bunker

19   Hill's claim under CERCLA.

20         I mean, there's fact issues that prevent summary

21   judgment in their favor on Bunker Hill's claims.  It -- water

22   infiltrates into the Crescent Mine.  There's no -- there's no

23   dispute about that.  There's so much evidence about water

24   coming into the Crescent Mine.  It is not a dry mine.  Their

25   own expert in 2003 to the Idaho Department of Environmental

Mr. Hogle                                                28

1   Quality said 225 gallons per minute is contributed by the

2   Crescent Mine to the Bunker Hill Mine.  There's -- there's a

3   contribution there.  If the water couldn't flow from the

4   Crescent Mine to the Bunker Hill Mine through the Y-U

5   Crosscut, it would overflow out the Crescent Mine, out the

6   Hooper tunnel.  It's got to go somewhere, and it goes to the

7   Bunker Hill.

8          Bunker Hill has been paying for pumping and water

9   treatment for the combined Bunker Hill and Crescent Mine

10   pools, and the Crescent parties have never pumped or treated

11   water.  They're the quintessential free riders.  CERCLA

12   requires that they pay their fair share, and that's all we're

13   talking about.  The memo, the evidence that we submitted,

14   shows that all the elements of CERCLA are met.  This is a

15   facility -- they're actually a combined facility because of

16   the Y-U, a CERCLA facility.

17          The Crescent Mine water is hazardous, has hazardous

18   substances.  Kelly Donahue, our expert, said that.  That's in

19   the record.  There are releases from the Crescent Mine to the

20   Bunker Hill.  There's -- there's too much evidence to go over

21   in the time today.

22          We've -- in addition to Mr. Beall's 2003 work,

23   there's Dr. Kym Morton's work.  There's other work.  The

24   EPA -- the most reliable evidence the EPA itself relies on is

25   a Hampton thesis which shows 200 to 250 gallons per minute

1    going from the Crescent to the Bunker Hill Mine.

2         Bunker Hill has incurred response costs.  It's paid

3    $12.8 million to pump and treat water, and some of that is

4    Crescent Mine water.  And the Crescent parties are among the

5    classes of persons subject to CERCLA liability.  The Crescent

6    Mine is the owner.  Crescent Silver is the operator.  Syringa

7    was an owner.  They're both -- they all fall within the scope

8    of CERCLA.

9         And, Your Honor, I want to reserve what I see is five

10   minutes left of my time for rebuttal.

11        THE COURT:  That's fine.

12        MR. HOGLE:  Thank you.

13        THE COURT:  Counsel, before you sit down -- and I'm

14   not asking you specifically, but in the back of my mind, I've

15   got this problem that I'm hoping all of you can just tell me

16   that I'm out to lunch.

17        Two weeks ago or last week the Supreme Court issued a

18   case on district judges and agency decisions and whether or

19   not the district court had -- could -- was required to rely on

20   the agency's interpretation.  That has nothing to do with this

21   case; right?  Because there's no -- there's no statutory

22   interpretation going on.  We've got an EPA order and a plan.

23   But do you agree with me that that case has nothing to do with

24   this?

25        MR. HOGLE:  I do, Your Honor.

1        THE COURT:  I mean --

2        MS. NORTON:  I've not studied the case or looked at

3   it in depth.  I've read it once.

4        THE COURT:  Well, you're ahead of me.  I went to a

5   chief judges conference for two weeks in D.C., and it was

6   talked about, but I haven't read it yet.  But I don't think it

7   has anything here.

8        MR. HOGLE:  I agree, for what it's worth.

9        THE COURT:  Okay.  If one of you decides, after

10  reading it closer, it does, shoot us an email that you want to

11  do supplemental briefing.

12       Go ahead.

13       MS. NORTON:  We certainly will, Your Honor.  And

14  again, good afternoon.  My name is Maren Norton, and I

15  represent the Crescent parties.  It's a little bit of an odd

16  posture to go third in a case like this, so it may feel like

17  I'm going to jump around a slight bit to try to address some

18  of the things you've heard --

19       THE COURT:  You're not only third; you're getting

20  beat up on by two.

21       MS. NORTON:  Fair enough.  I am the mother of six

22  kids, so I'm pretty used to that.  So we'll give it our best

23  shot this afternoon.

24       I want to take a few steps back, though, and get

25  started and talk about that this case really arose in kind of

Ms. Norton

1    an interesting -- out of an interesting series of facts that

2    do color it in many ways.  It really is because the Crescent

3    Mine was for sale.  Bunker Hill had an interest in buying it,

4    but they wanted to buy it on the cheap, and Crescent said no.

5           Bunker Hill had to come up with a way, then, to

6    pressure Crescent to sell, and that they did.  That was the

7    first time that Bunker Hill started claiming that Crescent was

8    somehow liable for contaminated water in its mine, not in the

9    Crescent but in the Bunker Hill Mine.

10          And Bunker Hill's CEO, in fact, admitted as much,

11   describing their first demand letter to Crescent, as you know,

12   helping to keep -- in his words, quote, helping to keep our

13   negotiating position.  And then when he suggested they hire

14   Dr. Kym Morton, who you'll see in the record and you've heard

15   about already, he articulated that their aim in doing so was

16   to keep them, meaning Crescent, under pressure.

17          And at that point Bunker Hill began claiming, as you

18   heard in a couple different ways here, that somehow Crescent

19   was liable for a portion, somehow -- I think the words even

20   free rider were used, which I take issue with the use of that

21   word here.  We're free riders and, therefore, we're

22   responsible for some portion of Bunker Hill's costs.

23          What is actually quite wild about that kind of a

24   claim is that Bunker Hill's own staff admit that there was no

25   basis for that claim.  In an email to their CEO, at the time

1    Bunker Hill staff member Brad Barnett told the CEO that they

2    had a hydrologist, Barbara Ford, look at it and she could

3    not -- quote, could not create a basis for the allocated

4    percentage of water to Crescent.

5          And that's why we ended up here today, not because

6    Crescent owes Bunker Hill Mining Corporation anything.

7    Rather, because Placer -- and I'll get to Your Honor's

8    question.  I certainly heard your question about the flooding.

9    But Placer flooded the Crescent.  Bunker Hill Mining

10   Corporation failed to fix the problem, and then Bunker Hill

11   got mad when Crescent wouldn't swallow that fact and sell the

12   Crescent Mine to them for essentially pennies.

13         So now let's step back even further.  And you put --

14   you heard a few facts from Mr. Carter, and I want to reset

15   actually the stage, because these things actually matter when

16   you're looking at the issues in this case.  So let's go ahead

17   and look.  I put together a few slides, and these were all

18   taken from the record and have citations as well.  And the

19   first, as you've heard, Bunker Hill and Crescent -- it doesn't

20   look like it's showing up.

21         MR. FOSTER:  Just a minute.

22         MS. NORTON:  Bunker Hill and Crescent are, in fact,

23   neighboring mines, and to the east of the Crescent is the

24   Sunshine Mine.  And it's a really cool picture if it comes up,

25   but we'll just keep going and try to get to that point.

Ms. Norton

1            The mines are very different.  Although they're sort

2    of both in the Silver Valley, they're different in key ways.

3    First, the Bunker Hill dwarfs the Crescent.  One way we look

4    at and measure the size of a mine is sort of the ore tonnage

5    of a mine, and if you compare the ore tonnages -- this is just

6    to give you a geographic idea of the three mines and where

7    they're situated.  If you look at it in terms of ore tonnage,

8    Crescent is a mere 2.4 percent the size of Bunker Hill.

9            There are three creeks, including the west fork of

10   the Milo Creek.  If you go to the next slide, you can see that

11   it flows into the Bunker Hill.  So there's three creeks.  You

12   see Milo Creek there.  You see Deadwood Creek.  There's

13   also -- I think it's the south fork of the Milo Creek that

14   also flows into the Bunker Hill Mine.  No such creek flows

15   directly into the Crescent Mine.  Below Milo Creek, as you see

16   here today, is a pyrite-rich ore body known as the

17   Flood-Stanly workings.  There's no such pyrite-rich ore body

18   in the Crescent.

19           There's also -- the Crescent also, in contrast to the

20   Bunker Hill, is divided -- if we go to the next slide -- is

21   divided into sort of the upper and lower Crescent.  So there's

22   a lot of references in the briefing and things that have

23   already been said today that kind of muddy this, but it's an

24   important distinction.  Because if you look here, you see that

25   the Bunker Hill has workings throughout.  That's all of that

Ms. Norton

1    purple that you can see here.

2          In contrast, the Crescent has kind of some orange

3    there at the top.  And there's, in the middle of that, a swath

4    of really white, kind of a -- the 10 level, the 1200 level you

5    can see there.  That white is thousands of feet of very dense

6    rock, rock that's dense enough that Kym Morton actually said

7    water would move through that kind of rock at a rate of about

8    1 foot per hundred years.  Bunker Hill doesn't similarly have

9    anything keeping water that comes from the top of the mine

10   into the lower parts of the mine.

11         Now, you've heard a lot about EPA.  And we took a

12   deposition in this case and we've heard from Mr. Stefanoff,

13   who was an EPA consultant who worked at the Bunker Hill Mine

14   since 1995.  And he sort of put it, I think, in terms that

15   made it easier some of us lawyer types to start understanding,

16   which is really these mines can be thought of as two buckets,

17   so two buckets connected by maybe a pipe at the bottom.  So if

18   the water -- if the pumps were stopped and the water level

19   were to rise on one side -- that pipe in the middle is that

20   Y-U Crosscut, and it kind of flows from left to right

21   depending on elevations, et cetera.  So if you put in more

22   water on one side, it's going to flow to the other side.

23         And we've heard and seen throughout the record even

24   with the numbers that you heard today, which we can correct --

25   and the briefing does a good job of correcting the actual

1    flows into the Crescent.  If you look at the contrast between

2    perhaps 1300 gallons per minute and Crescent's 10 to 25 of

3    natural infiltration or even taking numbers that we think are

4    inaccurate of 225, the contrast is much bigger.  So there's a

5    lot more water going into the Bunker Hill side than the

6    Crescent side.

7            Now, no one knows today if that crosscut is open or

8    closed.  The Bunker Hill and the lower Crescent have been

9    flooded and continue to be flooded, which prevents access to

10   the Y-U.  So once the crosscut was under water, the water

11   level in the Crescent mine has remained approximately equal to

12   the water level in the Bunker Hill.

13           Now let's go ahead and go to the next.  Prior to

14   any -- kind of a little bit of history here.  I think it's

15   important.  Prior to any of the parties' involvement, there

16   was a central treatment plant built to treat water.  You heard

17   reference to that a little bit.  The operators went bankrupt

18   around 1991.  The pumps were turned off and then removed.

19           Now, Placer completed its purchase of the mine in

20   1992.  And there were some references in Your Honor's

21   question, I think, earlier about the flooding.  The flooding

22   didn't miraculously start and then stop at the time Placer

23   acquired the mine.  And we'll talk more about that.  In fact,

24   the flooding started in 1991, when they were under common

25   ownership, but it continued.  If, by what you just heard, it

1   would have been flooded in two weeks before Placer owned the

2   mine, then it would have been flooded to this 1100 level long

3   before Placer ever took ownership of the mine.  And as we'll

4   look at in just a minute, that certainly did not happen.

5          In October 1993 Placer stopped pumping and began

6   diverting, as you heard Mr. Carter reference, 100 percent of

7   the Bunker Hill Mine water into the mine's lower workings.

8   And they did that, according to the Placer 30(b)(6) witness,

9   to avoid water treatment costs.

10         Now, you heard Placer reference that 1993 letter and

11  say that somehow EPA told them that was okay.  The language of

12  the 1993 letter is, in fact, clear.  It says as a short-term

13  solution, EPA said you could actually divert some.  But EPA

14  never absolved Placer's liability for that diversion, nor did

15  EPA say that it could go on and on and on.

16         And it certainly wasn't just for, as Mr. Carter said,

17  a few months.  It wasn't until November of '94, so a year and

18  a half later, when Placer still had not stopped diverting

19  water to the lower workings, EPA had to come in and order them

20  to do so.  And they came in, and then it sounds like the pumps

21  were up and running in about a month.

22         By that time the surface level of the Bunker Hill

23  Mine pool -- in other words, that top water level -- had risen

24  as high as the 11 level.  Now, again, the parties disagree

25  about volumes of water entering the mine, but putting aside

Ms. Norton                                                    37

1    specific numbers, what they don't disagree about is that the

2    amount of water entering the Bunker Hill Mine dwarfs the

3    amount entering the Crescent.

4         So really the questions before this Court today are

5    threefold.  First, are Placer and Bunker Hill liable for

6    trespass of the Crescent Mine?  The answer, as we laid out in

7    our extensive briefing in this case, is yes.  Both are liable.

8         Second, are Placer and Bunker Hill liable under

9    CERCLA for response costs that Crescent has incurred and will

10   continue to incur investigating and responding to the

11   contaminated Bunker Hill Mine water that flooded the Crescent?

12   And the answer there again is yes.

13        And the third issue is whether Crescent is liable

14   under CERCLA for Bunker Hill's costs it has incurred to pump

15   its own water from its own mine under its order with EPA, to

16   which Crescent is not a party.  And the answer there is no.

17        Now I want to touch -- then let's first touch on this

18   trespass claim.  Pages upon pages of briefing and a lot of

19   argument today has already been -- has already addressed it,

20   but it really boils down to simply this:  Placer flooded the

21   Crescent.  The flooding, sure, maybe started in 1991, but it

22   certainly wasn't done and didn't end in 19- -- in April '92,

23   when the sale went through and was finished.  In fact, it

24   continued, and it went on through the time when the diversion

25   happened, et cetera.  And that flooding, in fact, continues

Ms. Norton                                      38

1   today.

2            Now, under Idaho law, any person who enters or

3   remains upon the real property of another person without

4   permission commits civil trespass.  And again, under common

5   law, trespass is committed by the wrongful interference with

6   the right of exclusive possession of real property.  And

7   again, as I said, both are liable, Placer in particular for

8   that period during late 1993 to late 1994, when it was

9   diverting so much water to the lower workings of the mine.

10  Bunker Hill is, in fact, despite Mr. Hogle's argument, liable

11  as the current owner of the Bunker Hill Mine because it has

12  failed to remove the trespassing mine water that remains in

13  the Crescent today.

14           Now, defendants' own expert, Mr. White, opined that

15  the Bunker Hill Mine discharges on average approximately

16  3300 gallons of contaminated mine water per minute.  So if you

17  take that period from October '93 to November '94, when

18  Placer was diverting all of that water, that means that for

19  more than a year -- more than a year, not a few months --

20  Placer diverted more than 1300 gallons of contaminated water

21  per minute into the Bunker Hill Mine's lower workings.  And as

22  Placer did so, the water elevation in the Bunker Hill Mine

23  rose from the 15 level to the 11.  Think again about those

24  buckets.  If you put more water in, the water level rises.

25           Now, because we've heard a lot, I thought it would be

Ms. Norton                                    39

1    interesting to actually look at defendants' expert's slides to

2    really demonstrate this.  Their expert, Kym Morton, concedes

3    that the water level in both mines rose in unison from an

4    elevation equal to the 1500 of the Bunker Hill in '93.  You

5    can then see this in is April 1992.  1992, it even notes that

6    that's when Placer acquired the mineral rights.  The

7    flooding's at the 18 level.  And then if you just go through

8    time, then July of '92 it continues to rise.  December '92

9    it's rising more.  January '93 it rises more, and so on and so

10   forth.

11          Now, Placer's response is that they started pumping

12   again.  Yes, no one disputes that they pumped, but the pumping

13   has only ever been enough to keep that Bunker Hill Mine pool

14   slightly below that 11 level.  They never pumped out

15   everything.  All that EPA ever required was that they keep it

16   below the 11 level, not that they dewater down as far as the

17   Y-U in any way.

18          Now, they also claim -- and again, we've addressed

19   this at length in our briefing -- that the Bunker Hill Mine

20   water that flooded the Crescent in these years was somehow all

21   pumped out, but there's simply no evidence of that.  That

22   argument rests on this fiction that the Bunker Hill Mine pumps

23   run continuously, which everyone knows they do not.  Experts

24   alike have said that.  All of the witnesses for both Bunker

25   Hill and Placer have said the same.

Ms. Norton                                                        40

1          This on again, off again pumping was only intended to

2     take that surface level to keep it at just below the 11.  Now,

3     EPA's technical consultant, CH2M Hill, concluded the same.

4     They concluded that there's little mixing between the surface

5     and the deeper portions of the mine, meaning that the water

6     that continuously drains down through the Bunker Hill Mine and

7     reaches the mine pool is, in CH2M's words, thought to flow

8     across the upper pool towards the extraction pumps and

9     maintain that water level.  Thus, the pumping from the 11

10    level is just removing, as I said, that new water.

11         Now, you also -- I want to address this -- heard

12    Mr. Carter also say that there was no way for them when they

13    acquired the mine to stop the pumping.  Now, that's simply not

14    true.  It was somehow impossible at that time until EPA came

15    in and ordered them, and then within a month they put in the

16    pumps necessary to stop the flooding and so -- or to start

17    pumping again.  So they were able to start pumping as soon as

18    EPA ordered them to.  Up until then, they were trying to avoid

19    the cost.

20         Now, somehow there's -- you know, we've heard a lot

21    about the argument that somehow Bunker Hill Mining Corporation

22    is not liable for the continuing trespass.  Bunker Hill, first

23    of all, was well aware of the issues when it acquired the

24    mine, which is a prerequisite to some liability.  It paid a

25    portion of Placer's settlement costs with EPA in doing so.

Ms. Norton                                        41

1   Bunker Hill doesn't need to enter or remain on the property to

2   be liable for trespass.

3        Now, Bunker Hill attempts to read the Restatement in

4   a way unsupported by the case law, that they had to own the

5   migrating contamination.  Case after case says otherwise in

6   interpreting the Restatement.  They bought the mine.  It came

7   with the contaminated mine water.  End of story.

8        And I also want to -- another important point that I

9   want to make is that every time that Bunker Hill turns off the

10  mines -- which, again, it's intermittent pumping.  Each time

11  that Bunker Hill allows those pumps to turn off -- which

12  happens all the time -- a new trespass occurs.  A portion of

13  the water accumulating in the Bunker Hill Mine pool floods

14  into the Crescent once again.  And again, I already addressed

15  that they are somehow -- that it was already flooded.  It

16  certainly wasn't already flooded.  The flooding had not

17  stopped and did not stop in that 1991-92 period.

18       I want to talk a little bit about, for a moment --

19  and I will reserve some at the end, but I want to touch on

20  this argument that somehow that EPA orders with the Bunker

21  Hill Mine preclude any of these common law claims, that

22  somehow these claims are preempted by both Section 113 and 122

23  of CERCLA, as you heard them addressed at length again.

24       EPA -- I think the fundamental premise of their

25  argument sort of fails on its face.  EPA has never ordered

Ms. Norton

1    that the Crescent not be dewatered or that anything be done at

2    the Bunker Hill Mine that would preclude dewatering the

3    Crescent.  Quite the opposite.

4         As you heard, EPA's selected remedy includes three

5    primary obligations:  maintain the water level before the 11,

6    convey all of the Bunker Hill Mine water that is discharged

7    from the mine to the CTP, and provide for emergency mine

8    storage for Bunker Hill Mine water.  There's no mention of

9    Crescent, no preclusion on dewatering.  And in fact, if Bunker

10   Hill were to dewater both mines at the same time, that would

11   certainly accomplish the obligation to maintain the Bunker

12   Hill water below the 11 level.  EPA set a ceiling, not a

13   floor.

14        Now, you heard reference to somehow -- the suggestion

15   that we're somehow looking at Ed Moreen's email that's in the

16   record, the EPA remedial manager, as some sort of an

17   authorization from the president.  Well, it's clearly not an

18   authorization.  It's just instructive.  When you look at it,

19   EPA's site manager or remedial manager would certainly not

20   have said that something was okay if it was in contrast or if

21   it was going to undermine the orders.

22        The irony of some of this argument, candidly, is that

23   Bunker Hill has actually repeatedly told their investigators

24   that they intend to dewater the mine.  They intend to dewater

25   the mine.  EPA's orders don't say they can't dewater the mine.

Ms. Norton                                                43

1    There's nothing in what Crescent is seeking here that would

2    somehow conflict in any way with the actual EPA orders.

3          Now, you heard that there's a remedial action.

4    They're asking for remedial action.  I think there's a couple

5    key points, and I'll skip around a little bit here.  First of

6    all, I'd like to point out that the 1992 ROD that Mr. Carter

7    references applies to what are known as Operable Units 1 and

8    2.  The Crescent Mine, to which the Crescent claims apply --

9    I'm not talking about the Bunker Hill Mine; we're talking

10   about the Crescent Mine -- is in an entirely different

11   operable unit.  It's in Operable Unit 3.

12         So the EPA orders that we've heard so much about

13   today have nothing to do with the Crescent Mine.  In fact, the

14   RI/FS that led to the order only references the Crescent in

15   essentially background, and then the ROD does not reference

16   the Crescent.  There's nothing, nothing that precludes this.

17         Temporary dewatering to unplug the Y-U is not a

18   permanent -- is not permanent, so it's not necessarily a

19   remedial action.  The remedy is keeping the water below the

20   11.  That's what the order of remedy is.  Dewatering is not

21   some sort of a new remedial action to accomplish that.

22         I also think it's important, and I want to hit on

23   this.  This -- we sort of heard some blurring of the lines on

24   this *Atlantic Richfield v. Christian* case.  It blurs the lines

25   because, as I said, there's two mines here.  That case was

1   about the same soil.  It was saying, well, we want something

2   more than EPA's order.  It was a challenge to EPA's order for

3   the same bucket of dirt, if you will, the same area, the same

4   soil.  Here, the claims that Crescent has brought in this case

5   apply to its mine, not Bunker Hill's mine.  And Bunker Hill's

6   mine is what is subject to all of these orders.

7         Now, on the 122 point, I just want to make -- on

8   CERCLA 122, the Court need only decide that issue if you were

9   to find that even nominal damages are not available on

10  Crescent's tort claims.  They are available as a matter of

11  law.  Nothing in CERCLA or the case law says that once -- that

12  once a party has settled with EPA or entered into an order

13  with EPA, that somehow the settling PRP is absolved of

14  liability for torts wholly outside of the scope.

15        So I want to -- I need to hit a few other points.

16  And I only have a few minutes, and so I'm going to save those

17  minutes.  So I just want to make the point on this cost point.

18        You heard -- and I think Your Honor asked a question

19  to clarify it.  The question -- the relevant question for a

20  CERCLA claim is not who paid the cost.  It's who incurred the

21  cost.  It's incurred the cost.  Here, Crescent Mine, LLC,

22  incurred the cost, and they need only incur $1 of response

23  costs to have a viable claim.

24        So this argument that somehow Crescent Silver paid

25  the cost is irrelevant.  The question is who actually incurred

1    the cost.  It's a liability of Crescent Mine, LLC.  It's like

2    I got -- you know, my niece gets a speeding ticket.  If I pay

3    it, it's still her speeding ticket on her record.  It's the

4    same concept.  Crescent Mine incurred the cost.  Crescent Mine

5    is liable for those costs.  Whether their parent company or

6    anyone else paid it is irrelevant.

7             And again, if that were not the case or if Your Honor

8    struggles with that, I'll just -- we have moved to amend to

9    add Crescent Silver to try to address this issue and put it to

10   bed and resolve all these issues once and for all.  But we

11   think that's unnecessary for this purpose.

12            THE COURT:  Maybe it would help if you could explain

13   to me, what's the relationship between Crescent Mine and

14   Crescent Silver?

15            MS. NORTON:  Crescent Mine is the LLC that owns the

16   mine, Crescent Silver being its parent.

17            THE COURT:  And Crescent Mine has no assets, no --

18   nothing to --

19            MS. NORTON:  It has an asset.  It has the mine.

20            THE COURT:  It has the mine?

21            MS. NORTON:  Yep.

22            THE COURT:  But who runs the mine?  I mean, are they

23   its employees?  Are they Crescent Silver?  How does that work?

24            MS. NORTON:  They're Crescent Silver.  It's a pretty

25   common -- you know, you hold the asset in one entity, the

1    Crescent Mine entity.  And then operationally, Crescent Silver

2    does the accounting and things like that, as Mr. Gross

3    explained in his deposition to counsel.

4              And so, you know, the motion to amend -- and I know

5    we're talking about summary judgment -- was just to clean this

6    up.  But really the legal issue before this Court is just who

7    actually -- what legal entity incurred the cost, meaning what

8    legal entity is on the hook for those costs, must incur those

9    costs.  And that would be Crescent Mine, LLC.

10             THE COURT:  And I agree with you; we're here on the

11   summary judgment.  But on the motion to amend, aren't we way

12   past the deadline to amend?

13             MS. NORTON:  Way past it?  There's no prejudice, so

14   there's nothing in the case -- ordinarily, sort of amendment

15   as of right, yes.  But that's why we brought the motion;

16   right?  And there's certainly no prejudice and nothing -- and

17   as the facts developed in this case --

18             THE COURT:  I'm talking about the litigation plan.

19   Doesn't it have a deadline for when you can amend, when you

20   can no longer amend?

21             MS. NORTON:  I apologize for not having all of the

22   briefing in front of me or --

23             THE COURT:  I'm asking because I don't know if this

24   one had it or not, but typically my litigation plans have a

25   deadline by which you have to do any amendment to the

Mr. Carter                                                           47

1   pleadings.  Why would you have to do any amendment to the

2   pleadings?

3            MS. NORTON:  Yeah, and I think we were within that,

4   if there was one.  And I'm looking at my co-counsel because

5   believe that -- I don't believe that it was untimely in terms

6   of your litigation plan --

7            THE COURT:  Okay.

8            MS. NORTON:  -- at all.  And we also brought the

9   punitives, which you can't bring right away anyway.  So that's

10  why that's before the Court at this point.

11           I'm going to reserve the rest of my time and hit on a

12  few other points, if I may, Your Honor.

13           THE COURT:  And I'm going to give each of you ten

14  minutes for rebuttal.

15           MS. NORTON:  Thank you very much.

16           MR. CARTER:  Thank you, Your Honor.

17           Okay.  So I would like to, I guess, address a couple

18  things that I think confused me initially and then sort of

19  sort it out as the briefing did.

20           So as Your Honor recognized, the prior owner, the

21  owner of the mine in 1991, knowingly and intentionally flooded

22  both of their own mines.  So that can't be trespass.  So I

23  think Crescent picked up on that in the briefing, and they

24  have now shifted and they have now said, oh, we weren't ever

25  saying that the original flooding was trespass.  I think they

1    sort of realized that you can't predicate trespass on flooding

2    your own property.  And now they're saying, well, it was the

3    act of Placer diverting water in '93 and '94 for however many

4    months that is, whether it's a year or a couple months or

5    whatever.

6            That is what they're saying is the act that

7    constituted trespass.  So they sort of abandoned the idea that

8    the '91 flooding was the trespass, recognizing you can't flood

9    [sic] your own property, and they're now trying to say that by

10   saying, well, the '93 and '94 flooding diversions were

11   trespass.

12           We don't believe that's the case for a couple

13   reasons.  Number one -- well, I guess sort of whether it was

14   tortious or not, it ended in 1994.  That's 26 years late.  The

15   trespass claims are subject to a three- or a four-year --

16   excuse me.  The state law claims are subject to a three- or

17   four-year statute of limitations.  You had to bring them 26

18   years ago.  Those are untimely.

19           Now Crescent tries to say, well, these are continuing

20   torts.  The flooding has been there since 1994.  It's

21   permanent for all practical purposes.  They try to say, oh,

22   it's continuing.  But the only way it's continuing is if the

23   flooding is reasonably abatable.  So that's really the

24   question for the Court on the statute of limitations argument,

25   which --

1          THE COURT:  Why wouldn't the reasonably abatable be a

2    jury question?

3          MR. CARTER:  So because, I guess, for two reasons.

4    One, Section 122(e)(6) -- so Crescent says it's reasonably

5    abatable because Bunker Hill can dewater the Crescent Mine by

6    pumping the Crescent Mine dry through the Bunker Hill Mine and

7    sending all of that water to the central treatment plant.

8          That, by the way, seeking a court order to order

9    Bunker Hill to pump all the water out of the Bunker Hill Mine,

10   that's a remedial action at the Bunker Hill Mine.  They're

11   asking the Court to order Bunker Hill to pump all the water

12   that's at the Bunker Hill --

13         THE COURT:  Empty its mine --

14         MR. CARTER:  Correct.

15         THE COURT:  -- so the other mine gets emptied as

16   well.

17         MR. CARTER:  That's correct.  That action is legally

18   prohibited by Section 122(e)(6).  So it's not a fact question,

19   because it's legally prohibited.  In other words, Crescent is

20   saying, well, it's reasonably abatable because Bunker Hill

21   could just pump down both mines.  They can't.  They are

22   legally prohibited from pumping down both mines under

23   Section 122(e)(6).

24         THE COURT:  But if it's a floor -- if it's a ceiling

25   and not a floor, then is it prohibited?

1          MR. CARTER:  Perfect.  That's exactly the question.

2     It's a ceiling and a floor, the 11 level.

3          So let's look at *Atlantic Richfield*.  In that case,

4     EPA issued an order to the mining defendants that said you

5     have to remove 1 foot of contaminated residential soil.  The

6     landowners there sued and said we think you should, as a

7     matter of state tort law, remove 2 feet of soil.  And the

8     Court said it doesn't matter whether there's consistency.

9     EPA's order sets a ceiling and a floor.  There's one unified

10    EPA-led cleanup at a CERCLA site.  And if what the plaintiff

11    is seeking is a remedial action, that can't happen without EPA

12    authorization.

13         And so in *Atlantic Richfield*, the 1 foot of soil

14    removal component of the order was a ceiling and a floor.  And

15    here the 11 level at the Bunker Hill Mine, maintaining water

16    below the 11 level, that's the ceiling and the floor.  And

17    there's good reason for it.  There's a reason why Chief

18    Justice Roberts says Section 122(e)(6) is one provision of

19    CERCLA that ensures an EPA-led remedy rather than multiple

20    competing ones.  The reason is every action on a CERCLA site

21    leads to unintended consequences that cascades to others.

22         And here, if the Bunker Hill Mine is dewatered, you

23    saw those graphics of all the open space in the bottom of the

24    Bunker Hill Mine.  Your Honor, if oxygen is exposed to that,

25    you'll increase the generation of AMD.  That's what Bunker

Mr. Carter                                                    51

1    Hill's consultant said in the report, which is -- it's in the

2    binder and attached to my exhibit.  That was the 1999 report

3    by EPA's consultant.  It addressed the dewatering proposal and

4    said, hey, we've got serious concerns with dewatering because

5    it's going to increase AMD.

6          The second point, I guess, on the point of a single

7    EPA-led effort, the central treatment plant treats water not

8    only from the Bunker Hill Mine but the whole Bunker Hill site.

9    And so the central treatment plant has limited capacity.

10         What Crescent Mine is asking the Court to do is

11   commandeer all the capacity at the central treatment plant and

12   say -- order Bunker Hill to use all the capacity of the

13   central treatment plant to empty the Bunker Hill Mine under

14   power of state law sort of as a remedy for Crescent's state

15   law tort claims.  That's a competing cleanup that is barred

16   without EPA authorization under 122(e)(6).

17         I think we heard sort of Crescent acknowledge the

18   obvious, which is a one-paragraph email from Ed Moreen

19   cannot -- isn't authorization of a remedial action.  That's

20   right.  But the problem is there is no authorization absent

21   that email.  That's the only thing they've pointed to as

22   authorization for their proposed remedial action.  That

23   remedial action is not authorized, and therefore it's legally

24   prohibited.  Bunker Hill can't do it.

25         Bunker Hill can't do it, and therefore, A, the

1    injunctive relief is barred directly; and, B, the tort -- or

2    excuse me -- the injury isn't reasonably abatable, because

3    what Crescent wants -- what Crescent points to just is legally

4    prohibited.  They can't do it as a matter of law.

5            And second, they do not present expert testimony on

6    the technical feasibility of plugging the Y-U Crosscut.

7    Crescent says just plug it.  It ain't just plugging it.  If

8    you look at the actual expert testimony of, I believe, Neal

9    Rigby or Paul Rosasco, they say there's never been a plug at

10   that depth.  And they don't present any expert testimony that

11   says, well, you need this many pounds of concrete, here's how

12   you would do it, and here are the costs.  There's no expert

13   testimony on what it would take to plug the Y-U Crosscut.  So

14   they do not create a genuine issue of material fact on

15   reasonable abatability, and therefore the claims are barred on

16   statute of limitations grounds.

17           I hit this sort of -- Crescent says, well, you know,

18   customizing OU2 or OU3, the fact is Crescent is asking the

19   Court to order Bunker Hill to pump water out of the Bunker

20   Hill Mine.  That's in Operable Unit 2.  And then I pointed out

21   in sort of my original presentation the 2020 five-year report

22   on pages 14 to 16, it identifies all the studies over the

23   decades that EPA has commissioned and all the CERCLA remedies

24   for the entire site.  And that includes studies on OU2 and

25   OU3.  SO OU3 is also a CERCLA site for which an RI/FS has been

Mr. Carter                                                    53

1    remediated, and so EPA authority would be needed for remedial

2    action at OU3 as well as OU2.

3            And so I find this confusing.  There was sort of a

4    lack of precision, a lot of facts stated without sort of

5    citations, et cetera.  They said something along the lines of

6    every time the pumps shut off, the flooding starts again or

7    something.  There's no expert evidence about when that

8    happened, how much water allegedly flowed into the Crescent

9    Mine, what damages were incurred for those alleged sort of

10   post-'94 flooding.  There's no expert testimony on that.  So

11   this -- these phantom post-'94 flooding events can't be the

12   basis for their tort law claims.

13           So the fact is in their newly phrased tort claims --

14   their old tort claim was the '91 flooding was illegal or

15   tortious.  They backed away from that and now say this '93 to

16   '94 flooding was tortious.  Those claims are 26 years late.

17   They're barred by the statute of limitations.

18           In addition -- and the Court doesn't need to go here

19   because we've got -- so the 122(e)(6) argument bars the claims

20   for injunctive relief.  Statute of limitations bars the claims

21   for damages.  But that 1993 letter, Your Honor, I just -- I

22   encourage you to read that in full.  Placer went to EPA, said,

23   hey, we're concerned that the private company that's operating

24   the central treatment plant is going to stop treating our

25   contaminated water.  What do we do?

1          EPA says, well, you can divert the water.  You're

2     authorized to divert the water into the lower levels of the

3     mine.  We recognize that this will increase the rate of

4     flooding, but that's fine so long as you pump and treat before

5     the water rises and spills out the Kellogg tunnel.  That's

6     exactly what Placer did, and for -- state law tort liability

7     cannot be imposed on EPA-authorized actions at a CERCLA site.

8          And I'll rest.

9          THE COURT:  Before you do, it seems to me like I read

10    somewhere in the briefing that there was a Supreme Court case

11    that says, at least in the concurrence, that when a party had

12    not yet sought the EPA approval, the appropriate thing is to

13    stay the case and let them go seek it.  Is that a appropriate

14    remedy here under your theories?

15         MR. CARTER:  Good question.  So that's in the

16    *Atlantic Richfield* case, and I believe that's Justice Alito's

17    opinion.  So I think the 122(e)(6) claim begs the question:

18    What's the remedy?  Do you dismiss, or do you stay for

19    Crescent to seek EPA's authorization?

20         I would say -- I would say this.  My first argument

21    is Crescent, as the plaintiff, bears the burden of showing all

22    of the elements that entitle it to relief.  It's failed to

23    show EPA authorization.  Therefore, it's failed to bear its

24    burden of the case.

25         But if the Court wants to and stay the case for

1    EPA -- or stay the case for Crescent to seek EPA's

2    authorization of the proposed remedial action, you know, some

3    sort of reasonable stay directing Crescent to do so, you know,

4    could be the correct sort of remedy under that

5    Section 122(e)(6) argument.

6            I would just, given the history of this site -- like,

7    if you look at the 1992 ROD, the 2001 ROD, and then the 2012

8    interim ROD amendment, EPA's sort of rigorous studies because

9    of the complicated nature of the site and everything that's

10   done on one portion impacts things that are done on the other,

11   and if you look at Section 117(c) of CERCLA, which governs the

12   procedures for approving a remedial action, that might take a

13   long time.  So some reasonable period of time for them to seek

14   authorization might be warranted.  If that is open-ended, I

15   mean, it could go on indefinitely.

16           THE COURT:  I guess the other way to do without

17   making it open-ended or without putting a deadline on it is to

18   dismiss it without prejudice.  But then if your argument is

19   right, when they do come back later, they're going to be

20   limited to the four years again, from the new four years.

21           MR. CARTER:  Yes.  I believe that's correct.

22           THE COURT:  Okay.  Thank you.

23           MR. HOGLE:  Thank you, Your Honor.

24           My colleague, Mr. McCurdy, brought to my attention

25   Your Honor's scheduling order, document number 64, that set a

Mr. Hogle                                                          56

1    deadline for amendment of pleadings and joinder of parties of

2    November 15, 2022.

3              THE COURT:  2022?

4              MR. HOGLE:  2022.

5              On the issue of the stay or dismiss with or without

6    prejudice, Bunker Hill would resist a stay.  I mean, we have

7    our own claims that we're here on, and we shouldn't be -- we

8    shouldn't be held up, because they've known about this for a

9    long time.  They've known about this since 2014, and they've

10   never approached the EPA for authorization for what they're

11   asking for.  I don't think they want to go to the EPA because

12   they don't want to get on EPA's radar screen.  They don't want

13   to be in the -- on the target, so to speak.  So it should be

14   dismissal.

15             I'm going to address some points that Ms. Norton

16   made.  First of all, she talked about this theory of sloshing,

17   sloshing water when the pumps go off in the Bunker Hill.  As

18   Mr. Carter indicated, they don't have any expert evidence on

19   this.  Their one expert, Geoffrey Beall, testified that

20   there's insufficient data to identify any time since

21   April 1991 when water allegedly entered the Crescent Mine from

22   the Bunker Hill.  That's his deposition at page 145, line 17,

23   through 146, line 5.  And that's Exhibit 18 to my 2024

24   declaration.

25             Mr. Rosasco, their other hydrogeologist expert, he

1    has no evidence of any instances in which water flowed to the

2    Crescent Mine.  He merely suggests that when Bunker Hill

3    pumping needs to stop due to central treatment plant capacity

4    restraints, the water might flow to the Crescent Mine.  So

5    what he's saying is when you're following EPA's orders to

6    pause pumping, maybe some of that water back-flows into the

7    Crescent Mine.

8            So that goes to the 122(e)(6) point.  Their -- this

9    whole sloshing theory depends on Bunker Hill defying EPA

10   orders to pause pumping.  And if they don't, then they're

11   going to come back and say, oh, you're trespassing.

12           And this pause -- this pumping pausing in compliance

13   with EPA orders, it's not an act.  Idaho law requires an

14   invasion, which is a direct result of some act committed by

15   the defendant.  We're stopping pumping because EPA tells us

16   to.  That's passive nonfeasance.  As a matter of law, that

17   can't be an act that would support a trespass claim.

18           Ms. Norton brought up the Bunker Hill statements to

19   investors about plans to dewater, but what she doesn't

20   mention, though, is each and every one of those statements to

21   investors were qualified, expressly qualified, that says, you

22   know, be careful.  These are forward-looking statements that

23   depend on authorization, for example, to make sure that we can

24   do this.  They ignore that part of it.  And there is no

25   authorization, as Ms. Norton admitted.  That Ed Moreen email

1    she said, is not an authorization.

2          Ms. Norton also argued that Bunker Hill pumping only

3    removes new water that enters the Bunker Hill Mine pool.  That

4    just -- well, first of all, that's on their motion for summary

5    judgment, and there's fact issues in abundance with regard to

6    that claim.  But here's just one.

7          If that's true, if no -- if the pumping of the Bunker

8    Hill Mine didn't remove water from the Crescent Mine, then it

9    would have overflowed at least three times, at least three

10   times, even at the low infiltration rates that their experts

11   talk about, 15 to 20 gallons per minute.  If that's true -- I

12   mean, the water's got to go somewhere.  Based on void space

13   calculations, Dr. Morton has concluded that if it's -- if the

14   infiltration rate is even that low, 15 gallons per minute,

15   then it would be flushed every 8.6 years, every eight and a

16   half years basically.  So in the 30 years since 1994, that's

17   three times.

18         And if the water that enters into the Crescent Mine

19   couldn't go to the Bunker Hill Mine, then it would have

20   overflowed at the Hooper tunnel.  Their own expert, Geoff

21   Beall, admitted that.  He admitted that.  Their own documents

22   say that.  In the World War II time period, before the Y-U was

23   put in, it did.  It did overflow out the Hooper tunnel, and it

24   would do it again if the water couldn't go through the Y-U to

25   the Bunker Hill.

1          She talked about the graphics.  She put the graphic

2     up there that had the number -- I think it was 1330 gallons

3     per minute versus 10 to 25 gallons per minute, which is --

4     which is low and not supported by the evidence.  But at least

5     there's questions of fact on that, or even the 225 gallons per

6     minute.  What that graphic ignores with the buckets is all the

7     void space beneath the Y-U level in the Bunker Hill Mine.

8     There's a lot of void space for water to go in there.

9          And then finally, Your Honor, she started by saying

10    Bunker Hill admitted that there's no basis for its claim,

11    which I think is an exaggeration.  I don't think that's

12    supported by the evidence.  But they could just look to

13    Mr. Gross.  He knew about the basis for Bunker Hill's claim

14    even before Bunker Hill asserted it.  It kept him up at night,

15    as he candidly confided to his boss.

16          And, Your Honor, there's nothing more I'd like to add

17    unless there are any questions for me.

18          THE COURT:  I don't have any.  Thank you.

19          MS. NORTON:  As Your Honor noted earlier, I'm

20    responding to both in my limited ten minutes, so I'm going to

21    actually just encourage the Court -- we heard a lot today and

22    it would take me much longer than ten minutes to go point by

23    point and walk through everything that I think was either

24    inaccurate or not quite accurate.  And so I would just direct

25    the Court to the briefing.  It's really extensive in this

1   case.  And we spent a lot of time making sure that all the

2   cites and the factual pieces that Your Honor would need and

3   also all of the string cites and things that were cited were

4   included and that the Court would have it.  So I would

5   encourage the Court to go back and look at the record.

6           With that said, I want to go back.  We heard a lot

7   about EPA orders, and I want to clarify.  First of all,

8   Mr. Hogle just stood up here and said that every time EPA

9   orders them to stop pumping, that somehow we're suggesting

10  that they violate that EPA order.  They're stopping pumping

11  just because they stop pumping.  The EPA order only says

12  maintain the level below the 11.  It doesn't -- EPA doesn't

13  order them, hey, Tuesday, quit pumping; Thursday, stop

14  pumping; Friday, stop pumping.

15          Suggesting that every time those pumps are turned off

16  are pursuant to an EPA order is a blatant misrepresentation,

17  and I take issue with that and encourage the Court to look at

18  the record on that point.

19          The other point I want to make is that you don't need

20  EPA involvement for nominal tort damages here.  We don't need

21  to go seek EPA authorization.  The only thing that 126(e)(6)

22  [sic] prevents is inconsistent response action at the same

23  facility, inconsistent response action at the same facility.

24  There's nothing inconsistent about what is being sought here.

25          I also want to make a couple other points here.

Ms. Norton

1    First of all, you heard that somehow Crescent is suggesting

2    that they'd violate the EPA order again by somehow exceeding

3    and taking all the capacity in the central treatment plant.

4    They cite to that 1990s memo and the 1993 letter.

5          That memo predates a massive upgrade of the central

6    treatment plant.  Today the central treatment plant can take

7    8,000 gallons per minute.  The only testimony in this case --

8    the undisputed testimony in this case is that you could

9    dewater at a rate of 2,000 gallons per minute.  So actually,

10   dewatering would not violate any order that requires them to

11   allow for capacity in the central treatment plant.  There is

12   more than sufficient capacity.  And in 1990 -- I think it's

13   the 1998 memo that raises concerns about a central treatment

14   plant of the past, long before there was increased capacity.

15   It's irrelevant to that analysis.

16         The other point of this OU3, and Mr. Carter pointed

17   out there's a list of studies that have been done.  The OU3

18   remedy is a 2012 interim ROD amendment, and it mentions

19   Crescent only to say that it doesn't apply to Crescent.  So

20   there is no such reference and order applicable to Crescent,

21   as was suggested.

22         Congress did not intend Section 113(h) of CERCLA to,

23   quote, serve as a shield against litigation that is unrelated

24   to disputes over environmental standards.  This is not a

25   dispute over the environmental standards.  This is not a

Ms. Norton                                                     62

1    dispute, like *Atlantic Richfield*, about the same soil and not

2    sufficient standards for this soil.  This is none of that.

3    This is not a challenge to an EPA order.  This is very

4    different.  There are two mines.  The Bunker Hill Mine water

5    flooded the Crescent, continues to flood the Crescent every

6    time.  That's not a shift of position.  We've taken that

7    position and will continue taking that position.

8            Now, one note along those lines about this prior

9    ownership question.  The flooding continued long after there

10   was no longer common ownership.  Kym Morton said that.  I

11   showed you Kym Morton, their expert's, slides to show how the

12   flooding continued for a long time after, and the flooding

13   continues today.

14           And they were not -- and so just to put a finer point

15   on it, they were not in a common ownership in that 1993-1994

16   period, when the diversion occurred.  No one says otherwise.

17   And they were not under common ownership at any time since

18   that.

19           The other point is you heard a reference to somehow

20   there's no expert testimony about plugging the Y-U.  There's

21   also no citation in any of the briefing suggesting that there

22   needs to be expert testimony on that point.  And in fact, it's

23   ironic that they would say that there is no expert testimony

24   and therefore you can't show when both of the witnesses for

25   Placer/Bunker Hill, Sam Ash -- who's sitting here today -- and

1    Brad Barnett, said it is possible to plug the Y-U.  You don't

2    need an expert to opine that it is feasible to do something

3    that they know they can do in their own mind.

4           Now, I just want to suggest that we will also rest on

5    the briefing, Your Honor, in response to -- for the most part,

6    in response to Bunker Hill's claim.  Just to remind Your Honor

7    once again of a point there, which is that Crescent has never

8    been and is not the owner-operator or any sort of liable party

9    for the Bunker Hill Mine.  Their claims rest on the treatment

10   costs for their water coming out of the Bunker Hill Mine.

11          And even if assuming, arguendo, that you take their

12   argument that somehow they're pulling what they're pumping,

13   that they're pulling water from the Crescent into the Bunker

14   Hill, that's a secondary release.  They're liable for their

15   own act of pulling water then.  If it's contaminated, which

16   they say -- and I'll give them the benefit of the doubt for

17   the sake of argument.  If they are pulling water from the

18   Crescent that they say is contaminated water that they are

19   then treating, that is their act.  And the case law and the

20   law say that the act of them pulling the water, they are

21   liable for their own acts.  EPA refers to, repeatedly, this

22   secondary release or secondary disposal.

23          The Crescent parties never asked for such pumping.

24   We never even asked about the pumping, have never had an

25   opportunity to object to the pumping.  And there's no

1    suggestion that the Bunker Hill Mine owners expected the

2    Crescent parties to pay for any portion of that pumping until

3    Crescent rejected their offer in early 2021.  Bunker Hill

4    cannot demonstrate that anything other than releases of its

5    own and disposals of its own hazardous substances and by its

6    own acts contaminated its mine.

7           So in sum, Your Honor, Placer and Bunker Hill Mining

8    Corporation are liable for trespass.  Placer and Bunker Hill

9    are liable on Crescent's CERCLA claims.  And again, the

10   question of the amount of damages is to be determined at

11   trial.  What is before the Court today is liability, and

12   liability is properly found at summary judgment.  Crescent, on

13   the other hand, is not liable for any of the CERCLA costs that

14   Bunker Hill is incurring for pumping costs under its order

15   with EPA, and those claims should be dismissed.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          Counsel, I'm ready to rule.  And if you believe that,

19   I am not.  I'm going to take the matter under advisement.

20   This may take a while, and I appreciate your patience.

21          Unless there's anything else, though, we'll -- Court

22   will be adjourned.

23      (Proceedings concluded at 3:08 p.m., June 23, 2025.)

24

25

1                    C E R T I F I C A T E

2

3        I, ANNE BOWLINE, a Registered Merit Reporter and

4    Certified Realtime Reporter, do hereby certify that I reported

5    by machine shorthand the proceedings contained herein on the

6    aforementioned subject on the date herein set forth, and that

7    the foregoing 64 pages constitute a full, true, and correct

8    transcript.

9           Dated this 28th day of July, 2025.

10

11

12

13                    /s/ Anne Bowline

14                    ANNE BOWLINE
                      Registered Merit Reporter
15                    Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25